UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ------------------------------------------------------------ X
ANTHONY ZAPPIN,

                              Plaintiff,

            - against -                              Case No. _____

CLAIRE COMFORT,
ROBERT WALLACK,                                     **COMPLAINT**
THE WALLACK FIRM, P.C.,
HARRIET NEWMAN COHEN,                               Jury Trial Demanded
COHEN RABIN STINE SCHUMANN LLP,
COMPREHENSIVE FAMILY SERVICES, INC.,

                              Defendants.
 ------------------------------------------------------------ X

       Plaintiff Anthony Zappin ("Plaintiff"), proceeding *pro se*, hereby alleges the following

against Defendant Claire Comfort ("Comfort"), Defendant Robert Wallack ("Wallack"),

Defendant The Wallack Firm, P.C. ("Wallack Firm"), Defendant Harriet Newman Cohen

("Cohen"), Defendant Cohen Rabin Stine Schuman LLP ("CRSS") and Defendant Comprehensive

Family Services, Inc. ("CFS") (collectively, "Defendants"):

## INTRODUCTION

       1.      Plaintiff brings this action in hopes of bringing an end to an ongoing scheme of

harassment, fraud and the deliberate undue infliction of harm by Defendants directed at Plaintiff.

In a truly sad state of affairs, the welfare and the future of a young boy has been thrown aside and

tossed in the trash.  Instead, Defendant Wallack and Defendant Cohen have exploited a child

custody proceeding to churn enormous legal fees totaling well over $1,000,000, to defraud the

state family court system and to inflict irreparable financial harm in total disregard for the well-

being of the child.  As this Complaint details, Robert Wallack and Harriet Cohen are fraudsters

and sycophantic monsters who will do and say anything for their own personal gain, even hatching

1

schemes with the supervised visitation agency to interfere with Plaintiff's access to his child in order to maintain the financial gravy train that has become the *Zappin v. Comfort* litigation. As this Complaint shows in detail, these two individuals have actively colluded, committed fraud and violated the Rules of Professional Conduct to the clear detriment of the clients – which in Defendant Cohen's case is a four (4) year old boy – for the sake of personal profit. Their current scheme seeks to cause irreparable financial harm by requesting counsel fees totaling over $400,000 from Plaintiff through the use of fraudulent and ostensible sham billing invoices.

2.     Meanwhile, the mother of the young boy, Claire Comfort, has sat back and even actively participated in Wallack and Cohen's corrupt scheme in order to deprive Plaintiff of a relationship with his son. In the process, though, Defendant Comfort's actions have only served to cause lasting harm to herself, her family and, most importantly, her child. Plaintiff has brought this action against Defendant Comfort in an effect to finally expose the truth and to try to bring an end to four (4) years of endless litigation.

3.     As set forth below, Defendants have engaged in repeated acts of fraud and other tortious conduct. Plaintiff has suffered damages and other harm as a result of their acts as alleged herein. As a consequence, Plaintiff brings this action to redress Defendants' continued unlawful conduct that must come to an end.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different states.

5.     Venue is proper pursuant to 28 U.S.C. § 1332(b)(1) and (b)(2) because the events that gave rise to this action occurred in this Judicial District.

## THE PARTIES

6.      Plaintiff Anthony Zappin is the former spouse of Defendant Claire Comfort. Plaintiff Anthony Zappin was the plaintiff in the matrimonial action *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending in New York County Supreme Court ("Matrimonial Action") in which he sought a divorce from Comfort as well as custody of their infant child. Plaintiff is the father of the minor-child R.Z., the primary subject of the Matrimonial Action. Plaintiff resides in the State of West Virginia at 1827 Washington Blvd., Huntington, WV 25701.

7.      Defendant Claire Comfort is the former spouse of Plaintiff Anthony Zappin. Comfort was the defendant in the matrimonial action *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending in New York County Supreme Court.  Comfort is the mother of the minor-child R.Z., the primary subject of the Matrimonial Action.  Upon information and belief, Comfort resides in the District of Columbia.

8.      Defendant Robert Wallack is the principal of The Wallack Firm, P.C.  Wallack represented Comfort through The Wallack Firm, P.C. throughout the Matrimonial Action. Wallack maintains a professional place of business at 777 Third Avenue, 21st Floor, New York, NY 10007.  Furthermore, upon information and belief, Wallack resides in the State of New York.

9.      Defendant The Wallack Firm, P.C. is a professional organization organized under the laws of the State of New York.  It has one principal:  Defendant Robert Wallack.  The Wallack Firm maintains its principal place of business at 777 Third Avenue, 21st Floor, New York, NY 10007.  The Wallack Firm represented Comfort throughout the Matrimonial Action in New York.

10.     Defendant Harriet Newman Cohen is a named-partner at the firm Cohen Rabin Stine Schumann LLP.  Cohen was appointed by Justice Deborah Kaplan in August 2014 to act as the "Attorney for the Child" for minor-child R.Z. and represented him throughout the Matrimonial

Action in New York beginning with her August 2014 court-appointment. Cohen maintains a professional place of business at 11 Times Square, 10th Floor, New York, NY 10036. Furthermore, upon information and belief, Cohen resides in the State of New York.

11.     Defendant Cohen Rabin Stine Schumann LLP is a limited liability partnership organized under the laws of the State of New York. Upon information and belief, Defendant Harriet Newman Cohen is a managing partner in the CRSS firm. CRSS maintains a principal place of business at 11 Times Square, 10th Floor, New York, NY 10036. Throughout the Matrimonial Action, CRSS as well as its partners, associates and employees held itself out as representing the minor-child R.Z., despite there being no court order permitting the firm itself to represent the child. More importantly, during all of Cohen's tortious actions in the Matrimonial Action as set forth herein in this Complaint, she held herself out as a representative of CRSS and admittedly received substantial support from CRSS in engaging in the unlawful and tortious conduct Plaintiff seeks to redress in this Complaint.

12.     Defendant Comprehensive Family Services is a corporation organized under the laws of the State of New York. It is operated by its founder and chief executive officer Rick Spitzer. CFS maintains a principal place of business at 291 Broadway, Suite 808, New York, NY 10007. By court orders signed by Justice Deborah Kaplan and Justice Matthew Cooper, Plaintiff's visitations with the minor-child R.Z. was directed to be supervised by CFS beginning in April 2014 to July 2017.

## FACTUAL ALLEGATIONS

**I.**    **BACKGROUND**

        **A.**    <u>History of Plaintiff's Relationship with Defendant Claire Comfort</u>

       13.     Plaintiff and Comfort both attended Columbia Law School together in 2009. However, they did not begin dating until October 2012. At that time, Comfort had been living in New York City for approximately six (6) months after being fired from *Winston & Strawn LLP* in Washington, DC. According to statements made by Comfort to Plaintiff, Comfort moved to New York City after being fired were she sought treatment for alcoholism, drug use and mental health issues. After several months of being unemployed, Comfort obtained a job at *Weil Gotshal & Manges LLP* through a partner with whom she had a sexual relationship with while attending Columbia Law School. Plaintiff, on the other hand, arrived in New York City in October 2012 after transferring from the Washington, DC office of *Quinn Emanuel Urquhart & Sullivan LLP* to its New York office in an attempt to take on more responsibility within the firm as a patent litigator.

       14.     Plaintiff's relationship with Comfort was difficult from the start. During their brief relationship in 2012, Plaintiff repeatedly observed Comfort black-out drunk on several dates as well as using illicit drugs such as cocaine, marijuana and ecstasy. Indeed, in an undisputed text message from November 2012, Comfort boasted about doing lines of cocaine off her iPad approximately a month into her relationship with Plaintiff and approximately one month before she conceived the child:

PLAINTIFF'S EXHIBIT 10 - TEXT MESSAGE [135]



(Ex. 1, Screenshot of Comfort Test Message.)  At that time, Plaintiff saw Comfort more as a casual

dating friend rather than a long-term romantic companion as a result of her rampant alcohol and

drug use.  Plaintiff believes that it was this drug and alcohol use that fueled Comfort's emotionally

and physically abusive behavior to Plaintiff almost from the inception of their relationship.

Between November 2012 and January 2013, Comfort hit, shoved, scratched and kicked Plaintiff

on multiple occasions, which Plaintiff documented on many occasions.  For example, on one

occasion in early January 2013 when Plaintiff attempted to end their relationship, Comfort shoved

and tackled Plaintiff in his bathroom.  Plaintiff landed on a towel rod and the side of the bathtub

leaving serious bruising to his ribs and stomach as well as injuries to Plaintiff's head and elbows.

(Ex. 2, Collection of Zappin Photographs.)  On another occasion in November 2012, Comfort

became upset with Plaintiff for leaving a party early and began to slap him.  This culminated in

Comfort throwing Plaintiff's phone at him smashing it against the wall.  (*See* Ex. 2, Collections of

Zappin Photographs.)  Most wild of all, days after learning that Comfort was pregnant, Comfort

shoved Plaintiff out of a beach chair and repeatedly kicked and slapped him while having a delusional episode believing Plaintiff was or had been sleeping with Taylor Swift.

15.     Comfort was also emotionally abusive, constantly threatening relationships with other men.  On at least one occasion in December 2012, Comfort told Plaintiff that she was having sex with as many as three (3) different men, no doubt in an attempt to provoke jealousy out of Plaintiff and to emotionally manipulate him.   Whenever Plaintiff attempted to break off the relationship, Comfort profusely apologized, acknowledged that she was attempting to "hurt" him by making him jealous and begged Plaintiff not to end the relationship.  For example, in February 2013 Comfort disclosed that she was "having drinks" with another man that evening and that she had "lied" to him about it and the fact she was having a relationship with the other man.  When Plaintiff attempted to break up with her upon learning this news, Comfort repeatedly hit Plaintiff, threw things at him and scratched his face and body as Plaintiff was attempting to gather his things from her apartment in an attempt to terminate the relationship.  At that stage, however, Plaintiff ended up staying with Comfort due to the pregnancy.  On other occasions, though, Comfort would show up to his apartment or his office unannounced and stage sit-ins until Plaintiff would talk to her and take her back after Plaintiff would attempt to end the relationship due to the emotional and physical abuse Comfort inflicted.  These episodes were witnessed by several of Plaintiff's close work colleagues, friends and neighbors, all of whom expressed concern of Comfort's behavior and stability.

16.     This all paled in comparison to Comfort's sexually violent behavior.  Throughout the early months of their relationship, Comfort repeatedly stated to Plaintiff that she was desperate to have a child.  She stated that her desire to become a mother was prompted by her younger brother recently having a child a few months prior in early 2012.  Comfort stated to Plaintiff on

several occasions that she wanted to get married and have children because she believed her "clock was ticking" as she was thirty (30) years old without a husband or child.

17.     Comfort's statements to Plaintiff, however, were categorically untruthful.  While Plaintiff and Comfort were engaged in a sexual relationship between October 2012 and January 2013, Comfort repeatedly represented to Plaintiff that she was on birth control.  Even so, Plaintiff still insisted on wearing protection with Comfort, particularly given her pattern for dishonesty and her repeated assertions about sleeping with other men in attempts to make Plaintiff jealous.  To thwart Plaintiff's insistence, many of Plaintiff's sexual encounters with Comfort during this time period were unprotected, having been alcohol induced at the instigation of Comfort.  Put another way, Comfort would initiate binge drinking sessions on her dates with Plaintiff so that Plaintiff would lose his inhibition and be more likely to have unprotected sex with her.  On other occasions, Comfort would get Plaintiff intoxicated with the intent to have sex by serving him spiked drinks laced with benzodiazepine and/or ecstasy unbeknownst to Plaintiff that she termed "Fresquillas." This resulted in Plaintiff becoming uncontrollably intoxicated and Comfort taking advantage of him by initiating and engaging in unprotected sex with him.  It should be noted that in many of these instances, Comfort was still physically aggressive and assaultive in initiating sex as Plaintiff still resisted having unprotected sex with her.  This physical aggression and assaultive behavior included throwing Plaintiff on the ground or the bed, pinning Plaintiff down using her body, holding her hand over his mouth and forcible removing his pants and grabbing his genitals to initiate sex with Plaintiff.

18.     Plaintiff believes that Comfort's actions and desire to have continued unprotected sex with him were part-and-parcel to a scheme to get pregnant.  For instance, during at least three (3) occasions between December 2012 and January 2013, Plaintiff was able to initially use

protection while having sex with Comfort.  However, Plaintiff was so inebriated that Comfort was able to deliberately remove the condom during sex.  When Plaintiff discovered that the condom was missing, Comfort would state to Plaintiff that she removed it because it "felt better" and there were "no worries" since she was on birth control.

19.     Of more concern, on at least four (4) occasions between December 2012 and January 2013, Comfort aggressively sexually assaulted Plaintiff during sex.  Specifically, while Plaintiff and Comfort were engaged in unprotected sex, when Plaintiff attempted to pull-out, Comfort forcibly grabbed him, wrapped her legs around Plaintiff's torso, dug her nails into his back and prevented him from doing so.  In other words, Comfort physically forced Plaintiff to continue with the sexual act of ejaculating inside of her even though he unequivocally sought to terminate the act.  These incidents of violence by Comfort left permanent scaring all over Plaintiff's back:





(Ex. 2, Collection of Zappin Photographs.)  Comfort also hit and smacked Plaintiff as well as peppered him with insults after sex due to his desire to pull-out.  Again, Plaintiff believes that Comfort's sexual assault on Plaintiff, in effect using force to make Plaintiff ejaculate inside of her against his will, was part-in-parcel to a scheme to get pregnant.

20.     Of course, in late January 2013, Plaintiff and Comfort learned that Comfort was pregnant.  It was at this time that Comfort admitted to Plaintiff that she had lied about being on birth control.  Comfort further stated to Plaintiff that she was trying to intentionally get pregnant because she did not want to be a "shrew" or a "spinster" and again that her desire to have a child was prompted by the fact that her little brother had a child a few months earlier.  Comfort further stated that she was going to have the child no matter what.  Although Plaintiff admittedly went back and forth upon learning of the pregnancy, he quickly became resolved to stay with Comfort, attempt to have a relationship with her and build a family for the sake of the child and to try to make the best out of a bad situation.  Upon Comfort's request, Plaintiff moved into her apartment with her in February 2013.

21.     Although Plaintiff was committed to raising the child with Comfort, she continued

on her path of emotional abuse towards Plaintiff.  Just weeks after learning of her pregnancy,

Comfort was caught carrying on a sexual relationship with a partner at *Weil Gotshal & Manges*

*LLP*.  Indeed, Comfort admitted to it and trying to make Plaintiff jealous:



(Ex. 3, Comfort/Zappin Text Message.[1])  In the months that followed, Comfort would repeatedly

abuse Plaintiff by telling him that the child was not his.  She would continuously refer to the unborn

child as a "nigger baby," "niglet" and "turdskin" in reference to ethnicity of the other men she

claimed to be the child's father.  Perhaps showing how callous and unstable Comfort was, in one

_____

[1] Plaintiff is producing the text message in the form Comfort provided to the Court and the forensic custody evaluator during the *Zappin v. Comfort* litigation.

instance in July 2013 Comfort attempted to provoke a verbal altercation by claiming that the child was not Plaintiff's while Plaintiff was waiting outside of a surgery room in Huntington, WV where his father was undergoing quadruple bypass surgery after having a massive heart attack at work in his pharmacy.   Comfort showed absolutely no regard for Plaintiff or his father and was only concerned about inflicting emotional abuse on Plaintiff.  On another occasion, Plaintiff had friends visiting from California.  While they were at Plaintiff and Comfort's apartment, Comfort became angry at Plaintiff and repeatedly belittled him in front of his friends by saying that she was going to have a "black baby" and the child was not his.  Indeed, the paternity of the child was a constant weapon of abuse Comfort employed against Plaintiff during her pregnancy.

22.    Moreover, Comfort's physical abuse of Zappin intensified during her pregnancy. In March 2013, Comfort repeatedly kicked Plaintiff in the legs while he was sitting on the couch after receiving an unsolicited text message from a former girlfriend.   Plaintiff sustained large bruises to his legs:



(Ex. 2, Collection of Zappin Photographs.)  In another episode in April 2013, Comfort repeatedly stabbed Plaintiff with a fork after Plaintiff received an unsolicited text message from another ex-girlfriend he had not spoken to in months.  This left Plaintiff with numerous lacerations to his arm:



(Ex. 2, Collection of Zappin Photographs.)  On another occasion in August 2013, Comfort falsely

accused Plaintiff of going to a strip club after work.[2]  When Plaintiff returned home and climbed

into the bed, Comfort deliberately and intentionally clawed his face claiming that he "smelled like

stripper."  Comfort's attack left permanent scaring to Plaintiff's face:



_____

[2] Plaintiff had gone to a steakhouse to eat dinner after work and watch football after Comfort have incessantly argued with him all day by telephone.

13

(Ex. 2, Collection of Zappin Photographs.)

23.     Comfort's abuse intensified as the child's birth approached.   On at least two instances in May and August 2013 Comfort sexually assaulted Plaintiff by biting his genitals.   On both occasions, Comfort was performing oral sex on Plaintiff.   When Plaintiff refused to have intercourse with her and asked her to discontinue oral sex, Comfort bite his penis causing it to bleed.   On at least one of the occasions, Comfort punched Plaintiff in the genitals after biting him. The abuse left Plaintiff in significant pain at the time.   As a result of these incidents as well as Comfort's sexual assaults in December 2012 and January 2013, Plaintiff suffers from ongoing impotence and psychological trauma.   Prior to their separation, Comfort was aware of Plaintiff's issue and repeatedly mocked him, calling him names such as "limp-dick," "faggot" and "homo" because he could not and would not have sex with her.   These incidents illustrate that the physical and emotional abuse by Comfort was omnipresent in Plaintiff's relationship with her.

24.     Fully aware of Comfort's emotional instability and abusive behavior, Plaintiff had no intention whatsoever of marrying her.   He was content just being in a relationship with her to provide a supportive family for the child.   Indeed, Plaintiff never missed Comfort's doctor's appointments, registered for and attended parenting classes with Comfort in anticipation of the birth of the child, purchased all of the child's necessities in awaiting his arrival and used virtually all of his savings to purchase a large single-family condominium for Comfort and the child. Plaintiff was fully supportive of Comfort throughout her pregnancy as well, which included exercising with her, planning activities to do together, keeping healthy eating habits with her and maintaining/upgrading the apartment in anticipation for the child.

25.     In May 2015, Plaintiff and Comfort learned through pre-natal testing that there was a substantial chance that the child would be born with a debilitating birth defect and/or congenital

14

disease, which included the possibilities of spina bifida and down syndrome.[3]  Given the news,

Plaintiff was resolved to stay with Comfort and support her and, more importantly, the child.

However, this is where Comfort's father – Brian Comfort, a family law attorney in Washington

State – stepped in and began to meddle in Plaintiff and Comfort's relationship for the first (but not

the last) time.  Upon learning of the child's pre-natal testing results, Brian Comfort began

pressuring Plaintiff to marry Comfort.  Indeed, Brian Comfort and his wife flew from Tacoma,

WA to New York City on May 5, 2013 unannounced to ensure that Plaintiff and Comfort were

getting married hell-or-high-water.  When Plaintiff expressed reservations about getting married

to his daughter, Brian Comfort threatened Plaintiff with the following:

> If you do not marry Claire, I will take Claire and the baby back to Tacoma, WA.
> I'll make sure you never see them.  And, I'll make sure you're saddled with child
> support for a special needs child that you'll never be able to pay.

Brian Comfort went on to pressure Plaintiff and Comfort to get married that same day, May 5,

2013.  Plaintiff was forced to acquiesce as his parents and siblings were hours away in West

Virginia and South Carolina and were not available to run interference on Brian Comfort's terrible

idea.  So, on the afternoon of May 5, 2013, Plaintiff and Comfort were married in a shotgun civil

ceremony in New York City with Brian Comfort being the only witness.  Brian Comfort's

meddling that resulted in the shotgun wedding between Plaintiff and Comfort would later

overcome their relationship and largely lead to their divorce.

     B.     <u>The Abduction of the Child by Claire Comfort and Brian Comfort</u>

     26.     The deterioration of Plaintiff's relationship with Comfort hastened after the birth

of the child in October 2013.  The child's pediatricians believed that Comfort was suffering from

---

[3] Plaintiff and Comfort learned several weeks later that the pre-natal tests were false positives and the child was born healthy.  However, Comfort had a incredibly difficult pregnancy, which was apparently caused by the fact that she continued to drink alcohol early in her pregnancy as well as smoke marijuana throughout the pregnancy.

post-partem depression (which was noted in the child's medical records) and recommended counseling, which she refused.  As a result, Comfort had apparent significant difficulties caring for the child.  This included leaving the child in soiled diapers for hours, locking the child in the parties' extra bedroom when the child was crying to drown out the noise, nearly suffocating the child while co-sleeping with him, dropping the child from the parties' bed, nursing the child after consuming alcohol (which she acknowledged in sworn documents) and smoking marijuana while the child was in the home, which was stored in containers underneath the child's bassinet, just to name a few of the difficulties.  (*See* Ex. 4, E-mails, Text Messages and Photographs Concerning Comfort's Care of the Child.)

27.     Comfort's post-partem depression also caused her emotional and physical abuse of Plaintiff to escalate after the birth of the child.  Comfort frequently screamed at Plaintiff, belittled him and emotionally terrorized him.  (*See* Ex. 5, Zappin Text Messages w/ Mother.)  For instance, while Plaintiff was at work, Comfort admittedly invited her "crazy ex-roommate Cathleen" (whom Plaintiff later learned Comfort was having sex with) and an "ex-boyfriend" over to the parties' home with the child present to "hang out."  When Plaintiff returned home from work, Plaintiff noticed the home reeked of marijuana with the child present in it.  Moreover, Comfort was incessant that the "ex-boyfriend" frequently come visit the parties' marital home to "hang out" and "see the baby" while Plaintiff was not present, leading Plaintiff to suspect that Comfort was repeatedly using drugs with the individual and that the "ex-boyfriend" was in fact her old drug dealer from when she previously lived in Washington, DC.

28.     While Comfort's behavior became more erratic after the birth of the child so did her physical abuse of Plaintiff.  For example, this included episodes of Comfort breaking Plaintiff's iPad, busting a bottle of baby formula over his head while Plaintiff was feeding the child,

brandished kitchen knives at Plaintiff and the child, digging her fingernails into Plaintiff's hands and kicking him when he attempted to pick up the child Comfort left laying face-down on the bed and threw a bucket of Halloween candy at Plaintiff. (*See* Ex. 2, Collection of Zappin Photographs.) The worst episode of Comfort's violence, however, came on the night of November 1, 2013. Ironically, what set Comfort off was Plaintiff receiving an innocuous text message from an ex-girlfriend. When Plaintiff refused to show Comfort his phone, she all-out physically beat Plaintiff leaving his entire body covered in bruises:

29.

 

 

(Ex. 6, November 1, 2013 Photographs of Zappin.)   After the initial onslaught, phone records

confirmed that Plaintiff called his parents requesting help.  (*See* Ex. 🟨, Annotated Zappin Phone

Records.)  Plaintiff's parents spoke with Comfort attempting to calm her down.  However, once

off the phone, Comfort again physically attacked Plaintiff.  This time, Comfort grabbed a kitchen

knife and stabbed Plaintiff in the leg (while attempting to stab him in the crotch):

 

(Ex. 6, November 1, 2013 Photographs of Zappin.)  After Plaintiff wrestled the knife away from her, Comfort then left Plaintiff bleeding in the floor.  During the entire altercation which included Comfort waiving and stabbing at Plaintiff with a knife, the child was just feet away in his rocker. The next morning, Plaintiff was forced to cancel a golf outing with friends to seek medical attention.  (*See* Ex. 7, Zappin Nov. 2, 2013 Text Messages.)

30.     In the weekend that followed the November 1, 2013 episode of domestic violence, Plaintiff attempted to keep peace with Comfort, despite her erratic behavior.  However, she remained violent at times repeatedly accusing Plaintiff of cheating on her.  This included Comfort kicking over a ladder Plaintiff was climbing on while he changing lights in the parties' marital home on November 2, 2013.  On another occasion, Comfort threw a Chik-Fil-A chicken sandwich and other objects at Plaintiff while he was holding the child.  Her behavior had spun out of control. Plaintiff had hoped to get through the weekend in hopes that Comfort's parents – who were flying in from Tacoma, WA the following week – would calm the situation.  However, the arrival of Brian Comfort only exacerbated the issues leading to an over four (4) year long litigation to bury Comfort's domestic abuse and sexual assault, while depriving Plaintiff's son of his father.

31.     Comfort's parents flew from Tacoma, WA to Washington, DC on November 6, 2013 to assist Comfort with the child while Plaintiff went out of town for work.  During the five-day period that Comfort's parents were in Washington, DC, credit card records revealed that they carried on their activities normally and not as if they discovered Comfort beaten and abused as they later claimed.  Indeed, records and testimony from Comfort herself illustrate that Comfort's mother took her shopping multiple times to Costco, Target, and even Bloomingdales to purchase designer clothing on at least one of the several trips to malls in the Washington, DC area.  Comfort and her parents also went out to eat with the child multiple times.  And, by Brian Comfort's own

admission, Comfort's parents consumed copious amounts of expensive alcohol in Plaintiff's home during trip. (*See* Ex. 8, Except of Transcript from *Zappin v. Comfort*; Ex. 9, Photographs of Zappin's Trashcan.)   By all appearances, nothing was amiss.

32.     As will become clearer below, Comfort and her father both testified under oath at the *Zappin v. Comfort* custody trial that during the five-day period in Washington, DC, Comfort never went to the hospital, called the police, left the condominium with the child or sought any intervention from the courts while Plaintiff was away on his trip.  In fact, family photographs taken by Comfort's parents during this time period and introduced into evidence by Comfort's mother at the *Zappin v. Comfort* custody trial show that the Comforts were carrying on, smiling and visiting with Comfort and the newborn as an ecstatic new mother and grandparents. (*See* Ex. 10, Brian Comfort Photographs.)

33.     On November 10, 2013, however, the day that Comfort's parents were scheduled to return to Tacoma, WA, Comfort and her father, Brian Comfort, abducted the child from the parties' marital home in Washington, DC just after Plaintiff returned home from his work trip. The pair flew the child over 3,000 miles away to Tacoma, WA when the child was just four-weeks-old.  Comfort and her father did so without Plaintiff's consent and with the apparent intent to permanently separate Plaintiff from his child.  According to Brian Comfort in conversations with Plaintiff and Plaintiff's mother, Leigh Anne Zappin, he had decided to take Comfort and the child to his home in Tacoma, WA because Comfort "was not a natural" with the newborn and that Comfort needed "time around her family" to cope with the post-partum depression and the struggles she was having caring for the child.  Plaintiff believes that Brian Comfort abducted the

child as a preemptive strike out of fear that Plaintiff was on the verge of filing for divorce from Comfort given the escalation of her physical violation and her apparent emotional instability.[4]

34.     After abducting the child and arriving in Washington State, Comfort became even more mercurial.  First and foremost, Comfort <u>never</u> made any allegation that Plaintiff had abused her in their communications between November 10, 2013, when she abducted the child, to November 13, 2013, when Comfort learned that Plaintiff had filed a petition for custody and a motion for the emergency return of the child.  Instead, Comfort repeatedly apologized to Plaintiff asking that he "forgive" her for the abduction of the child:



(*See also* Ex. 11, Zappin's DC Superior Court Petition and Emergency Motion.)  As illustrated above, Comfort's statements and conduct were wholly inconsistent with her later allegations that she was domestically abused by Plaintiff.  Moreover, originally on November 10, 2013, she told Plaintiff that she intended to stay in Tacoma, WA for one week.  After she arrived in Tacoma, WA on November 12, 2013, she told Plaintiff that she and the child were going to stay with her family

---

[4] Plaintiff has already began secretly speaking with attorneys approximately two (2) weeks prior to Comfort's abduction of the child.

through the Thanksgiving holiday.  That quickly changed to Comfort telling Plaintiff she intended to stay in Tacoma, WA through the Christmas Holiday after which she "might" return to Washington, DC with the child.  Throughout these few days, Comfort appeared to have little regard for the fact that Plaintiff was separated from his child and that her abduction of the child deprived Plaintiff of access to him.  Moreover, never once during these conversations did Comfort make any accusation that she was domestically abused by Plaintiff.

35.     It quickly became clear that Comfort was simply playing games with Plaintiff and had no intention of returning to Washington, DC with the child showing absolute disregard for Plaintiff's rights to the child as his father.  As a result, on November 13, 2013, Plaintiff filed a petition for custody and an emergency motion for the return of the child in the Superior Court for the District of Columbia ("DC Superior Court") through his counsel *Feldesman Tucker Leifer Fidell LLP*.  (*See* Ex. 11, Zappin's DC Superior Court Petition and Emergency Motion.)  That same day, Comfort was ordered to return to Washington, DC with the child by November 15, 2013.

36.     In Plaintiff's petition and emergency motion filed in DC Superior Court, he detailed a history of abuse perpetrated against him by Comfort since the beginning of their relationship.  (*See* Ex. 11, Zappin's DC Superior Court Petition and Emergency Motion.)  The petition sets forth that this abusive behavior by Comfort inflicted on Plaintiff included, but was not limited to, hitting, scratching and slapping him on numerous occasions.  (*See id*.)  Moreover, Plaintiff detailed Comfort's concerning behavior towards the newborn child in the petition and emergency motion.  (*See id*.)  This included an admission by Comfort in the midst of the abduction of the child on November 11, 2013 that she was "unstable":



(*See id.*)

37.     On November 14, 2013, Comfort was served with the DC Superior Court's order directing that she return to Washington, DC with the child the following day.  In a clear act of retaliation and with the assistance of Brian Comfort (a family law attorney), Comfort immediately went to the Pierce County Superior Court in Washington State and filed for a Temporary Order of Protection via a kiosk at the Crystal Judson Family Violence Center.  (*See* Ex. 12, Nov. 14, 2013 Comfort TOP Petition WA State.)  For the first time in the history of their relationship, Comfort alleged that Plaintiff had abused her.  In her petition for a Temporary Order of Protection filed in Pierce County Superior Court, Comfort only alleged one specific incident of abuse purportedly occurring on November 1 and/or 2, 2013.  (*See id.*)  The Temporary Order of Protection was granted *ex parte* via a <u>kiosk</u>.  (*See id.*)  What was clear, however, was that Comfort intended to weaponize false allegations of domestic violence as a defense of her abduction of the child in her admittedly "unstable" state.

38.     On November 15, 2013, Comfort did not return to Washington, DC with the child as ordered by the DC Superior Court.  Instead, she submitted a declaration to the DC Superior Court through counsel Matthew Andelman of *Delaney McKinney LLP*.  In that declaration,

Comfort acknowledged that she had abused Plaintiff by scratching his face in August 2013 because she (falsely) alleged that he had went to a strip club the evening of the incident.  (*See* Ex. 13, Nov. 15, 2013 Comfort Declaration.)  She further tacitly conceded that she had consumed alcohol during the timeframe she was breastfeeding the child and that she had fallen asleep with the child while co-sleeping with him.  (*See id.*) Most importantly, though, Comfort began changing her allegations of domestic violence, which became a pattern throughout the *Zappin v. Comfort* litigation.  In the declaration, Comfort alleged that in addition to November 1 and/or 2, 2013 alleged incident in her Washington State Temporary Order of Protection Petition that Plaintiff had also abused her on October 24, 2013 and in "the early morning hours" of October 11, 2013.  (*See id*.)  However, as a result of Comfort's non-appearance in court on November 15, 2013, the DC Superior Court adjourned the hearing and directed Comfort to return to Washington, DC with the child by November 20, 2013 for an emergency hearing on *pendente lite* custody and visitation.

39.    On November 20, 2013, the morning of the emergency *pendente lite* hearing, Comfort made up yet a third rendition of her allegations of domestic violence.  Despite the fact the she had a Temporary Order of Protection in Washington State and that the Family Relations Branch of the DC Superior Court would be hearing the case that afternoon, on the morning of November 20, 2013 Comfort went to the Family Violence Branch of the DC Superior Court and applied for a second Temporary Order of Protection.  In doing so, Comfort radically changed and expanded her allegations of domestic abuse.  In this petition, she falsely alleged that she was abused on November 1 and/or 2, 2013; October 29, 2013, October 23 or 24, 2013; October 14, 2013; October 10, 2013 and October 1, 2013.[5]  (*See* Ex. 14, Nov. 20, 2013 Comfort TOP Petition

---

[5] In a telephone conversation and in text messages exchanged with Plaintiff in March 2014, Comfort stated that she was pressured by her counsel Matthew Andelman of *Delaney & McKinney LLP* to exaggerate, expand and sensationalize her allegations of abuse to ensure that she would receive custody and distract from the fact that she had abducted the child.  Indeed, she admitted to Plaintiff that she did not

DC.)  Comfort's allegations not only necessarily conflicted with her prior sworn allegations without any explanation or reasoning, but were substantially embellished and added-to from her two prior sworn statements.

40.     As a result of Comfort's filing of a new petition for a Temporary Order of Protection in the Family Violence Branch of the DC Superior Court just two hours prior to the commencement of a *pendente lite* hearing before the Family Relations Branch of the DC Superior Court, the DC Superior Court adjourned the *pendente lite* hearing.  Indeed, Comfort's tactical filing that radically changed her allegations of domestic violence hours before the calendared *pendente lite* hearing left Plaintiff fundamentally unprepared to defend himself against her allegations.  On (bad) advice of counsel, Plaintiff agreed to enter into a Consent Order with Comfort providing for a limited three-month period of supervised visitation, where Comfort demanded supervised visitation as part of the agreement as she was otherwise threatening to return to Washington State to file for custody in that jurisdiction leaving Plaintiff without visitation with the child.  Plaintiff's counsel believed that without the additional time to gather evidence and witnesses to defend against Comfort's radically changed and new allegations of domestic violence dropped on him two hours before the emergency *pendente lite* hearing on November 20, 2013, the DC Superior Court would make a summary finding against Plaintiff and the presumption of joint custody of the child would be forever rebutted under the law in the District of Columbia. Moreover, Plaintiff's counsel represented to him that supervised visitation would generate neutral

---

even draft the allegations in the November 20, 2013 petition filed in DC Superior Court and they were entirely prepared by her counsel Matthew Andelman.  Comfort further told Plaintiff that she felt that both Matthew Andelman and her eventual counsel in New York, Defendant Robert Wallack of *The Wallack Firm, P.C.*, were exploiting the situation and trying to "brainwash" her by repeatedly "beating in her head" outrageous claims that Plaintiff intended to kill her, that Plaintiff intended to abduct the child if she settled the case and that she would never see the child again if she recanted her allegations of abuse.  Moreover, Comfort told Plaintiff that because her father was running and financing the litigation, there was little she could do to stop it.

witnesses, *e.g.* the supervisors, who could testify that Plaintiff was a more fit caregiver to the child. Finally, and most importantly, as part of the agreement to enter into the Consent Order Plaintiff and Comfort agreed and the DC Superior Court eventually ordered that a *pendente lite* custody hearing be calendared for March 5, 2014.  However, that *pendente lite* hearing never took place as a result of Comfort's gamesmanship.

41.    In February 2014, Comfort once again absconded with the child from Tacoma, WA to New York, NY in an effort to thwart the jurisdiction of the DC Superior Court over the child as well as to stop the impending March 5, 2014 *pendente lite* hearing on temporary custody of the child.  On February 7, 2014, the DC Superior Court relinquished initial child custody determination jurisdiction to New York State based on Comfort's relocation of the child to New York State. Plaintiff immediately filed an action for divorce seeking custody of the child in New York County Supreme Court on February 11, 2014 through his then counsel *Aronson Mayefsky & Sloan LLP* seeking custody of his son.  The matter was assigned to Justice Deborah Kaplan.

C.    Justice Deborah Kaplan, Justice Matthew Cooper and the *Zappin v. Comfort* Action

42.    The *Zappin v. Comfort* matter filed in New York was plagued with misconduct by presiding judges Justice Deborah Kaplan and Justice Matthew Cooper.  Their misconduct is detailed in a complaint filed in a separate action pending in this Court.  For the sake of brevity, Plaintiff hereby incorporates by reference his Amended Complaint filed in the matter *Anthony Zappin v. Kevin M. Doyle et al.*, Case No. 17-cv-8837-KPF in its entirety.[6]  Suffice it to say, however, the facts set forth in the *Zappin v. Doyle et al.* Complaint illustrate that not only did Justice Kaplan and Justice Cooper do absolutely nothing to curb the misconduct of Wallack, Cohen

---

[6] A redacted copy is available at http://www.anthonyzappin.com/zappinvdoyle.

or Comfort, but actively provoked and endorsed it turning the Matrimonial Action into what amounted to a drumhead proceeding.

## II.    THE UNLAWFUL COLLUSION OF DEFENDANT HARRIET NEWMAN COHEN AND DEFENDANT ROBERT WALLACK TO FRAUDULENTLY CHURN LEGAL FEES

### A.    Background of Defendant Robert Wallack

43.    In February 2014, Plaintiff learned for the first time that Comfort had retained Defendant Robert Wallack of *The Wallack Firm, P.C.* to represent her in the Matrimonial Action. Wallack claims to be a "Celebrity Divorce" attorney.  (*See* Ex. 15, Wallack Website Printout.) However, he unquestionably makes a mockery of the practice of law and himself advertising "tech entrepreneurs, Wall Street executives, CEOs, hedge fund managers, real estate barons, closely-held business owners, doctors, lawyers, movie stars, philanthropists, pro-athletes, hip-hop impresarios, the famous, the non-so-famous, the infamous … we've represented them all." (*See id.*)  Of course, Wallack's claims of celebrity fame and fortune are either extremely exaggerated or outright false.

44.    With respect to Wallack, it must be noted at the outset that at the time Plaintiff learned Comfort was represented by Wallack just prior to commencing the divorce action in February 2014, Plaintiff was represented by *BlankRome LLP* in New York.  However, upon learning that Wallack was representing Comfort, *BlankRome LLP* withdrew as Plaintiff's counsel and referred him to *Aronson Mayefsky & Sloan LLP* ("AMS") because the firm feared that Wallack would use the *Zappin v. Comfort* litigation as a new means and mechanism to harass his ex-wife – a partner at *BlankRome LLP* – and her firm.

45.    Plaintiff's first interaction (through counsel) with Wallack came at a hearing in New York County Family Court on February 13, 2014 in a proceeding where Plaintiff had obtained

a Temporary Order of Protection against Comfort.  At that hearing, Plaintiff's counsel AMS attempted to work out a visitation arrangement between Plaintiff and the child until the April 2, 2014 initial hearing before Justice Kaplan.  However, Wallack would only agree to a visitation schedule that provided for supervised visitation with the child at Comprehensive Family Services at a rate of approximately $150 per hour.  It was at this stage that Comfort, at the direction of Wallack, began using supervised visitation not only as a means from depriving Plaintiff of meaningful access to the child, but as a way to financially inflict pain on Plaintiff as he was forced to bear the entire cost.  Plaintiff was spending on average $5,500 to $6,500 a month (and sometimes over $10,000 a month) for a few hours a month with the child.  (*See* Ex. 16, CFS Supervised Visitation Invoices.)  As discussed *infra* Wallack and Defendant Comprehensive Family Services actively colluded to frustrate Plaintiff's visitation with the child to prolong supervised visitation for their own personal financial benefit and profit.

46.    Wallack's conduct over the next few months became more and more outrageous as it became clear that he intended to use the *Zappin v. Comfort* litigation to churn enormous fees both on Comfort and eventually Plaintiff.  Between February 2014 and July 2014, Wallack refused to respond to a single settlement meeting request or proposed access schedule that AMS sent to him – and according to Comfort – Wallack failed to notify her of AMS's settlement overtures and meeting requests.  Plaintiff was repeatedly forced to seek court intervention to approve access schedule driving up counsel fees for both himself and Comfort.  Likewise, Wallack deliberately lied to the state court on countless occasions between April 2014 and July 2014 in to order to ensure supervised visitation continued, which necessarily meant that the litigation would continue. For instance, Wallack made fabricated claims to the matrimonial court that Plaintiff shaved the child's head during a supervised visitation that was completely at odds with the reports from

Comprehensive Family Services and the Capital Regions Children Center.  (*See* Ex. 17, CRCC and CFS Supervisor's Reports.)   On another occasion, Wallack lied to the matrimonial court claiming that Plaintiff attempted to abduct the child during a supervised visitation, which was again completely at odds with Comprehensive Family Service's and the Capital Region Children Center's reports.  (*See id*.)   Indeed, each time Wallack appeared before the matrimonial court he would abuse process and come up with some newfangled bogus allegation for the unlawful collateral purpose of ensuring supervised visitation continued indefinitely and that the litigation would thereby continue indefinitely.  In other words, Wallack would say and do anything – no matter how untrue or unethical – in order to keep the litigation proceeding and the billable hours exponentially increasing.

47.     During a series of phone calls between Plaintiff and Comfort in March 2014 and again at an in-person dinner in December 2014, Comfort told Plaintiff that Wallack had encouraged her to make up the most heinous allegations against Plaintiff to ensure that she kept the child.  This included fabricating new allegations of domestic violence and further embellishing her false allegations that she had already made in DC Superior Court, including to falsely claim she was holding the child during the manufactured incidents of abuse.  Wallack also encouraged her to manufacture allegations of child abuse against Plaintiff – which to Comfort's credit she never did.  However, Comfort did apparently follow Wallack's advice of attacking Plaintiff's employment as a means of gaining an upper-hand in the custody litigation, discussed *infra*. Similarly, Comfort told Plaintiff that Wallack advised her to show up late to visits, withhold any and all information about the child from Plaintiff and taunt Plaintiff over text messages in an effort to agitate and anger Plaintiff so as to manufacture statements from Plaintiff in order to claim that he had a "temper" and that he had a pattern of making "false allegations against the mother."

Comfort further told Plaintiff that Wallack repeatedly instilled fear in her with threats that he would no longer represent her if she did not follow his instructions. He further insisted that if Comfort attempted to settle with Plaintiff, that Comfort would ultimately lose the child. Wallack even tried to instill terror in Comfort by telling her that he believed Plaintiff would come to her home and kill her if she did not continue with the litigation to "protect herself." Furthermore, during Plaintiff's conversations with Comfort, he further learned that Comfort had been working with Mr. Wallack since at least November 2013 in anticipation of trying to move the child custody litigation from Washington, DC to New York, NY, evidencing that the abduction of the child in Washington, DC had been long-planned by Comfort and her father, Brian Comfort.

48.     Even though Comfort was no innocent party and was engaging in repeated unlawful actions designed to inflict harm and deprive Plaintiff of the child, Wallack's predatory behavior towards Comfort was entirely a sham to put even more pressure on her to continue litigating the custody dispute to churn fees for his own financial benefit. He saw deeps pockets with respect to Comfort and her parents, who were assisting her in paying Wallack's invoices, as well as with respect to Plaintiff and his parents. Wallack sought to capitalize off the opportunity by not simply maintaining Comfort's position with respect to the child, but by engaging in unethical litigation tactics designed to prolong the litigation, create the need for voluminous pre-trial motion practice and force the divorce action into a costly and prolonged trial to generate enormous legal fees for his own benefit. Moreover, during Plaintiff's conversations with her in 2014, Comfort told Plaintiff that Wallack repeatedly attempted to pressure her to have sex with him to satisfy portions of her ballooning legal fees. Plaintiff learned, however, that in the summer of 2015 that Wallack and Comfort began a sexual relationship forcing Wallack's then girlfriend and associate at *The Wallack Firm, P.C.* to leave the firm in July 2015. It was at this point that Comfort and Wallack

went from having an objectively predatory attorney-client relationship to Wallack's financial benefit to becoming united as equal partners in their efforts to destroy Plaintiff financially, irreparably defame Plaintiff's reputation and deprive Plaintiff of being a father to his child.

49.     Wallack's wholly unethical conduct is of no surprise given his history of misconduct, perpetuating scams and abusing the court system. Wallack was formerly an Assistant District Attorney with the Manhattan District Attorney's Office from 1999-2003. Upon information and belief, Wallack was terminated from the position for repeated instances of misconduct, including but not limited to, attempting to have sex with female witnesses and victims, withholding exculpatory evidence and failing to appropriately handle himself in domestic violence cases. Subsequently, Wallack's only job in private practice was with *Kasowitz Benson, Torres & Friedman LLP*. He was terminated from the firm in 2007. Upon information and belief, Wallack was fired from *Kasowitz Benson, Torres & Friedman LLP* after he attempted to have sex with a client the firm was representing in a divorce.[7]

50.     With no firm willing to incur the liability of hiring Wallack, he started his own firm – *The Wallack Firm, P.C.* – in 2007 focusing solely on matrimonial litigation. Since founding his own firm, Wallack has been enveloped in one scheme, litigation or allegation of misconduct after another. These incidents include, but are not limited to:

- Wallack has been repeatedly rebuked by matrimonial judges for egregious unethical conduct. For example, in 2011, Justice Deborah Kaplan found that Wallack had engaged in multiple acts of attorney misconduct, including "fabricating" court orders, attempting to engage in *ex parte* communications with

---

[7] Plaintiff's sources for this information include, but are not limited to, matrimonial attorney Louis Newman at *Newman Denney P.C.*

the court and repeatedly violating court orders involving the children at issue in the

*Nacos v. Nacos* litigation:

- o "Mr. Wallack began a letter writing campaign to the Court choosing to litigate improperly by letter ... Mr. Wallack only increased the volume of mail and raised the level of hyperbole." (Ex. 18, February 8, 2011 Kaplan Letter);

- o "It was Mr. Wallack's improper restraint of [the husband's] bank accounts, achieved by sending misleading letters to numerous financial institutions informing them that the Court had issued restraints prohibiting release of any funds to [the husband], when it had not ....) (*Id*.)

- o "The improper behavior continued as Mr. Wallack chose to repeatedly disregard agreements, orders and directives." (*Id*.)

- o "[F]ollowing the November 10, 2010 [conference] where the Court instructed Mr. Wallack not to interfere with [the Attorney for the Child's] ability to meet with her clients, he directed the Wife not to allow the meeting." (*Id*.)

- o "Mr. Wallack continued to obstruct the Court's order of appointment and impeded [the Attorney for the Child's] attempts to see her clients." (*Id*.)

- o "It was Mr. Wallack's improper inclusion of sensitive and perhaps privileged [information] in his Reply [papers], which caused both defendant's counsel, and the children's attorney to seek the Court's permission to respond by sur-reply." (*Id*.)

- In 2016, Wallack and The Wallack Firm were sued by Nadine Bocelli & Company, Inc. (a legal staffing company) for failing to pay his associates and staff hired in part for the *Zappin v. Comfort* litigation. *See Nadine Bocelli & Co., Inc. v. The Wallack Firm PC*, Index No. CV-004670-16/NY (N.Y. County Civil Court). Rather than pay his staff, Wallack pocketed the nearly $500,000 Comfort and her father had paid him in 2015 splurging on expensive vacations, custom shoes and designer clothing. (*See* Ex. 19, Collection of Wallack Public Instragram Photos.)

- In 2015, Wallack was forcibly evicted from his Upper East Side apartment after failing to pay rent for over six (6) months.  This is shocking considering at that point Comfort and her father had paid Wallack nearly $400,000 in legal fees.

- In 2013, Wallack and The Wallack Firm were sued by American Express after running up large balances and refusing to pay off the firm's Business Platinum Card.  *See American Express Bank FSB v. Robert Wallack et al.*, Index No. 158371/2013 (N.Y. County Supreme Court).    American Express received a judgment of $50,221.30 against Wallack.  Upon information and belief, Wallack has not paid a penny of the judgment despite being paid over $400,000 from the Comforts in the *Zappin v. Comfort* litigation to date.

- In 2009, the State Worker's Compensation Board entered a $12,000 judgment against Wallack.  *See Workers' Compensation Board of the State of New York v. The Wallack Firm PC*, Index No. 454085/2009 (N.Y. County Supreme Court).

- During the *Zappin v. Comfort* litigation, at least two (2) female associates quit *The Wallack Firm, P.C.*  Upon information and belief, they subsequently alleged that Wallack sexually harassed them while they were employed at the firm.  Upon information and belief, other female employees had previously accused Wallack of sexual harassment and left *The Wallack Firm, P.C.*, prior to 2014.  Nevertheless, during the pendency of the *Zappin v. Comfort* litigation, Wallack stated multiple times on the record that he was dating his 26-year-old associate and former student, Brittney Hershkowitz.  Upon information and belief, Ms. Hershkowitz left *The Wallack Firm, P.C.* in the Summer of 2015 after learning of Wallack's sexual relationship with Comfort.

33

- Wallack has repeatedly sued clients *pro se* seeking outrageous judgments of hundreds of thousands of dollars in legal fees he churned from these unsuspecting individuals. In 2015, Wallack sued former client Kevin Mulrane seeking **$120,883.75**. *See The Wallack Firm, P.C. v. Kevin Mulrane*, Index No. 150248/2015 (N.Y. County Supreme Court). In 2013, Wallack sued former client Vanessa Dahlman seeking **$70,440.10**. *See The Wallack Firm, P.C. v. Vanessa Dahlman*, Index No. 159537/2013 (N.Y. County Supreme Court). And, in 2012, Wallack retaliated against Julie Nacos' for her malpractice suit by bringing a countersuit against her seeking **$409,356.91** in churned fees. *See The Wallack Firm, P.C. v. Julie Nacos*, 101546/2012 (N.Y. County Supreme Court).

51.     Unfortunately, this is only the tip of the iceberg with respect to Wallack's pattern of misconduct and unethical behavior. Because matrimonial cases are sealed in New York State, it is hard to truly gauge how extensive his misconduct is. But, as the above illustrates, Wallack had been chastised for engaging in unethical conduct designed to churn fees on unsuspecting matrimonial clients. He consistently refuses to pay obligations he owes requiring people to expend legal fees trying to collect. And, Wallack abuses the court system by retaliating against clients with *pro se* lawsuits seeking hundreds of thousands of dollars in churned legal fees.

52.     Perhaps most relevant to the instant suit, however, are what Wallack's former clients have said about him in malpractice litigations filed against him. For instance, in 2012 Wallack and The Wallack Firm were sued by former client Julie K. Nacos alleging that "lied about rulings of the Court," "disregarded Court orders and directions," "made excessive motions" and "churned Ms. Nacos' file … in order to generate enormous, excessive legal fees." (*See* Ex. 20, Complaint in *Nacos v. The Wallack Firm, P.C. et al.*, Index No. 154278/2012 (N.Y. County

34

Supreme Court).)  Upon information and belief, Wallack agreed to refund portions of Ms. Nacos'

fees in order to resolve the case and avoid a disciplinary complaint by Mrs. Nacos.  What is

important, however, is that Mrs. Nacos' description of Wallack's handling of her case aptly

describes Wallack's misconduct and fraudulent behavior in *Zappin v. Comfort* discussed herein

this Complaint.

53.     To put it simply, Wallack is a fraudster and a con-artist engaged in one sham after

another.  As his numerous schemes and run-ins with the legal system shows, he is precisely the

type of person who would falsify evidence, lie to the court, takes advantage of a client and

needlessly prolong a litigation solely for his own financial benefit.  In fact, this man publicly admits

he aspires to be Patrick Bateman as illustrated by his social media posts.  (*See* Ex. 19, Wallack

Public Instagram Posts.)  Sadly, Plaintiff has fallen victim to Wallack's unethical scam with

Comfort now aiding and assisting this fraudulent cause.   As further explained below, Wallack

repeatedly engaged in fraudulent behavior, abused legal process and unlawfully churned hundreds

of thousands of fees in *Zappin v. Comfort.*  What is all the more shocking, Wallack forged a

collusive alliance with an equally unscrupulous individual – Harriet Newman Cohen, the court-

appointed Attorney for the Child – that the two used to prolonged the litigation and force it to an

expensive and costly custody trial solely for their own financial benefit.

B.      Background of Defendant Harriet Newman Cohen and Her Appointment as
        Attorney for the Child in *Zappin v. Comfort*

54.     On August 11, 2014, Justice Kaplan appointed Harriet Newman Cohen of *Cohen*

*Rabin Stine & Schumann LLP* as Attorney for the Child for the parties' ten-month-old son.[8]  The

---

[8] On August 8, 2014, Justice Kaplan originally selected Susan Moss of *Chemtob Moss & Forman LLP* as Attorney for the Child.  Ms. Moss was forced to decline due a conflict of interest.  Much like Harriet Newman Cohen, Ms. Moss and her law partners were substantial contributors to Justice Kaplan's campaign for New York County Supreme Court Justice in 2012.

appointment of Cohen turned what was already a contentious litigation into an unmitigated disaster. Indeed, Cohen is known amongst her peers as one of the most unethical, underhanded and disreputable matrimonial attorneys in New York City.

55.     From the outset of her appointment as Attorney for the Child, Cohen did everything in her power to utterly destroy Plaintiff, smear his character with repeated *ad hominem* attacks, circumvent the law to further her agenda in the litigation and, most importantly, prevent Plaintiff any reasonable access to his child in an unlawful effort to churn fees for her own personal gain. This was no surprise as she is a self-proclaimed militant feminist who has made her livelihood attacking men and living off exorbitant *pendente lite* attorneys' fee awards in her representation of unwitting female clients not aware of the damage Cohen inflicts on their families until it is all too late by stringing out divorce litigations for years upon years. True to her lack of character, ethics and any moral compass whatsoever, Cohen is not at all ashamed of her behavior. Rather, she boasts and brags about her extremist position and the harm she has inflicted on men. This is evident from a New York Magazine article in which Cohen was quoted saying:

> Feminist divorce lawyer Harriet Newman Cohen, an unabashed supporter of all the various legal mechanisms – from equitable distribution to enhanced earnings – invented to protect women in divorce, thinks Duff should get all she's after, including "very, very substantial child support," "the nannies that she needs, her traveling, her clothing," and "a townhouse" – "and she certainly ought to have a chauffeur-driven car as well. I think that she's entitled to it."

(*See* http://nymag.com/nymetro/news/crimelaw/features/1670/index5.html.)

56.     Cohen took these radical views into *Zappin v. Comfort* by attacking Plaintiff in any way she could – which included fabricating allegations, overtly lying to the court, circumventing procedural laws and repeatedly breaching the Rules of Professional Responsibility – all the while thwarting his access to the child. In fact, Cohen even went so far as to demand that Justice Kaplan and later Justice Cooper terminate all of Plaintiff's visitation with the child – even supervised

visitation – where there was never an allegation that Plaintiff had harmed the child or was a danger to him as part of her unlawful scheme to perpetuate the litigation and fraudulently churn enormous legal fees. No doubt, Cohen's conduct was unquestionably disturbing given that fact that in the two-and-a-half-years Plaintiff was unlawfully subjected to supervised visitation without a hearing, Plaintiff was repeatedly described by supervisors as a loving, caring and attentive father and multiple supervisors testified under oath that in the hundreds of hours they spent with Plaintiff and the child that they never saw anything warranting a need for supervised visitation. (*See* Ex. 17, CFS Reports; *see also* Custody Trial Transcripts *available at* http://www.anthonyzappin.com/zappinvcomfort[9].) No one – not even Comfort or the forensic custody evaluator Dr. Alan Ravitz – believed that Plaintiff should have no access to his child. These positions taken by Cohen evidenced her fraudulent intention – wholly contrary to the best interest of the child she was appointed to represent and protect – to create a never-ending custody litigation where Plaintiff would be constantly forced to return to the court petitioning for access to the child. In such a scenario, Cohen would receive the financial windfall of representing the child in the never-ending litigation she created, while the child grows up without a father in his life.

57.     As part of her profiteering scheme, Cohen's radical positions and knowingly baseless allegations forced a never-ending array of litigation, motion practice, court appearances and a fourteen-day custody trial as explained more fully below. In deliberately driving up the cost of the litigation, she was one of two financial beneficiaries (Wallack being the other) where Cohen herself billed fees totaling over a **half-a-million-dollars in a custody case involving a then two-year-old-child**. In the end, Plaintiff, Comfort and, most importantly, the child all lost in *Zappin v. Comfort* while Cohen made an enormous profit from the court-appointed position churning over

---

[9] The transcripts from the custody trial in *Zappin v. Comfort* as well as the entire file from the matrimonial case can be found at http://www.anthonyzappin.com/zappinvcomfort.

$500,000.00 and counting straight to the bank in addition to the massive amount of media exposure the state court provided for her in the case discussed *infra*.

58.    It must be pointed out, however, that everything about the appointment of Harriet Newman Cohen as Attorney for the Child by Justice Kaplan was problematic, irregular, unlawful and outright corrupt.  First, Justice Kaplan appointed Cohen out-of-the-blue and without any notice to the parties.  This was unlawful and inconsistent with Due Process.  22 NYCRR 202.16(f)(3) provides that at a preliminary conference:

> The court may appoint an attorney for the infant children, or may direct the parties to file with the court, within 30 days of the conference, a list of suitable attorneys for children for select by the court.

At the April 2, 2014 preliminary conference in *Zappin v. Comfort*, Justice Kaplan neither appointed an Attorney for the Child, nor requested counsel to submit proposed names for an Attorney for the Child.  In fact, Justice Kaplan stated that an Attorney for the Child was not necessary given the child was less than a year old.  Justice Kaplan's tune changed less than five months later in August 2014 when she was forced to at least give the appearance of commencing a *pendente lite* hearing by appointing Cohen without notice or input from Plaintiff or Comfort.  Justice Kaplan never provided an explanation for this abrupt change of course and refused to entertain objections to Cohen's appointment.  Nonetheless, the purpose of Cohen's appointment as Attorney for the Child was apparent:  to have a voice friendly and politically-connected to Justice Kaplan in the litigation that could be characterized as acting on behalf of the child to advance and justify Justice Kaplan's unlawful and retaliatory imposition of supervised visitation on Plaintiff indefinitely.

59.    Second, Justice Kaplan appointed Cohen at a rate of $600 per hour without notice or an opportunity to be heard by the parties.  This is a usurious, outrageous and downright criminal rate for an Attorney for the Child.  Justice Kaplan never conducted a financial inquiry into whether

Plaintiff and Comfort could afford Cohen's fee and ignored all objections from Plaintiff concerning the issue.  As explained below, Cohen exploited this usurious rate bringing in virtually every other member of her law firm, *Cohen Rabin Stine Schmumann LLP*, to also bill at that rate or substantially similar rates without ever requesting approval from the matrimonial court.[10]

      60.    Third, and most importantly, Cohen was not qualified to be an Attorney for the Child when she was appointed by Justice Kaplan.  22 NYCRR 36.2(b) provides:

> All appointments pursuant to this Part [including appointments of Attorney for Children not paid with public funds] shall be made by the appointing judge from the appropriate list of applicants established by the Chief Administrator of the Courts pursuant to section 36.3 of this Part

Individuals seeking to become fiduciaries or guardians must apply, pass a background check and undergo training before their name can be added to the list.[11]  At the time of her appointment by Justice Kaplan, Cohen was not approved by the New York State Guardian and Fiduciary Services Office and had not ever received any training to be an Attorney for the Child.[12]  22 NYCRR 36.2(b)(2) only allows appointment of an Attorney for the Child not on the list of approved guardians upon a showing of "good cause." Justice Kaplan's appointment order does not specify any "good cause" why Cohen was appointed rather than someone on the list of approved law

---

[10] Initially, Plaintiff believed that the purpose of Justice Kaplan's unnoticed appointment of as Attorney for the Child at a rate of $600, to be split and paid equally between Plaintiff and Comfort, was to financially cripple both Plaintiff and Comfort into a settlement.  However, it later became known that Cohen was admittedly only billing Plaintiff – and not Comfort – in violation of the August 11, 2014 order appointing her Attorney for the Child.  When neither Justice Kaplan nor Justice Cooper took any action against Cohen for her violation of the appointment order, it became apparent that Cohen was appointed to add yet another bad faith and retaliatory financially crippling obligation onto Plaintiff in hopes that he would give-up on the litigation.

[11] *See* https://www.nycourts.gov/ip/gfs/.

[12] Defendant Cohen's first application to the New York State Guardian and Fiduciary Services Office to be on the list of approved law guardians was in March 2016 – months after the custody trial in *Zappin v. Comfort* and when Plaintiff began complaining about Defendant Cohen's appointment as Attorney for the Child.

guardians.  (*See* Ex. 21, Aug. 11, 2015 Order Appointing AFC.)  This only serves to illustrate that Cohen was duly unqualified to act as Attorney for the Child in *Zappin v. Comfort*.

61.     Lastly, perhaps most troubling about the whole corrupt enterprise was Justice Kaplan and Cohen's failure to disclose their prior relationship and dealings to the parties at the time of Cohen's appointment as Attorney for the Child.  After her appointment as Attorney for the Child, Plaintiff subsequently learned that Cohen was a participant in Justice Kaplan's 2011 election campaign for Supreme Court Justice.  Campaign contribution records reveal that members of her firm, CRSS, made significant donations to Justice Kaplan's campaign.  (*See* Ex. 22, Campaign Contributions to Friends of Justice Deborah Kaplan.)  Upon information and belief, Cohen and members of her firm CRSS threw fundraising and campaign events for Justice Kaplan's campaign.  Furthermore, upon information and belief, Cohen used her influence in the New York City Democratic Party (having represented Governor Andrew Cuomo in his divorce) and position in the New York Women's Bar Association to garner support for Justice Kaplan's selection as the Democratic Party's nominee for Supreme Court Justice in 2011.  Cohen's unusual appointment as Attorney for the Child at an exorbitant rate of $600 per hour without being properly qualified by the New York State Guardian and Fiduciary Services Office raises serious questions as to whether the Attorney for the Child appointment was a political kickback.  And, as explained below, Cohen used the unfettered appointment to churn over $500,000 in fees and counting on the parties, in effect using her fiduciary appointment to perpetrate a racketeering scheme.

C.     The Overall Fraudulent Scheme by Wallack and Cohen to Churn Fees

62.     When Cohen was appointed Attorney for the Child in August 2014, it was apparent that Cohen and Wallack had forged an unlawful agreement to ally with one another for their own personal gain in *Zappin v. Comfort*.  Initially, this took the form of Wallack and Cohen colluding

to take positions designed to prolong the litigation – such as demanding indefinite supervised visitation for Plaintiff, refusing to turn over court-ordered disclosure on multiple occasions, deliberately concealing pertinent information about Comfort and the child, attacking Plaintiff through various avenues in their never-ending motion practice and repeatedly forcing the parties to seek relief from the court even concerning the more miniscule issues.  As illustrated below, this unlawful, unethical and collusive strategy caused motion practice in *Zappin v. Comfort* to balloon and the matter to stretch out for years.  This allowed Wallack and Cohen to churn enormous fees that they would not otherwise be entitled to had they comported themselves in an ethical and lawful manner and had Cohen abided by her directive to represent the best interests of the child (and not the best interests of her own pocket book).  It should be noted that the record in *Zappin v. Comfort* reveals that Cohen never once deviated from a position held by Comfort and/or Wallack, effectively depriving the child of independent representation required under the law as a consequence of the unlawful collusive scheme.

63.     As the litigation progressed, however, Wallack and Cohen expanded their strategy.  First, any negative allegation against Comfort, Wallack or Cohen was met with letter-writing campaigns from Wallack and Cohen as well as significant motion practice to discredit Plaintiff and attack his professional standing.  As explained further below, Wallack and Cohen acted in concert to conceal court-mandated disclosure of Comfort's medical records showing her history of mental illness, alcoholism and drug use, which they knew would cause substantial motion practice from Plaintiff.  Similarly, they acted in concert to conceal all digital evidence surrounding Comfort's purported domestic violence photographs, despite court orders requiring production of the evidence.  Again, by failing to disclose these items and information as required by the state court, both Wallack and Cohen knew that this would lead to significant motion practice from

Plaintiff that they could use to their own financial benefit. And, most troubling, Wallack and Cohen instructed Comfort to conceal any and all information about the child from Plaintiff. This again forced Plaintiff to engage in substantial motion practice before the court just simply to get the names of the child's medical providers and medical records that Wallack and Cohen used to generate enormous fees all the while attacking Plaintiff. And, in order to distract the state court from their unlawful actions, they persistently taunted Plaintiff, engaged in *ad hominem* attacks directed at him and relentlessly attacked his professional standing with baseless and fabricated allegations of misconduct. making demonstrably false allegations concerning Plaintiff's conduct and engage in *ad hominem* attacks at Plaintiff's motivations.

64. Indeed, as set forth below in more detail, by violating court orders and colluding together to seemingly protect Comfort and their pocketbooks, Wallack and Cohen set themselves up to fraudulently and unethically churn enormous fees by deliberately generating needless expensive and extensive motion practice. More importantly, though, by concealing important information about the child, evidence contradicting Comfort's allegations of domestic violence as well as Comfort's history of mental illness and alcoholism, Wallack and Cohen effectively created a "Mary Sue" or a "Donna Reed." Comfort was portrayed as the "perfect" mother without any information to the contrary, while casting Plaintiff as litigious and a "bad litigant" deserving indefinite supervised visitation. Indeed, Wallack and Cohen employed the strategy of baselessly attacking Plaintiff because they knew the longer that Plaintiff was forced to have supervised visitation, the longer the case would go on generating even more motion practice, evidentiary hearings and appeals, whereby they would receive a patently fraudulent and unethical financial windfall.

65.     It should be noted that Comfort was not only aware of the collusion between Wallack and Cohen, but she actively encouraged it.  Indeed, Comfort benefited because she in effect had two sets of attorneys attacking Plaintiff and thwarting his access to the child. Additionally, Wallack and Cohen actively diverted the state court's attention away from concerns of her parenting of the child, the fact that she was engaging in destructive actions in an effort to deprive the child of his father and that fact that there was substantial evidence available conclusively proving that allegations of domestic violence were totally fabricated.  And, while Wallack initially bilked Comfort out of hundreds of thousands of dollars, as explained below, Comfort essentially stopped paying the vast majority of Wallack's billed fees after they began their sexual relationship in the Summer of 2015.  Instead, Comfort and Wallack concocted a scheme to inflate Wallack's bills that went largely unpaid, particularly through the custody trial in Fall of 2015, as part of a scheme to later seek fraudulently billed attorneys' fees from Plaintiff after trial. The scheme was intended to further inflict financial harm on Plaintiff both as an act of vengeance, but also to ensure that Plaintiff was so financially crippled such that he could never obtain custody of the child.  And, it was later learned that Cohen was not even billing Comfort for most of the proceedings in violation of the state-court's order that Comfort pay 50% of her fees.  (*See* Ex. 21, Order Appointing the AFC.)

D.     Specific Incidents of Fraudulent Collusion

66.     The unlawful collusion between Wallack and Cohen went well beyond merely coordinating strategy, reviewing each other's papers prior to filing and taking the same positions on every single issue raised in the case.  Wallack and Cohen's actions were much more insidious. Indeed, they repeatedly cooked-up schemes to not only antagonize Plaintiff, but where they could

needlessly heighten the litigation to churn enormous billable hours for their own personal profit. Plaintiff highlights some of these unethical and fraudulent schemes below.

### 1.   *Bogus Unnoticed Subpoena to Dr. Robert Brooks*

67.     In one of the most abusive acts by Cohen during the *Zappin v. Comfort* custody proceedings, Cohen served separate subpoenas on my then treating psychiatrist Dr. Robert Brooks. (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 23-25.[13])   More specifically, Cohen served subpoenas on Dr. Brooks on September 9, 2014 and May 11, 2015 requesting copies of my medical records and Dr. Brook's session notes.  (*See id*.)  Cohen even attempted to show up at Dr. Brooks' office unannounced demanding to review the records in his office without alerting Plaintiff or the state court.

68.     The subpoenas Cohen issued to Dr. Brooks represented demonstrable attorney misconduct as the subpoenas were not only abusive, but unlawful.  Indeed, Cohen failed to notice either subpoena as required by CPLR 2303, which was a blatant violation of the Rules of Professional Conduct.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 23-25.)  It was apparent that Cohen did not notice the subpoenas as an attempt to unlawfully gain unfettered access to Plaintiff's medical records without his knowledge or the Court's knowledge.  As Cohen was well-aware – having written an article on the subject in *The New York Law Journal* – psychiatric records are required to go through *in camera* review by the state court for relevancy

---

[13] For the sake of brevity, Plaintiff refers to and incorporates by reference his supporting affidavit filed in connection with Motion Sequence 18 in the *Zappin v. Comfort* matrimonial action.  The motion sought disqualification of Cohen for various acts of misconduct as well as her failure to appropriately represent the child.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18.)  Not unsurprisingly, in one of his first acts on the case, Justice Cooper denied Plaintiff's motion without opposition and without addressing any of her detailed contentions that required Cohen's disqualification as Attorney for the Child opting instead engage in repeated *ad hominem* attacks on Plaintiff and his motivations laying the groundwork for his later retaliatory acts.  Thus, Plaintiff's contentions concerning Cohen's misconduct have never actually been litigated or decided by the state court.  A copy of Justice Cooper's order denying the motion can be found at http://www.anthonyzappin.com/zappinvcomfort.

determinations, appropriate redactions and the issuance of appropriate protective orders before they are released to counsel.[14]  (*See id*.)  Cohen's intent in issuing the secret subpoenas was no doubt to unlawfully circumvent this requirement of *in camera* review.

69.     Cohen's actions in issuing the secret subpoenas to Dr. Brooks were disturbing for a number of reasons as they were clearly part-and-parcel of Wallack and Cohen's collusive and fraudulent scheme to churn legal fees.  First, Cohen's secret subpoenas generated substantial and unnecessary motion practice, including necessitating Dr. Brook's counsel filing multiple motions to quash.  Cohen no doubt knew that the manner in which she issued and served the subpoenas would cause such unnecessary motion practice, yet went forward with the secret subpoena on two separate occasions anyway to generate legal fees for her sole financial benefit.

70.     Second, Wallack and Cohen agreed that Cohen would seek Plaintiff's medical records from Dr. Brooks, not Wallack and Comfort.  To be clear, Comfort did not seek Plaintiff's medical records from Dr. Brooks during the custody litigation, which is highly unusual in any custody litigation for a litigant not to seek out the opposing party's mental health records.  Rather, it was agreed between Wallack, Cohen and Comfort that Cohen would seek the records as a means of fraudulent fee-shifting to Plaintiff.  Where Comfort would be required to bear the full cost of counsel fees, process servers and subpoenas fees if she and Wallack sought the records, by colluding with Cohen and having her be the person requesting Dr. Brooks records, Plaintiff was therefore required to pay fees and expenses as he was required to pay 50% of Cohen's fees.  (*See* Ex. 21, Order Appointing AFC.)  With Plaintiff bearing the full cost of supervised visitation costing thousands of dollars a month, Defendants' actions were a fraudulent attempt to impose further financial hardship on Plaintiff – particularly where Cohen was not billing Comfort at that

---

[14] Indeed, large portions of Plaintiff's records from Dr. Brooks withheld from Cohen and Wallack by the state court.

point as discussed *infra*.  Indeed, Comfort, Wallack and Cohen sought to drive Plaintiff's legal costs up with this fraudulent fee shifting so that he would be unable to afford supervised visitation, retaining his own experts or even hiring counsel to represent him.

71.    Third, Cohen's actions of aggressively serving secret subpoenas on Dr. Brooks was blatant harassment directed both at Plaintiff and Dr. Brooks.  Indeed, Cohen's intent was to disrupt the doctor-patient relationship Plaintiff had with Dr. Brooks by embroiling him in the custody litigation.  The apparent collateral goal in serving the bogus subpoenas was to cause Plaintiff to stop seeking therapy from Dr. Brooks for his depression that stemmed from the custody litigation as a means of inflicting emotional harm on Plaintiff and so that Cohen and Comfort could later use Plaintiff withdrawing from therapy as an argument as to why supervised visitation should continue.  This apparent scheme is all the more clear in light of the fact that Cohen never sought Comfort's psychiatric medical records discussed below.

72.    Lastly, and most importantly, while Cohen sought Plaintiff's mental health records, she never sought  any of Comfort's medical records.  This was a blatant act of unlawful collusion.  Throughout the custody litigation, Plaintiff presented evidence that Comfort had a long history of mental illness.  Moreover, Comfort was admittedly seeing a psychiatrist and a therapist in New York throughout the custody litigation.   She also admitted to seeing multiple mental health professionals while she was in Washington State.  And, Plaintiff proffered that just prior to her pregnancy, Comfort sought mental health treatment for alcohol and drug addiction, which Comfort never denied.  Despite these records being highly relevant to a custody determination, Cohen never subpoenaed them or otherwise took any action to obtain them in order to protect Comfort in furtherance of the fraudulent collusion scheme.

       2.       *Retention of Dr. Aaron Metrikin to "Fee-Shift" to Plaintiff*

46

73.     In September 2015, just prior to the commencement of the scheduled *pendente lite* hearing before Justice Kaplan on the sole issue of supervised visitation,[15] Cohen retained Dr. Aaron Metrikin to do a "peer review" of Dr. Alan Ravitz's forensic custody report.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 39-40.)  This was highly unusual as an Attorney for the Child virtually never retains an expert to do a peer review of the forensic custody report as that is left to the parties.  This is particularly so since an Attorney for the Child will inevitably rely on the "neutral forensic custody report" as the Attorney for the Child is appointed by the court and a forensic custody evaluator is deemed under the law "the court's witness" under the law.

74.     To further add to the bizarre actions of Wallack and Comfort, they did not retain any expert to do a peer review of Dr. Ravitz's report.  Incredibly, this was because Wallack, Cohen and Comfort had colluded and agreed that Cohen would retain Dr. Metrikin to advance their collective position that Comfort should have custody and Plaintiff should have no access to the child.  This collusive scheme was incredibly unlawful and unethical on the part of all parties, particularly where the child is entitled to independent representation under the law.

75.     Defendants' actions were further troubling as the retention of Dr. Metrikin represented another scheme to fraudulently shift fees to Plaintiff.  Whereas Comfort would have to bear the full cost of an expert if she had retained an expert to do a peer review, the collusive scheme to have Cohen hire Dr. Metrikin caused Plaintiff to bear 50% of the fees for an expert witness who was effectively Comfort's and was going to testify against Plaintiff.  (*See* Ex. 21,

---

[15] As discussed in the *Zappin v. Doyle et al.* complaint, Plaintiff repeatedly demanded a *pendente lite* hearing on the issue of supervised visitation between February 2014 through August 2014 before Justice Kaplan.  However, Justice Kaplan refused to grant his request, even though he was entitled to such a hearing based on New York black letter law.  After Plaintiff threatened to file an Article 78 proceeding, Justice Kaplan calendared a one (1) day hearing on the issue of supervised visitation for September 15, 2014 and simultaneously appointed Cohen as Attorney for the Child.  Although the September 15, 2014 *pendente lite* hearing was started, it was never completed as Justice Kaplan "stayed" the proceeding after Plaintiff moved to disqualify Cohen as Attorney for the Child.

Order Appointing the AFC.)   Again, the intent behind the scheme was to further inflict financial hardship on Plaintiff, particularly given the fact that he had retained his own peer review expert at his own expense.  This fraudulent intent to inflict financial harm on Plaintiff was all the apparent in light of the fact that Dr. Metrikin had no experience in child psychology, parenting or child custody matters, yet charged $700 per hour.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 39-40.)  This fee was between $200 and $300 more per hour than experts who were on the state court's published list of approved child forensic experts.  And, both Cohen and Metrkin attempted to charge Plaintiff his entire $700 per hour fee at times, even though the state court had ordered that Comfort split the fee 50%.  (*See id*.)

76.    It should further be noted that Dr. Metrikin never actually testified or even participated in the custody trial.  Again, Dr. Metrikin's retention was little more than a tactic with the collateral purpose of harassing Plaintiff with additional unnecessary fees paid to an expert. Again, Comfort, Wallack and Cohen sought to drive Plaintiff's legal costs up with the fraudulent fee shifting so that he would be unable to afford supervised visitation, retaining his own experts or even hiring counsel to represent him.   Likewise, given Dr. Metrikin's egregious rate (which was specifically requested by Cohen) and his lack of qualifications, Cohen's retention of Dr. Metrikin was yet another attempt to drive up counsel fees as Plaintiff was in effect forced to engage in motion practice to challenge Dr. Metrikin's qualifications and his billing practices in violation of the state court's orders.

3.    *Cohen Unlawfully Asserted Herself as a Witness on Behalf of Comfort Throughout the Custody Litigation*

77.    An Attorney for the Child is subject to the same ethical requirements applicable to all lawyers, "including but not limited to constraints on: *ex parte* communications; disclosure of client confidences and attorney-work product; conflicts of interest; and <u>becoming a witness in</u>

48

litigation." *S.A. v. S.K.*, 40 Misc. 3d 1241 (Family Ct. Bronx Cnty. 2013) (citing 22 NYCRR 7.2(b) (emphasis added).)  Thus, an Attorney for the Child cannot testify as to her own observations.  *See id.*  Moreover, the Attorney for the Child is forbidden from introducing unsworn facts through affirmations or submitting reports (even via colloquies), which are not part of the record.  *See Cervera v. Bressler*, 50 A.D.3d 837, 840-41 (2nd Dept. 2008); *New v. Sharma*, 91 A.D.3d 651 (2nd Dept. 2012).

78.    As part of the collusive scheme to advocate for Comfort rather than the best interests of the child, Cohen repeatedly asserted herself as a witness for Comfort during court proceedings.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 14-23.)  This included engaging in inappropriate colloquies with the state court, submitting unsolicited reports, testifying to her own observations and introducing hearsay into the record based on her own supposed conversations.  (*See id.*)  Each and every time Cohen engaged in this improper and ethical conduct, it was to advocate for Comfort and to attack Plaintiff, no matter what the issue was.  These incidents were widespread and had the effect of

- On September 15, 2014, Cohen testified in her opening statement at the *pendente lite* hearing on supervised visitation as to her supposed observations of Plaintiff with the child.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 14-15.)  In an egregious abuse of process, Cohen testified that she observed Plaintiff with a thermometer in his diaper and asserted that Plaintiff had inappropriately used the thermometer on the child.  (*See id.*)  Cohen statements were later proven unequivocally false by supervisors who were present during the visit.  The incident nonetheless represented the fraudulent and collusive scheme between Wallack and Cohen to assert demonstrably false facts as a means of generating more litigations and driving up counsel fees as Plaintiff was forced to defend the false accusations.

- On several occasions, Cohen asserted manufactured and unsworn hearsay which she claimed to be from the child's pediatrician countering whatever concern Plaintiff raised with the state court.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 15-23.)   Plaintiff had raised concerns that Comfort had admitted she was "alittle bit negligent" in the child's medical

care, that she failed to seek treatment for his torticollis until six months after it was diagnosed and, upon seeking treating at Plaintiff's insistence, the child's physical therapist identifying developmental delay in his motor skills, which was causing the child pain.  (*See id*.)  Additionally, on a number of occasions, she inappropriately testified as to her own observations and lay medical opinions about the child's medical conditions to counter Plaintiff's concerns.  (*See id*.)

- Most concerning, though, on a number of occasions, Plaintiff observed and photographed suspicious injuries on the child when he appeared at visitations.  This included repeated bruises on the child's buttocks and thighs, welts on the child's back, bruises on the child's temple, black eyes, substantial bruising on his ears and fingertip bruises on the child's mouth and cheeks.[16]  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 15-23.)  On a few occasions, the supervisors observed the injuries and noted that Comfort had given inconsistent explanations as to how they occurred.  (*See* Ex. 17, CFS Reports.)  When Plaintiff raised these concerns with the state court and even requested permission to take the child to the doctor, Cohen submitted unsolicited "reports" to the state court claiming she had examined the child and that the child did not have the injuries Plaintiff observed and photographs.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 15-43.)   Based on the photograph evidence, Cohen's representations in the reports were unequivocally false.

- In a December 10, 2014 affirmation, Cohen filed with the state court falsified text messages she apparently received by Comfort.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 15-23.)  The text messages would introduce to advocate that Plaintiff should have no access because the false text messages claimed he did not want to see the child any more.  (*See id*.)  Cohen refused to identify who exactly provided the falsified text messages to her and what she did to authenticate them since they were not actual screenshots.  (*See id*.)

Cohen's inappropriate and unethical actions had the effect of improperly dissuading the state court from addressing Plaintiff's genuine and documented concerns for the child.  Cohen's false statements and testimony were almost always quoted by the court in denying Plaintiff's requested relief.  Moreover, it was apparent that each and every time Cohen introduced unsworn facts and testimony, it was to protect Comfort and attempt to thwart Plaintiff's access to information about the child rather than advocating for the best interests of the child.  This collusive conduct denied

---

[16] Redacted photographs can be found at http://www.anthonyzappin.com/zappinvcomfort.

the child independent representation and only drove up litigation expenses as Plaintiff was repeatedly forced to document and request intervention from the state court requesting that Cohen be ordered to cease the inappropriate behavior and be reminded under her ethical responsibilities.

        4.      *Cohen Refused to Conduct Any Investigation into Comfort's Parenting, the Child's Home Life or Comfort's False Allegations of Domestic Violence*

79.    As part of the Wallack-Cohen collusive scheme, Cohen failed to perform the one duty she was required to do:  an investigation into the facts of the case.  Indeed, as part of the responsibilities of an Attorney for the Child as defined by the Appellate Division, the Attorney for the Child is required to "[c]onduct a full factual investigation and become familiar with all information and documents relevant to the representation of the child."  (*See* https://www.nycourts.gov/courts/ad4/AFC/AFC-ethics.pdf.)  Both the record from *Zappin v. Comfort* and Cohen's billing invoices reveal that she conducted no inquiry or investigation whatsoever into the allegations or the facts of the case.  Some of the instances in which Cohen shirked her duty to conduct appropriate investigations into the facts of the case included:

- Cohen failed to meaningfully meet with the child.  For instance, Cohen never observed the child in his home environment, either with Plaintiff or Comfort.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 3-4.).  In the two years the matter was pending, Cohen met with the child four times, where three meetings took place in her office.  (*See id.*)

- Cohen failed to conduct any investigation into the child's collaterals.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 4-5.)  She never interviewed the child's grandparents, aunts or uncles.  (*See id.*)  Cohen similarly never once interviewed the child's nanny, who Comfort hand-picked without any input from Plaintiff.

- Cohen failed to conduct any reasonable investigation into the child's medical care.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 4-5.)  Although she apparently had a handful of conversations with the child's pediatrician in New York (which she used to poison Plaintiff to the child's doctor), Cohen never once actually requested the child's medical records.  (*See id.*)  Similarly, she never spoke with the child's numerous medical specialists who were treating him for torticollis and developmental delay.

(*See id*.)  Cohen also never spoke with the child's original pediatrician in New York, his former pediatricians in Washington, DC or his pediatrician in Washington State.  (*See id*.)  These individuals were all relevant as it was during this time these pediatricians were treating the child after he was diagnosed with torticollis, which Comfort failed to seek treatment for until months later.  (*See id*.)

- Cohen failed to interview the supervisors either at the Capital Region Children's Center in Washington, DC or at Comprehensive Family Services in New York about Plaintiff's visitations with the child.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 4-5.)  One would think that these individuals would be most knowledgeable about Plaintiff's ability to parent the child having spent hundreds of hours with Plaintiff and the child.

- Cohen failed to conduct any investigation whatsoever into the parties' competing allegations of domestic violence.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 8-10.)  Cohen never requested digital copies of Comfort's purported domestic violence photographs and, in fact, opposed Plaintiff's requests that they be produced for examination.  (*See id*.)  Cohen's billing records reveal that she never once reviewed the photographs, communications and other documents Plaintiff submitted that contradicted Comfort's allegations of domestic violence.  (*See id*.)  Likewise, she never interviewed a single witness with information about the parties' claims to domestic violence.  (*See id*.)  And, Cohen did not even request Comfort's or the child's medical records during the one (1) months period Comfort alleges she was abused, as they revealed that no doctor ever observed Comfort with the injuries she claims to have sustained.  (*See id*.)  Rather, Cohen advocated that Plaintiff was the abuser based solely on Comfort's allegations.

- As mentioned above, Cohen never conducted any investigation into Comfort's mental health, alcoholism or admitted drug use.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 11-12.)

Rather than conduct legally required investigations into the facts to ensure the child had effective representation, Cohen simply accepted Comfort's positions and allegations as facts without any scrutiny whatsoever, which she in turn relayed and presented to the state court.  Again, this was part of the scheme to ensure Plaintiff had indefinite supervised visitation, which would only serve to prolong the matter for years driving up counsel fees.

5.      *Payment of the Attorney for the Child's Fees*

80.      Pursuant to the order appointing Cohen as Attorney for the Child, she was required to bill Plaintiff and Comfort equally.  (*See* Ex. 21, Order Appointing the AFC.)  As set forth below, Cohen violated the state court's directive on numerous occasions, by either waiving Comfort's 50% or by explicitly billing Plaintiff 100% of her fees.  Cohen's actions and violations of the state court order were part-and-parcel to the collusive scheme to harass and fraudulently drive up legal fees on Plaintiff.

81.      As an initial matter, there were numerous problems with Cohen's invoices.  For instance, although Cohen was appointed as Attorney for the Child, virtually every member of her firm billed on the *Zappin v. Comfort* matter without permission of the state court.  (*See* Ex. 24, Cohen Billing Invoices.)  This was not only highly unnecessary, but was deliberately intended to cause counsel fees to exponentially increase for her own personal gain.  Also, Cohen's bills were largely undecipherable with inadequate and vague descriptions.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at Ex. 45.)  Cohen's invoices also contained substantial entries for work that was never done and work that was double billed.  (*See id*.)  And, the bills were often sent well after the sixty (60) days required by the court rules.  Still yet, Plaintiff repeatedly requested that Cohen schedule a phone call with him to go over the bills and address his concerns.  (*See* Ex. 23, Zappin Affidavit Motion Sequence 18 at pp. 33-35.)  Cohen refused to even respond to Plaintiff's requests. Rather, Cohen repeatedly complained directly to the state court that Plaintiff was not paying her and continually threatened to file money judgments against him.  (*See generally* February 15, 2015 Tr.)

82.      As a prime example of Cohen's collusion with Wallack and Comfort, Cohen filed a motion for interim counsel fees on March 5, 2015.  Despite being appointed in August 2014 and

the matter being stayed from October 2014 to March 2015, Cohen somehow amassed over $40,000 in legal fees up to that point.  In the motion, she sought $18,286.32 from Plaintiff.  (*See* Ex. 25, Cohen Fee Motion (Mot. Seq. 12).)  Plaintiff – who was represented by counsel and forced to spend counsel fees to respond to the motion – opposed the motion on numerous grounds, including that Cohen billed for work never performed, had double-billed and that she had violated the appointment order by charging Plaintiff 100% for various legal work.  (*See* Ex.26, Zappin Sur-Reply (Mot. Seq. 12).)  On July 22, 2015, Justice Cooper summarily granted Cohen's fee motion and required Plaintiff to pay $18,286.32 by August 7, 2015.  Plaintiff filed a motion requesting that the state court institute a payment plan due to the cost of supervised visitation, which Cohen opposed and Justice Cooper denied.  Cohen subsequently entered a money judgment against Plaintiff.

83.    Shortly after the July 22, 2015 order granting Cohen's fee motion, Comfort provided her financial records in discovery.  They revealed that Comfort had only paid $6,841.92 of the $18,286.32 that she had owed similar to Plaintiff when Cohen moved for a money judgment.  Cohen never moved for a money judgment against Comfort, however. In connection with Mot. Seq. 19, Cohen acknowledged that these figures were correct, but claimed that it was "res judicata," in essence acknowledging that she waived the fees Comfort owed.  (*See* Ex. 27, Zappin Sur-Reply (Mot. Seq. 19).).

84.    Here, Cohen sought and obtained a money judgment against Plaintiff and made numerous disparaging remarks to the Court about Plaintiff in connection with the motion, which Justice Cooper later used to public disparage Plaintiff in the September 18, 2015 Sanctions Decision.  Meanwhile, Comfort owed Cohen substantially the same amount of fees, yet Cohen waived them in violation of the appointment order.  This episode only serves to confirm the

fraudulent collusive scheme between Comfort, Wallack and Cohen designed to abuse process for the collateral purpose of inflicting undue financial harm on Plaintiff and to saddle Plaintiff with financial obligations that would effectively prevent him from seeing the child. Here, the facts are apparent that Cohen sought attorneys' fees (which were largely fraudulent) and a money judgment from Plaintiff in collusion with Comfort and Wallack in an effort to drive up his legal expenses, financially impair his ability to pay for supervised visitation to deprive him access to the child, prevent him from hiring counsel and irreparably destroy his credit impacting Plaintiff's ability to financially support the child.

6. *Refusal to Even Negotiate a Settlement*

85.    In furtherance of their fraudulent collusive scheme, Wallack and Cohen entered into a apparent pact that they would not settle the matter with Plaintiff and would effectively force the matter to lengthy and costly trial.  As evidence of this, not once did either Wallack or Cohen attempt to settle the *Zappin v. Comfort* matter.  Indeed, both Plaintiff and his counsel sent Wallack numerous settlement requests and proposals (*See* Ex. 28, Collection of Zappin Settlement Proposals.)  Plaintiff never received a single response from either Wallack or Cohen.  At times early in the litigation, Wallack withheld these settlement proposals and overtures from Comfort in order to keep the litigation going for his own financial benefit.  At other times, Wallack made purely self-interested recommendations to Comfort that settlement should be off the table.

86.    What is most disturbing about Wallack's conduct, however, was that his refusal to even acknowledge Plaintiff's settlement overtures were part-and-parcel with his collusive scheme with Cohen to prolong the litigation as much as possible.  Cohen never once attempted to fashion a reasonable settlement between Plaintiff and Comfort despite Justice Kaplan directing her to do so.  Indeed, Cohen's only settlement offer came in October 27, 2014 where she demanded:

55

- Plaintiff leave that child's life for three (3) to four (4) years;

- Plaintiff pay full child support;

- Plaintiff agree not to challenge custody of the child in the future;

- Plaintiff could re-enter the child's life in three (3) to four (4) years with supervised visitation at Comfort's discretion.

(*See* Ex. 23, Zappin Motion Sequence 18; *see also* Mot. Seq. 13, Cohen Aff. at 1 (laughably characterizing above settlement proposal as "good deed") *available at* http://www.anthonyzappin.com/zappinvcomfort.)  This was not a settlement offer – particularly with respect to a father who was fighting to actually see his child – and ran counter to every public policy statement by the courts that children should have frequent and meaningful access to both parents.  In making such a proposal, Cohen without question sought to prolong the litigation, continue to deprive Plaintiff access to his child and effectively became an advocate for Comfort, and not the child.

87.    The clear thrust of Wallack and Cohen's pact not to settle with Plaintiff was that neither one of them wanted the litigation to stop because they viewed *Zappin v. Comfort* as their own personal limitless ATM machine.  The longer the litigation lasted, the most profitable it was to them at the expense of the parties, and most importantly, the child.  This conduct was not only unethical, but blatantly fraudulent.  This is particularly so with respect to Cohen where her unethical misconduct and illicit behavior in the form of colluding with Wallack to unnecessarily prolong the litigation and churn excessive fees while acting as a court-appointed fiduciary deprived an infant child of proper and competent legal representation constituting both financial fraud (as a privately paid Attorney for the Child) and a fraud upon the state court.

88.     In fact, the Wallack and Cohen pact of no settlement and no compromise to prolong the litigation was seen throughout the *Zappin v. Comfort* litigation.  At the very same October 27, 2014 hearing where Justice Kaplan directed her to negotiate a settlement, Cohen turned around to the Court after Plaintiff rejected the faux settlement offer and demanded that the Court strip Plaintiff of supervised visitation and order him to have **no access** to the child without any basis whatsoever:

> COHEN:     If I may, your Honor, for the safety of the baby, I would urgently request that you enter an order of custody of the baby, sole custody of the baby with the mother, and no access to the baby [by Plaintiff] pending until further order of this Court.

(*See* October 27, 2014 Tr. at 15-16 *available at* http://www.anthonyzappin.com/zappinvcomfort.) Although Justice Kaplan denied Cohen's wacky request that came directly from Cohen, it serves to illustrate Cohen's fraudulent conduct in seeking positions not in the best interests of the child,[17] but rather putting forth a position designed to prolong the litigation as a part of a strategy with Wallack to fraudulently churn enormous fees on the parties, particularly Plaintiff.

89.     Moreover, additional evidence of the collusive scheme between Wallack and Cohen is the fact that Cohen refused to abide by Justice Kaplan's direction that she attempt to reasonably mediate visitation disputes.  Specifically, Justice Kaplan stated at an August 28, 2014 hearing that:

> THE COURT: I think now that Ms. Cohen is in the case, what normally happens when there is an attorney for the child, that person make [sic] themselves very, very helpful, and is a good resource in trying to assist with any scheduling issues [with visitation]

---

[17] It is black letter law that a parent has a right to "reasonable visitation privilege," the denial of which is a "drastic remedy."  *See Nancy M. v. Brian M.*, 227 A.D.3d 404, 405 (2nd Dept. 1996).

(*See* August 28, 2014 Tr. at 27 *available at* http://www.anthonyzappin.com/zappinvcomfort.)  As the record illustrates, Cohen colluded with comfort and Wallack in an effort to frustrate Plaintiff's access to the child rather than abiding by her court-mandated directive to help mediate visitations disputes.  For instance, Cohen never once entertained Plaintiff's request that she mediate visitation disputes with Comfort and always "deferred" to the Comfort.  (*See* Ex. 23, Motion Sequence 18 at Ex. 40.)    Cohen took Comfort's position on every visitation dispute – no matter how unreasonable the position was – requiring Plaintiff to go to the state court for relief that in turn generated more fees for Wallack and Cohen. Moreover, the tactics of Wallack, Comfort and Cohen became so extreme that they colluded to insist through Cohen that Plaintiff's visitation with the child take place in the mornings during the workday in an effort to thwart his access to the child as well as jeopardize his employment.  (*See* February 15, 2015 Tr. at 33-40 *available at* http://www.anthonyzappin.com/zappinvcomfort.)  The  request  was  obviously  denied. Nevertheless, these tactics only served to needlessly and fraudulently drive up Wallack and Cohen's attorneys' fees as they baselessly asserted positions in an effort to force Plaintiff into court and drive up the cost of litigation.

### 7. *Collusion in Open Court at Trial*

90.     At the custody trial in *Zappin v. Comfort*, Cohen openly colluded and strategized with Comfort and Wallack throughout the thirteen (13) day trial.  As an initial matter, both Plaintiff and Comfort were each given 40% of the time at trial, while Cohen was given 20%.  Yet, the transcripts from the trial makes apparent that Cohen and Comfort effectively strategized to share their time.  Given that Cohen's position never once deviated from Comfort's, it was apparent that they divided up their questioning of witnesses such that Comfort was effectively given 60% of the trial time to prove her case.

91.     During the trial, Wallack and Cohen were regularly seen strategizing and coordinating their questioning during breaks.  At one point it became so egregious that Plaintiff's co-counsel was forced to point it out to Justice Cooper, who took no action.  (*See* November 16, 2015 Tr. at 33.)  They even assisted each other passing notes and setting up props for their cross-examination of Plaintiff.  And, most illustrative of their coordination, when Plaintiff called a forensic pathologist to testify concerning Comfort's purported injuries, it was Cohen – not Comfort – who once again hired a forensic pathologist on Comfort's behalf.

92.     In furtherance of their strategy to prolong the litigation, the custody trial for *Zappin v. Comfort* was originally calendared for five (5) days.  However, Wallack and Cohen kept Plaintiff on the stand for cross-examination for almost six (6) full days.  The majority of the time, their questioning was wholly irrelevant to the case.  Cohen asked nonsensical questions such as demanding whether to know if Plaintiff was sleeping with his prior counsel, Lara Ott.  Cohen further demanded the name of Plaintiff's girlfriend, who had nothing to do with the case and had never even met the child.  And, Cohen spent nearly an entire afternoon questioning Plaintiff about her prior marriages and questioning Plaintiff about a suit filed against her by his mother.  In total, Wallack and Cohen unnecessarily prolonged the trial from five (5) days to thirteen (13) days in an effort to drive up fees.

E.     Use of the Media to Inflict Reputational Harm on Plaintiff in Furtherance of the Fraudulent Churning Scheme

93.     While it is beyond dispute that Justice Cooper was the person who incited publicity to *Zappin v. Comfort*, defendants capitalized on Justice Cooper's actions to use the media to irreparably disparage Plaintiff, particularly with respect to Comfort's false allegations of domestic violence.  Both Wallack and Cohen thrive on the tabloid media.  Wallack has a portion of his firm's website dedicated to *The New York Post*, *The Daily News* and other tabloid publications.

(*See* Ex. 29, Wallack Website Tabloids.)  In fact, Wallack is listed as an "author" on *The New York Post's* webpage.  (*See* Ex. 30, Wallack New York Post Bio Page.)  And, he frequently tweets Julia Marsh, the reporter from *The New York Post* who wrote numerous disparaging articles about Plaintiff.  (*See* Ex. 31, Marsh/Wallack Tweets.)

94.    Cohen is similarly no stranger to the tabloid media.  In a July 2016 article written by Julia Marsh in *The New York Post*, Cohen remarked:

> "Sometimes, the biggest piece of leverage you have in the case is that it will never hit Page Six," said veteran divorce lawyer Harriet Newman Cohen.

(*See*         https://pagesix.com/2016/07/26/how-celebs-manipulate-the-system-to-keep-messy-divorces-private/.)  Without question, Wallack and Cohen used the media to try the *Zappin v. Comfort* custody trial in the press and to inflict irreparable damage on Plaintiff.

95.    Prior to trial, both Wallack and Cohen were regularly seen giving interviews to *The New York Post*, *The Daily News* and other legal publications.  In fact, Cohen had no qualms violating the privacy of her infant client by telling members of the press that Plaintiff's visitation with the child was supervised.  (*See* https://www.youtube.com/watch?v=YgK-hW08T6Q.)  Cohen likewise regularly gave comments to Law360 attacking and disparaging Plaintiff.  (*See* https://www.law360.com/articles/719863/ex-mintz-levin-patent-atty-says-judge-got-him-fired.)

96.    Wallack and Comfort, on the other hand, were much more vicious.  For example, Wallack and Comfort specifically invited Julia Marsh from *The New York Post* into the courtroom for the first day of the custody trial for the testimony of the forensic custody evaluator, Dr. Alan Ravitz.  Forensic custody reports are highly confidential and are not even permitted outside of the courtroom.  Yet, Wallack was allowed to read large sections of the highly confidential report during his cross-examination to feed false and unfounded material to his collaborator Julia Marsh.  Wallack would abuse process by reading large portions of the forensic custody report containing

something salacious to feed to Marsh (*e.g.*, a false allegation by Comfort that Plaintiff brought a

neighbor's window, Comfort's false allegation that he set up an Ashley Madison profile for an ex-

boss, etc.), then ask a vague or unrelated question. (*See generally* November 12, 2015 Tr. *available*

*at* http://www.anthonyzappin.com/zappinvcomfort.)   After that day of trial, Wallack, Cohen and

Marsh were seen together collaborating.   Marsh subsequently wrote an article entitled "'Hostile'

Mega-Lawyer Accused of Abusing Pregnant Wife" that contained references to most of the false

and disparaging passages that Wallack abusively read during the cross-examination of the forensic

custody evaluator.   (*See* https://nypost.com/2015/11/13/hostile-mega-lawyer-accused-of-abusing-

pregnant-wife/.)

97.   Wallack similarly invited Marsh into the courtroom during summations to instigate

more disparaging press, which were unlawfully held *ex parte* without Plaintiff present.   Again,

Wallack, Cohen and Marsh were seen collaborating both prior to and after summations.   Marsh

wrote yet another disparaging article about Plaintiff entitled:  "Ex-Lawyer a 'Monster' Who Need

to be Kept from Son."   (*See* https://nypost.com/2015/12/22/ex-lawyer-a-monster-who-needs-to-

be-kept-from-son-attorney/.)   The article was entirely based on Wallack's disparaging and false

statements about Plaintiff calling him a monster.

98.   In both situations, Wallack abused the courtroom by gratuitously reading and

making knowingly false statements for the sole purpose that they would be published in *The New*

*York Post* to publicly disparage Plaintiff.   Wallack's and Cohen's actions were undertaken for the

collateral purpose of inflicting financial and professional harm on Plaintiff by instigating

disparaging press about him.   Meanwhile they hide behind the courtroom privilege.   Additionally,

by generating disparaging media attention about Plaintiff and publicizing Comfort's false

allegations of domestic violence, they acted with the intent to prolong the matter and in essence

force the state court to indefinitely continue supervised visitation as a result of the horrendous, disparaging and false media attention their solicited concerning the case.

99.     It should be further noted that both Wallack and Cohen acted in complete disregard for the child by disseminating Justice Cooper February 27, 2016 custody decision in *Zappin v. Comfort* to both Julia Marsh at *The New York Post* and Barbara Ross at *The Daily News*.  Both tabloids wrote disparaging articles concerning Plaintiff that have inflicted irreparable harm to his personal and professional reputation.  There was no legitimate purpose for Wallack's and Cohen's dissemination of the statutorily sealed decision other than to inflict harm on Plaintiff and his son. Again, their actions under undertaken with the clear intent to prolong the matter and in essence force the state court to indefinitely continue supervised visitation as a result of the horrendous, disparaging and false media attention they deliberately and fraudulently solicited concerning Plaintiff and the case.  It should be further noted that Wallack was specifically questioned about whether he disseminated the February 29, 2016 custody decision to Marsh and Ross at a December 2016 hearing in *Zappin v. Comfort*.  Wallack deliberately and intentionally perjured himself on the stand denying that he provided the February 29, 2016 custody decision to them, despite both Marsh and Ross asserting that they received it from both Wallack and Cohen.

### F.     Filing False Disciplinary Complaints against Plaintiff

100.     Throughout the proceeding, defendants Comfort, Wallack and Cohen repeatedly filed false and unfounded disciplinary complaints against Plaintiff.  These complaints went directly to Staff Attorney Kevin Doyle, who has actively worked with Comfort, Wallack and Cohen to harass Plaintiff and trump up false allegations and evidence of attorney misconduct.  As discussed in the *Zappin v. Doyle et al.* complaint, Kevin Doyle has even gone so far as to admit that he has unlawfully failed to log Comfort, Wallack and Cohen's complaints against Plaintiff in an apparent

attempt to protect them from suit and to avoid having to disclose their communications with the AGC to Plaintiff as required by the First Department's attorney discipline rules.  Kevin Doyle has incessantly come to the protection of Wallack and Cohen, even taken the position with the Appellate Division that Cohen did not engage in billing fraud in *Zappin v. Comfort* despite clear evidence to the contrary.

101.   Upon information and belief, Cohen filed an unfounded disciplinary complaint against  Plaintiff  alleging  that  he  disparaged  her  with  the  website http://www.harrietnewmancohen.com.  It was apparent that Cohen filed the complaint because in an October 13, 2015 letter from the Attorney Grievance Committee ("AGC") opening a "*sua sponte*" investigation, Plaintiff was baselessly accused of violating the Rules of Professional Conduct with respect the website.  (*See* Ex. 32, *Sua Sponte* Disciplinary Letter.)  The evidence attached to the AGC's letter was a purported screenshot of the website taken by Cohen's daughter making it apparent that Cohen filed a complaint against Plaintiff.  Cohen filed the complaint knowing that it was baseless, but with the collateral purpose to retaliate against Plaintiff, distract the AGC from Cohen's own attorney misconduct, inflict harm on him and use a disciplinary proceeding to further deprive Plaintiff of his child.

102.   Upon information and belief, Wallack and Comfort filed an unfounded disciplinary complaint against Plaintiff alleging that he sent an e-mail to opposing counsel in the DC Superior Court purportedly threatening criminal charges against Comfort in violation of the Rules of Professional Conduct.  (*See* Ex. 32, *Sua Sponte* Disciplinary Letter.)  The evidence attached to the AGC's letter was a copy of an e-mail that is found nowhere in the court record in *Zappin v. Comfort*.  (*See id*.)  Thus, it is apparent that Wallack and Comfort filed a baseless disciplinary complaint against Plaintiff and did so with the intent and collateral purpose of retaliating against

Plaintiff, distract the AGC from their own attorney misconduct, inflict harm on him and use a disciplinary proceeding to further deprive Plaintiff of his child.

103. Upon information and belief, Wallack and Comfort filed an unfounded disciplinary complaint against Plaintiff alleging that Plaintiff falsely accused them of being under investigation by the Manhattan District Attorney's Office. (*See* Ex. 32, *Sua Sponte* Disciplinary Letter.) However, Wallack's invoices show that he was having conversations with the Manhattan District Attorney's Office in connection with an investigation. (*See* Ex. 33, Wallack Billing Invoices.) Wallack and Comfort filed a baseless disciplinary complaint with the intent and collateral purpose of retaliating against Plaintiff, distract the AGC from their own attorney misconduct, inflict harm on him and use a disciplinary proceeding to further deprive Plaintiff of his child.

104. Upon information and belief, Wallack and Comfort filed a disciplinary complaint against Plaintiff alleging that Plaintiff sent a public complaint naming Wendy Comfort in a federal action to her employer. (*See* Ex. 32, *Sua Sponte* Disciplinary Letter.) However, Wallack and Comfort knew that the allegation was baseless and unfounded. Yet, they filed it with the intent and collateral purpose of retaliating against Plaintiff, distract the AGC from their own attorney misconduct, inflict harm on him and use a disciplinary proceeding to further deprive Plaintiff of his child.

105. Upon information and belief, defendants Comfort, Wallack and Cohen also sent Justice Cooper's February 27, 2016 custody decision from *Zappin v. Comfort* to Kevin Doyle at the AGC. They did so knowing that Justice Cooper had deliberately and intentionally fabricated and manufactured rulings concerning Plaintiff falsifying text messages that were never entered into evidence (and don't even exist), Plaintiff "writing" Dr. William Manion's report and Dr. Manion's testimony concerning the issue, the testimony of Dr. William Manion as well as the

testimony of Ms. Linda Gottlieb Kase and the documents she considered.  Furthermore, they did

so knowing that Plaintiff had not committed acts of domestic violence against Comfort as there

was substantial evidence excluded by Justice Cooper or not considered by him that conclusively

disproved her claims.  Similarly, Wallack and Comfort were aware that Comfort had provided the

state court with two different versions of the November 9, 2013 "hit/yell" text message indicating

that Comfort falsified the text, not Plaintiff.  And, they requested that Plaintiff be prosecuted for

his statements to Brian Comfort on a FaceTime call, despite Comfort knowing that she recorded

the call in violation of Washington State wiretap laps and that the recordings were spliced.

106.    In sum, defendants Comfort, Wallack and Cohen have filed disciplinary complaints

against Plaintiff that they know to be unfounded with the intent and collateral purpose to inflict

financial and professional harm on Plaintiff to continue to maintain an advantage in the custody

litigation and to distract from their own attorney misconduct.

  G. <u>Evidence of the Fraudulent Collusion – Wallack and Cohen's Billing Invoices</u>

107.    In October 2016, in connection with a counsel fees motion filed by Wallack and

Comfort, Plaintiff received for the first time copies of Wallack's billing invoices.  These invoices

are important.  Wallack's invoices contain dozens of entries in which he and his associates assert

having communications with Cohen and members of her firm.  However, Cohen's billing invoices

fail to reflect even a single one of these communications.  (*See* Ex. 34, Chart Comparing Wallack

and Cohen Invoices.)

108.    Wallack's invoices show one of two things.  On one hand, if Wallack's invoices

are correct, it illustrates that Wallack and Cohen actively colluded throughout the *Zappin v.

Comfort* proceeding and denied the child independent representation.  Indeed, the entries in

Wallack's bills show that Wallack and Cohen continuously strategized as well as assisted each

other in drafting and filing papers.  Should Wallack's invoices be accurate, it would corroborate Plaintiff's assertions that they actively colluded to prolong the litigation and churn excessive fees on Plaintiff and, to an extent, Comfort.  More importantly, it would show that culpability as Cohen actively concealed her communications with Wallack in her billing invoices, which were required to be sent to the parties and the court as a fiduciary.  Cohen's sending invoices concealing material information from the court and Plaintiff would constitute both fraud on the court and an abuse of process in the *Zappin v. Comfort* proceeding.

109.    On the other hand, if Cohen's bills are accurate, it would demonstrate that Wallack padded his bills with tens of thousands of dollars in false entries.  It would again corroborate Plaintiff's allegations that Wallack fraudulently churned and drove up his counsel fees.  Since Wallack has requested $400,000 in counsel fees from Plaintiff, it would demonstrate that Wallack abused process and committed a fraud on the court by requesting fees he knew not to be owed.

H.    Wallack's Fraudulent Motion for Legal Fees

110.    On September 15, 2016, Comfort and Wallack filed a motion in *Zappin v. Comfort* seeking an order directing Plaintiff to pay $400,000 in Comfort's counsel fees.  At that point in time, Wallack alleged that he billed Comfort $857,881.19 in *Zappin v. Comfort* and that Comfort had paid him $530,000.  That left an outstanding balance of $327,881.19.  In essence, Wallack and Comfort sought to have Plaintiff pay Comfort's outstanding balance in legal fees.

111.    Wallack and Comfort's request for counsel fees is part of the fraudulent and abusive scheme to inflict financial harm on Plaintiff.  More specifically, Wallack and Comfort are seeking extraordinary fees for the collateral objective of continuing to maintain an advantage in the custody litigation and thwarting Plaintiff's access to the child by effectively financially ruining Plaintiff

and destroying his credit.  Indeed, if such an award were granted, it would be unlikely that Plaintiff could rent an apartment, buy a car or even find a job.

112.    As discussed throughout this Complaint, Wallack engaged in a strategy to unnecessarily drive up counsel fees and needlessly prolong the litigation, which generated an enormous and largely fraudulent legal bill.  It is unfathomable to think that a custody matter involving a then two (2) year old child could cost nearly a million dollars in legal fees.  Indeed, the fact that Wallack's purported fees are unreasonable, churned and outright fraudulent is evident from his invoices.  For instance, the entirety of Wallack's bills consist of non-descript entries such as:

- "E-mail correspondence with [John Doe]"

- "Travel Time"

- "Telephone call [or conference] with [John Doe]"

- "Motion work"

- "Review letters"

- "Attention to motion"

- "Review AZ documents"

- "Prepared for court"

- "Trial preparation"

(Ex. 33, Wallack Billing Invoices.)  Indeed, there is no way to determine what work Wallack and his associates actually did, whether it was necessary and reasonable or if the work was even performed at all.

113.    Additionally, Wallack's bills are littered with entries for work that was never filed, *e.g.*, Comfort's child support motion.  (Ex. 33, Wallack Billing Invoices.)  Wallack would not be

entitled to attorneys' fees for work that was never presented to the court.  Moreover, Wallack's invoices contain highly duplicative entries between himself and his associates.  Given that Wallack's billing entries are so vague, it is impossible to differentiate any work.  (*See id.*)  Of course, this padding of the bill was no doubt intentional on Wallack's part.  Wallack's invoices further consist of luxury valet parking charges, extravagant meals and other items that clearly indicate his churning and padding of the bill.  (*See id.*)  Worse of all, the total contains tens of thousands of dollars in interest charges from Comfort's non-payment of the bill.  (*See id.*)  Wallack has not even attempted to cull these invoices or the amount of fees owed.

114.   Moreover, in referring Wallack's motion to a referee for a report and recommendation, Justice Cooper explicitly stated that Wallack and Comfort would only be entitled to fees where they could "show what portion of the fees [Comfort] incurred were the result of [Zappin's] obstructionist and dilatory tactics or other oppressive behavior."  Both in their motion papers and during the hearing before Referee Marilyn Sugarman, neither Wallack nor Comfort could identify a single entry in Wallack's invoices that were a result of Plaintiff's "obstructionist and dilatory tactics or other oppressive behavior."

115.   As Plaintiff's opposition papers to the original September 15, 2016 sets forth, to the extent Comfort incurred substantial fees, it was a result of her own doing and Wallack's improper conduct in driving up fees.  For instance, in Plaintiff's motion filed before Justice Kaplan, he was repeatedly granted his requested relief.  (*See* Ex.  35, Plaintiff's Opposition Papers (Mot. Seq. 36).)  And, Plaintiff was repeatedly forced to bring motions as a result of Comfort refusing to compromise on visitation schedules, comply with discovery directives and obey court orders.  (*See id.*)  Comfort and Wallack, on the other hand, filed wholly frivolous motions like Wallack requesting an order of protection on behalf of himself against Plaintiff under the New York

Domestic Relations Laws, which was denied as such relief is unavailable under the statute. (*See id*.) Moreover, after Justice Cooper took over the case, it is shocking that Wallack somehow billed Comfort $857,881.19 when Justice Cooper denied over ten (10) of Plaintiff's motions without opposition and only required Comfort to respond two (2) motions, one of which involved her failure to comply with a judicial subpoena for a third time. (*See id*.)

116.    No reasonable person could conclude that Wallack's bills are an accurate reflection of the work performed in *Zappin v. Comfort*.  Rather, they are a product padding, churning and a fraudulent scheme to drive up legal fees in the matter.  Based on the evidence, the record of the case and Wallack's invoices themselves, Wallack and Comfort's demand for $400,000 in attorneys' fees is part-and-parcel to the ongoing fraudulent scheme to inflict harm on Plaintiff through the *Zappin v. Comfort* proceeding and constitutes a clear abuse of process where their apparent collateral objective in seeking the fee award is to wrongfully maintain an advantage in the custody litigation by further inflicting financial harm on Plaintiff.

**III.**    **THE UNLAWFUL AND FRAUDULENT ACTS OF DEFENDANTS ROBERT WALLACK AND CLAIRE COMFORT IN *ZAPPIN v. COMFORT***

117.    Throughout the *Zappin v. Comfort* litigation, Wallack repeatedly engaged in acts that were fraudulent on their and clearly intended to abuse process.  This includes, but is not limited to, Wallack's repeated deliberately misrepresentations on the record, proffering contentions he knew to be baseless, directing Comfort not to comply with court directives, failure to turn over court-ordered evidence and submitting documents and other items into evidence that he knew to be false.  Plaintiff was forced to exert substantial sums of money to defend against Wallack's fraudulent and improper actions in addition to being deprived access to his child.

A.      Comfort's Refusal to Produce Digital Copies of Her Purported Domestic Violence Photographs

118.     During the *Zappin v. Comfort* proceeding, Comfort raised and introduced into evidence at the custody trial a handful of photographs allegedly depicting injuries she sustained as a result of alleged attacks on her by Plaintiff.  Because Plaintiff knew that the photographs were not accurate and likely altered, throughout the proceeding Plaintiff sought digital copies of the photographs, particularly since Comfort always submitted them to the court in hard copy inkjet print-outs that were highly distorted.[18]  On September 9, 2014, Justice Kaplan signed a so-ordered subpoena directing Comfort to turn over digital copies of the photographs by September 15, 2014. Comfort failed to comply with Justice Kaplan's directive and Plaintiff was subsequently forced to bring a motion to compel compliance with the judicial subpoena.[19]  Comfort and Wallack's response to Plaintiff's motion to compel was as follows:

> As for as plaintiff's other requests for relief, including sanctions on defendant and me, the entering of orders "requiring Ms. Comfort to show cause why she should not be held in contempt," … blah … blah … blah, frivolous does not even begin to describe them … Suffice it to say, defendant opposes each and every one of plaintiff's arguments and associated requests for relief.  They are all meritless.  Mr. Zappin – please, for the sake of the Court and everyone involved, just pipe down. It's really enough already.

(Ex. 36, Wallack Opposition Affirmation (Mot. Seq. 6).)  In an order dated February 29, 2015, Justice Kaplan again directed that Comfort produce digital copies of the photographs by March 5, 2015.  For the second time, Comfort did not comply with the court's directive.  In April 2015, Plaintiff was forced to bring a second motion to compel requesting that Comfort either be required

---

[18] During the course of the proceeding, Comfort produced credit card receipts from Bloomingdales where she purchased make-up in October 2013.  Comfort originally alleged that she purchased the make-up to cover up bruising to her face.  However, the UPC code revealed that Comfort lied and purchased eye mascara.

[19] During the custody trial, Comfort testified that Wallack directed her not to produce the photographs as required by the subpoena.

to produce digital copies of the photographs or that they be excluded from evidence.  (*See* July 22, 2015 Tr. at 22 *available at* http://www.anthonyzappin.com/zappinvcomfort.)   Justice Cooper ordered that the digital files be produced by October 2, 2015.  (*See id*.)  For a third time, Comfort did not obey the court's order.  It should further be noted that Comfort was never admonished, much less punished, for her repeated failure to comply with the state court's orders and directives.

119.    On November 2, 2015, Plaintiff filed a third motion to compel compliance with the judicial subpoena requiring Comfort to produce digital copies of the photographs.  Comfort purportedly produced digital copies of the photographs directly to Justice Cooper on November 10, 2015 – two days before the commencement of trial.[20]  (*See* November 10, 2015 Tr.at 56-58 *available at* http://www.anthonyzappin.com/zappinvcomfort.)  However, Justice Cooper refused to provide Plaintiff with copies of the photographs, allow him to examine them digitally or permit Plaintiff's expert access to the digital copies based on Wallack and Comfort's baseless allegation that <u>Plaintiff would alter them</u>.  (*See id*.)  It is bewildering how anyone could think Plaintiff would get away with altering Comfort's photos when both Comfort and the state court would have held control copies.  Indeed, it was clear that Wallack and Comfort did not want Plaintiff to have access to the digital copies of the photographs because he would discover they were digitally altered. Regardless, based on Wallack and Comfort's baseless assertion with no foundation in reality, Plaintiff was denied access to critical and necessary evidence.  Justice Cooper unlawfully and prejudicially created his own evidence by providing black-and-white printouts of the supposed metadata associated with the photographs from an unverified third-party website called

---

[20] Comfort produced another set of digital photographs to Justice Cooper's chamber previously on November 6, 2015.  It was learned, though, that she and her counsel, Robert Wallack, had completely stripped the metadata out of those versions of the photographs.

JeffreyExif.com.  (*See id*.)  The printouts only contained a portion of each photograph's metadata, however.

120.    Wallack and Comfort's refusal to provide Plaintiff with digital copies of Comfort's photographs was part of a fraudulent scheme to introduce falsified evidence into the record at the custody trial and leave Plaintiff without a way to defend against the photos.  This was prejudicial in two ways.   First, Comfort's photographs of her alleged injuries conflicted with family photographs that were not only taken by Plaintiff, but also by her mother, Wendy Comfort.  Below are two examples.  In the first example, Comfort proffered the below photograph, which looks to show bruising around her left eye and marks on her chin, in support of her allegation that Plaintiff struck her in the face "in the early morning hours" of October 11, 2013.  (*See* Ex. ▮, November 14, 2015 Comfort Declaration.)



(Ex. 37, Claire Comfort October 11, 2013 Photograph.)  The above photograph was purportedly

taken on the morning of October 11, 2013 according to Comfort, but was not produced until over

a month later on November 15, 2013.  Wendy Comfort, however, produced several photographs

of Comfort that Comfort acknowledged in her testimony were taken the next day on October 12,

2013 in Central Park, which were entered into evidence at the custody trial.  These photographs

directly refuted Comfort's above photographs as they do not show any injuries whatsoever to

Comfort's face:

  

 

(Ex. 38, Wendy Comfort October 2013 Photographs.)  Plaintiff also took several photographs of

Comfort between October 12 and October 15, 2013 that conflicted with Comfort's photographs.

(*See* Ex. 39, Zappin Photographs of Comfort.)   The inescapable conclusion is that MComfort

falsified the photograph purportedly depicting injuries sustained "in the early morning hours" of

October 11, 2013.

121.    In the second example, Comfort introduced the below photograph of purported

bruising to her face in support of her allegations that Plaintiff abused her on November 1 and/or 2,

2013:



(Ex. 40, Claire Comfort November 10, 2013 Photograph.[21])   Comfort alleged that the above

photograph was taken on November 10, 2013, but she did not actually produce it until July 2014

during the forensic custody evaluation.   Wendy Comfort, however, produced a photograph of

Comfort taken the same day as the above photograph was allegedly taken according to Comfort

where there is no visible bruising to Comfort's eyes or forehead whatsoever:

---

[21] Comfort alleged that this photograph was taken by her mother, Wendy Comfort.  As explained below, Wendy Comfort refused to testify to authenticate the photograph.  However, Wendy Comfort did provide all the photographs she took of Comfort and the child in October and November 2013, which were entered into evidence at the custody trial.  This photograph was not among them.



(Ex. 41, Wendy Comfort November 2013 Photographs.)  The mere fact that Wendy Comfort was taking candid family photographs of Comfort while Comfort was alleging she had "noticeable bruises and marks" on her face completely undermines Comfort's domestic violence allegations. Wendy Comfort also produced two photographs allegedly taken on November 11, 2013 that similarly do not show any bruising to Comfort's face or forehead and depicts her smiling and laughing holding the child:



(*Id.*)  Again, the inescapable conclusion based on Wendy Comfort's photographs entered into evidence at the *Zappin v. Comfort* trial was that Comfort had falsified the photographs allegedly depicting injuries to her face on November 1 and/or 2, 2013.

122.   To further compound the necessity of the digital photographs, between November 1, 2013 and November 10, 2013, Comfort took the child to the pediatrician, went to the mall,

visited Plaintiff's then office, went to the bank multiple times, had coffee with friends at Starbucks and carried on numerous other activities. Comfort acknowledged during her testimony at the custody trial that not a single person saw her with injuries to her face during this time period, which was corroborated by both Comfort's and the child's medical records entered into evidence. Thus, digital copies of Comfort's photographs were absolutely necessary in order for Plaintiff to offer a defense. Without them, Plaintiff was denied a full and fair opportunity to explore the discrepancies between Comfort and Wendy Comfort's photographs and the other documentary evidence negating Comfort's photographs or present any digital forensic evidence refuting the authenticity of Comfort's these clearly inauthentic photographs. Indeed, the digital copies of the photographs were the only way to resolve the discrepancies in the photographs and other documentary records and to contest their authenticity.

123.    Comfort and Wallack's refusal to produce the digital copies to Plaintiff was also prejudicial in a second way. More specifically, the partial print-outs of Comfort's photographs revealed that they had been altered. As Plaintiff explained to Justice Cooper at trial on November 19, 2015, the metadata printouts showed that Comfort's photographs contained "XMP" tags demonstrating that they had been altered using Photoshop or a similar photo editing program. (*See* Custody Trial Transcript at 826-828 *available at* http://www.anthonyzappin.com/zappinvcomfort.)    Additionally, the metadata showed that Comfort's photographs depicting images of her had been put through filters to distort and change their coloring. (*See id*.) Comfort's photographs of the child taken during the same time frame and produced to Justice Cooper did not have the metadata tags. In other words, there was reliable forensic evidence available that Comfort's photographs introduced into evidence and relied upon by Justice Cooper in making his domestic violence finding were inauthentic.

124.     Comfort and Wallack's actions of proffering unfounded accusations detached from reality as a basis to deprive Plaintiff of access was blatantly fraudulent and part-and-parcel to their scheme to prolong the litigation by introducing fabricated evidence with the intent to force Plaintiff into indefinite supervised visitation and obtain a gratuitous counsel fee award.  Likewise, Comfort and Wallack knowingly submitting falsified photographs into evidence constituted a clear abuse of process, particularly where Comfort and Wallack are requesting $400,000 in counsel fees based on this "legal work."

B.     Comfort's Submission of Demonstrably Altered Text Messages

125.     In addition to submitting falsified photographs, Comfort and Wallack also introduced an altered text message in hopes of corroborating Comforts allegations of domestic violence.  At the very end of the forensic custody evaluation in August 2014, Comfort provided what was purportedly a November 9, 2013 text message exchanged between herself and Plaintiff that stated:



(Given to Ravitz)

(Ex. 42, Comfort "Hit/Yell"Text Message (Ravitz Version).)  Comfort did not provide a screenshot of the text message, but rather some type of computer printout made to look like a text message. (*See id*.)  Dr. Ravitz extensively relied on this text message in his forensic custody report.  For months prior to the trial, Plaintiff complained that this and other text messages Comfort's counsel

attached to his affirmations were altered.  Comfort never provided screenshots of the text messages, only these computer printouts made to look like text messages.  And, Comfort never retained an expert to verify the authenticity of her text messages.

126.    During the custody trial, Plaintiff introduced an actual screenshot of the November 9, 2013 text message between Comfort and himself:



(Ex. 43, Zappin "Hit/Yell" Text Message.)  Plaintiff's screenshot of the text message showed that Comfort had changed the word "yell" to "hit" in her version.  (*See id*.)  When Plaintiff introduced this text message into evidence, Plaintiff allowed Comfort, Wallack, Cohen and Justice Cooper to inspect his actual physical device containing the text message in the courtroom.  (*See* November 21, 2015 Transcript *available at* http://www.anthonyzappin.com/zappinvcomfort.)

127.    On December 10, 2015, the next to last day of trial, Comfort finally introduced her version of the text messages into evidence.  Again, they were not screenshots, but rather computer printouts made to look like text messages.  The November 9, 205 "hit/yell" text message was among several thousand pages of text messages she introduced, which neither Plaintiff nor Mr. Schorr had an opportunity to examine in detail prior to the close of trial due to the volume of text messages Comfort dumped into the record.  It was discovered shortly after the custody trial, however, that the version of the November 9, 2013 "hit/yell" text message that Comfort gave to Dr. Ravitz differed from the one she introduced into evidence:



(Given to Ravitz)



(Introduced into evidence)

(Ex. 44, Comfort "Hit/Yell" Text Message (Evidence Version).)  In the Ravitz version, the text message immediately above the "hit/yell" text message is different in that it is missing the "11." This evidence demonstrated that Comfort's printouts were mutable and altered.  In contrast, the text message on Plaintiff's device, which was inspected by everyone in the courtroom, could not have been altered without cracking the encryption to Apple's iOS filesystem, which the FBI and DOJ have been unable to do.[22]  It was later learned that Comfort apparently accidentally deleted the "11" while changing the text message from "yell" to "hit" in the Ravitz version in August

---

[22] *See* http://www.tehnologyreview.com/428477/the-iphone-has-passed-a-key-security-threshold/ (article from 2012 reporting the significant difficulties law enforcement personnel encountered performing forensic evaluations of iPads and other Apple products, including a comment from a Department of Justice official that whenever an examined product has an encrypted hard drive, "you're done")

2014.  She apparently saw the alteration/mistake and added the "11" back upon seeing Plaintiff's text message on the device in the courtroom on November 24, 2015 at trial.

128.    Here, it is scientifically impossible for Plaintiff to alter a text message stored in Apple's encrypted iOS filesystem.  Comfort, on the other hand, produced two different versions of mutable print-outs that are not even screenshots of the text messages.  Without question, Comfort's message is falsified and was submitted in furtherance of her fraudulent scheme to prolong the litigation and supervised visitation as well as obtain a gratuitous counsel fee award. Likewise, Comfort and Wallack knowingly submitting falsified text messages into evidence constituted a clear abuse of process, particularly where Comfort and Wallack are requesting $400,000 in counsel fees based on this "legal work."

C.    Wallack's Churning Fees with Frivolous Motions for a Protective under the N.Y. Domestic Relations Laws after Taunting Plaintiff

129.    On May 8, 2015, Plaintiff noticed Wallack and the Court that he intended to seek emergency relief on May 12, 2015.  (*See* Ex. 45, May 10, 2015 Wallack E-mail.)  When Wallack asked what relief was being sought, Plaintiff responded "[p]rovisions to safeguard the well-being of the child" as Plaintiff intended to request that the child be permitted to be taken for a developmental assessment.  (*See id*.)  In response, Wallack began to taunt Plaintiff:



(*Id.*)  Wallack's conduct was without question discourteous and in violation of the Rules of Professional Conduct.

130.    Immediately thereafter, Wallack noticed Plaintiff and the Court stating that he was going to file his own emergency motion on May 11, 2015.  He refused to specify what relief he was seeking at that time.  However, on May 11, 2015, Wallack filed an entirely frivolous motion seeking *inter alia* an "Order of Protection, pursuant to Section 240, 252 of the Domestic Relations Law ("DRL")" on behalf of himself.  Such an order of protection is only available to married persons or people involved in an "intimate relationship."  Thus, Wallack's motion was entirely without merit and filed with the specific intent to drive up the cost of litigation.  The motion for a protection order was denied.   Wallack's actions constitute an apparent abuse of process, particularly where Comfort and Wallack are requesting $400,000 in counsel fees based on this "legal work."

D.    Comfort and Wallack's Other Frivolous Conduct

131.    In addition to the above actions, Comfort and Wallack persistently engaged in frivolous conduct designed to drive up litigation expenses and prolong the litigation with needless supervised visitation.  Their actions included, but were not limited to:

- Even though Comfort failed to submit any papers in connection with Mot. Seq. 19 and Mot. Seq. 21 that resulted in Justice Cooper's September 18, 2015 Sanctions Decision, Comfort and Wallack filed an improper appellate brief.  In that brief, Wallack and Comfort abused process and acted in furtherance of their scheme by calling Plaintiff gratuitous names, repeatedly misrepresenting the record, referencing purported facts outside the record and making materially false statements concerning Plaintiff.  (*See* Ex. 46, Zappin Affidavit Motion to Strike Brief.)

- On November 10, 2015, Wallack made materially false statements to Justice Cooper falsely accusing reporter Sebastian Doggart of recording the proceeding.  (*See* November 10, 2015 Transcript at 66-92 *available at* http://www.anthonyzappin.com/zappinvcomfort.)  As a result of Wallack's deliberate misrepresentations, Mr. Doggart was arrested, unlawfully

interrogated and the *Zappin v. Comfort* proceeding delay for over an hour. (*See id*.)

- On December 15, 2014, Wallack and his associate e-mailed Justice Kaplan (rather than calling the police?) falsely accusing Plaintiff of spitting on them. (*See* Ex. 47, Hershkowitz Spitting E-mail.) In fact, Plaintiff was verified at the doctor when they alleged it occurred.

- In an attempt to raise his "celebrity profile," Wallack purportedly attempted to serve a subpoena on Taylor Swift based on Comfort's delusional allegations that Plaintiff "dated" her.

- Wallack and Comfort repeatedly served subpoenas of Plaintiff's then employer in an attempt to get Plaintiff fired. They also served subpoenas on Plaintiff's former employers for the sole purpose of harassing them. (*See, e.g.,* Ex. 48, Latham & Watkins E-mail.) Their conduct was so egregious that Justice Cooper granted Plaintiff a protective order enjoining them from contacting Plaintiff's employer and former employer. (*See* July 22, 2015 Order *available at* http://www.anthonyzappin.com/zappinvcomfort.)

- Wallack and Comfort repeatedly harassed Plaintiff's employers and their clients by sending them pleadings from *Zappin v. Comfort* containing Comfort's false allegations of domestic violence in an attempt to get Plaintiff's fired from his job.

- Wallack and Comfort continued to attack Plaintiff and anyone associated with him. Upon information and belief, Wallack and Comfort sent Plaintiff's employer a copy of the First Department's appellate decision in November 2017 in an attempt to get him fired. They have also been repeatedly sending copies of the February 29, 2016 custody decision to opposing counsel in matters where Plaintiff's experts from the custody trial, Ms. Linda Gottlieb Kase and Dr. William Manion, in destroy their livelihood. (*See, e.g.* Ex 49, Nissman E-mail.)

- For the third time in four (4) years, Comfort absconded with the child from New York City to Washington, DC in February 2017 without informing the court or notifying Plaintiff. At a hearing on Comfort's unlawful relocation, Wallack and Comfort deliberately lied to Justice Michael Katz stating that Plaintiff had failed to pay Comfort any child support since Justice Cooper entered the child support award. More importantly, Comfort has since engaged in repeated acts to thwart Plaintiff's access to the child.

As shown above, Comfort and Wallack and engaged in a clear pattern of fraudulent and abusive behavior with the intention to drive up litigation costs, prolong the matter with indefinite supervised visitation and to inflict financial harm on Plaintiff.

## IV.   THE FRAUDULENT ACTS OF DEFENDANT COMPREHENSIVE FAMILY SERVICES AND ITS COLLUSION WITH WALLACK

132.   Beginning in February 2014, Plaintiff began having supervised visitation at Comprehensive Family Services.  At the time, Plaintiff signed a contract for services with CFS. (*See* Ex. 50, CFS Contract.)  Plaintiff continued to have supervised visitation with the child at CFS through January 2016.

133.   Throughout Plaintiff's tenure with CFS, the child repeatedly showed up with suspicious injuries.  This included repeated bruises on the child's buttocks and thighs, welts on the child's back, bruises on the child's temple, black eyes, substantial bruising on his ears and fingertip bruises on the child's mouth and cheeks.[23]  The child also frequently appeared at visitations late, with extreme diaper rash where he was left in soiled diapers for long periods of time and clothing that was not proper for the weather (*e.g.,* short sleeve shirts with no hat in 0-degree weather). Although the individual supervisors would sometimes make notes of the suspicious injuries, they would almost never be reported in CFS's reports to the Court.  (*See* Ex. 17, CRCC and CFS Reports.) CFS's failure to report the suspicious injuries and other aspects of the visits that would negatively reflect of Comfort did not provide an accurate reflection of the visits to the state court omitting information that was highly pertinent to the safety and well-being of the child.

134.   Moreover, CFS repeatedly violated the Court's directive concerning the submission of reports.  Pursuant to the state court's order, CFS was required to submit reports twice per month. (*See* Ex. 50, November 6, 2014 Order.)  However, between November 2014 and November 2015,

---

[23] *See supra* at fn. 16.

CFS submitted exactly four (4) reports to the state court.  (*See* Ex. 17, CRCC and CFS Reports.) This was highly prejudicial to Plaintiff as Plaintiff had a virtually perfect record during his supervised visits.  (*See id*.)  Again, CFS omitted information that highly pertinent to the safety and well-being of the child in failing to submit reports are set forth in the state court's order.

135.    CFS's failure to submit reports are directed by the Court as well as refusing to report suspicious injuries appearing on the child certainly raised questions.  Throughout Plaintiff's two (2) years at CFS, Plaintiff was told by its CEO Rick Spitzer that they did not communicate with the attorneys.  Mr. Spitzer always stated that CFS dealt directly with the parties and the court.  This was patently not true.

136.    In September 2016, Plaintiff received Wallack's billing invoices as a part of Comfort's September 15, 2016 counsel fee motion discussed above.  Upon review of Wallack's invoices, Wallack and Cohen were frequently communication with Mr. Spitzer.  (*See* Ex. 33, Wallack Billing Invoices.)  Upon lining up Wallack's billing invoices with CFS's communications to Plaintiff, it became apparent that Wallack and Cohen were actively attempting to frustrate Plaintiff's visitation at CFS.  This included mandated conditions on Plaintiff's visitation with the child, cancelling visits citing CFS unavailability when Comfort did not want to do visits and apparently requesting that CFS not file reports with the Court and/or downplay information about suspicious injuries to the child in the reports.  By way of example, Plaintiff received an e-mail from Mr. Spitzer on September 26, 2015 out-of-the-blue (seemingly prompted by Justice Cooper's September 18, 2015 Sanctions Decision) stating the following:

---

**(no subject)**

Richard Spitzer <rspitzer@cfs-nyc.com>                                    Sat, Sep 26, 2015 at 10:22 AM
To: Anthony Zappin <anthony.zappin@gmail.com>
Cc: Joanne Jaquez <jjaquez@cfs-nyc.com>, Bettina Thomsen <bthomsen@cfs-nyc.com>

Good morning Anthony,

I understand you mentioned to Chava last night some new developments. I have also seen the nyl journal article.
First, I'm sorry that your situation has seemingly gotten a little worse recently. Second, I'm directing our staff to make
sure they are in eyesight and earshot at all times.  This is as much as protection for you as anyone as to prevent any
chance or minimize any false allegations. Therefore, I am also asking you to cooperate and ensure same. So for
example, if Reid needs the bathroom, please use a unisex bathroom or make some other accommodation so that
again our staff is in eyesight and earshot at all times.  If you have any questions please let me know.

Thanks,

Rick

Richard Spitzer LCSW; ACSW
Director, Comprehensive Family Services
291 Broadway, Suite 808
New York, NY 10007

Tel: 212.267.2670
Fax: 212.267.2665

www.cfs-nyc.com

Please pardon any typos-sent from mobile device

---

(Ex. 51, Spitzer E-mail.)  These restrictions on Plaintiff's visits came out of nowhere as Plaintiff

had never had an issue during his visits that would call for such new limitations.  These conditions

made it virtually impossible to attend to the needs of the child and only served to frustrate

Plaintiff's visits.  For instance, Plaintiff's visits during the weekdays took place at the Time Warner

Center where there were no "unisex" bathrooms.

137.     In reviewing Wallack's billing invoices, it became much clearer where the new

restrictions came from, *i.e.*, Wallack and Cohen.  Wallack's billing invoices contains the following

billing entry for September 25, 2015 – the day before Mr. Spitzer's e-mail to Plaintiff:

| | Hours | Amount |
|---|---|---|
| 9/24/2015 Telephone call with HC; Telephone call with client; Email correspondence with TC | 0.90 | 585.00 |
| 9/25/2015 Telephone calls with HC, BT; Email correspondence with RS, BT, HC, client | 1.20 | 780.00 |

(Ex. 33, Wallack Billing Invoices.)  "RS" stands for Rick Spitzer and "BT" stands for Bettina

Thompson, an Assistant Director at CFS.  Based on this billing entry, it is apparent that Wallack

and Cohen had extensive communications with CFS to limit and frustrate Plaintiff's visitations

87

with the child.  It should further be noted that CFS put these limitations in place without a consultation with the state court and failing to ever notify Plaintiff that Mr. Spitzer had communication with Wallack and Cohen.

138.    Upon review of Wallack's billing invoices, there are several other instances where Wallack and/or Cohen communicated with CFS resulting in out-of-the-blue limitations, restrictions or outright cancellation of Plaintiff's visitation due to a "lack of a supervisor."  Wallack and Cohen's actions constituted direct interference with Plaintiff visitation with the child, which was designed to frustrate and hinder the visits as well as agitate both Plaintiff and the child give the locations and length of the visits.  This was particularly egregious considering that Wallack, Cohen and CFS concealed their communications from both Plaintiff and the state court.  These actions constituted a breach of the duty of good faith and fair dealing with respect to Plaintiff's contract with CFS.  It also constituted apparent fraud by and tortious interference by Wallack and Cohen in covertly placing limitations on Plaintiff's access to the child.

## COUNT I:  FRAUD / FRAUDULENT MISREPRESENTATION (STATE LAW)
(Defendant Comfort)

139.    Plaintiff incorporates and re-alleges Paragraphs 1 through 138 as if fully set forth herein.

140.    Defendant Comfort made repeated representations to Plaintiff affirming that she was on contraceptives while they were in a relationship between October 2012 and January 2013.

141.    Defendant Comfort's representations to Plaintiff affirming that she was on contraceptives while they were in a relationship between October 2012 and January 2013 were in fact false.  They were false because Defendant Comfort became pregnant in January 2013.

142.    Defendant Comfort knew that the representations to Plaintiff that she was on contraceptives between October 2012 and January 2013 were false when she made them.

143.    Plaintiff relied on Defendant Comfort's representations that she was on contraceptives between October 2013 and January 2013.

144.    Plaintiff has suffered damages as a result of Defendant's tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

## COUNT 1I: FRAUD (STATE LAW)
### (Defendants Wallack, The Wallack Firm, Cohen, CRSS)

145.    Plaintiff incorporates and re-alleges Paragraphs 1 through 144 as if fully set forth herein.

146.    Defendants are all officers of the court.

147.    As set forth above, Defendants have each engaged in repeated acts of deceit during the *Zappin v. Comfort* litigation pending in New York County Supreme Court for an illicit purpose. That illicit purpose being to unlawfully inflate counsel fees by engaging in deliberate acts to prolong the litigation, proffering positions that Defendants knew to be false in order to protract the litigation and engaging in acts directed at Plaintiff to cause him unlawful financial harm and to prevent him from exercising his parental rights.  Additionally, Defendants have submitted bills and/or requested fees from Plaintiff for alleged work that they knew they did not perform and/or for purported work that they were not entitled collect monies from Plaintiff.

148.    Defendants knew that they actions were wrong and unlawful.  They further knew that their representations to the court were false when they made them.  And, Defendants knew that their billing invoices were false and/or that they were not entitled to fees when the invoices were submitted to Plaintiff and/or the state court.

149.    Defendants had a duty of under the law as officers of the court to not engage in unlawful acts during the course of the litigation, make false representations or otherwise submit billing invoices that they knew to be false.

150.    Defendants' unlawful actions, misrepresentations and deceitful billing invoices were relied upon by Plaintiff, the state court and branches within the state court system.

151.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

### COUNT III: CONSPIRACY TO COMMIT FRAUD (STATE LAW)
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS)

152.    Plaintiff incorporates and re-alleges Paragraphs 1 through 151 as if fully set forth herein.

153.    Defendants are all officers of the court.

154.    As set forth above, Defendants have each engaged in repeated acts of deceit during the *Zappin v. Comfort* litigation pending in New York County Supreme Court for an illicit purpose. That illicit purpose being to unlawfully inflate counsel fees by engaging in deliberate acts to prolong the litigation, proffering positions that Defendants knew to be false in order to protract the litigation and engaging in acts directed at Plaintiff to cause him unlawful financial harm and to prevent him from exercising his parental rights.  Additionally, Defendants have submitted bills and/or requested fees from Plaintiff for alleged work that they knew they did not perform and/or for purported work that they were not entitled collect monies from Plaintiff.

155.    Defendants entered into an agreement to commit the above-referenced unlawful acts as set forth in the Complaint in furtherance of a common scheme and/or goal.  This agreement between Defendants may be implied by their conduct as set forth above in this Complaint.

156.    Defendants knew that they actions were wrong and unlawful.  They further knew that their representations to the court were false when they made them.  And, Defendants knew that their billing invoices were false and/or that they were not entitled to fees when the invoices were submitted to Plaintiff and/or the state court.

157.     Defendants had a duty of under the law as officers of the court to not engage in unlawful acts during the course of the litigation, make false representations or otherwise submit billing invoices that they knew to be false.

158.     Defendants' unlawful actions, misrepresentations and deceitful billing invoices were relied upon by Plaintiff, the state court and branches within the state court system.

159.     Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

### COUNT IV: FRAUD (STATE LAW)
(Defendants Wallack, The Wallack Firm, Cohen, CRSS, CFS)

160.     Plaintiff incorporates and re-alleges Paragraphs 1 through 159 as if fully set forth herein.

161.     Defendants have each engaged in repeated acts of deceit during the court of the *Zappin v. Comfort* matter pending in New York County Supreme Court.  As set forth above, Defendants deliberately engaged in unwarranted and unlawful actions to frustrate Plaintiff's visitation with the child.  Defendants further engaged in wrongfully actions and/or omissions to unlawfully influence the state court to deliberately cause Plaintiff's supervised visitation to persist and to unlawfully interfere with Plaintiff's access to his child, which includes but is not limited to violating state court orders and concealing material facts from the court.  Defendants committed these unlawful acts for their own personal profit.

162.     Defendants knew that they actions were wrong and unlawful.  They further knew that their actions were in violation of court orders.  And, Defendants knew that their omissions withheld from the court were material to the court's determinations in *Zappin v. Comfort*.

163.     Defendants had a duty of under the law to not engage in unlawful acts during the course of the litigation, violate court orders and/or conceal material information from the court.

164.     Defendants' unlawful actions and misrepresentations were relied upon by Plaintiff, the state court and branches within the state court system.

165.     Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

### COUNT V: CONSPIRACY TO COMMIT FRAUD (STATE LAW)
(Defendants Wallack, The Wallack Firm, Cohen, CRSS, CFS)

166.     Plaintiff incorporates and re-alleges Paragraphs 1 through 165 as if fully set forth herein.

167.     Defendants have each engaged in repeated acts of deceit during the court of the *Zappin v. Comfort* matter pending in New York County Supreme Court.  As set forth above, Defendants deliberately engaged in unwarranted and unlawful actions to frustrate Plaintiff's visitation with the child.  Defendants further engaged in wrongfully actions and/or omissions to unlawfully influence the state court to deliberately cause Plaintiff's supervised visitation to persist and to unlawfully interfere with Plaintiff's access to his child, which includes but is not limited to violating state court orders and concealing material facts from the court.  Defendants committed these unlawful acts for their own personal profit.

168.     Defendants entered into an agreement to commit the above-referenced unlawful acts as set forth in the Complaint in furtherance of a common scheme and/or goal.  This agreement between Defendants may be implied by their conduct as set forth above in this Complaint.

169.     Defendants knew that they actions were wrong and unlawful.  They further knew that their actions were in violation of court orders.  And, Defendants knew that their omissions withheld from the court were material to the court's determinations in *Zappin v. Comfort*.

170.     Defendants had a duty of under the law to not engage in unlawful acts during the course of the litigation, violate court orders and/or conceal material information from the court.

171.   Defendants' unlawful actions and misrepresentations were relied upon by Plaintiff, the state court and branches within the state court system.

172.   Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

**COUNT VI: ABUSE OF PROCESS (STATE LAW)**
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS, CFS)

173.   Plaintiff incorporates and re-alleges Paragraphs 1 through 172 as if fully set forth herein.

174.   As set forth above, Defendants unlawful and tortious actions took place in the course of the *Zappin v. Comfort* litigation pending in New York County Supreme Court whereby their actions necessarily invoked court process.

175.   Defendants engaged in the unlawful and tortious actions within the course of the *Zappin v. Comfort* litigation for an ulterior, collateral and/or improper purpose.

- With respect to Defendant Comfort, she engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from her own attorney misconduct; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Wallack and The Wallack Firm, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper

93

purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Cohen and CRSS, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendant CFS, it engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose defrauding Plaintiff financially for personal profit.

176.   Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

**COUNT VII: CONSPIRACY TO COMMIT ABUSE OF PROCESS (STATE LAW)**
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS, CFS)

177.    Plaintiff incorporates and re-alleges Paragraphs 1 through 176 as if fully set forth herein.

178.    As set forth above, Defendants unlawful and tortious actions took place in the course of the *Zappin v. Comfort* litigation pending in New York County Supreme Court whereby their actions necessarily invoked court process.

179.    Defendants entered into an agreement to abuse lawful process by engaging in acts as set forth in the Complaint in furtherance of a common scheme and/or goal.  This agreement between Defendants may be implied by their conduct as set forth above in this Complaint.

180.    Defendants engaged in the unlawful and tortious actions within the course of the *Zappin v. Comfort* litigation for an ulterior, collateral and/or improper purpose.

- With respect to Defendant Comfort, she engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from her own attorney misconduct; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Wallack and The Wallack Firm, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child

custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Cohen and CRSS, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendant CFS, it engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation for the ulterior, collateral and/or improper purpose defrauding Plaintiff financially for personal profit.

181.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

## COUNT VIII: BREACH OF CONTRACT – DUTY OF FAIR DEALING (STATE LAW)
(Defendant CFS)

182.    Plaintiff incorporates and re-alleges Paragraphs 1 through 181 as if fully set forth herein.

183.    Plaintiff and Defendant CFS entered into a contract for services, namely for CFS to provide supervised visitation services for Plaintiff.

184.    Plaintiff did all, or substantially all of the significant things that the contract required him to do.

185.    All conditions required for Defendant CFS's performance had occurred.

186.    As set forth above in the Complaint, Defendant CFS unfairly interefered with Plaintiff's right to receive reasonable services by acting together with Defendant Wallack and/or Defendant Cohen to place unreasonable limitations on Plaintiff's access with the child, by failing to abide by court orders to subject reports as directed by the court and by withholding and/or omitting material facts from the court that would be highly relevant to its determination.

187.    Plaintiff was harmed by Defendant CFS's conduct and has suffered damages as a result.  Plaintiff seeks damages in an amount to be determined at trial.

## COUNT IX: TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RIGHTS (STATE LAW)
(Defendants Wallack, The Wallack Firm, Cohen, CRSS)

188.    Plaintiff incorporates and re-alleges Paragraphs 1 through 187 as if fully set forth herein.

189.    Defendants knew that Plaintiff had a contract for reasonable supervised visitations services with Defendants CFS.

190.    As set forth above, Defendants deliebratealy and intentionall interfered with Plaintiff's prospective contractual relationship with Defendant CFS by exerting influence and/or engaging in a scheme to restrict and frustrate Plaintiff's access with his child, to induce Defendant CFS not to file reports as directed by the state court and to induce Defendant CFS to conceal and/or withhold material facts from the state court that would be highly relevant to its determinations.

191.    Plaintiff was harmed by Defendants' conduct and has suffered damages as a result. Plaintiff seeks damages in an amount to be determined at trial.

### COUNT X:  TORTIOUS INTERERENCE WITH PARENTAL RIGHTS (STATE LAW)
(Defendants Wallack, The Wallack Firm, Cohen, CRSS, CFS)

192.    Plaintiff incorporates and re-alleges Paragraphs 1 through 191 as if fully set forth herein.

193.    Plaintiff had a right to establish and maintain a parental or custodial relationship with his minor child.

194.    Defendants intentionally interfered with Plaintiff's parental and custodial relationship with his child by preventing Plaintiff from exercising reasonable access rights through unlawful and tortious conduct as set forth in this Complaint.

195.    As a result of Defendant's intentional interference through unlawful and tortious conduct as set forth in this Complaint, Defendants have caused hard to Plaintiff's parental and custodial relationship with his child.

196.    Plaintiff was harmed by Defendants' conduct and has suffered damages as a result. Plaintiff seeks damages in an amount to be determined at trial.

### COUNT XI:  N.Y. JUDICIARY LAW 487 (STATE LAW)
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS)

197.    Plaintiff incorporates and re-alleges Paragraphs 1 through 196 as if fully set forth herein.

198.    As set forth in this Complaint, Defendants have engaged in acts of deceit and collusion within the *Zappin v. Comfort* litigation pending in New York County Supreme Court with the intent to deceive Plaintiff and the state court.

199.    As further set forth in this Complaint, Defendants have engaged in acts within the *Zappin v. Comfort* litigation pending in New York County Supreme Court with the intent to delay resolution and/or prolong the matter for their own personal gain.

200.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial, including treble damages as provided by statute.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

(a)    Enter judgment in favor of Plaintiff against Defendants;

(b)    Enter judgment awarding Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendants' activity complained of herein and for any injury complained of herein, inclusive of interest and costs, in an amount to be determined at trial;

(c)    Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)    Enter judgment awarding Plaintiff injunctive relief requiring Defendants to remove its defamatory statements concerning Plaintiff from their websites.

(e)    Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(f)    Order such other relief that the Court deems just and appropriate.

Dated:  February 23, 2018
        Huntington, WV

_____
Anthony Zappin
1827 Washington Blvd.
Huntington, WV 25701
(304) 654-6195 (tel.)
anthony.zappin@gmail.com
*Plaintiff, Pro Se*