UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTHONY ZAPPIN,

                 Plaintiff,

      -against-

CLAIRE COMFORT,
ROBERT WALLACK,
THE WALLACK FIRM, P.C.,
HARRIET NEWMAN COHEN,
COHEN RABIN STINE SCHUMANN LLP,
COMPREHENSIVE FAMILY SERVICES,
INC.,

                 Defendants.

---

No.  18 Civ. 1693 (RWS)

**<u>DECLARATION OF
CLAIRE K. COMFORT
IN SUPPORT OF MOTION TO
DISMISS</u>**



1.     I am a defendant named in this action.  I offer this declaration is support of Defendant Claire Comfort's Motion to Dismiss.

2.     Annexed hereto as **Exhibit 1** is a Decision and Order After Custody Trial, dated February 29, 2016, in *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 (New York State Supreme Court).

3.     Annexed hereto as **Exhibit 2** is an appellate decision, dated November 21, 2017, in *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 (New York State Supreme Court, Appellate Division, First Judicial Department).

4.     Annexed hereto as **Exhibit 3** is a decision and order, dated February 15, 2018, entered in *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 (New York State Supreme Court).

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

5.      Annexed hereto as **Exhibit 4** is a Report and Recommendation from a Special Referee, dated December 7, 2017, in *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 (New York State Supreme Court).

6.      Annexed hereto as **Exhibit 5** is a decision and order, dated March 8, 2018, in *Attorney Grievance Committee for the First Judicial Department v. Anthony Jacob Zappin* (New York State Supreme Court, Appellate Division, First Judicial Department).

7.      Annexed hereto as **Exhibit 6** is an Order of Protection (with dates of birth redacted), issued on February 29, 2016, in *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 (New York State Supreme Court).   This Order of Protection remains in force through March 1, 2021.

8.      Annexed hereto as **Exhibit 7** is a decision and order, dated June 4, 2018, in *Anthony Zappin v. Claire Comfort*, Docket No. 2017 DRB 3832 (Superior Court of the District of Columbia, Family Court Domestic Relations Branch).

Executed:  Washington, DC
              June 8, 2018

I declare under penalty of perjury that the foregoing is true and correct.

*Claire Comfort*
_____
Claire K. Comfort
*Pro Se Defendant*
1212 4th Street SE, Apt. 801
Washington, DC 20003
(253) 592-1578

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 51
-----------------------------------------------------------------X
ANTHONY ZAPPIN,

                     Plaintiff,                Index No.  301568/14

         -against-                 **DECISION AND ORDER**
                                           **AFTER CUSTODY TRIAL**

CLAIRE COMFORT,

                     Defendant.
-----------------------------------------------------------------X

| **For the Plaintiff** | **For the Defendant** | **Attorney for the Child** |
|---|---|---|
| Self-represented | Robert Wallack, Esq., | Harriet N. Cohen, Esq. |
| 194 W. 10th Street #D1 | The Wallack Firm, P.C. | Cohen Rabin Stine Schumann, LLP |
| New York, NY 10014 | 777 Third Avenue, 21st Fl. | 11 Times Square, 10th Fl. |
| | New York, NY 10016 | New York, NY 10036 |

**Hon. Matthew F. Cooper, J.S.C.**

      Child custody trials, almost by definition, are difficult, contentious, even brutal affairs, as

each parent attempts to portray the other as negatively as possible.  Unfortunately, this case has

set a new standard for brutality, both with regard to the trial itself and the two years of

continuous litigation, in this court and others, that preceded the trial.  One reason for this is that

the allegations are so serious, consisting as they do of acts of domestic violence and other forms

of abuse.  Another reason is that the conduct of the plaintiff-husband, an attorney who has

represented himself either as sole or co-counsel throughout most of the proceedings, has been so

inappropriate and out of line with what is considered acceptable behavior for both attorneys and

non-attorneys alike, even when he is in the courtroom or on the witness stand.

      Although all aspects of custody concerning the parties' two-year-old child were at issue,

the predominant focus of the trial was on parental access. Since the parties' separation shortly after the child's birth, plaintiff has had supervised visitation. Plaintiff contends that he was forced to consent to supervised visitation here, and in Washington, D.C., where the parties resided for a brief time, because he had ineffective lawyers and the defendant-wife made damaging and false allegations against him. He argues that supervised access deprives him of his right to have a normal relationship with his child. The defendant and the Attorney for the Child ("AFC") maintain that if there is any access at all – both of them asserted in their closing arguments that the child's interests would be best served by having no contact at all with plaintiff – it must continue to be supervised. It is their position that plaintiff has a serious personality disorder, with defendant going so far as to label him a sociopath and a monster, and, as such, one who poses a serious danger to the child.

The custody trial consisted of 13 days of testimony before this court, starting on November 12, 2015, and concluding December 11, 2015. In addition, there was one day of testimony, September 15, 2014, before Justice Deborah Kaplan, the judge who previously presided over the matter. The transcript from that earlier trial date, as well as the transcript of a hearing held before this court on November 10, 2015, which concerned an incident that took place in the courtroom four days earlier, on November 6, 2015, were made part of the record.

Plaintiff called a total of 10 witnesses, two of whom testified before Justice Kaplan at the earlier trial date.[1] Defendant called four witnesses. There was one court witness, Dr. Alan

---

[1] The two witnesses were Chris Hudson and Mariah Ely, social workers at Comprehensive Family Services ("CFS"), who supervised plaintiff's court-ordered visitation

2

Ravitz, the court-appointed forensic custody evaluator, who testified before Justice Kaplan on September 15, 2015, and before this court on November 12, 2015. The AFC did not call any witnesses of her own, but she conducted extensive examinations of the parties' witnesses and Dr. Ravitz. As will be discussed where relevant, the credibility of the witnesses varied drastically, with some fully credible and others completely lacking credibility to the point that this court was forced to conclude that the witness was intentionally not telling the truth.

There were a multitude of exhibits introduced into evidence at the trial. These included hundreds of text messages contained in binders, scores of photographs, and a child's blood stained garment known as a "onesie." In all, plaintiff introduced 161 exhibits, defendant introduced 68 exhibits, and the AFC introduced four exhibits. There were also nine court exhibits, including the forensic report and the parties' psychological testing reports.

Closing arguments were heard from defendant and the AFC on the afternoon of December 21, 2015. Plaintiff, who had earlier e-mailed that he was too ill to appear in court, was ultimately able to hear the arguments over speakerphone after he finally responded to e-mail and voice mail messages the court left for him.[2] At that time, plaintiff was given permission to submit a written summation in lieu of a closing argument provided that it was filed by December

---

with the child. Three other CFS supervisors, Sarah Nadeau, Chava White, and Joanne Jaquez, all called by plaintiff, testified before this court on November 16, 2015.

[2] The court later learned that on December 21, 2015, the date plaintiff was supposedly too ill to appear in court to give his closing argument, he purchased an index number and commenced an action against the New York Post and the New York Daily News for $20 million (Index No. 162911-2015). According to the summons, which is dated December 21, 2015 and stamped by the New York County Clerk as filed that same day, plaintiff is suing both newspapers for "defamation, invasion of privacy, trespass of chattels, intentional infliction of mental distress, negligent infliction of mental distress, negligence, tortious interference with a business relationship, misappropriation of likeness, prima facie tort and civil conspiracy."

3

23, 2015 at 4:30 p.m. On December 22, 2015, plaintiff came to the courtroom to obtain a copy of the minutes of the December 21 proceedings. The next day, plaintiff, again citing illness, requested an additional extension, this time to December 24, 2015 at 9:30 a.m. Plaintiff did not submit his written summation by that date either. Instead, he sent it by e-mail on December 25, 2015 at 1:46 p.m., accompanied by a message that read, "I apologize for its late submission, but I had some computer issues during my travel coupled with the flu." Despite the repeated failure to abide by deadlines for its submission, and the questionable representations made in connection with those failures, the court nevertheless accepted plaintiff's written summation.

In making this post-trial custody decision, this court has fully considered the testimony of the witnesses, either by having heard the testimony directly or, as agreed by the parties, having read the transcript of the one day of the trial that was held before Justice Kaplan. Because all but two of the witnesses testified before it, this court had the opportunity to hear the witnesses' words directly, note the way they delivered those words and observe their overall demeanor while on the witness stand and in the courtroom. As a result, this court had the opportunity to assess their credibility. This court also reviewed in depth the exhibits submitted into evidence. Finally, it considered the oral closing arguments presented by defendant's attorney and the AFC, and the written summation submitted by the plaintiff.

The starting point of this decision will be a brief review of certain pretrial matters. Next, this court will make Findings of Fact, with the Findings divided into four sections. Each of these sections will focus on a specific factual question that was a subject of the trial. Following this, the court will reach its Conclusions of Law as to the ultimate legal issues: the custody of the child; the procedure for decision making; the form and extent, if any, of parental access to the

4

child by the non-custodial parent; and the issuance of an order of protection. The decision will end with a directive as to the settlement on notice of a partial judgment entitled "Partial Judgment of Divorce Resolving Custody, Parental Access and Decision Making."

## PRETRIAL BACKGROUND

On September 18, 2015, this court rendered a decision detailing the history of the abusive litigation tactics employed by plaintiff and imposing sanctions on him of $10,000 (*see Zappin v Comfort*, 49 Misc 3d 1201[A][Sup Ct, NY County 2015] "Sanctions Decision"). The decision was a last resort – as all sanctions decisions should be – after plaintiff, a graduate of Columbia University Law School and an experienced attorney who has worked at a series of major law firms, repeatedly failed to abide by multiple judicial directives, including those from this court, to comport himself properly.

The sanctions decision, however, had little or no effect in curtailing plaintiff's misconduct. To the contrary, it seemingly resulted in further abusive behavior. Instead of ceasing his internet campaign against defendant's attorney, Robert Wallack, and the AFC, Harriet Cohen, plaintiff established a new website, *www.zappinvcomfort.com*, which featured irrelevant and scurrilous postings about both attorneys.[3] These included a copy of the complaint in a lawsuit filed in the Federal District Court for the Southern District of New York by plaintiff, purportedly on behalf of his incarcerated mother, against the AFC and her law firm. This complaint contains a laundry list of bizarre allegations concerning the AFC's conduct and her

---

[3] As part of what was a decidedly insincere apology delivered on December 7, 2015, after a series of outbursts during the trial, plaintiff promised on the record to take down the postings about the attorneys. On December 10, 2015, when asked why he had failed to comply with his promise, plaintiff responded that he had not had time to deal with the matter. A full month went by before the postings about the attorneys were finally removed.

personal life (*see Leigh Anne Zappin v Harriet Newman Cohen, et al*, Case Number: 1:2015cv07271 [SDNY 2015]).

What was even more troubling about the *www.zappinvcomfort.com* website is that plaintiff used it to post a copy of his motion to reargue the Sanctions Decision, including all of the exhibits attached to the motion. By so doing, plaintiff revealed the name of the parties' child and made available to the world photographs taken of him. He also provided a copy of the motion and the accompanying exhibits for posting to an online legal news service and the website of a judicial watchdog organization. Even though plaintiff, after having been taken to task by the court for violating the child's privacy, redacted the name and photos of the child on his website, the unredacted materials are still on full display on the other two websites.

In anticipation of the trial proceeding on November 12, 2015, the parties appeared on November 6, 2015 to attempt to deal with outstanding pretrial matters. After this court left the bench to have the parties review subpoenaed documents so that they could be premarked, there was an incident in the courtroom. Plaintiff ended up on the floor screaming that he had been attacked by one of the AFC's law partners, Paul Kurland, Esq., that he wanted the court officers to arrest Mr. Kurland, and that he was going to sue him. As a result of this incident, the collective document review could not proceed, and arrangements had to be made for each side to review them separately.

In order to determine what had actually occurred in the courtroom on that date, the court held a hearing on November 10, 2015. After taking sworn testimony from plaintiff, and from the three court employees who witnessed the alleged assault – a court officer, a court reporter, and the part clerk – this court made findings. The conclusion drawn, as reflected in the minutes

which have been made part of the record here, is that Mr. Kurland never even touched plaintiff and that plaintiff faked the whole incident. The only unanswered question was what possible reason could there be for plaintiff deciding to pull such a foolish – and ultimately self-destructive – stunt. Then again, the ever-present question was why plaintiff, who stood accused of being abusive, would insist on acting the way he did in the courtroom and throughout the litigation.

### FINDINGS OF FACT

The determinative factual questions to be decided in the custody trial are: (1) whether there was domestic violence, (2) whether there was a pattern of coercive, controlling behavior, (3) whether there was a lack of appropriate parenting on the part of either party, and whether the parties each possess sufficient parenting skills, and (4) whether either party committed acts against the other that would be the basis for the granting of an order of protection. This court will answer each of these questions in its specifically captioned section, with the question of whether there was domestic violence, the issue which played center-stage at the trial, receiving the most extensive discussion. The credibility of witnesses will be determined in the section most relevant to their testimony.

1. **WAS THERE DOMESTIC VIOLENCE?**

Under our system of law in New York State, domestic violence occupies a special position in child custody proceedings. In fact, it is the one specific factor that a court is statutorily required to consider when making a determination as to what is in the child's best interests with regards to custody and visitation. Domestic Relations Law ("DRL") § 240 (1) (a) states, in relevant part:

> When either party to an action concerning custody of or a right to

7

> visitation with a child alleges . . . that the other party has
> committed an act of domestic violence against the party making the
> allegation . . . and such allegations are proven by a preponderance
> of the evidence, the court must consider the effect of such domestic
> violence upon the best interests of the child, together with such
> other facts and circumstances as the court deems relevant in
> making a direction pursuant to this section and state on the record
> how such findings, facts and circumstances factored into the
> direction.

The reason our legislature has imposed this statutory requirement is clear: The propensity to

commit domestic violence speaks volumes as to a party's poor moral character, lack of self-

control, erratic temperament, an absence of concern for another person's physical and emotional

safety and well-being, and a disregard for societal norms. These are all signs of

psychopathology, particularly an antisocial personality disorder, and are strongly indicative of an

overall inability to properly parent a child. Moreover, a history of domestic violence essentially

eliminates consideration of any form of joint custody or decision making inasmuch as it would

require a parent to interact with his or her abuser and subject that parent to the risk of further

physical and emotional harm.

Plaintiff is correct when he asserts in his written summation that a finding that a person

has committed domestic violence is an extremely serious matter that carries with it a significant

stigma. The label of "domestic abuser" is indeed a black mark that in many ways the person will

bear forever. In making this point, plaintiff quotes at length from a Queens County Family Court

case, *Aaron H. v James G.*, 35 Misc 3d 1219(A) (Fam Ct, Qns Cty, 2012). The last paragraph

that he quotes reads as follows:

> Because of the direct and collateral consequences which may flow
> from a finding that a person has committed a family offense, such
> an adjudication 'constitutes a permanent and significant stigma,'

8

> which may have 'enduring consequences.' Given these
> circumstances, the respondent in a family offense proceeding has a
> substantial interest in ensuring that any family offense finding be
> made only upon competent evidence

(*id.* at 14).

As in a family offense proceeding, a finding of domestic violence in this divorce

proceeding can be made only upon competent evidence. Moreover, as specified in DRL § 240

(1) (a), the person alleging domestic violence must prove the allegations by "a preponderance of

the evidence." This court, while fully aware of the serious consequences that may ensue from

such a determination and the stigma a party may very well bear, finds that the evidence

unequivocally establishes that *plaintiff committed acts of domestic violence against defendant*

*and that he is indeed a domestic abuser.* Specifically, this court finds that on September 30,

October 1, 10, 13, 24, and 29, and November 1 and 2, 2013, plaintiff hit, slapped, grabbed, or

kicked defendant, or threw objects at her, with such force as to cause her bruising, bleeding, and

other physical injury. These findings are founded not only on competent evidence or a

preponderance of the evidence but, to this court's mind, evidence beyond a reasonable doubt.

Because the finding that plaintiff committed domestic violence is of such great consequence,

both to the parties and to the child, this court will set forth a comprehensive and detailed analysis

of the evidence that led it to make the finding.

### A.    The Testimony of the Parties as to Domestic Violence

Both plaintiff and defendant testified at trial. Plaintiff called defendant as his first

witness and had her on the witness stand for more than a day. Defendant also testified on her

own behalf, and was cross-examined by plaintiff and the AFC. Plaintiff was not called as a

witness by defendant; he testified on his own behalf and was then cross-examined by defendant and the AFC.

### (1). *Defendant's Testimony*

The most convincing and compelling of all the evidence presented with regard to domestic violence was the testimony of defendant as to the facts and circumstances surrounding the assaults that she suffered at plaintiff's hands. In graphic detail, defendant recounted how, for such perceived transgressions as falling asleep while nursing the child or not being sufficiently supportive of plaintiff's career concerns, she was repeatedly beaten by plaintiff during the last weeks of her pregnancy and the weeks after she gave birth to their child.

Defendant, in describing how her life with plaintiff became the proverbial living nightmare, provided a full explanation as to why she did not call the police, report his conduct to medical providers, or even inform her friends and family as to what she was undergoing. There were, of course, the concerns about careers being impacted, with both she and plaintiff being associates at major law firms. But the overriding sense she conveyed in her testimony was just how difficult it was to come to terms with what was happening to her. Asked on direct examination how she felt after one of the assaults, she responded, "I was feeling confused. It sort of . . . didn't feel real" (12/7/15 tr at 2352). She went on to say:

> I really wanted everything to work and then we are in DC and it
> has become like a nightmare. I mean, it is beyond anything that I
> had ever thought possible and I didn't even just know what to
> make of it

(*id.* at p 2353).

And, fully expressing how difficult it was to accept the horrific change that had occurred

in her life and her child's life, she added:

> I don't know if I really knew things like this happened on any kind
> of real level. I mean, it is sort of like, you know, you know terrible
> crimes happen and distant from you. This was not something I ever
> thought was remotely possible. Not something that Anthony would
> do

(*id.*).

But as defendant came to realize, beating her was something that plaintiff would indeed do, and a

penchant for physical violence was only one part of his abusive personality.

In all respects, defendant was a credible witness. Remarkably, she remained composed

and restrained, perhaps even somewhat submissive, while being questioned by plaintiff, who

insisted on doing the direct and cross-examinations of her himself instead of heeding this court's

urging that he delegate the task to his then co-counsel. If at times she spoke hesitantly and

tentatively, it appeared it was because she was being careful to testify as accurately and precisely

as possible, all the while resisting the urge to overstate or overdramatize. And if there were

minor inconsistencies in her accounts of the various incidents, this is consistent with the general

pattern for victims of domestic violence where the trauma of the incident interferes with the

witness's precise recollection of the details of the event.[4]  In any case, this court has no doubt that

what defendant testified to was very much her attempt to convey what happened as truly and

accurately as possible.

### (2). *Plaintiff's Testimony*

Plaintiff's testimony concerning domestic violence was the opposite from defendant's

---

[4] The court appointed custody forensic expert, Dr. Ravitz, testified that there is "abundant
data in the literature that victims of domestic abuse get confused about dates, times, exactly what
happened, exactly when it happened" (11/12/15 tr at 195).

testimony in almost every respect. He denied ever hitting defendant or even touching her, except to defend himself from her attacks on him. As will be discussed below, plaintiff's claims of being assaulted by defendant rang even more hollow than his denials of having assaulted her.

Whereas defendant's testimony about the incidents of domestic violence had every imprimatur of the truth, most everything plaintiff said about the incidents was a departure from the truth. For that matter, plaintiff's propensity to lie or otherwise distort the truth was apparent throughout the trial. Instances where he was obviously not telling the truth, to name but a few, ranged from his implausible explanation as to why he could not produce the cell phones on which he received and sent text messages ("I have over 100 phones" [11/24/15 tr at 1148]), to his claim that he went to the police about plaintiff's treatment of the child without ever intending to initiate an investigation until he was "forced" by a detective to do so, to his conflicting accounts as to what his basis was for making the astonishing sworn allegation in his lawsuit filed in the Court of Claims that Justice Kaplan contacted the West Virginia Parole Board to urge that plaintiff's mother not be released from prison, and to his outright denials of having said things in text messages and recorded FaceTime calls, only to later acknowledge that, he may in fact have said those things but was "forced" to do so because defendant "kidnapped" the child (12/13/15 tr at 1804).

With regard to matters that should have been relatively straightforward, such as what was happening with his purported blood stain and digital forensic experts, to the more complicated questions, such as what occurred between the parties when only they were present, plaintiff was at best calculatingly evasive and misleading, and at worst willing to blatantly lie. In short, plaintiff's testimony was utterly lacking credibility and left the court convinced that what it was

12

hearing from him was decidedly not the truth.

In this case, the incidents of overt domestic violence took place in private. They occurred either in the parties' apartment in New York or in the Washington D.C. condominium where they moved to, at plaintiff's insistence, when the child was just 15 days old. Thus, this court, as the finder of fact, must rely first and foremost on the accounts of the only two people who were there and were actual eyewitnesses to the incidents: plaintiff and defendant. The same way that there is not even a question as to defendant being the more credible witness, there is no question that defendant's account of the incidents, if inadvertently falling short, as all such accounts must, of being 100% accurate, is still infinitely more accurate, and certainly more truthful, than plaintiff's account.

**B.      Defendant's Witnesses as to the Issue of Domestic Violence**

As credible as defendant's testimony was concerning the incidents of violence perpetrated against her by plaintiff, it was far from the only compelling testimony that was adduced to establish her case. Three witnesses called by defendant – Cathleen Doyel, Heather McFadden and Brian Comfort – were all credible and their testimony corroborated defendant's account of domestic violence in a number of ways. Among other things, all three of them convincingly testified that they witnessed the bruises that defendant claims were the result of the attacks.

**(1).    *Heather McFadden's Testimony***

Heather McFadden is a lactation consultant who came to the parties' New York apartment on October 15, 2013, a little more than a week after the child was born, to assist defendant with breast feeding. This was the first, and until she came to court to testify, the only time she met defendant. She testified that she "saw that Claire had a good bruise over her eye"

13

and that "she had some bruises on her arm that were kind of symmetrical" (12/11/15 tr at 2812).

When asked what she thought when she observed the bruises, she responded, "added with her

shakiness, I suspected spousal abuse, or someone, someone abusing her" (*id.* at 2813). Although

defendant told Ms. McFadden that the bruises resulted from a fall in the shower, Ms. McFadden

did not believe that was the case and when she completed her case notes that evening she added

the notation "possible spousal abuse" (*id.* at p 2815).

Ms. McFadden testified that, as a lactation consultant, she is not a mandatory reporter for

spousal abuse, so she took no further action with regards to her suspicions. But because she is a

mandatory reporter for child abuse, and because she had "concerns for the mom that something

was going on, where she was being hurt," she conducted a thorough examination of the child "to

make sure the baby was not in danger" (*id.*). Fortunately, Ms. McFadden was able to conclude

that the child was healthy and thriving.

Ms. McFadden testified that as a result of the consultation, defendant was able to breast

feed the child without any difficulty. She also explained how it was completely normal for an

infant to lose weight, as the child did here, for the first few weeks following birth.

### (2)    *Cathleen Doyel's Testimony*

Cathleen Doyel, who is a lawyer and college friend of defendant, testified as to what

occurred when she came to visit the parties and see the child in their Washington, D.C. apartment

on October 28, 2013. When Ms. Doyel was sitting with the parties after she first arrived, she

asked about the bruises on defendant's forehead and leg. According to Ms. Doyel, the parties

looked at each other and then "they both kind of laughed, not like a funny laugh, but like, oh, and

dismissed it" (12/3/15 tr at 1771). Twenty minutes later, when she was touring the apartment,

plaintiff "spontaneously" said to her, "you know how klutzy Claire is. She was carrying some boxes while we were moving and she tripped and fell and hit her head" (*id.* at p 1772). Ms. Doyel testified that she found it "odd" that he would make a reference "to a conversation that had occurred 20 minutes ago that had since been dropped and moved on and it just came out of nowhere" (*id.* at p 1773). When asked what plaintiff's demeanor was like when he said this, the witness stated, "he was a little nervous, I would say" (*id.*).

In addition to giving testimony that verified the fact that defendant bore bruises, and suggested how concerned plaintiff was about the bruises being visible to others, Ms. Doyel recounted an incident that offered insight into plaintiff's problematic personality. She testified that after plaintiff left to either go to work or run an errand, she went out to get defendant some food and then returned to the apartment with her boyfriend, Justin, so he could see defendant and the child. Defendant then received a call from plaintiff. According to Ms. Doyel, a "tense conversation" ensued, which she described from the witness stand in these terms:

> Claire seemed to be defending our presence at the condo without Anthony there. I couldn't – obviously I could not hear what he was saying, but with what she was saying it sounded as if he was upset that a man that he did not know was near his child. Claire had known Justin for years at that point

(*id.* at p 1774).

Ms. Doyel's testimony about the phone conversation highlighted a recurrent theme in the case: that plaintiff regarded the child as being his personal property and that he is hypersensitive to anything he viewed as encroaching on his rights of possession. This hypersensitivity manifested itself as full fledged rage and all-out vindictiveness once defendant and the child left

15

Washington, D.C. to stay with her parents in Washington State. Although the evidence firmly establishes that defendant fled to protect herself and the child from plaintiff's abuse, in plaintiff's distorted view it was a "kidnapping" and an act of "disrespect" designed to deprive him of what was rightfully his.

(3).    *Brian Comfort's Testimony*

Brian Comfort is defendant's father. He is an attorney specializing in real estate and probate, and lives with his wife, defendant's mother, in Takoma, Washington. His testimony was the most extensive of any nonparty fact witness. Like his daughter, Brian Comfort had to go through the ordeal of being questioned in court by plaintiff himself. On cross-examination, he and plaintiff engaged in this exchange:

| | |
|---|---|
| Mr. Zappin: | Mr. Comfort, is it fair to say you don't like me very much. Right? |
| Mr. Comfort: | What's that? |
| Mr. Zappin: | You don't like me very much? |
| Mr. Comfort: | I guess I find your actions reprehensible. I guess that's a good way to say it. |
| Mr. Zappin: | But, you don't like me very much. Is that right? |
| Mr. Comfort: | No, I don't. I can't like somebody whose [sic] done everything you've done |

(12/1/15 tr at 1729).

Despite feeling the way he did about what plaintiff had done to his daughter, his family and to him, Brian Comfort maintained a remarkable level of composure and restraint during his testimony. And again, like his daughter, he remained objective, honest, and direct. He testified to having traveled to Washington, D.C. with his wife on November 7, 2013, and upon exiting the Metro stop, being met by defendant with the child and then almost immediately observing that his daughter had "a large upraised welt on her forehead" and "two black eyes" (*id.* at 1545). He

16

further testified to hearing the shocking revelation from defendant that the wounds were the

result of plaintiff hitting her.  When asked how it felt to learn that defendant had been hit by

plaintiff, Brian Comfort responded:

> It's indescribable to know that your daughter had to go through
> something like that, that she would actually get struck by
> somebody.  I mean, this was just a shock and, you know, I can
> honestly say those four days were probably the worst four days of
> my life from that day

(*id.* at 1547-1548).

   Brian Comfort did not embark on some kind of revenge-fueled course of retaliation or

seek to do anything that could harm plaintiff or his professional standing.  His only concern,

certainly at first, was with everybody's well being, even plaintiff's.  Asked on direct examination

if he felt it was important to speak with plaintiff, Brian Comfort stated:

> Yes, you know, to really talk about this and my initial thought was,
> you know, Claire needs to be safe. [The child] needs to be safe. We
> got somebody who has committed domestic violence and that, you
> know, he clearly needed treatment. You know, I don't care what of
> kind pressure he indicates he was under. So, yeah. I really wanted
> to talk to him. I wanted to make sure that when we left that Claire
> would be safe with [the child] in her home

(*id.* at 1548).

   It soon became clear that the situation with plaintiff was untenable and no amount of

talking would make it safe for defendant and the child to continue living with him.  Moreover, on

November 9, 2013, plaintiff informed defendant that he would not commit to participating in

domestic violence counseling.  Although plaintiff maintained during the trial that it was Mr. and

Mrs. Comfort who made defendant and the child go back to Washington State – all the while

controlling defendant's actions and masterminding the ensuing litigation – Brian Comfort's

17

testimony totally refuted that notion.[5]  The Comforts are dedicated and caring parents and

grandparents, but the decision to leave was left solely to their daughter.  Brian Comfort drove

home the point during this line of questioning on cross-examination:

> Mr. Zappin:     But she was battered – its [sic] your testimony she
>                 was battered, bruised, had a four-week old baby and
>                 was being indecisive and you left it up to her as to
>                 whether she would go to Washington State with you
>                 and your wife?
> Mr. Comfort:    Claire made that decision. Absolutely.
> Mr. Zappin:     You left it up to her?
> Mr. Comfort:    Absolutely.
> Mr. Zappin:     In her condition?
> Mr. Comfort:    Absolutely left it to her.  I cannot make an adult
>                 follow me to Washington

(*id.* at 1680-1681).

Especially striking was Brian Comfort's account as to what plaintiff did on November 10,

2013, after defendant told him that she was leaving.  Before packing his car and driving off, he

engaged in extended bouts of screaming at defendant and her parents, and could be heard yelling

over the phone to his mother.  Among the litany of charges plaintiff made in those tirades was

that by defendant going to Washington with the child, she and her family were "disrespecting"

him (*id.* at 1564).  The sense that plaintiff's concerns in this matter come very much from a self-

centered perspective – where everything revolves around him and it is his needs and wants which

matter more than anyone else's, including the child's – is reinforced by his constant refrain about

not being treated with the proper respect to which he is due.

Brian Comfort further testified that after he, his wife, defendant, and the child left later

---

[5] Both defendant's and Brian Comfort's testimony establishes that plaintiff initially
agreed, and in fact suggested, that defendant and the child should go stay for a while with her
parents in Washington State.  Plaintiff then abruptly changed his position.

that day to stay in a hotel to await their flight to Washington State, he spoke to plaintiff over the phone.  He described how the conversation went on for at least 30 minutes and that initially plaintiff "was very apologetic," with his admitting that he "struck [Claire] on three different occasions" (*id.* at 1571).  Brian Comfort testified that plaintiff, alluding to his anger problems, attempted to explain to him why he had hit defendant:

> He said he had beaten anger issues in the past about golf.  I said we're not talking about golf, we're talking about a human being.  I asked him what made you do what you did.  And he just said I'm under a lot of pressure, I hate my job and, you know, Claire, you know Claire is not trying to help by getting a new job

(*id.* at 1571-1572).

The tone of the conversation changed dramatically, however, when it came to the question of defendant leaving Washington D.C.  Plaintiff stated that just because he had hit defendant, it did not make it right for her to leave with the child.  And, according to Brian Comfort, when he told plaintiff that he was in need of "intensive counseling as a batterer," plaintiff said he would not agree to go into a program if defendant ended up leaving (*id.* at 1573).  When Brian Comfort told plaintiff that defendant was intent on going to stay for a while in Washington State, the "conversation went from veering towards the apologetic to the same type of threatening that he would drag us into court if Claire left" (*id.* at 1573-1574).

The rapid-cycle about-face from apologetic to threatening that Brian Comfort observed is apparently an essential feature of plaintiff's personality.  As testimony would reveal, plaintiff would plead for forgiveness and promise to change his behavior, and then almost instantaneously fly into a rage and unleash a barrage of threats and abuse.  And as it turns out, plaintiff made good on his threat to drag the family into court.  In fact, he brought multiple lawsuits in various

19

courts against just about anyone who he saw as aiding and abetting the "disrespect" he felt he had been shown when defendant fled to a safe place to escape the cycle of domestic violence.

### C. Plaintiff's Witness to the Issue of Domestic Violence - *Matthew K. Roskoski, Esq.*

Plaintiff called only one fact witness with regard to the allegations of domestic violence. The witness was Matthew K. Roskoski, an Assistant General Counsel at Latham & Watkins, LLP. Mr. Roskoski was permitted to testify via Skype from his Washington, D.C. office.   The witness was called to testify as to certain records kept by the law firm as to plaintiff's use of the firm's computer system on the night of October 29, 2013 and the early morning hours of October 30, 2013. Mr. Roskoski was fully credible, but he went to great lengths to make one point clear: all he could testify to was when plaintiff logged on to his office computer and when he logged off.

Mr. Roskoski's testimony established that plaintiff logged on to his office computer at 9:15 p.m. on October 29 and logged off at 12:56 a.m. on October 30.  When asked, however, whether he could testify as to what plaintiff was doing between those hours, or what he was doing after he logged off at 12:56 a.m., the witness stated he could not.  In fact, Mr. Roskoski testified that there were no records to indicate anyone was using the computer between the hours in question, with the next logged activity not being until 1:15 p.m. on October 30.  As the witness stated, "I don't know what [plaintiff] was doing at anytime and I know that no activity on his user ID was logged on by iManagement for twelve hours" (12/11/15 tr at 2702-2703).

Although Mr. Roskoski's testimony confirms that plaintiff was in his office at Latham & Watkins at 9:15 p.m. on the evening of October 29, 2013, and at 12:56 a.m. later that morning, it

has little bearing on the question of whether plaintiff assaulted defendant on that date.  For instance, the parties' residence in Washington, D.C. was only one half mile from plaintiff's office.  Thus, it is entirely possible that plaintiff could have gone to his office, logged on to his computer, returned to the residence, and then finally returned to his office to log off, thereby seeking to create an alibi to shield him from defendant's allegations.

It is equally likely that the assault took place before or after, or even both before and after, the hours plaintiff claims to have been in his office.  As defendant explained in her testimony, plaintiff's physical assaults were not momentary incidents that took place in a matter of minutes; instead, they were often fluid events that went on for hours, making it impossible to fix an exact time that a particular blow was struck.  When coupled with the well-known factors that make it difficult for domestic violence victims to recall with exact specificity how and when they were assaulted, it is readily understandable how the nature of the event could cause defendant to misstate the time of the attack on the date in question.

### D.    Exhibits Admitted Into Evidence as to the Issue of Domestic Violence

As set forth in the opening paragraphs of this decision, there were many exhibits introduced during the trial.  These include text messages, an infant's blood-stained garment, and photographs.  The overwhelming majority of the authentic exhibits, as opposed to those that were fabricated or manipulated by plaintiff, support defendant's claim of domestic violence and serve to confirm her testimony and the testimony of her other witnesses.

### (1).    *Text Messages*

Text messages took up much of the trial time.  Apparently, the parties exchanged text messages constantly during their brief marriage, and they continued to text each other for some

21

time after they separated.  Texting was also the method by which plaintiff largely interacted with

Brian Comfort, after defendant left to temporarily stay with her parents in Washington State before

ultimately returning to reside in New York.  Many of the text messages that were introduced into

evidence are of major significance as to the issue of domestic violence.  The most important reason

is that they contain unequivocal admissions by plaintiff of having committed acts of violence

against defendant.  They also serve to confirm defendant's testimony in that she confronts plaintiff

in the messages with her claims that he assaulted her, claims that he does not deny, but instead,

apologizes for.  Finally, plaintiff materially altered a number of these text messages and then

introduced them into evidence despite the fact that he knew that they were fabrications.

An especially telling series of text message exchanges, all of which were included in the

binder marked as Defendant's Exhibit OOO, took place between plaintiff and defendant on

November 27, 2013.[6]  The first of these exchanges, which are presented unedited with grammar,

punctuation and spelling errors left unchanged (but with the child's name redacted), reads as

follows:

| | |
|---|---|
| Mr. Zappin: | I knew you want to go home and I wasn't going to stop you |
| Ms. Comfort: | You also know you beat me up repeatedly for a month and I saw almost no one |
| Ms. Comfort: | And you are lucky I never felt vindictive enough to file a police report. |
| Mr. Zappin: | Did you watch Arrow? |
| Ms. Comfort: | Yes, it's about things spinning out of control? |
| Ms. Comfort: | But in arrow the boyfriend was open to getting hit with boxing gloves |
| Ms. Comfort: | Hitting someone who doesn't want to be hit isn't the same |

---

[6] The court will reference certain text exchanges found in Defendant's Exhibit OOO by
date, as no pages numbers were inserted.

22

| Mr. Zappin: | You're right about that |
| Mr. Zappin: | There is really no excuse. I could spend the rest of my life apologizing and it wouldn't be enough. I just want you to be happy |
| Ms. Comfort: | Anthony - you deserve compassion too |
| Mr. Zappin: | And I think that is us being apart unfortunately |
| Mr. Zappin: | I just hate it for [the child]. |
| Mr. Zappin: | I really don't I'm a monster |
| Mr. Zappin: | I'm doing what I need to do to get through my issues |
| Ms. Comfort: | I think that's good. Maybe [the child] can motivate us all to be better |
| Mr. Zappin: | Maybe |
| Ms. Comfort: | I don't think you are a monster or hopeless. I just think change is very tough |
| Mr. Zappin: | But I'm really sorry about all this. You didn't deserve it. |
| Mr. Zappin: | Well you have to want to change and I want to change and I want to change. My attitude and temper has impacted too many of my relationships and if I want to be a happy person I have to change |

(Defendant's Exhibit OOO, 11/27/13).

The above exchange reaffirms defendant's claim that she was beaten "repeatedly for a month." Notably, plaintiff readily admits to the charge by acknowledging "there is really no excuse" and stating that he could spend the rest of his life apologizing for what he did "but it wouldn't be enough."

The text exchange also offers insight into the type of person defendant is and how she was struggling to maintain some type of relationship with the father of her child. Despite everything to which he had subjected her to, she still strove to remain civil to plaintiff and even have some understanding for him. This is shown by her telling plaintiff that he "deserve[s] compassion too," and stating that she never felt "vindictive" enough to go to the police about the beatings. It is also demonstrated by her response to plaintiff calling himself a "monster." Rather than simply agreeing

23

that he is indeed a "monster" (a position she later adopted in face of plaintiff's ongoing outrageous conduct), defendant, in November 2013, still held out the hope that plaintiff might be able to change, while at the same time recognizing "that change is very tough."

The second set of text messages reads as follows:

| | |
|---|---|
| Ms. Comfort: | I'm not hiding at my parents |
| Ms. Comfort: | I'm taking time to work on myself, get educated, and think independently form you |
| Ms. Comfort: | I'll be blunt. There was a clear pattern of escalating verbal abuse and coercive tactics culminating in physical abuse |
| Mr. Zappin: | That's great, but there's no time for you and I to discuss what we are doing. It takes two Claire |
| Mr. Zappin: | Claire I'm not minimizing what I did. It was horrific, but the verbal and emotional stuff went both ways |
| Ms. Comfort: | I don't want a relationship where that cycle repeats or where you resolve the physical abuse but don't get at the other more insidious stuff |

(*id.*).

Here, too, defendant is absolutely direct with plaintiff: he physically abused her as part of an escalating cycle of coercion and domestic abuse. Plaintiff does not deny the charge. Instead he acknowledges that what he did was "horrific."

The following three messages are from plaintiff to defendant in which he attempts to address defendant's concerns about the insidious cycle of abuse she experienced with him:

| | |
|---|---|
| Mr. Zappin: | I understand you fear of it being a cycle but I'm not so sure. Regardless I'm nailing down my triggers to my temper |
| Mr. Zappin: | I've never hit anyone before |
| Mr. Zappin: | Think about everything we had going on: leaving Quinn [the law firm Quinn Emanuel], new stressful job, transferring, new house, new car, all the issues with the baby, the baby, moving and the kicker was |

24

my mom

(*id.*).

Again, plaintiff expressly admits to having hit defendant, stating that "I've never hit anyone before." Instead of denying his unacceptable conduct, he blames it on the stressful events in his life and vows to "nail down" what triggers his temper.

Texts from two days later, November 29, 2013, show plaintiff to be purportedly so serious about "nailing down" what causes him to lose his temper and dealing with the issues that led him to commit domestic violence against defendant that he has enrolled in a batterers' program. This text exchange reads:

| | |
|---|---|
| Ms. Comfort: | Anthony - I want you to go to abuse program and change your thinking and values.  I don't know that you want that. |
| Mr. Zappin: | I'm already doing that Claire |
| Ms. Comfort: | It's down to stuff like you thought your dad pinching the nurses ass was funny |
| Ms. Comfort: | And you are racially insensitive |
| Mr. Zappin: | I've had 3 sessions, not to mention appointments with Dr Brooks |
| Ms. Comfort: | But anger management is different |
| Mr. Zappin: | No it's not just anger management |
| Mr. Zappin: | I'm in that too |
| Mr. Zappin: | I enrolled in a batterers program against the advice of counsel |

(*id.* at 11/29/13).

There are other text messages as well in which plaintiff admits to having abused defendant. In a message dated February 14, 2014, plaintiff states: "I am sorry that I abused you. I have regretted it everyday because I lost the best friend I ever had and the two people who mean the most in the world to me.  You deserved better" (Defendant's Exhibit DDD at 4-5).

25

Later that month, on February 22, 2014, plaintiff sent a long text message to Brian

Comfort.  The message reads in relevant part:

> I want to apologize for the things I said to you and about you.  I
> know that many of them were uncalled for and I hope you can
> accept my apology.  I was wrong.
>
> More importantly, I want to apologize to you and Wendy
> [defendant's mother] for the things I did to Claire and my
> contributions to the animosity and the situation as a whole.  There
> are a lot of things I wish I could take back, but all I can do is try to
> do better in the future.
>
> I'm not going to make excuses because there is no excuse. I take
> responsibility for my actions.  I hope you can accept my apology
> and one day all of us can put the last 4 months behind us and work
> together for [the child's] sake.
>
> Lastly, I've taken the steps Claire has asked me to: individual and
> group counseling weekly.  I'm trying to regain her trust so we can
> co-parent [the child]

(Defendant's Exhibit P at 1).

Unfortunately, plaintiff was neither serious about taking responsibility for his actions nor

sincere in his apologies.  He never entered a batterers' program or, it seems, received any treatment

outside of seeing the psychiatrist that had been treating him all along.  Even more tellingly, he

quickly returned to denying that he ever hit or abused defendant, all the while continuing to heap

abuse on defendant and her parents through threatening texts, e-mails, phone calls, and legal

papers.  Indicative of this cycle – where plaintiff would go from acting contrite to blaming

everybody but himself for what he alone did – are a series of texts that plaintiff sent Brian Comfort

on March 15, 2014, only a month after his effusive apology.  These texts read, in relevant part:

> Today was the last straw showing up almost 45 minutes late with
> the same cavalier bullshit "victim" attitude. She's on her own. I'm

26

not going to be abused and wait around hoping and praying that Duchess Claire comes to her senses. You guys have pulled a lot of shit and I've yet to hear an apology, and you guys just continue to make it worse.

I'm making it clear to you, she better not ask me for a damn thing. If I were you, I would advise her to split the house proceeds 50/50, sign my pledge account back, change [the child's] name from Zappin to Comfort and NEVER contact me or even speak my name again. I've given you shitheads every chance to make things right for [the child's] sake and you guys just shit on everything. She's fucked up and I don't want her crazy shit in my life, especially when she uses an infant to inflict revenge.

She is going to lose everything, including [the child] and her bar license. At the end of the day you're going to be writing me a check to pay all these legal expenses that were caused by Claire's little tantrum and lies. I'm done being nice and reasonable with you guys.

Don't respond. You guys don't know how to act or resolve things like normal people and not apes.

I'm done protecting her. I'm going to the bar on Monday. She's done Brian. Actions have consequences and Claire's will cost her [the child] and her bar license. I'm done being the one who loses everything.

You're an excellent parent/grandparent. You raise three delinquents, kidnap my son and hold him 3,000 miles away while he suffers for five months with an asymmetrical jaw and crossed eyes without following up with a doctor as Claire was instructed. All this so I wouldn't know and Claire could throw her tantrum. You are a fine human being and you're all not fit to care for a gerbil let alone a baby.

(Defendant's Exhibit P at 4).

In the section below that describes plaintiff's pattern of coercive, controlling behavior,

there is further discussion of how plaintiff would swing wildly from trying to appear reasonable

and apologetic to engaging in something which Dr. Ravitz, the court's forensic psychiatrist,

27

labeled "intimate terrorism" – a scorched earth policy of abusive communications, actions and litigation tactics designed to intimidate, humiliate and destroy anybody who plaintiff felt had denigrated or opposed him in any manner. Defendant, of course, was the primary target of this waged war of intimate terrorism. But because defendant could not capitulate to his demands and plaintiff could not explain away what he himself had said in the text messages, plaintiff needed a strategy to attack the messages themselves.

The strategy plaintiff employed to attack the incriminating text messages was to deny their authenticity. He did this by claiming that defendant fabricated her exhibits by either completely making up texts that did not exist or otherwise manipulating exchanged text messages so as to radically alter the words that appear in them. Plaintiff also claimed the text messages that Brian Comfort provided were similarly falsified. According to plaintiff, this was all part of a grand scheme on the part of defendant and her father to frame him for acts of violence and other misdeeds that he did not commit.

In many ways, the test case for the validity of each side's text messages was the text sent by defendant to plaintiff on November 9, 2013 ("the 11/9/13 text"), two days before defendant left to stay temporarily in Washington State and a week after the last incident of domestic violence. Defendant's copy of the message reads: "I do not deserve to be hit if I happen not to burp [the child] at the end of every breastfeeding" (Defendant's Exhibit OOO, 11/9/13). Plaintiff's version of the same message reads: "I do not deserve to be yelled at if I happen to not burp [the child] at the end of every breastfeeding" (Plaintiff's Exhibit 14). The difference, of course, between the two versions of the message is substantial: defendant's says "hit" and plaintiff's says "yelled at."

All sides agreed that it would be impossible for there to be two different versions of the

28

same text message that was actually sent and received. As a result, the only explanation for the discrepancy was that one of the messages had been altered. Because neither side's cell phones or other devices had been examined by a digital forensic expert, the court, on November 23, 2015 (the fifth day of trial), determined that a neutral expert should be appointed to do an examination and issue a report. Plaintiff and defendant were told to provide their cell phones to the court, and all sides – plaintiff, defendant and the AFC – were given the opportunity to do a blind submission listing the names of two proposed experts.

At this point, plaintiff disclosed that he had in fact sent two cell phones to a digital forensic expert, Global Digital Forensics, but the company had not done anything with them.[7] As agreed on the record, the court called Global Digital Forensics. The person there told the court that the phones were still in a package that had never been opened and that the package was being returned that day. Two days later, on November 25, 2015, plaintiff, defendant, and the AFC each submitted their two names to the court, and defendant dropped off her and her father's cell phones (*see* Court Exhibits II, III, IV).

---

[7] On plaintiff's witness list was an unnamed digital forensic expert. Plaintiff, however, never submitted an expert's report as is required 60 days before trial, or for that matter, *anytime* either prior to or during trial, nor did he make a motion seeking permission for the late submission of a report. And even though plaintiff announced in court on November 23, 2015, that his phones had been sent two months earlier to be tested by Global Digital Forensics, no testing was ever done. When asked why this was the case, plaintiff's implausible story was that his "lady friend" sent his expert the phones, but "she didn't e-mail him with a tracking number, so it's a mistake" (11/30/15 tr at 1500). Thus, plaintiff asks the court to believe that his phones sat untested at Global Digital Forensics for two months and that he never inquired as to what was happening with them until the neutral digital forensic testing was to be implemented. This explanation lacks any semblance of credibility. The same goes for the assertion made in plaintiff's written summation that the court prevented him from having his digital forensic expert test his phones; the only thing that prevented this from happening was plaintiff himself, who for his own reasons did not want the forensic examination to go forward or a report issued.

On November 30, 2015, the next trial date, the court announced that it had selected MSA Investigations as the neutral digital forensic expert. From what defendant's attorney and the AFC later said, MSA Forensics was one of the two experts that plaintiff himself had proposed. Nevertheless, plaintiff refused to turn over his cell phones or otherwise cooperate with the neutral expert evaluation process that the court was seeking to implement. Among the reasons he gave for refusing to cooperate was that he used "20 to 25 devices" to communicate with defendant and that it was "going to cost $100,000" to have the digital forensic examination done (11/30/15 tr at 1327). It is noted that on November 24, 2015, plaintiff, when asked how many cell phones needed to be examined, responded: "There are five or six phones that I communicate with Miss Comfort with" (11/24/15 tr at 1189).[8] It is also noted that the $100,000 figure that plaintiff cited is a grossly exaggerated number he clearly picked out of thin air.

What is clear is that plaintiff did not want his phones forensically examined by an expert, and, especially, by a neutral expert whom he would be unable to control. In response to plaintiff's intransigence, this court had no choice but to abandon the idea of the neutral digital forensic expert. As a result, it announced that the determination as to whose text messages were authentic and whose were fabricated would be determined by the credibility of the witnesses.

Defendant was unwavering and unconditional in her declarations to the court that every text message contained in Defendant's Exhibit OOO, or in any other exhibit she submitted, were true and accurate copies printed directly off her cell phone. She was adamant that her messages appeared just how she sent them to plaintiff, and that plaintiff's text messages appeared just how

---

[8] Earlier on November 24, 2015, in response to a question from defendant's counsel on voir dire, plaintiff testified, "I mean I worked on smart phone cases so I have over 100 cell phones" (11/24/15 tr at 1148).

she received them from him.  Her credibility is only reinforced by the fact that she promptly turned her phone over to the court and was prepared, without any reservation or restriction, to have it examined by a neutral expert, even if the expert was one suggested by plaintiff.

Similarly, Brian Comfort was completely credible when he testified with his characteristic directness, and in his calm, measured tone, as to the authenticity of the text messages he sent to and received from plaintiff.  His text messages were projected directly from his cell phone onto the wall of the courtroom, and their content read into the record by defendant's attorney.  After each message was displayed and read, he unequivocally stated it was exactly how he either sent or received it.  Brian Comfort, like his daughter, immediately complied with the court's request to produce his phone, demonstrating his willingness to have it tested by a digital forensic expert.

While defendant and Brian Comfort were credible as to the issue of whether the text messages they produced were genuine and unaltered, plaintiff was without credibility when it came to his version of the messages.  More specifically, he was evasive and defensive, and when he was not being confrontational, he would often lapse into mumbling answers in a low voice that made it difficult to understand his words.  Plaintiff seemingly went out of his way to make himself even more inaudible by speaking with a paperclip in his mouth, and then expressing umbrage when the court asked him to remove it (12/1/15 tr at 1734).  The overall impression left, as with so much else that he testified to, was that plaintiff was not telling the truth when it came to the text messages.

The court's determination that plaintiff lied about the authenticity of his text messages, and that he intentionally introduced manufactured exhibits into evidence, is grounded on more than the finding that defendant's and Brian Comfort's testimony was credible and that plaintiff's was not.

31

One of the additional factors supporting the determination is plaintiff's established pattern of

denying the authenticity of messages or recordings, only to later concede that he did in fact say, at

least in sum and substance, what the message or recording shows him to have said. An example of

this pattern of conduct occurred during Brian Comfort's direct testimony when defendant's

attorney projected onto the wall and read aloud this text message from plaintiff to Brian Comfort:

> Hi Pedo, I have a surprise for you. I might be going out of order.
> Looks like I'm going after your money first. I want you to realize
> that I'm filing a federal lawsuit against you, Claire and Wendy
> tomorrow for 25 million

(12/1/15 tr at 1622).

After the court observed plaintiff laughing, the following colloquy took place:

| | |
|---|---|
| The Court: | Mr. Zappin, can I ask you what is so funny? You are sitting laughing hysterically. |
| Mr. Zappin: | These are so outrageous they couldn't be true on their face. They are so outrageous I can't help laugh. You either got to laugh or cry at something like this. |
| The Court: | It's your testimony these are totally made up, fabricated? |
| Mr. Zappin: | Yes. |
| The Court: | All right. |
| Mr. Comfort: | I can tell you they are not fabricated |

(12/1/15 tr at 1622).

Plaintiff later conceded in his testimony that he in fact called Brian Comfort "Pedo," as in

pedophile, and that he used this word or similar terms about Brian Comfort during FaceTime calls

with the child. He also admitted that he both threatened to file, and then actually filed, a law suit in

federal court against defendant and her parents alleging, among other things, RICO violations with

regards to defendant having fled to Washington State with the child, and seeking money damages

32

against them for millions of dollars. This pattern of denial, coupled with subsequent concessions and admissions, was also evident with regard to the FaceTime calls that are discussed later in this decision.

Another, and even more compelling, factor which demonstrates that plaintiff falsified his set of text messages in an attempt to defuse the incriminating nature of the real messages is found in a motion plaintiff made in this proceeding on December 9, 2014. The motion, in evidence as Defendant's Exhibit PP, was brought by plaintiff to exclude from evidence the forensic custody evaluation report of Dr. Alan Ravitz and the testimony Dr. Ravitz gave in this trial before Justice Kaplan on September 15, 2014. In the motion, plaintiff alleges that Dr. Ravitz's report and testimony were unsound because he "cherry-picked the text messages in order to justify his conclusion that I was 'coercive' towards Ms. Comfort" (Defendant's Exhibit PP at 26).

Remarkably, in that motion, plaintiff never once states or even suggests that any of the text messages that were provided to Dr. Ravitz, which were the same ones contained in Defendant's Exhibit OOO, were fabricated or altered. In fact, the much-disputed November 9, 2013 text is annexed as Exhibit 13 to plaintiff's motion. It reads: "I do not deserve to be *hit* if I happen to not burp [the child] at the end of every breastfeeding" (emphasis added). However, with reference to that text message, plaintiff only goes so far as saying that at the time it was sent "Ms. Comfort was already posturing for litigation," and that Dr. Ravitz ignored his text response that read, "You're ridiculous," to defendant's allegation that he hit her.

The first time plaintiff presented his version of the November 9, 2013 text message – the one reading "I do not deserve to be *yelled at* if I happen to not burp [the child] at the end of every breastfeeding" (emphasis added) – was when, on cross-examination, he showed Dr. Ravitz

Plaintiff's Exhibit 14 on November 12, 2015, the second day of trial. This was almost a year after

plaintiff brought his motion and included as an exhibit a copy of the November 9, 2013 text

containing the word "*hit,*" more than a year after he received Dr. Ravitz's report referencing that

message, and at least 15 months after he received copies of all the text messages that defendant had

provided to Dr. Ravitz.

While being cross-examined by defendant's counsel, plaintiff attempted to explain this

discrepancy. After being asked if indeed the November 9, 2013 text said "*yelled at*" instead of

"*hit,*" and why he would have failed to point that out in his motion, plaintiff responded:

> Well, I don't know. I don't think that I had looked through all the
> text messages at that point. I think that I was more focused on
> bleeding money, on the fact that there was a forensic report that
> didn't take all the evidence into consideration, it didn't interview
> collaterals, so I responded to what he relied on not what the actual
> text messages said and if I had to do it over again and had the time
> I would have included this and, in fact, I brought it up at the
> appropriate – included this exhibit Plaintiff's Exhibit 14 I brought
> it up at the appropriate time which was when he [Dr. Ravitz] was
> being cross-examined

(12/3/15 tr at 1899).

During defendant's counsel's cross-examination of plaintiff, the court intervened with the

question "wouldn't it seem to have done away with the whole issue" if plaintiff had come forward

with his version of the November 9, 2013 text as part of his December 9, 2014 motion

(Defendant's Exhibit PP). To the court's mind, it made complete sense that plaintiff would have

done so inasmuch as plaintiff seemed to view the text as the "smoking gun" that proved

defendant's text messages were false and that his were the "total truth because they are screen

shots" (12/3/15 at 1900). Plaintiff later sought to expand his explanation for his failure to raise the

34

issue by testifying, "I didn't have a chance to go through and look through, you know, compare every text message for, what is it, 15, 1600 pages of text messages until more recently" (*id.* at 1901).

Finally, in response to a further question from defendant's attorney on cross-examination, plaintiff gave yet another meandering explanation for his late "discovery" of defendant's alleged falsified texts:

> Well, I didn't have the Android phone from May, 2013, to January, 2014. The – I couldn't find it and I only – well, I guess I got it last Spring so I couldn't have looked at those text messages. It was in my parent's house and it was buried in a drawer. I mean, its other falsified documents. As I said I didn't have time to go through 1500 pages of text messages and compare them line by line. I put in what I responded to what he relied in

(12/2/15 tr at 1902).

None of the explanations given by plaintiff for having failed to raise the issue of the authenticity of defendant's November 9, 2013 text message, with the word "hit" instead of the words "yelled at," in his December 9, 2014 motion have even the slightest ring of truth. Plaintiff, if nothing else, has obsessively focused on every detail of this litigation from its inception, and he compulsively scours the record for every discrepancy, no matter how minute, that he believes favors his case. Thus, it is inconceivable that he would overlook a message that defendant supposedly altered, and certainly not one as significant as the November 9, 2013 text. What really happened, as the record conclusively demonstrates, is that plaintiff always knew that the message said "hit," and it was only later that he decided that rather than seeking to explain away its impact he would simply create a new message.

The court does not know the method by which defendant's November 9, 2013 text message

35

was altered, but it is convinced that plaintiff was the one who altered it. As the AFC aptly pointed

out, if anyone was capable of falsifying a text message it was plaintiff, who has a Bachelor of

Science degree in Computer Sciences, was heavily involved in technical smartphone patent

litigation as a lawyer, and during the trial, was constantly using multiple devices (e.g. phones,

laptop, iPad, and Samsung Smartwatch). In addition, as the custody forensic report reveals,

plaintiff began using a computer by the time he was three-years-old, and he started to program at a

very early age. Conversely, there is nothing in the record to indicate defendant had the technical

expertise necessary to change the message, even if she were so inclined to do so.

The credible evidence overwhelmingly establishes that every text message defendant

introduced, be it between plaintiff and her, or plaintiff and her father, is true and accurate. It also

establishes that the text messages introduced by plaintiff, including the November 9, 2013 text

(Plaintiff's Exhibit 14), to the extent such messages differ from defendant's exhibits, were

intentionally altered or otherwise falsified by plaintiff.[9] As a result, the conclusion that must be

drawn is that not only do the text messages introduced by defendant constitute proof of plaintiff's

guilt in perpetrating acts of domestic violence against her, but they stand as proof of his guilt in

knowingly introducing tampered evidence into the record.

---

[9] The text messages that plaintiff fabricated and introduced into evidence include, but are
not limited to, those that purportedly have defendant using racist, antisemitic or other derogatory
and unacceptable language, as well as those that supposedly have her apologizing for assaulting
plaintiff or otherwise harming him. Plaintiff also altered his own text messages to defendant by
removing his admissions of having assaulted her and having committed to her that he would
attend a batterers' program. Furthermore, plaintiff introduced into evidence a photograph of a
card he received from defendant that included her words but omitted the extensive message that
he wrote on the card to her in response (Plaintiff's Exhibit 64 [C]).

(2).    *The Blood-Stained Garment*

Introduced into evidence as a court exhibit was an infant's garment known as a "onesie." The garment is spattered with blood, which defendant submits resulted from plaintiff's assault on her on November 1, 2013, when, while she was holding the child, he tweaked her ears with such force that the left ear bled profusely onto the child's clothing. Defendant testified that because of the shock and trauma of being abused by plaintiff, she sat immobilized as the blood dripped from the wound, staining the garment.

At plaintiff's request, the court, which had received the garment from defendant, sent the onesie to plaintiff's blood splatter expert, LeeAnn Singley, to be tested in her lab. However, as happened with plaintiff's purported digital forensic expert, Ms. Singley never conducted any testing and never issued a report. Instead, the expert, without explanation, returned the onesie to the court. According to plaintiff, Ms. Singley merely provided him with some photographs of the garment.

Plaintiff represented to the court that the reason his expert did not conduct blood splatter testing on the garment was that it was labeled "up to 7lbs," and that on November 1, 2013, the child weighed more than seven pounds. Thus, according to plaintiff, the expert told him that the child could not have been wearing it that night (12/4/15 tr at 2022). Plaintiff did not provide confirmation from Ms. Singley that this was the reason for her not having conducted any testing, and there was no communication between her and the court.

As to the child's weight on the date in question, defendant testified that the onesie still fit the child – who, according to medical records, weighed 7 lbs. 8 oz. at birth, 7 lbs. 11.5 oz. on October 24, 2013, and 9 lbs. 1 oz. on November 6, 2013 – and that he was wearing it on November

37

1, 2013, when he was little more than three weeks old.  The testimony of Heather McFadden, the lactation consultant, established that it is normal for a newborn's weight to fluctuate during the first few weeks (12/11/15 tr at 2831).  Additionally, putting aside that a garment's actual size may differ from its label due to defect or stretching, it is not unreasonable to assume, as the AFC suggested, that the onesie was unbuttoned at the time of the incident (12/7/15 tr at 2241).  Therefore, plaintiff's assertion that the child would have outgrown the onesie is pure conjecture, not supported by credible testimony, and belies the logical conclusion drawn from the totality of the circumstances.  Irrespective of what the garment's label may have said, the credible evidence establishes that the child was wearing the garment on the night of November 1, 2013, the night plaintiff pulled her ear and caused her to bleed on the child.

Plaintiff did not dispute that the blood on the onesie was defendant's.  By retaining a blood splatter expert, he was apparently intending to show that defendant's blood could not have dripped on the garment the way defendant represented it did.  Plaintiff, for reasons of his own, had the garment recalled from the expert and he did not have her submit a report or testify.  Instead, he chose to make the argument that the child was too big to be wearing the onesie on the night plaintiff says she was attacked.  In his written summation, he goes even further and states that it was "unlikely [the child] ever had the onesie" as he was already over 7 lbs. when he was born (Plaintiff's Written Summation at 27).

By making this argument, plaintiff is putting forth a rather startling series of propositions as to how defendant conducted herself in the case.  First, defendant purchased a garment solely to fabricate evidence.  Second, she intentionally cut herself to splatter her blood over the garment.  Third, she knowingly had the fabricated evidence admitted into the record as a court exhibit.  And

fourth, defendant falsely testified under oath that the child was wearing the garment on November 1, 2013, when she bled from a wound inflicted by plaintiff to her ear.

There is simply no evidence in the record to suggest that defendant is capable of doing what plaintiff says she did with regard to the onesie. If anything, the record shows that defendant would be temperamentally and characterologically incapable of fabricating evidence. The court's careful observations of defendant, both when she was on the witness stand and when she was otherwise in the courtroom, is that she understands the sanctity of judicial proceedings, behaves in a manner consistent with that understanding, and, at all times, endeavors to be as cooperative and respectful as possible. These observations are confirmed by the psychological testing that revealed her to have a "rigid compliance to social propriety and convention," "a strong sense of duty to obey and follow others with leadership responsibilities," and describes her as being someone who "makes every effort to be a considerate and competent person" (Court Exhibit I at 46).

In the same way this court found that plaintiff's accusation that defendant created fraudulent text messages was without basis, and instead, found it was plaintiff who created fraudulent messages, it finds that his allegations concerning the onesie are unfounded. Plaintiff once again chose to pursue the dubious course of accusing defendant of fabricating evidence as a way to deflect attention from his own wrongdoing. Following this strategy – and no doubt recognizing that the onesie had indeed been stained in the manner described by defendant – plaintiff abandoned his pretense of having the garment tested by a blood splatter expert. As a result, plaintiff was left with no evidence to counter defendant's clear and convincing testimony that the blood stains on the child's garment resulted from blood dripping from her ear. Accordingly, the court finds the exhibit to be further proof of plaintiff having committed domestic

39

violence against defendant.

### (3). *Photographs*

Defendant introduced a wide array of photographs depicting the various injuries she suffered to her head, face, body and legs as a result of plaintiff assaulting her. Plaintiff's response to these photographs was, as with the text messages and the onesie, to claim that they were fabricated or altered as part of a grand conspiracy to frame him for assaults he did not commit. Much of his line of attack against the authenticity of the photographs centered on plaintiff's fixation with their metadata – all of which was either conjured or blown out of proportion, and none of which was supported by expert testimony.

Despite plaintiff's assertions, the fact remains that the credible evidence establishes that the photographs of defendant's injuries accurately depict how defendant's bruises and wounds appeared when the photographs were taken. The photographs correlate to the dates on which defendant states plaintiff assaulted her, and the injuries depicted in them match the descriptions given on the witness stand by Brian Comfort, Cathleen Doyel, Heather McFadden, and the defendant herself.

Perhaps recognizing the weakness of his claim as to the photographs' lack of authenticity, plaintiff had an alternate position. The position was to claim that the photographs, even if authentic and accurate, merely showed bumps and bruises that defendant had incurred through self-infliction or as a result of her own clumsiness. This claim was refuted by defendant's clear and convincing testimony as to how she sustained the injuries, as well as plaintiff's incriminating admissions contained in the text messages. As a result, the convergence between what the photographs show, the testimony establishes and the text messages contain paints a convincing

portrait of a woman who suffered multiple beatings at the hands of her husband.

### E. Plaintiff's Forensic Pathologist's Testimony as to Domestic Violence – Dr. William Manion

Plaintiff's expert in forensic pathology, Dr. William Manion, reviewed the photographs of defendant's injuries and apparently took them to accurately depict the bruises and wounds in question. Dr. Manion, however, opined that the photographs did not show that the injuries were the result of an assault, but instead, were the result of defendant falling on the steps while moving boxes, bumping into furniture, or suffering from cold sores. With regard to the large bump on defendant's forehead and the resultant blackening around the eyes, he made the somewhat astonishing claim that this resulted from defendant hitting herself in the forehead with her own fist (11/17/15 tr at 518-519).

There were serious problems with Dr. Manion's testimony. The first, as was brought out on cross-examination, is that numerous courts have found in published opinions that his testimony was suspect, unworthy of belief, and ill-founded. One of the reasons for this was that he relied on materials that he, as an expert, should not have relied upon, or certainly not relied on to the degree that he did. In this case, those impermissible materials included two volumes of material prepared by plaintiff himself entitled "Evidence Contradicting Claire Comfort's Allegations of Domestic Abuse," as well as another booklet prepared by plaintiff, entitled "Lack of Evidence and Inconsistencies Regarding Claire's Domestic Violence Allegations." The end result was that Dr. Manion's work on the case consisted almost exclusively of reviewing the material prepared by the person who hired him and then molding his testimony to conform with those materials.

One example as to how Dr. Manion's opinions parroted those supplied to him by plaintiff

41

concerned two wounds to defendant's legs. On direct testimony, Dr. Manion stated that the

injuries depicted in the photographs of her leg were not consistent with an assault, but instead,

were caused by defendant moving heavy furniture and boxes (Plaintiff's Exhibits 33, 36). On

cross-examination, he was asked these questions and gave these answers:

> Mr. Wallack: Mr. Zappin told you that Ms. Comfort sustained these injuries by moving boxes, correct?
>
> Dr. Manion: That's correct.
>
> Mr. Wallack: That is what he said, right?
>
> Dr. Manion: Yes. He believed they occurred as she was moving some heavy furniture upstairs.
>
> Mr. Wallack: What if I told you that she didn't move any boxes that day or didn't move any heavy furniture that day, would that change your conclusions that is how she sustained her injuries?
>
> Dr. Manion: If you can show me the time and date of these photographs and everything matches up, then yes, my opinion could be changed.
>
> Mr. Wallack: I'm telling you now as a hypothetical, assume for a moment Ms. Comfort did not move boxes or heavy furniture that day, would that change your conclusion that that is how these injuries were sustained?
>
> Dr. Manion: These injuries could be several days old. Should we say go back like two or three days?
>
> Mr. Wallack: Sure. Would that change your conclusion?
>
> Dr. Manion: Yes

(11/17/15 tr at 558-559).

The problem, of course, is that the evidence shows that defendant, who had just given birth

a few weeks earlier, had not moved heavy boxes or furniture. Similar to plaintiff's awkward and

"out of nowhere" comment to Cathleen Doyel about defendant tripping and hitting her head while

moving boxes, the explanation he provided to Dr. Manion was something he concocted to cover up

his acts of domestic violence against the defendant. Yet Dr. Manion unquestioningly took what

42

plaintiff – the person who was paying him nearly $10,000 for his testimony – told him to be the truth and blindly used it to formulate an opinion that best served plaintiff's interests (11/17/15 tr at 536).

Not only were Dr. Manion's information and his resultant conclusions spoon-fed to him by plaintiff, but Dr. Manion acknowledged in his testimony that plaintiff went so far as to draft the affidavit that served as his report. All Dr. Manion had to do was sign the affidavit that plaintiff prepared and sent to him for his signature not even bothering to change the jurat that indicates the affidavit was signed in New York when it was actually signed in Las Vegas, Nevada. In every sense of the word, Dr. Manion was an expert for hire, paid to say exactly what plaintiff wanted him to say with little or no regard for the truth. Accordingly, the court finds that his testimony was not credible and the opinions he professed to have reached cannot be given any credence.

### F.   Plaintiff's Allegations as to Domestic Violence Inflicted on Him by Defendant

Plaintiff went beyond denying that he assaulted defendant, and he even went beyond falsifying evidence to support those denials. What he did was to claim that it was he, not defendant, who was the victim of domestic violence at the hands of the other. Not content to assert that these assaults took place during the same time defendant asserted plaintiff was assaulting her, he created fictitious incidents that occurred from the very start of their relationship. Complete with stories of defendant's out-of-control drinking and unremitting sexual demands on him, the lack of veracity of these tales is blatantly obvious (*see e.g.* 11/24/15 tr at 1261-1262, 1268; 11/30/15 tr at 1337). The evidence establishes that the only time defendant caused any physical harm to plaintiff was in August 2013 when plaintiff came home late one night and defendant, after being pinched

43

repeatedly by him while in bed, "kind of swung out at him" (12/10/15 tr at 2489-2490). According to defendant, "one of my nails accidently hit his face and left a very small, small cut" (*id.*).

The rest of plaintiff's claims of wounds, bruises, scratches and bites – stemming from everything from defendant stabbing him with a knife and a fork, to her biting his penis, not once, but twice, in retaliation for his refusing to succumb to her sexual advances – lack even a shred of credibility (*see* 11/24/15 tr at 1233-1234, 1276). The question then becomes why would plaintiff make up these absurd claims? One likely possibility is that they are yet another desperate, and all too transparent, attempt by plaintiff to deflect attention from the very real wounds and bruises that he inflicted on defendant and to deny responsibility for what he did to her.

The extent of plaintiff's desperation is clearly shown by the photographs of purported injuries that he introduced into evidence. The inescapable conclusion that must be drawn is that, to the extent the photos do not depict injuries inflicted on him by persons other than defendant, they reflect injuries that were self-inflicted. As defendant's counsel stated in his closing argument, plaintiff was so intent on avoiding being held responsible for what he did to defendant that he would even stab himself to create false evidence against her.

Whereas Dr. Manion's opinion that defendant created the large bruise on her forehead by striking herself was totally inconsistent with who she is and what she is capable of, plaintiff's self-infliction of wounds is fully consistent with his personality and the lengths he is willing to go to declare victory in this litigation. Not only is it consistent with his acute narcissism, which will not let him lose this case, or his obsessive-compulsiveness, which will not let him focus on anything other than winning this case, but it reflects his need to be the center of attention and, above all, his need to be seen as a victim.

44

As Dr. Ravitz testified, and as was documented in his report and the psychological testing, plaintiff is histrionic and dramatic (11/12/15 tr at 139; Court Exhibit 51, 54). When these traits are coupled with a "pattern of not taking responsibility for the behavior that gets him into trouble" (11/12/15 tr at 166) and a "willingness to do whatever he needed to seek vengeance against people that he felt had harmed him," (*id.* at 135) it is easy to see how plaintiff could do something as extreme as stab himself so long as he saw it as a route towards vindication by defeating defendant in this divorce action.

Putting aside plaintiff's exorbitant effort in trying to create a totally false case of having been abused by defendant, what is most notable is how those false claims fall within another established pattern he exhibited. This pattern consists of plaintiff repeatedly claiming that he has been assaulted by others. In what might be the ultimate in dramatic self-victimization – extending even beyond his need to inaccurately portray himself as suffering from serious illnesses like colon cancer – plaintiff often feels compelled to claim, in lawsuits and elsewhere, that he has been brutally attacked by people who have offended him in some way.

As the record reflects, plaintiff has professed that he has been assaulted by everyone from an ex-girlfriend named Amy Steadman, who he testified beat, kicked, and burned him with a cigarette, to a television reporter with whom he was involved in an altercation in a West Virginia courthouse following his mother's criminal court proceeding (*see* 11/19/15 tr at 913, 916; Plaintiff's Exhibit 54; 12/3/15 tr at 1951-1952). In addition, he filed a lawsuit in the Court of Claims against the State of New York alleging that he was assaulted in the courtroom by Justice Kaplan's court officer, Jeffrey Katz. In the complaint in that case, plaintiff swore that the "Officer Katz intentionally caused and attempted to cause, or otherwise recklessly caused, an unwanted

45

touching of Claimant with the intent to harm Claimant, causing injury to Claimant" (Defendant's

Exhibit NN). During this trial, however, plaintiff, when being questioned on direct examination by

his then co-counsel, David Schorr, testified as follows:

> Mr. Zappin:  I mean, I filed the action because I was just standing
> at the bar and got grabbed. I had all of these bruises
> on me. And I think Officer Katz – I don't think he
> did it intentionally.
> Mr. Schorr:  What do you mean by that?
> Mr. Zappin:  I don't think that he was trying to hurt me.
> Mr. Schorr:  Yet, did you end up being injured?
> Mr. Zappin:  Quite substantially

(11/19/15 tr at 926).

Pursuant to 22 NYCRR 100.3 (B) (8) of the Rules of Judicial Conduct, a judge is

prohibited from discussing a case pending in another court. Therefore, with regard to the alleged

assault by Officer Katz, this court will simply note that along with his pattern of claiming to be the

victim of attacks to his person, plaintiff, as evidenced by his testimony in this trial, often makes

allegations that he eventually backs off from or changes substantially. In his sworn Court of

Claims complaint, plaintiff avers that Officer Katz acted with the "intent to cause harm" to him;

before this court, and while testifying under oath, he changed his story to say that the officer did

not intend to hurt him.

Plaintiff also gave testimony in this case concerning another of the allegations made in his

Court of Claims case. This allegation was against Justice Kaplan, whom he charged with Civil

Conspiracy for having "directed Officer Katz to harm Claimant" and having "acted in concert"

with him in carrying out the assault. In the complaint, plaintiff alleges:

> Upon information and belief, Justice Kaplan retaliated against
> Claimant for his remarks about her father by contacting the West
> Virginia State Parole Board to recommend that Claimant's mother

46

> (who is currently incarcerated in West Virginia) be denied early
> parole. Upon information and belief, Officer Katz's actions
> referenced herein were the result of further retaliation by Justice
> Kaplan for Claimant's remarks about her father, as well as for the
> Article 78 proceeding

(Defendant's Exhibit NN).

During this trial, plaintiff, while on the witness stand, was asked more than once about

what the information he had that formed a basis to make such an incendiary allegation – that a

judge retaliated against a litigant by interfering in parole proceedings in another state so as to

prevent parole being granted to a litigant's mother. Each time plaintiff gave a different answer as

to what the information was (12/2/15 tr at 1875, 1879, 1880, 1882). It was made clear that plaintiff

simply had no information. Plaintiff was unable to state one single fact upon which he could

make, with anything remotely approaching a good faith belief, the allegation that Justice Kaplan

interfered with his mother's parole proceedings. This is further evidence of plaintiff having no

boundaries, limits, or compunctions when it comes to him attacking those who he views has

having caused him harm in one way or another.

There was one assault alleged by plaintiff that was intrinsically connected to this case

inasmuch as it took place in this courtroom and resulted in the court conducting a hearing on the

matter. This was the incident that took place on November 6, 2015, where, in full view of court

staff, plaintiff threw himself to the courtroom floor shouting that he had been "stabbed" by an

elbow wielded by attorney Paul Kurland. As set forth in the "Pretrial Background" section of this

decision, the court, after the November 10, 2015 hearing, found that the 69 year-old Mr. Kurland

never even touched the 31 year-old plaintiff (*see* 11/10/15 tr 42-44, in evidence as Court Exhibit

IX). The conclusion drawn is that plaintiff fabricated the whole incident.

47

Plaintiff did not conceal his dislike for Mr. Kurland and the resentment he felt over his being involved in the case. While he was on the courtroom floor, writhing in mock-pain after the feigned assault, he shouted at him, "You shouldn't even be here" (*id.* at 20). Later in the hearing, expressing his anger that Mr. Kurland, as the AFC's law partner, would be part of what he saw as a campaign against him, plaintiff stated: "It is absurd that we have two attorneys here double billing for their time. It's not even clear what Mr. Kurland's role is other than to instigate" (*id.* at 37).

This incident involving Mr. Kurland speaks to more than plaintiff's egregiously bad judgment and lack of impulse control. It speaks to his compulsion to act out in a way that inflicts harm on someone who he feels has offended him while at the same time satisfying his need to be seen as the victim of people acting badly towards him. When asked by the court what could have possessed plaintiff to have acted the way he did, Dr. Ravitz opined:

> It is possible that the more trouble that he can cause for people who
> he feels are causing him trouble, the more vindicated he feels, the
> better he feels. That he's angry at all of these people who he feels
> misunderstand him and treat him unfairly and he's going to get
> them back

(11/12/15 tr at 175).

Dr. Ravitz went on to suggest that the reason plaintiff would feign the assault, the same way he would tell defendant he had cancer, was because "he wants people's sympathy to feel like he's been victimized" (*id.* at 175).

Viewed in this context, and taking into consideration plaintiff's history of making similar claims against others, it becomes clear why plaintiff would allege that defendant assaulted him. First, it his means of inflicting harm on his enemy. Second, and perhaps even more importantly, it allows plaintiff to claim the precious mantle of being the true victim. Thus, in plaintiff's mind, he

is not someone who abuses women; he is someone who is abused by women. In the end, however, the allegations must be seen for what they are: an attempt by plaintiff to avoid taking responsibility for his own heinous actions. By making his baseless allegation that defendant committed domestic violence against him, plaintiff has only reinforced the finding that he is the one who committed domestic violence against her.

### G. The Parties Conduct in Court as it Impacts on a Finding of Domestic Violence

In almost every child custody case that comes before this court, each side tries diligently to depict him or herself in the most favorable light possible. While in the courtroom, the goal is to appear cooperative, calm, self-controlled, respectful, willing to listen, reasonable, and above all, concerned first and foremost with the child's well being. Some litigants do this well, some are less successful.

In this case, defendant acted totally appropriately in court, both when she was on the witness stand and at the counsel table. The court was left with the clear impression that how defendant presented in court is how she is in real life: sincere, considerate, and conscientious. If the court had any concerns about defendant, it was that she appeared somewhat insecure and unassertive. Apparently, these are among the issues that defendant is addressing in therapy with a psychologist.

Plaintiff, on the other hand, was incapable of acting appropriately in court. It was almost as if he was on a mission to prove that he is the type of person defendant accuses him of being: volatile, narcissistic, vindictive, antisocial, and abusive. Whereas most litigants can summon the necessary self-control to mask or at least temper their character flaws and personality defects while in court, plaintiff, seemingly, was intent on putting his flaws and defects on full display.

49

The court will not spend the time needed to recite all of the many instances during the trial where plaintiff was disruptive or disrespectful, or the times he was incapable of controlling his frustrations or concealing his anger. What it will do, instead, is refer to certain incidents that occurred during the trial which provided insight into how plaintiff could have committed domestic violence against defendant.

Throughout the trial, plaintiff was continually admonished, first by Justice Kaplan (9/15/14 tr at 149, 160) and then by this court, not to do things like bang his hand on the counsel table, roll his eyes, or audibly sigh whenever he lost on a trial ruling (12/1/15 tr at 1627-1628). More often than not, he would deny that he acted in such a manner, and he would accuse the court of "tainting the record" against him (12/4/15 tr at 2027-2028, 2037). These many instances vividly illustrated plaintiff's propensity for doing something inappropriate in full view and then not only denying it, but accusing the observer (in this case the court) of having made it up (see 12/4/15 tr at 2027-2028 ["The antics are what you [the court] create"]).

These incidents were minor compared to the instances where plaintiff, either at the bench or on the witness stand, would disrupt the proceedings while venting his rage at some perceived slight. One such instance occurred when the court instructed plaintiff to stop yelling at defendant's counsel when responding to a question on cross-examination. The following exchange took place between the court and plaintiff:

| | |
|---|---|
| Mr. Zappin: | Attack Anthony Zappin, attack Anthony Zappin. He's here fighting for his child. He just wants to see him. And opposing counsel just screamed in my face and you're yelling at me because I tried to answer a question. |
| The Court: | He did not scream in your face. If you want to do that, be a credible witness, act like one. Don't start going to asides like attack Anthony Zappin. Control |

|              | yourself, Sir. |
|--------------|----------------|
| Mr. Zappin:  | I would ask you to do the same because you have problems, your Honor, you really do |

(11/23/15 tr at 1073-1074).

An even more tumultuous disruption of the trial occurred when, on December 4, 2015, plaintiff stormed off the witness stand in the midst of redirect examination, shouting "I'm done with this," "this is such a drumhead trial," and "everything is an attack" (12/4/15 tr at 2025-2026). When he finally returned to the stand, and after attempting to make a perfunctory and decidedly disingenuous apology,[10] plaintiff engaged in the following exchange with the court:

| The Court:  | The issue is can you control yourself and not lash out and – |
|-------------|----------------|
| Mr. Zappin: | I'm not lashing out. |
| The Court:  | You just stood up and said "I can't take it –" |
| Mr. Zappin: | Then I calmly walked out. |
| The Court:  | And walked off the witness – |
| Mr. Zappin: | I have to walk into this courtroom every day and I have to [stare] at the face of my abuser and it's not Miss Comfort, it's you. |
| The Court:  | I now have joined the list of abusers. |
| Mr. Zappin: | You are an abuser. You caused me my job.[11] You wouldn't allow me any access to my child. You wouldn't allow me expanded access which the parties have agreed on. You're an abuser. You beat up on me every day in this courtroom for no reason whatsoever |

(*id.* at 2026-2027).

Plaintiff's lack of impulse control and his need to lash out at everyone he perceives as

---

[10] Plaintiff's attempt at an apology for bolting off the witness stand was this: "I apologize. I get very frustrated when it's a constant attack on me. It's a tainting of the record. It's a theme you're trying to create. It's wrong" (12/4/15 tr at 2026).

[11] To be clear, the transcript incorrectly reflect the words "You *caused* me my job," but Mr. Zappin's actual words were "You *cost* me my job."

"abusing him" was by no means restricted to his interactions with this court. The true brunt of his

wrath at the trial was reserved for the AFC, Harriet Cohen, who had been the object of much of

plaintiff's misconduct leading to the sanctions decision of September 18, 2015. Responding to a

question posed to him by Ms. Cohen during recross-examination, plaintiff went so far as to

sneeringly call her "honey" (*id.* at 2173). This court, shocked that plaintiff would refer to Ms.

Cohen, a grown woman and long-time respected member of the bar, in such a demeaning and

misogynist manner, directed him to apologize to her. Plaintiff did say the words, "I'm sorry Ms.

Cohen," but, as the court noted on the record, he said them in a "sarcastic tone" (*id.* at 2174).

Plaintiff's unjustified and unconcealed contempt for the AFC caused him to act

inappropriately at other points in the trial as well. When plaintiff made a second and more

concerted attempt to apologize for having walked off the witness stand, he was instructed by the

court that any real apology to the court would have to include an apology to the other attorneys.

Plaintiff, however, adamantly refused to apologize to the AFC. The record reflects that instead of

apologizing, plaintiff, while "pointing" and "thrusting" his finger and "speaking in an elevated

voice" that was "very much aggressive and threatening," launched into a diatribe against Ms.

Cohen for having played a video of newscast footage taken at his mother's West Virginia criminal

court proceeding[12] (*id.* at 2031).

Plaintiff displayed similar conduct towards the AFC when he was, once again, unable to

restrain his fury over her having played the news footage of his mother's West Virginia court

---

[12] As part of the AFC's case, the court viewed footage of plaintiff's mother's court
proceeding in West Virginia where she claimed that her criminal acts were a result of her being a
victim of domestic violence. The significance of the claim to this case is that, according to the
testimony given by Dr. Ravitz, a person who is raised in a household where there is domestic
violence has an increased chance of committing domestic violence (12/12/15 tr at 117).

appearance. This was despite the court ruling that the footage was relevant to the custody case and

having allowed it to be played. Plaintiff and Ms. Cohen engaged in the following exchange:

> Ms. Cohen:   Mr. Zappin, you are very, very, angry that we played
> the video yesterday that showed your mother and
> you were particularly angry at me. Correct?
>
> Mr. Zappin:   I think what you did was one of the worst and most
> despicable things anybody could do to another
> person. I think you should be in an orange jumpsuit
> shackled.
>
> Ms. Cohen:   Because when you get angry like that a switch goes
> off in your mind? Right? Makes you very, very
> angry? Right?
>
> Mr. Zappin:   No. You played a video of one of the most
> traumatic events of my life my mother in an orange
> jumpsuit in shackles and you don't think that would
> elicit a reaction? I didn't physically attack you. I
> didn't do anything. I said what you did was
> deplorable, it was wrong and personally I want to
> see you in an orange jumpsuit and shackles. I think
> that's where you belong. I think that's where you
> should spend some time

(*id.* at 2161-2162).

   Plaintiff was not always out of control or acting aggressively or threateningly during the

trial. At times, he would appear polite and respectful, sometimes to the point of seeming almost

obsequious. The problem was that plaintiff's behavior and demeanor in the courtroom could

change in an instant. Just as defendant described things that would trigger a mercurial reaction in

defendant causing him to lash out at her – at best with scathing words, at worst with punches, slaps

and kicks – things would occur in the courtroom that would cause a "switch to go off" in plaintiff's

mind. The result was that his demeanor changed dramatically and his conduct became abusive and

out of control.

   As shown, one of the triggers that would set off a negative reaction from plaintiff was the

53

sense that he was being criticized, even if it was something so minor as the court overruling an objection he had made.  If plaintiff was in any way admonished for his reaction – such as slamming his hand or audibly sighing – that reaction would only intensify.  All too often it would ratchet up to the point of being a full-blown outburst.  Plaintiff's outbursts would, in turn, be replete with claims that he was being bullied, picked-on, unfairly treated, and even abused.[13] Although none of those claims have the slightest merit to them, they are fully consistent with plaintiff's worldview in which he is always right, nothing is ever his fault, and he is unfairly victimized.

There were also instances during the trial that highlighted plaintiff's deeply imbedded feelings about being disrespected and not receiving the recognition he feels he deserves.  These instances included plaintiff's numerous accusations that he was being laughed at, either by Justice Kaplan ("If you're going to laugh at me, your Honor . . . " [9/15/14 tr at 14]), this court ("You're laughing, your Honor" [12/3/15 tr at 1898]), defendant's attorney ("your Honor, Mr. Wallack has been staring at me smirking and laughing . . . " [11/19/15 tr at 738]), or defendant ("You see Ms. Comfort over there laughing like a hyena" [11/23/15 tr at 1085]).  Another instance was this peculiar exchange, where plaintiff took exception with the court praising his co-counsel, David Schorr:

---

[13] One example, out of many, of these outbursts occurred when the court cautioned plaintiff not to interrupt the trial by continuing to make unwarranted accusations of misconduct against the AFC.  Plaintiff responded: "I'm tired of being attacked by you.  I'm tired of you beating me down.  You cost me my job.  You have an attorney that engaged in misconduct here lying to you and you accuse me, beat me down because I point it out to you.  It's troubling that every word out of your mouth to me is an attack on me" (11/19/15 tr at 745).  Not coincidentally, plaintiff's use of the phrase "every word out of your mouth" basically mirrors the words he used when, on March 3, 2015, he told Justice Kaplan that "it's lie after lie after lie that comes out of your mouth" (*see Zappin v Comfort*, 49 Misc 3d 1201[A] at 8).

54

| | |
|---|---|
| The Court: | Mr. Schorr, has conducted himself as a proper attorney here the way you should. |
| Mr. Zappin: | And, you played him off of me. You have done this brilliantly. You played Mr. Schorr, an insurance salesman who hasn't practiced law in 20 years as Clarence Darrow, the finest trial attorney of all time to make me look like an angry monster, and, its brilliant. It is maniacal, what you have done. It is maniacal. |
| The Court: | I don't think – |
| Mr. Zappin: | He is an insurance salesman. |
| The Court: | I can tell you one thing, sir, if anyone made you look like an angry monster, it was you |

(12/10/15 tr at 2606).

Apparently, plaintiff's sense of his own self-worth is so fragile that he could not tolerate another attorney, even one who happens to be his own co-counsel, being told he was doing a good job. As with so much else that happened during the trial, the switch would go off and plaintiff would lash out at what he perceived as another affront in a grand scheme designed to diminish and discredit him.

What was remarkable about plaintiff's conduct at trial, both as a witness and an attorney representing himself, was how it served to illustrate, in real time, every negative and troubling thing that had been said about him. Outside of actually committing a physical assault in the courtroom, he committed every act defendant accused him of committing in their short, troubled marriage – losing control of his emotions, flagrantly violating the rules of proper and appropriate conduct, flouting authority, failing to take responsibility for his actions, and lashing out at anyone who offended him in any way – all the while portraying himself as the victim.

Throughout the trial, the court continually pondered why plaintiff would act the way he did and reveal his personality and character in such a negative and unflattering light. Thankfully, Dr.

55

Ravitz shed some light on the issue when the court's posed a question to him about plaintiff pursuing abusive "scorched earth" tactics in the litigation at the same time defendant was accusing him of a having an abusive personality. When asked why plaintiff would act in such a way that would only serve to confirm those allegations, Dr. Ravitz answered: "Because he lacks insight. People who have personality disorders don't think there's anything wrong with them. They think there are things wrong with everyone else" (11/12/15 at 177).

The court finds that the behavior it observed defendant exhibiting in the courtroom during the trial is consistent with a person who was the victim of domestic violence. It further finds that the behavior it observed plaintiff exhibiting in the courtroom is consistent with a person who was the perpetrator of domestic violence. Thus, the parties' in-court conduct constitutes further proof that plaintiff assaulted defendant.

### H. Testimony of Dr. Alan Ravitz and Linda Gottlieb Kase as to Domestic Violence

The court heard from two mental health practitioners with regards to domestic violence and other matters concerning custody and access to the child. The first was Dr. Ravitz, the psychiatrist appointed by the court to conduct the neutral forensic custody evaluation. His report, dated September 8, 2014, was admitted into evidence as a court exhibit, and he testified on the afternoon of September 15, 2014 before Justice Kaplan and for the whole day on November 12, 2015 before this court.

Dr. Ravitz was a credible witness. His answers, based on his long experience as a forensic evaluator, were considered, cogent and reflective of a witness who did not have a preconceived notion of the case or an agenda to advance. And even though the report was completed and his last testimony given more than a year before the trial recommenced, Dr. Ravitz exhibited a strong

command of the material and excellent recall as to the facts and circumstances.[14]  As he explained, his knowledge of the case was derived from his many hours of interviewing each party, speaking with a host of collaterals, reviewing reams of documents (including the text messages), and considering the results of the psychological testing conducted on the parties.

Much of what Dr. Ravitz testified to regarding domestic violence, often in the form of answers to hypothetical questions from the parties and the court, has already been discussed under the previous subsections of this evidentiary analysis.  He also gave specific opinions as to what he believed took place between plaintiff and defendant.  He testified that it was his professional opinion that it was "likely" that plaintiff physically assaulted defendant (11/12/15 tr at 23) and that "it was more likely than not that Claire's allegations were within the realm of accurate" (*id.*).

Later in his testimony, Dr. Ravitz elaborated on those opinions, by stating:

> My own assessment of the personalities of the two parties and
> histories they provided me was such that I found it exceptionally
> hard to believe that Claire was the aggressor in these situations. It
> was much more likely, in my opinion, that Anthony was

(11/12/15 tr at 173).

Thus, the credible evidence given by Dr. Ravitz, both in the form of his report and testimony, supports a finding that plaintiff is guilty of having physically assaulted defendant.

Plaintiff called a witness, Linda Gottlieb Kase, who ostensibly conducted a peer review of Dr. Ravitz's forensic report.  Ms. Gottlieb Kase, who is a Licensed Marriage and Family Therapist (LMFT) and a Licensed Clinical Social Worker (LCSW) testified on November 19, 2015.  This

---

[14] Plaintiff's actions that caused the trial to be initially interrupted and its delayed resumption are discussed in this court's Sanctions Decision (*Zappin*, 49 Misc 3d 1201[A] at 10-12).

court finds that Ms. Gottlieb Kase neither performed a legitimate peer review, nor was she a credible witness in most instances. At best, she was able to convey some knowledge as to domestic abusers and their victims; at worst, she presented flawed opinions based on equally flawed methodology.

Whereas Dr. William Manion, plaintiff's forensic pathologist, formulated his opinions to say exactly what plaintiff wanted him to say, Ms. Gottlieb Kase went one step further. She seems to have had a preconceived notion of the dynamics of the case even before she was hired by plaintiff to work on his behalf. As the AFC showed, Ms. Gottlieb Kase's website (*www.endparentalalienation.com*) bears the heading "Have Expert Will Travel"and a banner across the top reading "End Parental Alienation." (AFC's Exhibit 1). From this, one could reasonably assume that Ms. Gottlieb Kase would conclude, as she did, that this was just another case where a mother was alienating a child from his father with false claims of domestic violence.

The methodology Ms. Gottlieb Kase utilized to ensure that her findings conformed to her hypotheses was simple. Rather than review the report and analyze it for departures from accepted practices, inherent contradictions, or other flaws, as is the standard procedure for a peer review, she conducted interviews and reviewed evidence. But instead of interviewing multiple people and reviewing evidence from multiple sources, she interviewed only one person and reviewed only the evidence supplied to her by one person. That person, of course, was plaintiff.

Based on speaking to plaintiff for five to six hours and accepting everything he told her to be the truth, and reviewing the documents and fully accepting plaintiff's representations that they were all accurate and genuine, Ms. Gottlieb Kase determined that defendant was lying about every aspect of the case. Her conclusion was that defendant had harmed plaintiff, that she was alienating

the child from plaintiff, that plaintiff should have full custody of the child, and that the child, who has lived his whole life with defendant, should have no contact at all with her for a period of at least 90 days. After those 90 days, according to Ms. Gottlieb Kase, defendant should only be entitled to supervised visitation.

Needless to say, Ms. Gottlieb Kase's conclusion is absurd. And the methodology she employed to reach that conclusion is equally absurd. First, it bears no resemblance to the way a proper peer review of a forensic report is to be conducted. Second, even if it was proper to conduct interviews and review evidence, considering only one side's evidence and not interviewing both parties undoubtedly results in a highly flawed analysis. And third, there can be no assumption that the one party interviewed, who happens to be the party paying for the testimony, is indeed telling the truth and that the documents supplied by that party are true and accurate.

As has been shown, plaintiff was not truthful and the documents he had Ms. Gottlieb Kase review were falsified. Consequently, her position that because defendant lied about the text messages – which she did not – she was, in turn, lying about everything is a fallacy based on an false premise. Accordingly, Ms. Gottlieb Kase's testimony that plaintiff did not assault defendant, and in fact, it was defendant who harmed plaintiff, lacks any credibility and must be rejected.[15]

What Ms. Gottlieb Kase was able to do competently was to present certain information that she acquired from the years she has spent as a social worker involved with domestic violence

---

[15] Ms. Gottlieb Kase's methodology, if it can be called that, is similar to that of the mother's expert psychiatrist in *In re Custody of Rebecca B.*, 204 AD2d 57, 58 (1st Dept 1994). In that case, the Appellate Division took issue with the psychiatrist having only interviewed the mother. The court stated: "Since the mother's psychiatrist has not interviewed the child or appellant, little weight should be accorded to his recommendation that custody be awarded to the mother."

cases. She testified that only 50 percent of domestic violence victims go to the police (11/19/15 tr at 731). Similarly, she testified that "anywhere between 25 percent to 50 percent" of domestic violence victims do not seek medical care (*id.* at 855-856). By so doing, plaintiff's own witness provided statistics that refute his argument that defendant's failure to go to the police or seek medical attention for her injuries constitutes proof that he did not assault her. In this way, Ms. Gottlieb Kase's testimony must be seen as further evidence that there was domestic violence, and that the violence was committed by plaintiff against defendant.

Ms. Gottlieb Kase also showed herself to be knowledgeable about the contents of the Diagnostic and Statistical Manuel of Mental Disorders, Fifth Edition. Better known as the DSM-5, it is used by mental health professionals to diagnose and classify mental disorders. In response to defendant's attorney's questions on cross-examination, she testified as to how the DSM-5 defines the characteristics of an antisocial personality disorder (*id.* at 862). Plaintiff exhibits most, if not all, of these characteristics including disregarding and violating the rights of others, failing to conform to social norms with regard to lawful behavior, repeatedly lying, being deceitful and manipulative in order to gain personal profit or pleasure, demonstrating a pattern of impulsivity, displaying a reckless disregard for the safety of himself and others, providing superficial rationalizations for hurting and mistreating others, blaming his victims, and failing to compensate or make amends for his behavior. Accordingly, Ms. Gottlieb Kase's testimony served to confirm that plaintiff is afflicted with an antisocial personality disorder. This testimony, along with the conclusions drawn by Dr. Ravitz opinions, further establishes the likelihood that plaintiff is a domestic abuser.

## 2.   WAS THERE A PATTERN OF COERCIVE CONTROLLING BEHAVIOR?

Physical violence may be the most reviled form of domestic abuse, leaving as it does black eyes, bruises, wounds, and worse. But it is not the only form of abuse. There is also non-physical violence in the form of coercive, controlling behavior on the part of the abuser. Also referred to as "coercive controlling violence," Dr. Ravitz described it this way:

> Domestic violence can be categorized in a variety of different ways but coercive controlling violence is violence that's perpetrated in an effort to control the partner and so there are things like intimidation, isolation, threats. So, I mean, that's basically what it is. Its coercive. Its like if you want the person to do something you coerce them into doing something by intimidation, threats or actual violence and that violence can be either verbal or emotional or physical

(11/12/15 at 121).

One only needs to read a cross section of the text messages plaintiff sent defendant to understand how potent a weapon "coercive controlling violence" can be. Even relatively early on in the relationship, plaintiff established a pattern of threats that he would leave defendant if she failed to do what he wanted, or accusing her of being selfish and uncaring when she would not or could not meet his demands, or undermining her confidence and sense of self-worth if plaintiff felt he was being deprived of the confirmation and recognition that he believed he was entitled to but was not receiving, either personally or professionally.

It ultimately turned out that plaintiff could no longer threaten to leave defendant because she made the decision to escape the pattern of physical and coercive violence and leave him first. This resulted in plaintiff's coercive controlling behavior intensifying even further into what Dr. Ravitz termed "intimate terrorism" (11/12/15 tr at 121). This behavior included threats to take the child from her, only to be followed by texts stating that he never wanted to see the child again and

did not want to play a role in his life (12/3/15 tr at 1194). One of these texts read, "No relationship with you and no relation with [the child]. I don't even want him to know my name." Another read, "I've made the decision to have no role in [the child's] life. I hope you can respect that." (Defendant's Exhibit OOO 12/4/13; 12/6/13).

As with so many of plaintiff's actions, his threats concerning the child could change at a moment's notice. As a result, defendant would never know what plaintiff was planning. Would he be intent on taking the child away from her or was he really just going to walk away and never see his son again? A striking example of this conduct occurred in this litigation on December 16, 2015, when, after testimony in the trial had concluded and only summations remained, plaintiff's then co-counsel, David Schorr, sent an e-mail to the attorneys and the court. Mr. Schorr's e-mail stated, "Mr. Zappin has directed me to inform the Court that he wishes to relinquish his custody and access rights to [the child]." Plaintiff himself sent an e-mail the next day, December 17, 2015, stating, "Given the pressing nature of my intentions, we request an immediate telephone conference (with a court reporter present) with the Court. I am available all afternoon."

Plaintiff's e-mail declaring his intention to relinquish all rights to custody and visitation turned out to be just another tactic designed to create more drama, make sure he remained the center of attention, and get defendant to meet his demands. When the court declined to hold the "immediate telephone conference" that plaintiff wanted, he dropped the matter. Predictably, in his written summation submitted on December 25, 2015, there was no indication that he had ever even considered relinquishing those rights. Instead, he was back to demanding expanded, unsupervised visitation and being awarded custody.

Plaintiff's threats to defendant went beyond taking the child from her. He constantly stated

he was going to destroy her, both personally and professionally.  His text messages to defendant

have repeatedly referenced reporting her, an attorney at a large law firm, to the disciplinary

committee and making sure she loses her license to practice law.  An example of a text message

sent by plaintiff to defendant threatening to both take the child away from her and cause her to lose

her license to practice law is one dated March 15, 2014, which reads:

> But this is the way to act Claire. Not talking out problems or being
> reasonable. I don't care anymore. I'm done with your lies and
> abuse. I'm not protecting you anymore. Actions have
> consequences and yours will be your bar license and [the child]. I
> hope it was worth it

(Defendant's Exhibit OOO, 3/15/14).

Plaintiff also felt compelled to use text messages to lash out at defendant in other ways as

well, saying the most reprehensible things he could to her, such as "[The child ] was nothing but an

attempt from an aging shrew to have a baby" (*id.* at 12/4/13).  On December 11, 2013, he sent her

this cruel and belittling series of messages:

> No one wants you Claire! No one! You have run everyone out of
> your life. So *what's it going* to take to get you out of mine?
>
> Please tell me!
>
> Well enjoy the ride from here on out.
>
> Single mom Claire comfort
>
> You know what using [the child] as a weapon is the worst form of
> abuse right?
>
> Oh well I can't wait until a ny judge deems you an unfit mother
>
> It's only a matter of time.
>
> No response? Your whole family is full of maladjusted lying scum

(Defendant's Exhibit OOO, 12/11/13).

Plaintiff's threats and outrageous comments were not directed just to defendant; he sent

many equally horrible text messages to her father, Brian Comfort.  In these texts, he accused Brian

Comfort of being a child abuser and threatened to disseminate this falsehood to the elementary

school where his wife, defendant's mother, taught second grade.  He also threatened Brian Comfort

that he was going to get him disbarred in Washington State, where he practices law.  In a text sent

on January 25, 2014, plaintiff summarized his threats:

> I promise you Brian I will expose the truth about you with the
> evidence I've found and burn you [sic] reputation to the ground
> like you've attempted to do to mine. Then I'm going after your bar
> license.  And when you think I'm done, I'm going to take every
> penny you have.  You're not above the law and you poked at the
> wrong person.  You orchestrated and escalated this whole situation
> and I'm going to make sure that in the end it will be you who
> suffers the consequences, you child molesting sicko.  You make
> Michael Jackson look like a saint

(Defendant's Exhibit O).

Many of the text messages to Brian Comfort were used as an opportunity to make further

threats concerning defendant and her job.  One of the more disturbing of these messages, which

plaintiff sent to Brian Comfort on May 7, 2015, refers to defendant's employment at Weil, Gotshal

& Manges, LLP, and reads as follows:

> And since you went after my job at both Latham and Mintz, I
> won't hesitate to hold back at Weil.  I'm sure Weil's clients will
> love to have someone who calls their child "niglet" "retard" and
> "nigger baby," shows up to client meetings hungover with her
> clothes inside out, doing lines of coke off their iPad and "getting
> hammered" while pregnant working on their cases (not to mention
> she beats and smacks her baby, I have the security footage).  I
> mean I'll have to include those screenshots in my very public
> complaint against Harriet [Cohen, the AFC], Governor Cuomo's
> divorce attorney, for malpractice since she believes Claire is a

"wonderful mother." Publicity really sucks, ask my buddy David Schorr.

But that's not even counting all the forged documents down in DC that will get her disbarred. I gave you 20 months to settle, stop lying and think about your grandson and daughter so don't come pointing the finger at me when there's nothing left of Claire's career or character much less your retirement account

(Defendant's Exhibit P).

Aside from being one of a constant stream of messages about how plaintiff will destroy defendant's "career" and "character," what is especially troubling about this text message is that it includes allegations of racism, drug and alcohol abuse, child abuse and falsification of evidence. These are the type of sensational allegations that indeed can destroy a career or ruin a person's reputation. The truth, of course, is that none of the allegations are true, and plaintiff knew them not to be true when he made them.

The credible evidence establishes that the only party who "forged documents" was plaintiff, and every text that is purportedly from defendant and has her using words like "niglet" and "retard" was fabricated by him to cast her in a negative light. Defendant convincingly testified that she would never use, in either speech or writing, the offensive terms that plaintiff tried to attribute to her through the falsified texts. The evidence also shows that defendant did not use drugs (the iPad reference came from a story that plaintiff told defendant about somebody in *his* office), drink excessively or hit the child. Thus, the text message, sent only six months before the resumption of the trial before this court, is yet another chilling example of how plaintiff not only threatens and intimidates, but how he lies and falsifies evidence in the process.

One of the characteristics of this campaign of harassment, threats and vilification, is how plaintiff would, on occasion, profess to be contrite and express remorse for what he did, and then

65

soon after resume acting the way he had all along. These changes could be as abrupt as plaintiff

vacillating over the course of a few hours between demanding custody of the child and then

declaring he wanted nothing to do with him, or acting reasonably in the courtroom and then

suddenly exploding at the slightest perceived provocation.

An example of this rapid-cycle mood swing from abusive to apologetic and back again is

the text exchange between plaintiff and Brian Comfort, which was previously discussed above (*see*

*e.g., supra* at 25-27). An even more startling example, and an indication of how as part of the

pattern of abuse plaintiff sought to play on defendant's emotions, is a series of texts he sent her on

March 3, 2014. After months of barraging defendant with harrowing messages, he then turned

around, as part of a cordial and polite text conversation, to tell her that she is a "good person and a

good mom," that he loves her, and that he "just wants things to get better" between them

(Defendant's Exhibit OOO, March 3, 2014).

The last three messages sent the evening of March 3, 2014, between 10:32 p.m. and 10:34

p.m., read as follows:

> I hope you can trust me again. I know you're upset and angry at
> me, but no one cares more about [the child] and you than me.
>
> I'm always here for either of you.
>
> Thank you again for chatting. Goodnight. Tell [the child]
> goodnight for me

(*id.*).

By 5:34 a.m. the next morning, however, plaintiff was swinging wildly back to a state of

abuse towards defendant. There had been no communication between the parties since plaintiff's

messages seven hours earlier, so there could not have been anything that defendant did or said that

to prompt or provoke him to attack her.  Nevertheless, having had time to obsess and fixate, plaintiff abandoned any attempt to be civil and immediately returned to castigating defendant, he ominously beginning a new series of text messages to her by saying, "Claire, I was just reflecting on our conversation" (Defendant's Exhibit OOO, March 4, 2014).  Plaintiff then proceeds to repeat his standard accusations that she "ripped" the child away from him "in the dead of night," and that she "strong armed and fibbed" her "way to custody" (id.).  This time, notably, there was yet another emotional swing after defendant told him "please don't contact me further," and plaintiff again sought to be conciliatory (id.).

The unpredictability of plaintiff's conduct has cast a pernicious shadow over every aspect of this case, especially his dealings with defendant.  Towards the latter part of 2014, the pattern of threats followed by nice words followed by more threats had apparently run its course.  By then, defendant had come to terms with the fact that any attempt at having a dialogue with plaintiff would only result in exposing her to further abuse as part of his pattern of coercive controlling behavior.

Another aspect of plaintiff's campaign of coercion and control has been the litigation itself. To plaintiff, this court case, along with the many other lawsuits he has brought against defendant, her parents, and their attorneys, is not the means to a legitimate end, with the end being the adjudication of a good faith dispute between the parties as to important issues.  Rather, plaintiff looks at the litigation as an end in itself.  That end has little or nothing to do with the outcome of a dispute and far more to do with plaintiff's desire to inflict pain on others by making them defend against his never ending lawsuits, and contend with his constant abusive litigation tactics.  One way of inflicting pain is by making the other side spend countless dollars in legal fees.

67

As someone who describes himself as a "trained and skilled" litigator, plaintiff is perfectly situated to pursue a path of "scorched earth" legal warfare against his foes. In so doing, he incurs no counsel fees of his own because he is *pro se* and Mr. Schorr, when he was serving as co-counsel, was volunteering his time. This has resulted in defendant having had to spend hundreds of thousands of dollars on lawyers to defend herself against plaintiff, while he has spent little or nothing. Clearly, this gives plaintiff immense satisfaction, as evidenced by his taunting text messages to defendant's father saying "I would really love to see your face when you write those checks to Wallack [defendant's attorney]," and "you wouldn't be half [a] million dollars in the hole if you hadn't butted into our relationship and created a mess. I hope you go broke over this . . . " (Defendant's Exhibit P).

Dr. Ravitz testified that he is familiar with the concept of an abuser using the court system to perpetuate abuse, and he has seen this happen in cases in which he has been involved as the forensic evaluator (11/12/15 at 123). In this case, the tactics plaintiff pursued leading up to the trial, many of which are described in detail in the Sanctions Decision, and the unpredictable and often unacceptable conduct he exhibited at the trial itself, combined to create a perfect storm of abusive litigation. To make matters even worse, plaintiff indicated during the trial that the practice would continue.[16] Clearly, abusive litigation was – and could very well continue to be – an integral

---

[16] Plaintiff's threats of further litigation extend not only to defendant and counsel, but to the court as well. When asked on cross-examination by defendant's counsel what he would do for a job if he was unable to practice law in New York, plaintiff responded:

> What if I'm unable to practice law in New York? I'll do something else but if it comes to that then I think we have you and I have a problem and Justice Cooper and I have a problem and it will have to be litigated

part of plaintiff's pattern of coercive and controlling behavior. That pattern, when coupled with plaintiff's history of committing actual physical violence against defendant, in turn, renders him guilty of being an abuser in every sense of the word.

### 3. WAS THERE A LACK OF APPROPRIATE PARENTING ON THE PART OF EITHER PARTY AND DO THEY EACH POSSESS SUFFICIENT PARENTING SKILLS?

DRL § 240 (1) (a) requires the court to make two findings. First, whether the parent alleging that the other parent committed domestic violence has proven the allegation by a preponderance of the evidence, and second, what effect the finding of domestic violence has upon the best interests of the child.

The court has directly answered the first question, finding that defendant proved the allegation that plaintiff committed domestic violence against her – both in terms of actual physical violence as well as coercive controlling violence – by a preponderance of the evidence and more. Although not directly addressing the second question, the court has made reference throughout the preceding sections of the decision to the negative consequences domestic violence is deemed to have upon children in general. In this case in particular, those consequences are almost self-evident: plaintiff's history of assaulting defendant coupled with his explosive anger and inability to control his emotions raises the distinct possibility that he could hurt his son; plaintiff will be unable, or even unwilling, to conceal from the child his unbridled anger and aggression towards defendant; plaintiff will communicate to the child, by either word or deed, that it is acceptable to abuse other people and be oblivious to their needs, safety and feelings; and that instead of being a

_____

(11/30/15 at 1336).

69

positive role model for his child, plaintiff will impart to him the notion that one need not take responsibility for his actions, but rather, should seek to place the blame on others.

Perhaps the most gripping moment of the trial was when defendant's counsel played the audio recordings of FaceTime calls that took place between plaintiff and the child in January 2014.[17] These offered a chilling glimpse as to what plaintiff would do to harm defendant without the slightest concern for the effect of his actions on the child. Although the child was only a little more than three-months-old at the time, plaintiff directed his remarks to him and made reprehensible comments about defendant and her father. This is what plaintiff said to the child in those FaceTime calls:

January 22, 2014

Hey buddy. Sorry your mommy's going to jail tomorrow. I'm coming to get ya.

January 27, 2014

Does mommy not comb your hair buddy. No she doesn't. No. She's a bad mommy, isn't she? Yes she is. Daddy gon' come get you. He's writing a motion right now. He's gon' get you, he's gonna love you. He's gonna take care of you. Yes he will. He not gonna let mommy not comb your hair anymore. No he's not. Daddy gonna get you. Yes he is. Are you happy? You miss your daddy [inaudible]? Your mommy's a mean old lady. Yes she is. I'm gonna come get you. Yes I am. I'm gonna come get you. Look at you. Your hair's not even combed. There's my buddy. Yes he is. My buddy. That's my buddy.

January 29, 2014

---

[17] Predictably, plaintiff initially challenged the authenticity of the recordings, but he eventually acknowledged that it was indeed him saying the things that could be heard being said. Although he has persisted in insisting that defendant improperly spliced the recordings, the court is confident that the calls were recorded verbatim and what it heard was exactly the way plaintiff said it. A flash drive containing the recordings was admitted into evidence as Defendant's Exhibit W. The transcript of what is on the flash drive is in evidence as Defendant's Exhibit V.

Hey little man. Hey little man. Your mommy's gonna be a defendant tomorrow. Again. That's funny isn't it? And your grandpa, and your grandma. Defendant. [inaudible] You laughin'. Daddy's workin' hard. He's gonna get you back. Yes he is. He's gonna be in that courtroom tomorrow. Yes he is. Aww that's my boy. That's my boy. That's my boy. Yes it is. Well, sorry, sorry you came to notoriety in court pleadings buddy. It's not funny. It's not funny. I'll get you outta there I promise. I made you that promise when you left. I'mma get you outta there, I promise. Defen-dant. That's probably gonna be your first word. I'm comin' for ya buddy. I'm gonna get you outta there. I promise. You're welcome. God, who is that, is that Brian back there trying to finger that kids asshole? Fuckin' pervert.

Fuckin' pervert man. Pedos. Fuckin' everything else in that family.

There's my buddy. There's my buddy. Geez, Brian, quit fuckin' with that kid, come on. Fuckin' pedo. I'll talk to you later buddy. Daddy's gonna get back to work so he can be in court tomorrow. Bye. Love you.

January 31, 2014

Hey buddy. Ol' Brian doesn't have his finger up your butt tonight does he? Yeah. That's my boy. That's my boy. Yeah. Looks like they left you in that rocker again. You have a mean mommy, yes you do. I'm sorry buddy. Doing everything I can to get you. It's just a matter of time buddy. Look at you, you got him sitting on fucking toys. Gosh. Let me take a picture [inaudible]. That's bullshit. I'm sitting here trying to take a picture of him. You have him layin on toys and [inaudible] there and grab him. That's ridiculous. Well hopefully Brian isn't sexually abusing you buddy. We'll make sure he never does. I know. I know. That's my boy. That's my boy. Daddy's got a lot of work to do. He's gonna put the hurtin' on your momma. Yes he is. He gonna put the hurtin'. Put the ol' [inaudible] whoopin' as they say. Alright buddy it's just a matter of time. [inaudible] Don't worry, you'll thank me later when you're not around a bunch of drug addicts and alcoholics.

As disturbing as plaintiff's FaceTime comments to the child are to read, it is not nearly as

disturbing as listening to the tapes and actually hearing plaintiff say what he did. This is because

plaintiff spoke to the child in a leering, twisted and cruel voice.

Plaintiff's defense to the FaceTime calls, after first making his usual claim that defendant somehow fabricated them, was that he was upset because defendant and her parents had "abducted" his child. This defense was in line with plaintiff's overall position throughout the trial that he was entitled to do whatever he had to do and say whatever he had to say because he was the victim here. As plaintiff saw it, defendant and her parents caused him grievous harm and treated him with profound disrespect by taking his child and going to Washington State. This, of course, ignores the fact that it was essential for defendant to leave Washington, D.C. and seek the safety of her parent's home to protect both the child and herself in the face of plaintiff's violently abusive conduct.

Plaintiff's other defense with regard to the FaceTime calls is that because the child was so young he was in no way cognizant of anything that was happening and whatever was said, no matter how inappropriate, would not have any effect on him. As the AFC noted, however, even infants are aware of their surroundings and can sense stress exhibited by the people around them, particularly their primary caregivers and attachment figures. Thus, the stress and anguish defendant experienced from hearing those horrible calls may very well have been sensed by the infant whom she held in her arms.

One point plaintiff sought to make throughout the trial, and one he stresses in his written summation, is that even if he committed bad acts against defendant, and even if some of those acts, like the FaceTime calls, may have been in the presence of the child, they all took place some time ago. What he argues is that the court should focus on the quality of the supervised visitation that he has had with the child for the last two years. According to plaintiff, the many hours of visitation

72

have all been without incident and his behavior at all times has been exemplary.

As proof of how well his visits have gone, plaintiff called five supervisors from CFS as witnesses. Two of them testified before Justice Kaplan and three testified before this court. All of these witnesses were credible. They uniformly testified that plaintiff has shown care and concern for the child, been attentive to the child's needs, been cooperative with their directives, and for the most part, has not done or said anything that could be construed as being inappropriate. This testimony from the CFS supervisors was corroborated by written reports from CFS (Plaintiff's Exhibit 171) and the records of The Capital Region Children's Center, the organization that supervised plaintiff's visitation while the child was still in Washington, D.C. (Plaintiff's Exhibit 172).

Although the court is pleased that supervised visitation have gone as well as they have, the current situation, is, in many ways, an optimum environment for plaintiff to be on his best behavior and control the problematic parts of his personality that are of such concern. For one thing, the child has yet to become fully verbal. Consequently, there is little chance that he will say anything to provoke an angry reaction from plaintiff; a reaction, which we have seen, can often turn into an uncontrollable rage. Similarly, the child is not at the point where he will make decisions or take actions that could cause plaintiff to react against him. Finally, the presence of the supervisors, although largely acting as silent and neutral observers, creates an environment where plaintiff feels compelled to restrain himself from disparaging the defendant and her family in front of the child.

But even within the protected environment of supervised visitation, plaintiff has still been unable to control an obsession that is harmful to the child's well being. This is his delusional belief that the child is suffering physical injury as a result of defendant's abuse or neglect. The

73

CFS supervisors' testimony confirmed that the plaintiff repeatedly examines the child looking for bruises, scrapes and other injuries, many of which he insists on bringing to the attention of the supervisor. Every time, the supervisors, all of whom are mandatory child abuse reporters, declined to take action. The reason they do not report the injuries as suspected abuse or neglect is because they recognize them for what they are: minor and routine nicks, scratches and bruises that every child sustains while playing, walking, or engaging in other age-appropriate activities (*see e.g.,* 11/16/15 at 233).

Plaintiff's fixation on what he perceives to be evidence of defendant's abuse and neglect of the child is problematic in two ways. First, by scrutinizing every inch of the child's body as he does, plaintiff sends a signal to the child that he is at risk of harm when he is with his mother. The message, which has no basis in reality, is that the child is in constant danger and only plaintiff is there to protect him. It is likely that even now the child has some awareness of what plaintiff is saying and doing in these instances. This false and harmful message that plaintiff is seeking to impart – that the child's mother is a danger to him – will only become more dangerous as the child's capacity to understand words and actions increases.

The second problem, stemming from plaintiff's fixation with the child's routine bruises and scratches is even more serious. This is plaintiff's pattern of using those minor bruises and scratches as a basis to report suspected child abuse, at the hand of defendant, to the Administration of Children's Services ("ACS") and filing criminal charges against her with the police. There were three separate reports to ACS, one in 2014 and two in 2015. All were dismissed as unfounded, but they required defendant – and the child – to have to go through the trauma of an investigation. Plaintiff contended that at least some of the reports were made by his father, Jeffrey Zappin (who

74

he also blames for setting up the website on which the child's photograph and name were posted), but the evidence is clear that plaintiff was involved in the matter every step of the way.[18]

Plaintiff caused even more trauma when he chose to file criminal charges against defendant with the New York City Police Department ("NYPD"). On July 14, 2015, detectives from the Special Victims Squad came to defendant's apartment in the middle of the night. Once there, they woke the child to inspect him for the injuries plaintiff alleged that defendant had inflicted upon him. The detectives, of course, found absolute nothing to indicate any form of child abuse or mistreatment, and they promptly closed the case.

Seeking to distance himself from the incident involving the Special Victim Squad, plaintiff sought to explain how he simply went to the police station to express his concern that "at worst [defendant] might have been a little bit neglectful" (11/23/15 at 969). According to plaintiff, he was expressing his concerns to a police officer when "suddenly they put me on the phone with a Detective Fronerberger or something like that" (12/3/15 tr at 1836). This resulted in the Special Victims Squad's involvement on the case, although plaintiff testified that "it wasn't my intent to send it to the Special Victims, not at all." The next thing plaintiff knew, or so he testified, was that Detective Fronerberger made a record of him stating that defendant "had been abusing [the child] for some time" even though he never said that (12/3/15 tr at 1838).

Plaintiff would have us believe once more that someone, this time the Special Victims

---

[18] Jeffrey Zappin was on plaintiff's witness list and was a constant presence in the courthouse during most of the trial. At one point he was actually in the courtroom helping plaintiff set up a visual aid he was using for his direct examination of defendant. Yet, plaintiff did not call him as a witness. Moreover, when defendant sought to call Jeffrey Zappin as her witness, and had him served with a subpoena to appear, plaintiff had his father flee the courthouse.

Squad detective, was putting words in his mouth. Yet again, plaintiff claims he was being made by others to do something he had no intention of doing. The reality, though, is that plaintiff intentionally sought to have criminal charges brought against defendant because he was obsessed with the idea that she was abusing the child and it was another opportunity to retaliate against her and cause her harm.

Related to plaintiff's fixation that the child is being physically injured by defendant's abuse, is his preoccupation with what he perceives as the child's medical and developmental problems, and defendant's inattention to those problems. Throughout his text messages and the countless motions he has brought in the case, he has continually asserted that the child suffers from torticollis, asymmetrical jaw, eczema and developmental delays. Furthermore, he has continually claimed that while he was prepared to address these problems, defendant ignored them because she was too involved with herself and her career.

The credible evidence, from the testimony of the parties and other witnesses, and from the many medical records admitted into evidence, establishes that the child is healthy in all regards and is fully meeting his developmental milestones. Yes, the child did have torticollis, a congenital condition involving a tilting of the head, and a slightly asymmetrical jaw for a short time following his birth, but those conditions are often found in newborns, and as is generally the case, the conditions were quickly resolved. And yes, the child does have some eczema, but it is a mild case that is being properly treated. And finally, yes, some small developmental delays were initially observed, but the child is now doing everything a healthy and perfectly functioning two-year-old should be doing (*see* Plaintiff's Exhibits 47, 48, 49 and 173; Defendant's Exhibit GGGG).

Plaintiff's irrational insistence that the child is suffering from serious ailments that are not

76

being treated properly may stem in part from his preoccupation with his own health. The evidence

show that plaintiff was frequently telling defendant that he was afflicted with cancer, suffering

from serious heart problems or beset by kidney ailments. None of this was true, as is reflected by

the testimony and plaintiff's medical records (Plaintiff's Exhibit 176).

The other reason for plaintiff's fixation with the child's health and his need to exaggerate

relatively minor problems, all of which were being properly treated, is that it gives him another

tool with which to assail defendant. This can be seen throughout the text messages, the repeated

motions in which he sought (and was denied) orders requiring the child to be examined by

specialists in hospitals and in the child's medical records themselves. A perfect illustration of how

plaintiff has sought to use the child's health as part of his campaign against defendant and as

fodder for this litigation is found in an entry that the child's pediatrician, Dr. Amy DeMattia, made

in her records on July 29, 2015. The entry reads:

> I contacted Harriet Cohen [the AFC] approximately 1-2 weeks ago
> secondary to my concern regarding father's frequent phone calls
> here, and his ACS allegations against [the child's] mother. I
> continued to emphasize to Ms. Cohen that [the child] is a healthy,
> thriving, developmentally appropriate 1 ½ year old, and this his
> mother Ms. Comfort appears at all times appropriate. I expressed
> my concern that the frequency/type of phone calls made by [the
> child's] father Mr. Zappin, appears at times to represent additional
> interests aside from that of the health of [the child]. Ms. Cohen
> expressed her understanding

(Plaintiff's Exhibit 47).

The court does not doubt that in his own way plaintiff loves and cares about the child, even

if that love and caring, in large part, has to do with himself more than it has to do with another

human being. One of the few times that plaintiff expressed positive emotion, as opposed to anger

and resentment, during the trial was when the court, after plaintiff was making accusations of

defendant being with other men around the time that the child was conceived, asked if he was

questioning paternity. Plaintiff's response, delivered in a voice beaming with pride, was

"Have you seen a picture of [the child]. He looks exactly like me" (11/24/15 tr at 1265).

Unfortunately, plaintiff's love and caring only goes so far. It has not prevented him from

violently abusing the child's mother in his presence, subjecting the child to intrusive examinations

at his hands or the hands of police detectives and ACS officials, and saying unspeakable things to

him during FaceTime calls. That love and caring has also failed to prevent him from posting on a

website he operates pictures of the child and documents containing the child's name, or providing

those pictures and documents to websites run by others. And it has not prevented him from leaving

defendant, his child's mother, fully responsible for almost every dollar needed to keep his child

clothed, fed, sheltered, participating in enrichment programs, and receiving medical care. At the

same time plaintiff was earning over $230,000 a year, he only managed to pay a total of $4,000 in

child support over the course of two years, all the while seemingly spending freely on the latest in

high-tech communication devices and whatever he needed to fuel his incessant campaign of

abusive litigation.[19]

There is little that need be said about defendant. Aside from plaintiff and Linda Gottlieb

Kase, the witnesses, including Dr. Ravitz, uniformly testified that she is a good mother. She is

---

[19] Plaintiff blamed his failure to pay child support on the fact that he pays CFS for
supervised visitation. Although the cost is substantial, it is not the "well in excess of $100,000"
that he claims it to be (Plaintiff Written Summation at 4). Based on the bills plaintiff submitted,
his average monthly cost over an 18 month period amounts to $5,700 (Plaintiff's Exhibit 183).
Inasmuch as plaintiff was earning $231,000 a year, he certainly had the means, regardless of what
he was paying CFS, to pay child support; he simply chose not to do so. Moreover, his need to
pay for supervised visitation is not something that he can blame, as he has continually sought to
do, on defendant. It is an obligation he incurred as a direct consequence of his own misconduct.

attendant to the child's needs, nurturing, caring, and fully committed to his best interests. At the same time she is raising her son, she is also working in a demanding job so that she can single-handedly provide him with both the necessities and the additional benefits that a child needs to thrive in New York City.

The evidence further shows that despite the way she has been treated by plaintiff, defendant has studiously avoided doing anything to alienate the child from him. Even in the face of his physical abuse and coercive controlling behavior, she sought to placate plaintiff and be conciliatory so as to keep him in the child's life. And never once did she interfere with plaintiff having visitation. In fact, despite her demanding work schedule, she has almost always had the child ready on time to see plaintiff, and she has regularly cooperated with him if he needed a schedule change.

It seems, however, that despite her best efforts to remain committed to having plaintiff play a role in the child's life, irrespective of all the harm he had inflicted and all the problems he had caused, defendant's resolve faltered after the trial. This is reflected in the request made by her attorney in his closing argument, and joined by the AFC on behalf of the child, that there be no visitation at all. One can only assume that after all that plaintiff did during the trial – lie, falsify evidence, throw temper tantrums, and blame her and everybody else for the all the wrongs he has committed – defendant reached the point where she just could not endure any more.

In his written summation, plaintiff states the following about defendant:

> Put simply, the evidence deduced (sic) suggest that Ms. Comfort is not the person she has attempted to portray herself as during this proceeding. Behind the smokescreen and veil is a person who can be vindictive, controlling, intemperate and unstable, who at times shows little regard for those around her – including her own child

79

(Plaintiff's Written Summation at 16).

Actually, the evidence adduced at trial shows the complete opposite; it is not defendant, but plaintiff who has those characteristics and personality traits. What needs to be added to the list, though, is plaintiff's complete lack of self-awareness and willingness to be held accountable for his actions.

Based on the credible evidence contained in this record, the court finds that defendant has properly parented the child and possesses sufficient skills necessary to continue parenting the child in a manner fully consistent with his best interests. On the other hand, the court, based on the credible evidence, finds that plaintiff, by committing domestic violence and other acts inimical to the child's well being, has not properly parented the child. It further finds that plaintiff, with his propensity for violence and other problematic personality traits does not posses sufficient skills necessary to parent the child in a manner consistent with the child's best interests.

## 4.    DID EITHER PARTY COMMIT ACTS AGAINST THE OTHER THAT WOULD BE THE BASIS FOR THE GRANTING OF AN ORDER OF PROTECTION?

Both sides have requested an order of protection against the other. Defendant made her application in a motion brought before Justice Kaplan. By an order dated February 27, 2015, the portion of the motion seeking the order of protection was deferred to an evidentiary hearing that was to commence on March 6, 2015. For the reasons set forth in previous decisions in this matter, the hearing was ultimately incorporated into this custody trial.

Plaintiff made his application for an order of protection under convoluted circumstances. On the night of April 29, 2015, plaintiff, complaining of actions allegedly taken against him that day, went to the Criminal Court. The next day, April 30, 2015, plaintiff filed a petition in New York County Family Court (Defendant's Exhibit XXXX). The judge there granted him an *ex parte*

temporary limited order of protection. Once it was brought to this court's attention that plaintiff

had done this, the matter was ordered removed from Family Court and consolidated with this

divorce case. In addition, this court vacated the temporary order. As with defendant's application

for an order of protection, the hearing on plaintiff's application, in the form of the consolidated

Family Court petition, was incorporated into this custody trial.

The credible evidence, all of which has been set forth in Sections 1 and 2 above,

demonstrates that plaintiff committed acts against defendant that constitute family offenses. These

include the numerous counts of Assault in the Third Degree (Penal Law § 120.00 [1]; *see e.g.*

*Matter of Panico v Panico,* 100 AD3d 907 [2d Dept 2012]), Menacing in the Third Degree (Penal

Law § 120.15; *see e.g. Matter of William M. v Elba Q.*, 121 AD3d 489 [1st Dept 2014]),

Harassment in the Second Degree (Penal Law § 240.26 [1]; *see e.g. Matter of Ramona A.A. v Juan*

*M.N.*, 126 AD3d 611 [1st Dept 2015]) and Aggravated Harassment in the Second Degree (Penal

Law § 240.30 [4]). All of these offenses provide a firm basis upon which the court can issue an

order of protection in favor of defendant and against plaintiff.

Plaintiff's petition provides no such basis. The reason it does not is that there is no credible

evidence to support a finding as to any of the allegations. Most of them are, frankly, just plain

absurd, such as defendant having killed plaintiff's dog in 2013 by feeding him chocolate, or on

April 29, 2015, at the Time Warner Center, defendant having called plaintiff a "shrimp dick

motherfucker," shouting at him "I'm going to snap your neck like a chicken, wait till next time,"

or stalking and menacing him in front of the media at a red carpet event (Defendant's Exhibit XXX

at 2).

The record firmly establishes that defendant is in no way a dog killer (the dog died from the

ravages of old age), that she would not be given to making reference to "shrimp dicks" or making threats about snapping necks "like a chicken," and that she is neither a stalker nor a menace to plaintiff or anyone else. As defendant credibly testified, the only thing unusual that happened that night is that because of a scheduling mishap, the supervisor failed to appear so the visitation could not go forward. When the child ran towards plaintiff, defendant picked him up and brought him back to where they had been sitting waiting for the supervisor. Plaintiff, in turn, then filed the petition consisting of these fabricated events and a litany of recycled allegations about defendant stabbing and beating him. As the court has already found, none of those allegations have even a grain of truth to them.

## CONCLUSIONS OF LAW

A singular characteristic of custody trials, aside from their difficulty, is how highly individualized and fact-specific each one is, with every case having its own story told in its own way. Thus, each case has a particular set of facts and circumstances upon which the court's determinations as to custody and parental access are to be made.

Just about the only constant in a custody trial, other than the requirement imposed by DRL § 240 (1) (a) that the court consider the effect of domestic violence, is that the focus must always be on the best interests of the child (*Eschbach v Eschbach*, 56 NY2d 167, 171 [1982]; *Matter of Frank M. v Donna W.*, 44 AD3d 495, 495 [1st Dept 2007] ["It is well settled that the question of a child's best interests, the foremost consideration in matters of custody and visitation, is within the discretion of the trial court whose determination will not be set aside unless it lacks a sound and substantial evidentiary basis"]; *Matter of James Joseph M. v Rosana R.*, 32 AD3d 725, 726, [1st Dept 2006], *lv denied*, 7 NY3d 717 [2006] ["It is axiomatic that in considering issues of child

custody, a court must determine what is in the best interests of the child, and what will promote the child's welfare and happiness"); *Matter of Jules v Corriette*, 76 AD3d 1016, 1017 [2d Dept 2010] ["In adjudicating custody and visitation rights, the most important factor to be considered is the best interests of the child").[20]  Because a "best interests" analysis is so highly fact-driven, it is incumbent on a court rendering a post-trial custody decision to make specific and comprehensive findings of fact *(see Moseku v Moseku*, 108 AD2d 795 [2d Dept 1985]; *Corso v Corso*, 48 AD2d 652 [2d Dept 1975]; *see also Giraldo v Giraldo*, 85 AD2d 164 [1st Dept 1982], *lv dismissed*, 1982 NY LEXIS 5921 [1982]; DRL § [1][a]).

The questions of fact in a custody trial go beyond the usual "who did what and when?" type of questions that are the basis of so many other kinds of trials.  "As custody determinations turn in large part on assessments of credibility, character, temperament and sincerity" *(Matter of Tori v Tori*, 103 AD3d 654, 655 [2d Dept 2013]; *see Eschbach*, 56 NY2d at 173), the trier of fact is called upon to consider what kind of person each of the parents is.[21]  In a very real sense, the court must

---

[20] DRL § 70, "Habeas Corpus for Child Detained by Parent," charges a court to conduct a best interests analysis in a habeas proceeding.  Subsection (a) of the statute states in relevant part "In all cases there shall be no prima facie right to custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly."  Plaintiff brought a writ of habeas corpus after he discontinued his divorce action.  After he restored the divorce to the calendar, the writ was consolidated with the divorce action and subsumed therein.

[21] Other characteristics and personality features of a parent that have been cited as factors in determining custody and visitation issues are the parent's "stability" and "fitness" *(Ulmer v Ulmer*, 254 AD2d 541, 542 [3d Dept 1998]), "empathy, attachment, judgment and flexibility" *(M.M. v L.M.*, 42 Misc 3d 1235(A), 46 [Sup Ct, NY County 2014]), capacity to "behave in a mature and civilized fashion" *(Jones v Jones*, 185 AD2d 228, 229 [2d Dept 1992]), and the "ability to provide for the child's emotional and intellectual development" *(Gant v Higgins*, 203 AD2d 23, 24 [1st Dept 1994]).  These factors, along with credibility, character, temperament and sincerity, cited in the main text above, all fall within what the Court of Appeals in *Eschbach* referred to as "subjective factors," the evaluation of which "can best be made by the trial court"

83

delve below the exterior persona each side seeks to project and the characteristics each claims to

possess, in order to obtain a true understanding as to what he or she is really like. Family and

matrimonial law practitioners sometimes speak about this process as the court "peering into a

party's true nature."

     In this case, the court had the opportunity to hear extensive testimony from the parties, their

witnesses, and the court's witness over the 13 full days of trial held before it.[22] As a result, the

court was able to make a "first-hand assessment of the credibility of the witnesses" (*Matter of*

*Saunders v Stull*, 133 AD3d 1383 [4th Dept 2015]). In addition to being able to fully assess the

credibility of plaintiff and defendant and thereby determine the truthfulness of what each of them

said, the court, from the many hours each of the parties was on the stand, was, in large measure,

able to ascertain who they truly are. As the Court of Appeals observed quite some time ago, "Face

to face with living witnesses, the original trier of the facts holds a position of advantage" (*Boyd v*

*Boyd*, 252 NY 422, 429 [1930], *rearg denied*, 253 NY 532 [1930]).

     Added to the court's advantageous vantage point was its ability to see the parties' actual

conduct as it played out in the courtroom, both when they were on the witness stand and otherwise.

As discussed at length in the Findings of Fact, the behavior that the court directly observed on the

part of each of party was in itself further proof that plaintiff was the perpetrator and defendant the

victim of domestic violence. Moreover, the parties in-court behavior served to corroborate the

testimony of the court's forensic psychiatrist, Dr. Alan Ravitz, as to the character and personality

---

(56 NY2d at 173).

    [22] The court also carefully read the transcript of the one day of trial held before Justice
Kaplan, at which two CFS supervisors testified and Dr. Ravitz gave the first few hours of his
testimony. Neither plaintiff nor defendant testified before Justice Kaplan.

traits of each party, with plaintiff often acting inappropriately by being unable to control his temper and his impulses, and defendant always comporting herself properly (*see Matter of Noonan v Noonan*, 109 AD3d 827 [2d Dept 2013]; *Matter of Kira J.*, 85 AD3d 1030 [2d Dept 2011]).

Upon the extensive Findings of Fact set forth in this decision, the determination as to custody of the child is fairly straightforward. Although plaintiff generally maintained that defendant was an unfit parent and that he should have sole custody of the child, on occasions he would take the position that the parties should be able to co-parent and raise the child together. Such an arrangement is neither desirable nor even possible. "Entrusting the custody of young children to their parents jointly . . . is insupportable when parents are severely antagonistic and embattled" (*Braiman v Braiman*, 44 NY2d 584, 587 [1978]). Plaintiff's contempt and ferocious, unbridled anger towards defendant makes him completely unsuitable to make joint decisions with her or co-parent in any way. Even absent the fact that plaintiff is a domestic abuser, any form of joint custody would be hard to imagine; with plaintiff's pattern of physical violence and coercive controlling behavior towards defendant, it is unthinkable (*see West v Vanderhorst*, 92 AD3d 615 [1st Dept 2012]).

Because joint custody, or any other form of cooperative parenting, is decidedly not an option here, the court must decide which party is to have sole custody of the child. Based on the Findings of Fact set forth above, it is abundantly clear that the best interests of the child will be served by awarding custody to defendant. As discussed, she has exhibited the character, fitness, temperament and sincerity necessary "to provide for the child's emotional and intellectual development" (*Eschbach*, 56 NY2d at 172) and to afford the child appropriate "parental guidance" (*Gant v Higgins*, 203 AD2d 23, 24 [1st Dept 1994]). In addition, defendant has "always been the

85

primary caregiver and made sure that the [child] received the . . . medical attention [he] required" (*Matter of Xiomara M. v Robert M.*, 102 AD3d 581, 582 [1st Dept 2013]), and that at all times "her decisions centered around the child" (*Sonbuchner v Sonbuchner*, 96 AD3d 566 [1st Dept 2013]). Furthermore, she has been the one "to provide for the child financially" (*Craig v Williams-Craig*, 61 AD3d 712, 712 [2d Dept 2009]).

What is somewhat surprising considering how greatly defendant has suffered from plaintiff's treatment of her, both during the time they were together and since, is that she has refrained to the extent that she has from interfering with plaintiff's access to the child. It is true that she insisted on maintaining supervised visitation, but this is only because she has a good faith reason for believing that unsupervised access could prove injurious to the child's well-being, and even his safety. It is also true that in his closing argument defendant's attorney advocated for the suspension of visitation, even if supervised, but this seems to be a reaction born out of exasperation with the intolerable conduct plaintiff engaged in at trial and throughout the litigation more than it is a deeply held long-term position on her part. Thus, it can be said that despite plaintiff's actions, defendant has nevertheless shown a "willingness and ability to foster a relationship between the child and the other party" (*Matter of Lionel E. v Shaquana R. B.*, 73 AD3d 434, 434 [1st Dept 2010]). This is yet another indication of how defendant's paramount concern is with the best interests of the child, and it constitutes another factor favoring the award of sole physical and legal custody to her.

Plaintiff, on the other hand, has exhibited neither the character nor the fitness necessary to raise the child in a manner consistent with the child's best interests. A key factor that militates against plaintiff having custody is the finding that he committed acts of domestic violence against

86

defendant (*see* DRL § 240 [1] [a] ["(T)he court must consider the effect of such domestic violence upon the best interests of the child"]; *Matter of Xiomara M.*, 102 AD3d at 582 ["In determining the best interests of the children, the court considered the appropriate factors, including . . . the history of domestic violence at the hands of respondent"]; *Costigan v Renner*, 76 AD3d 1039, 1040 (2d Dept 2010] ["Acts of domestic violence committed by (a party) against the (other) demonstrate that the (party) is ill-suited to provide the children with moral and intellectual guidance"]).

In *Matter of Wissink v Wissink*, 301 AD2d 36, 40 (2d Dept 2002), the court set forth these compelling reasons why domestic violence must be afforded such great importance when determining custody:

> There is overwhelming authority that a child living in a home where there has been abuse between the adults becomes a secondary victim and is likely to suffer psychological injury. Moreover, that child learns a dangerous and morally depraved lesson that abusive behavior is not only acceptable, but may even be rewarded.

Plaintiff's abusive behavior was made that much worse in that many of the acts of physical violence, as well as the most egregious episodes of verbal abuse, were committed in the presence of the child (*see Matter of Fayona C. v Christopher T.*, 103 AD3d 424, 425 [1st Dept 2013] [sole custody awarded to the mother upon a finding that the father "had committed acts of domestic violence and/or verbal abuse that were directed at the mother in front of the child"]; *Drew v Gillin*, 17 AD3d 719, 720 [3d Dept 2005] [custody to the father where, *inter alia*, "there was an incident of domestic violence instigated by (the mother) against (the father) in the presence of the child . . . "]). Here, the incidents involving the child include the assault resulting in blood pouring from defendant's ear onto the child and the FaceTime calls in which plaintiff directed his abusive remarks about defendant and her father directly to the child.

An especially troubling aspect of plaintiff's violent impulses is that he has taken no action to treat them. Although on a number of occasions he promised defendant he would enter a batterers' program, and in one text message stated that he had enrolled in such a program, there is no evidence that he actually did. Instead, he ended up denying he had ever committed domestic violence, and insisted that it was he who was the victim of defendant's violence. Plaintiff's total denial of the problem, and his need to transfer the blame to the innocent party, raises further concern about his psychological state and "the impact of [that] state upon his parenting skills" (*see Matter of Doyle v Doyle*, 120 AD3d 676, 681 [2d Dept 2014]).

To be clear, the presence of domestic violence, as important as it is, is not the only factor that the court has considered in determining that the "continued best interests and welfare of the child" (*Matter of Pignataro v Davis*, 8 AD3d 487, 488 [2d Dept 2004]) would be threatened if plaintiff were to have custody of the child. Other factors are plaintiff's extreme "anger and hostility towards [defendant and her family] that caused [him] to engage in conduct which was clearly detrimental to [the child's] welfare" (*Jones*, 185 AD2d at 229), and his overall inability to control his emotions or behave "in a mature and civilized fashion" (*id.*), even while in the courtroom. An additional troubling factor is plaintiff's need to put his own interests above the best interests of the child (*see M.M.*, 42 Misc 3d 1235[A]; *Allen v Farrow*, 197 AD2d 327 [1st Dept 1994]). This is exemplified by his willingness to post the child's name and picture on the internet as part of a public campaign brought by him in response to his being previously sanctioned by this court, as well as by his refusal, even when earning a substantial salary, to make any meaningful financial contribution to the child's support, while at the same time spending freely on a course of vindictive litigation against defendant and her family.

As the court has found, plaintiff demonstrated that he poses a threat to the child's best interests by obsessively examining the child in the hope of finding injuries that he can use to fabricate claims of defendant's abuse and neglect (*see Matter of James Joseph M.*, 32 AD3d at 726), and by his irrational insistence that the child is suffering from various illnesses and developmental delays (*see In re Suffolk County Dep't of Soc. Servs.*, 215 AD2d 395, 396 [2d Dept 1995]). This behavior is a further indication of how incapable plaintiff is of providing for the child's emotional and intellectual development, affording the child appropriate parental guidance, or promoting the relationship between the child and defendant (*see Matter of Andrew B.*, 49 AD3d 638, 639-640 [2d Dept 2008]) ("The evidence established a history of repeated fabrication as to [the child's] medical conditions . . . [The mother's] conduct demonstrated fundamental flaws in her understanding of the duties of parenthood").

Added to this multitude of negative factors is the finding that plaintiff has an antisocial personality disorder, which manifests itself, among other ways, in his inability to accept responsibility for his actions and his willingness to lie and falsify, even under oath. Having considered the totality of the circumstances, including, as mandated by DRL § 240 (1) (a), the injurious effect of plaintiff's acts of domestic violence on the best interests of the child, the court determines that plaintiff is not an appropriate custodial parent. Accordingly, defendant is awarded sole physical and legal custody of the child.

As the custodial parent, defendant is also awarded full and final decision making as to all aspects of the child's life. Although the preferred procedure in most situations is to have the custodial parent make decisions only after "meaningful consultation" with the non-custodial parent, that procedure cannot be implemented here. The reason it cannot is that requiring

89

defendant to converse and consult with plaintiff would only serve to subject her to further domestic abuse from him in the form of his coercive controlling behavior (*see S.R, v W.R.*, 47 Misc 3d 1223A [Sup Ct, Richmond County 2015] ["Moreover, while it is generally preferable for parents to discuss major decisions, generally referred to as a 'duty to confer,' the history of domestic violence between the parties, together with the power imbalance associated therewith, makes such communication inappropriate in this case"])

As detailed in the Findings of Fact, the record is replete with evidence that plaintiff uses any opportunity to communicate with defendant as an opportunity to assail, threaten and criticize her. Moreover, based on the court's findings, plaintiff's input could reasonably be expected to be far more about his own agenda and his campaign against defendant and her family than about what is best for the child (*see Bliss on behalf of Ach v Ach*, 86 AD2d 575 [1st Dept 1982] ["(T)he requirements for constant consultation . . . will merely be the seed for unending future litigation, with resultant damage to the child"). Accordingly, defendant shall be required to communicate with plaintiff only to the extent that she shall inform him of major decisions she makes with regard to the child, with said notice to be given to plaintiff by letter, text or e-mail within a reasonable time of her having made the decision.

Similarly, plaintiff, under the facts and circumstances presented here, cannot be afforded the type of access to health care providers, schools, extra-curricular activity providers, and the like, that the non-custodial parents are often granted. As was found with regard to the child's current pediatrician, plaintiff has misused that access and has subjected the pediatrician to repeated phone calls that are less about the child's health and far more about his campaign against defendant. Accordingly, until further order of the court, plaintiff is barred from contacting any of the child's

health care providers, extracurricular services providers, or educational facilities or institutions (*see Matter of Andrew B.*, 49 AD3d at 639). Additionally, all records from any such providers, facilities or institutions shall be provided solely to defendant, who in turn shall forward to plaintiff within a reasonable time copies of records that defendant deems significant.

Whereas the decision to award custody of the child to defendant follows directly from applying the statutory requirements imposed by DRL § 240 (1) (a) and the dictates found in case law to the Findings of Fact made herein, the situation is less straightforward as it concerns plaintiff's visitation rights. This is particularly true as to the issue of whether the visitation plaintiff enjoys with the child, if any, should be supervised or unsupervised. Defendant and the AFC take the position that if there is to be any visitation at all, it must continue to be supervised. Plaintiff argues that supervised visitation violates his rights, is injurious to his relationship to the child, and ultimately is harmful to the child himself.

In deciding custody, a court is not bound by any presumption favoring an award to either parent, even where there has been an established custodial arrangement already in effect (*see Friedwitzer v Friedwitzer*, 55 NY2d 89, 93 [1983]). In deciding issues of visitation, however, there is a presumption favoring the non-custodial parent having access to the child, with regular visitation being viewed as being in the the child's best interests. As the Court of Appeals observed in its seminal case on parental access, *Weiss v Weiss*, 52 NY2d 170, 175 (1981): "In initially prescribing or approving custodial arrangements . . . an appropriate provision for visitation or other access follows almost as a matter of course." The view that visitation is a natural component of custodial arrangements has been expressed in numerous decisions that have been rendered in the wake of *Weiss* (*see Zafran v Zafran*, 28 AD3d 752 [2d Dept 2006] [absent

91

exceptional circumstances, "some form of visitation by the noncustodial parent is always appropriate"]; *Thomas v Thomas*, 277 AD2d 935 [4th Dept 2001] ["It is generally presumed to be in the child's best interest to have visitation with his or her noncustodial parent"]; *Susan G.B. v Yehiel B.H.*, 216 AD2d 58, 58 [1st Dept 1995] ["Visitation with non-custodial parents is preferred"]); *see also, Hotze v Hotze*, 57 AD2d 85, 87 [4th Dept 1977] ["Normally, when custody of a child is granted to one parent or nonparent, the noncustodial parent should have reasonable rights of visitation"]).

The presumption in favor of visitation stems in large part from the understanding that "visitation is a joint right of the non-custodial parent and of the child" (*Weiss*, 52 NY2d at 175). It also reflects the now well-accepted view that a child benefits from exposure to both of his or her parents. As the Court of Appeals stated in *Weiss*: "How valuable the mature guiding hand and love of a second parent may be to a child is taught by life itself" (*id.* at 174). As a result, courts will make every effort to craft an access schedule that allows a child to have regular and meaningful access with the parent with whom he or she does not reside.

Naturally, the presumption favoring visitation is not absolute; the first consideration must always be the "primacy of the child's welfare" (*id.*). But unlike the best interests standard employed in custody determinations, which might be likened more to a "what-is-better-for-the-child standard," the "primacy of the child's welfare" standard imposes a burden on the court to find an actual threat to the child's well-being if it is to deny a noncustodial parent reasonable visitation with the child. "The denial of this right of a noncustodial parent to see the child is such a drastic remedy that an order doing so should be based upon substantial evidence that the visitation is detrimental to the child's welfare" (*Hotze*, 57 AD2d at 87). "Absent extraordinary circumstances

92

where visitation would be detrimental to the child's well-being, a noncustodial parent has a right to reasonable visitation privileges" (*Nancy M. v Brian M.*, 227 AD2d 404, 404 [2d Dept 1996]). "Although conditions for visitation, including limitations of time, or requirements for supervision, are not unusual, a complete denial of visitation has been rare, and based on compelling circumstances presented at a full hearing" (*John C. v Marlene C.*, 179 Misc 2d 72, 75 [Fam Ct, Kings County 1998]).

Despite the presumption in favor of there being some form of visitation between the noncustodial parent and the child, and the recognition that the curtailment of parental access is a "drastic remedy" to be applied only when there are "compelling reasons" (*Hameed v Alatowaneh*, 19 AD3d 1135, 1136 [4th Dept 2005]), there are situations where the denial of visitation is appropriate. These include instances of domestic violence (*Susan G. B.*, 216 AD2d at 59 ["The record herein shows a history of physical abuse of the plaintiff by the defendant"]); incidents of extreme insensitivity to the needs and feelings of the child (*Hotze*, 57 AD2d at 89 [among other things, mother, who had a "possessive, domineering nature," divulged information about the case and the identity of the child to the public, and committed other actions that reflected how "her animosity (against father) so overcame her judgment"]; and the making of false child abuse reports to child protective agencies and the police (*Susan G. B.*, 216 AD2d at 59; *Jones*, 185 AD2d at 229 ["Defendant was either directly or indirectly responsible for the filing of three unfounded child abuse complaints against plaintiff"]).

As the Findings of Fact establish, plaintiff is guilty of the conduct that courts have found to furnish a sufficient basis for denying visitation. Along with his other misdeeds, plaintiff abused defendant both physically and emotionally; he showed insensitivity to the child's needs by posting

the child's name and photograph on the internet, making abusive FaceTime calls to him and failing to provide for his support; he waged a scorched earth campaign of litigation and threats against defendant and her family where his animosity has clearly dominated his judgment; and he made false child abuse reports against defendant to both ACS and the police.

Despite the foregoing, the court does not deem it proper to deny plaintiff his right to reasonable visitation. Although the record demonstrates that he has significant personality and behavioral issues, the evidence further shows that plaintiff has bonded with the child to forge a meaningful father-son relationship. During his supervised visitation, he interacts appropriately with the child and generally does not do or say anything that could be construed as being physically or emotionally harmful to him. The notable exception to this good and caring conduct is plaintiff's obsession with the child's physical condition, particularly the bumps, bruises and scratches that an active young boy, like the child, is bound to have. Fortunately, the social workers who supervise the visitations are able to intervene and for the most part prevent this from becoming a bigger problem during the visits. The problem that has arisen has occurred outside of the visitation itself, when plaintiff has opted to make his false reports to ACS and NYPD.

The question then becomes whether plaintiff's visitation with the child should continue to be supervised. The starting point for the analysis is to note that case law, both from this judicial department and others, uniformly holds that supervised visitation is not tantamount to the denial of the right to visit. As the First Department stated in an often-cited decision, *Lightbourne v Lightbourne*, 179 AD2d 562, 578 (1st Dept 1992), "While a parent may not be deprived of his or her right to reasonable and meaningful access to a child absent exceptional circumstances, supervised visitation is not a deprivation of meaningful access" (citations omitted; *see Carl J.B. v*

*Dorothy T.*, 186 AD2d 736 [2d Dept 1992]; *Bibas v Bibas*, 62 Ad3d 924 [2d Dept 2009]; *Graham v White*, 16 AD3d 583 [2d Dept 2005]).

Unlike a determination that deprives a party of visitation, which requires substantial evidence of a danger to the child's welfare, the determination that visitation be supervised need only be based on substantial evidence that it is in the child's best interests (*see Matter of Frank M. v Donna W.*, 44 AD3d 495, 496 [1st Dept 2007]; *Matter of Abranko v Vargas*, 26 AD3d 490, 491 (2d Dept 2006); *Matter of Kryvanis v Kruty*, 288 AD2d 771, 772-773 [3d Dept 2001]). Additionally, it is well established that "it is within the sound discretion of the court to determine whether visitation should be supervised" (*Matter of Morgan v Sheevers*, 259 AD2d 619, 620 [2d Dept 1999]; *Matter of Custer v Slater*, 2 AD3d 1227 [3d Dept 2003]).

Plaintiff's position is that he should not be subjected to supervised visitation with the child because there is no evidence that he ever physically harmed the child. Although the court's finding of physical violence concerns only the child's mother, not the child himself, this is of little moment in terms of whether plaintiff's visitation should continue to be supervised. "Contrary to [plaintiff's] claim, supervision is not limited to instances where a court fears for a child's physical safety; rather, the court can also consider whether a parent is having a negative impact on the child's emotional well-being" (*Matter of Frank M.*, 44 AD3d at 495). Consequently, supervised visitation has been upheld in this judicial department where a party has made "repeated false allegations of abuse" (*Matter of James Joseph M. v Rosana R.*, 32 AD3d 725 [1st Dept 2006]), has "demonstrated inability to understand the impact that his words and deeds have upon the emotional well being of the children" (*Allen v Farrow*, 197 AD2d 327, 334 [1st Dept 1994]), or has had substance abuse issues (*Matter of John M. v Lisa Rossi M.*, 125 AD3d 407, 408 [1st Dept 2015]).

95

Here, supervised visitation has been in place since the parties' separation when the child was a newly born infant. There is ample reason for it being in the best interests of the child for supervision to continue. The reason plaintiff's parenting time with the child has been largely successful is that it has been supervised. Simply stated, plaintiff has been compelled to restrain his impulses and his anger when with the child– something he was unable to do in his dealings with defendant and her family, and something he was unable to do during the trial and throughout the preceding litigation – only because he has been under the direction of trained supervisors. Even with that supervision, plaintiff has been unable to restrain his impulses to harm defendant, and in turn harm the child, by subjecting defendant to interrogation and the child to physical inspection by ACS and the police. The court, along with defendant and the AFC, fears for the child's safety and well-being if the protective shield that the supervisors afford is removed at this time.

Plaintiff, in his written summation, cites two cases, *Gainza v Gainza*, 24 AD3d 551 (2d Dept 2005) and *Ulmer v Ulmer*, 254 AD2d 541 (3d Dept 1998), to support his argument that supervised visitation is unnecessary and unreasonably intrudes on his right to have meaningful visitation with his son. However, both those cases are distinguishable from this one because they involve conduct by parents that was far less serious than what plaintiff was found to have done here. The parents in those two cases were, at worst, slightly lacking in their parenting abilities. This stands in stark contrast to plaintiff, who in terms of temperament, character, and fitness lacks the basic abilities necessary for proper parenting.

Plaintiff further argues in his summation that supervised visitation differs in many ways from "real" visitation. The court understands plaintiff's argument and it is not blind to the negative consequences that supervised visitation can engender. These include a stilted, unsatisfying

96

interactive experience for both parent and child as a result of having a third party present, and a

perception on the part of the child that the supervised parent is not "really a parent" with parental

authority but is instead a person who himself or herself is in need of a "babysitter." As a result,

this court has been inclined to order extended supervised visitation only in cases where there is a

real risk of harm to the child from unsupervised visitation.

Unfortunately, this is a case where unsupervised visitation poses an unacceptable risk. The

credible evidence adduced at the trial, including but not limited to the expert testimony of the court

appointed forensic psychiatrist, establishes that the child's best interests would be seriously

jeopardized if plaintiff did not continue to benefit from and the child did not continue to be

protected by the watchful eyes of skilled supervisors. Accordingly, until further order of the court,

plaintiff's access with the child will be supervised, as it has since the parties return to New York,

by social workers from CFS.

The court also needs to balance defendant's and the growing child's need for a structured

schedule with plaintiff's need to have ample time with the child so as to have real, meaningful

visitation. In order to accomplish this, and to avoid the type of miscues that led to plaintiff and

defendant coming into contact with each other at the Time Warner Center on April 29, 2015, the

court will a set schedule for plaintiff's supervised access. Effective as of March 1, 2016, and until

further order of the court, plaintiff's access with the child will be on alternate weekends from 10:00

a.m. to 5:00 p.m. on Saturdays and 10:00 a.m. to 5:00 p.m. on Sundays. Plaintiff will also have

access every Tuesday from 2:00 p.m. until 6:00 p.m. On weeks where there is no weekend access,

plaintiff will have additional access on Thursday from 2:00 p.m. until 6:00 p.m. To permit

defendant the flexibility to travel with the child to her parents and elsewhere, she will be entitled to

designate six weeks a year where plaintiff will not have access. As before, plaintiff will continue to assume the full cost of the CFS supervision.

The court is aware that supervised visitation is not intended to be permanent, nor should it be (*see Matter of Myles M. v Pei-Fong K.*, 93 AD3d 474 [1st Dept 2012]). In *Matter of John M.*, 125 AD3d at 409, the Appellate Division, noting that "there are indications that respondent has made good progress in her treatment," recommended "that the trial judge convene an early hearing to reexamine the continued necessity for the supervision requirement." In this case, an "early hearing" would be senseless since there is no sign that plaintiff has made any progress in addressing his deficiencies, nor is there even an indication that he acknowledges having those deficiencies. Thus, the court, which will retain sole and exclusive jurisdiction over all custody and visitation issues, will permit plaintiff to make an application to modify the visitation order on or after September 1, 2017.

Although case law, particularly from the Second Department, dictates that a court cannot require therapy as a condition for future visitation, (*see e.g. Notley v Schmeid*, 220 AD3d 509 [2d Dept 1995]; *Nacson v Nacson*, 166 AD2d 510 [2d Dept 1990]), the First Department in *Matter of John M.*, 125 AD3d at 409, tied the mother's successful drug treatment to the reexamination of her need for supervised visitation. Likewise, this court would see plaintiff's successful completion of an intensive batterers' program as an important indication that he has taken steps to deal with one of his most serious problems, a problem that poses a threat to the child's security, safety and healthy development.

The court in *Hotze*, 57 AD2d at 89, in addressing what would be needed in order for the mother's visitation rights with her son to be restored, stated the following:

> This is not to say that appellant will never be permitted visitation rights with her son. There is much that she could do to correct this situation. She could seek the counseling which she has consistently refused, and attempt to gain some insight and understanding into of her responsibilities to her son's needs. She could direct her efforts toward developing a healthy interest in her son's activities and cease her attempts to destroy his affection for his father and his stepsister. A 13-year-old who has suffered from such a traumatic childhood has great need for genuine maternal love and support. Certainly, if appellant were to take positive steps to give it to him, a court might properly consider a modification of the no visitation order.

The child in *Hotze* was a troubled 13-year-old, while the child here is a still-untroubled, healthy, and happy two-year-old, and that case involved the suspension of visitation as opposed to supervised visitation. Nonetheless, it would serve plaintiff well to heed the advice the *Hotze* court offered the mother. Plaintiff writes movingly in his summation as to how he looks forward to taking the child to Super Soccer Stars or tucking him in bed at night. But before he can be entitled to the full privileges of parenthood, he has to first accept the responsibilities that come with it. It is up to him, and him alone, to show that he can change from being a violent and destructive person to a father "who is capable of behaving in a mature and civilized fashion" and "cooperating with [defendant] to further the best interests of the [child]" (*Jones*, 185 AD2d at 229). Until then, he will remain a parent who has supervised visitation.

The last issue is whether either party's application for an order of protection is legally sufficient. As a result of the court having made specific Findings of Fact as to the issue, only a brief legal analysis is necessary. "To support a finding that a respondent has committed a family offense, a petitioner must prove his allegations by a fair preponderance of the evidence" (*Everett C. v Oneida P.*, 61 AD3d 489, 489 [1st Dept 2009]; *see* Family Court Act § 812). Plaintiff, who

lacked credibility, failed to prove the allegations contained in his petition (*see Downing v Downing*, 31 AD2d 913 [1st Dept 1969]). Accordingly, his application for an order of protection against defendant is denied.

Defendant, who was highly credible, proved her allegations of domestic violence by the requisite evidentiary standard (*see Okpe v Okpe*, ____AD3d____, 2016 NY Slip Op 01108 [1st Dept 2016]). Although the series of physical assaults that plaintiff committed against her ended when the parties separated in November 2013, the amount of time that has elapsed is not an impediment to the granting of an order of protection (*see Matter of Barbagallo v Cotto-Donis*, 131 AD3d 1237 [2d Dept 2015], *lv dismissed*, 2015 NY LEXIS 3715 [2015]; Family Court Act § 812[1]). In any event, the assaults were part of an ongoing pattern of coercive controlling behavior that has continued even throughout the pendency of this case. On the basis of plaintiff having the committed the family offenses of Assault in the Third Degree (Penal Law § 120.00 [1]), Menacing in the Third Degree (Penal Law § 120.15), Harassment in the Second Degree (Penal Law § 240.26 [1]) and Aggravated Harassment in the Second Degree (Penal Law § 240.30 [4]), the court, pursuant to DRL § 252, grants defendant a five-year order of protection (*see Weiner v Weiner*, 27 Misc3d 1111, 1121-1122 [Sup Ct, NY County 2010]).[23]

The order of protection that is granted is a full "stay away" order barring plaintiff from having any contact with defendant. The sole exception to the no-contact provision is that plaintiff may communicate with defendant by letter, text or e-mail as to matters concerning the scheduling of visitation and the receipt of the notices and records to which he is entitled. This exception is to be used only in exceptional circumstances and not as a matter of course. The communications are

---

[23] The order of protection is annexed herewith.

to be brief, civilized and to the point.

### DIRECTIVE AS TO THE SETTLEMENT OF A PARTIAL JUDGMENT

This constitutes the decision of the court. Defendant is directed to settle, within 15 days and on notice to plaintiff and the AFC, a partial judgment entitled "Partial Judgment of Divorce Resolving Custody, Parental Access and Decision Making." The provisions of the partial judgment are to incorporate the determinations set forth in this decision.

The parties are directed to appear for further proceedings regarding finances on March 30, 2016 at 9:15 a.m.

Dated:

FEB 2 9 2016

_____

Matthew F. Cooper, J.S.C.

**MATTHEW F. COOPER**
**JSC**

# Exhibit 2

Acosta, P.J., Tom, Webber, Singh, JJ.

4995-                                              Index 301568/14
4996 &   Anthony Zappin,
M-5523         Plaintiff-Appellant,

                    -against-

         Claire Comfort,
              Defendant-Respondent.
         _____

Peter C. Lomtevas, Brooklyn, for appellant.

The Wallack Firm, P.C., New York (Robert M. Wallack of counsel),
for respondent.

Cohen Rabin Stine Schumann LLP, New York (Harriet Newman Cohen of
counsel), attorney for the child.
         _____

    Judgment of divorce, Supreme Court, New York County (Matthew

F. Cooper, J.), entered August 16, 2016, inter alia,

incorporating an order, same court and Justice, entered March 1,

2016, which awarded defendant sole physical and legal custody of

the parties' child, granted plaintiff supervised visitation, and

granted a five-year stay-away order of protection in defendant's

favor, and awarding defendant basic child support beginning July

1, 2016, and child support arrears for the period from December

2013 through June 2016, unanimously affirmed, without costs.

Appeal from the March 1, 2016 custody and visitation order

                             23

unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

The court's determination that it was in the child's best interests to award sole custody to defendant has a sound and substantial evidentiary basis (*see Matter of Frank M. v Donna W.*, 44 AD3d 495 [1st Dept 2007]; *see also Eschbach v Eschbach*, 56 NY2d 167, 171-173 [1982]). It was based in part on the court's findings that plaintiff committed acts of domestic violence against defendant, both during her pregnancy with the child and after the child was born, rendering joint custody impossible.

The court saw both parties testify, and there is support in the record for its determination that defendant and the three witnesses she called were credible, whereas plaintiff's testimony regarding the domestic violence incidents was frequently not truthful. Photographs of defendant's injuries taken shortly after the incidents of abuse, as well as defendant's witnesses, corroborated defendant's account. Moreover, plaintiff's conduct and outbursts throughout the trial reinforced the court's conclusions that, unlike defendant, plaintiff was unable to control his emotions.

The evidence that plaintiff had physically and verbally harmed the child's mother, engaged in abusive litigation tactics,

and lacked the emotional restraint and personality to look after the child's best interests provides a sound and substantial basis for the court's finding that unsupervised visitation would have "a negative impact on the child's well-being" (*Matter of Arelis Carmen S. v Daniel H.*, 78 AD3d 504, 504 [1st Dept 2010], *lv denied* 16 NY3d 707 [2011]; *Ronald S. v Lucille Diamond S.*, 45 AD3d 295 [1st Dept 2007]).  Plaintiff also made repeated false allegations of abuse to the Administration for Child Services and the police, which rendered supervised visitation appropriate (*Matter of James Joseph M. v Rosano R.*, 32 AD3d 725 [1st Dept 2006], *lv denied* 7 NY3d 717 [2006]).

The court detailed its reasons for issuing a five-year order of protection, and found that plaintiff committed numerous family offenses, including assault in the third degree (Penal Law § 120.00[1]) and harassment in the second degree (Penal Law § 240.26[1]).  A fair preponderance of the evidence supports the determination (*see generally Okpe v Okpe*, 136 AD3d 511 [1st Dept 2016]).  The court was not required to make a finding of "aggravating circumstances" before issuing the order of protection (*compare* Domestic Relations Law § 252 *with* Family Court Act § 842).

We have considered plaintiff's remaining challenges to the court's rulings in connection with the custody trial and find them unavailing.  In any event, any claimed error would not warrant a different custody determination.

In determining the award of child support, the court properly imputed income to plaintiff based on his income in 2014. Although he presented no direct evidence of it, plaintiff claims that he was terminated from his position at his law firm because of the negative publicity he received after he had been sanctioned during these proceedings in 2015 (*Zappin v Comfort*, 49 Misc 3d 1201[A], 2015 NY Slip Op 51339[U] [Sup Ct, NY County 2015], *affd* 146 AD3d 575 [1st Dept 2017]).  Even if he was terminated for that reason, the sanctions – and therefore his unemployment – resulted from his own misconduct at trial, not from the court's conduct in sanctioning him or publicly releasing the sanctions order (*see* Domestic Relations Law § 240[1-b][b][5][v]; *Johnson v Chapin*, 299 AD2d 294 [1st Dept 2002]). Moreover, plaintiff presented only vague, conclusory testimony regarding his purportedly unsuccessful attempts to find work since he lost that job.

The court properly declined to modify child support to account for plaintiff's cost in paying Comprehensive Family

26

Services to supervise his visits with the child.  Plaintiff's
need for supervision stemmed from his own previously described
conduct, and there is no basis for a conclusion that such an
expense is extraordinary in this context or that it renders his
child support obligation unjust or inappropriate (*see* Domestic
Relations Law § 240[1-b][f]).

In setting a child support income cap of $250,000, the court
cited the parties' incomes in the mid- to high $200,000s and
their upper-middle class lifestyle, and thus properly considered
the parties' financial resources and the child's standard of
living had the marriage not dissolved (Domestic Relations Law
§240[1-b][f]; *Bast v Rossoff*, 91 NY2d 723, 726-727 [1998]).

The court properly awarded child support arrears retroactive
to the date of defendant's application for child support in
Washington, D.C., where the parties previously had resided,
rather than when she later sought such relief before the New York
Supreme Court (Domestic Relations Law § 236[B][7][a]), based on
plaintiff's valid waiver of any objection to such an award.
During proceedings before the Superior Court of the District of
Columbia, when the court discussed the possibility of
transferring the case to New York, as the more convenient forum,
and the impact on any child support to which defendant was

27

entitled in Washington before the transfer, plaintiff personally agreed to waive "any objection if this case proceeds in New York to an award of child support beginning on the date that [defendant] made the request in D.C."  Contrary to plaintiff's contention, the mere fact that proceedings in Washington, D.C., were stayed in the event that not all child support issues were resolved in the New York proceeding is not an indication that defendant disavowed the waiver.

The court should have at least directed the filing of a note of issue before proceeding to trial (*see* 22 NYCRR 202.21; *see also* CPLR 3402[a]; 22 NYCRR 202.16[i]).  However, on these facts, a new trial on the issue of child support is not warranted (*see Hughes v Farrey*, 48 AD3d 385 [1st Dept 2008]).  Plaintiff was not, as he claims, prejudiced by having to proceed to trial without further discovery.  The parties had exchanged the financial documents relevant to the calculation of child support, the only issue at the financial trial.  He had ample time to retain an expert on the issue of his earning potential if he wanted to do so.

We have considered plaintiff's remaining arguments regarding the award of child support and find them unavailing.  In particular, we note that the court's rulings in this lengthy,

28

contentious proceeding were fair and impartial, and were based in part on credibility determinations that have support in the record.

        **M-5523 -** *Zappan v Comfort*

        Motion to transfer proceedings to
        another Appellate Division pursuant to
        CPLR 5711 denied.

      THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

        ENTERED:  NOVEMBER 21, 2017

_____
                CLERK

29

# Exhibit 3

301568/2014 IAS PART 24 SEQ 043 MOTION AND CROSS-MOTION ARE DECIDED WITH ATTACHED DECISION ORDER

EA
2/21/18
E

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    ~~HON. MICHAEL L. KATZ~~          PART  24
                        Justice

Index Number : 301568/2014                    INDEX NO.  _____
ZAPPIN, ANTHONY                               MOTION DATE  _____
vs
COMFORT, CLAIRE                               MOTION SEQ. NO.  _____
Sequence Number : 043
CONFIRM/REJECT REFEREE REPORT                 MOTION CAL. NO.  _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|   | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion:  ☒ Yes   ☐ No

Upon the foregoing papers, it is ordered that this motion and cross-motion are decided in accordance with the accompanying Decision / Order.

**FILED**

FEB 21 2018

COUNTY CLERK'S OFFICE
NEW YORK

RECEIVED

FEB 21 2018

GENERAL CLERK'S OFFICE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: _____2/15/18_____          _____ mi Katz_____
                                                                          J.S.C.
                                         HON. MICHAEL L. KATZ
                                                            J.S.C.

Check one:  ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

Check if appropriate:  ☒ DO NOT POST          ☐ REFERENCE

      ☐ SUBMIT ORDER/ JUDG.      ☐ SETTLE ORDER/ JUDG.

301568/2014 IAS PART 24 SEQ 043 MOTION AND CROSS-MOTION ARE DECIDED WITH ATTACHED DECISION/ORDER

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 24
-------------------------------------x
ANTHONY ZAPPIN,

                    Plaintiff,              DECISION/ORDER
                                            Index No. 301568/2014
         -against-                          Motion Seq. No. 043

CLAIRE COMFORT,

                    Defendant.
-------------------------------------x

MICHAEL L. KATZ, J.:

**FILED**

FEB 2 1 2018

COUNTY CLERK'S OFFICE
NEW YORK

        Defendant Claire Comfort previously moved, under motion
sequence number 036, for an order directing plaintiff Anthony
Zappin to pay $400,000 towards the $857,881.19 in counsel fees she
incurred in this case between February 2014 and June 2016, based on
her contention that the extraordinary amount that she has had to
pay for her legal representation is the result of plaintiff's
abusive litigation tactics.

        By Order dated October 31, 2016, the Hon. Matthew F. Cooper
held that "the record clearly establishes ... that from the very
inception of the case, plaintiff consistently employed abusive
litigation tactics that were designed to inflict as much pain as
possible on defendant, defendant's family and others, and that one
of his primary goals was to make defendant and her family spend as
much as possible on counsel fees."

Justice Cooper thus determined that defendant was entitled to recover "sufficient counsel fees to compensate her for having to spend more than she should have had to spend but for plaintiff's misconduct," and referred the matter to a Special Referee to hear and report with recommendations on the issue of "what portion of the fees [defendant] incurred were the result of plaintiff's obstructionist and dilatory tactics or other oppressive behavior."

By Reference Order issued simultaneously therewith, Justice Cooper directed that "the parties shall order a transcript of the proceedings before the Special Referee and equally share the cost of such transcript. The transcript shall then be submitted to this court for consideration."

The matter was referred to Special Referee Marilyn T. Sugarman, who held an evidentiary hearing on December 5 and 7, 2016, during which time both parties, as well as defendant's counsel, Robert M. Wallack, Esq., testified.

Defendant submitted a post-hearing brief on or about March 7, 2017. Plaintiff failed to submit a post-hearing brief.

Special Referee Sugarman issued a 24-page detailed Report and Recommendation on December 7, 2017, in which she found, *inter alia,* that

2

301588/2014 IAS PART 24 SEQ 045 MOTION AND CROSS-MOTION ARE DECIDED WITH ATTACHED DECISION/ORDER

[p]laintiff's actions created the need for proceedings that would normally not be a part of a matrimonial action, such as the hearing that Justice Cooper was compelled to hold on November 10, 2015 after plaintiff claimed that he was attacked in the courtroom by another attorney in this action. (Court Ex. XXV) Plaintiff also served a Notice to Admit containing over 300 separate statements, which led defendant to bring an OSC (Mot. Seq. No. 031) to vacate; Justice Cooper noted that most of the statements were totally irrelevant and "clearly abusive." (Court Ex. XXV at 44-45) On another occasion, plaintiff brought an emergency OSC (Mot. Seq. No. 002) seeking to have his mother deposed by video deposition to preserve her testimony. Following oral argument on August 25, 2014, Justice [Deborah] Kaplan granted the request, on the record, to the extent that plaintiff would be permitted to take his mother's video deposition in New York, with defendant's counsel and the AFC having the right to cross-examine. (Pl. Ex.2 at 23) The next day, plaintiff submitted a letter to the court that having his mother travel to New York was "logistically impossible" and he did not further pursue having his mother testify. (Court Ex. XII at 9-10).

The record reflects that plaintiff's conduct in this case was so egregious that it permeated the entire litigation. He essentially waged war on defendant by a campaign of chronic abuse on her and everyone else involved in this matter. There can be no question that plaintiff's conduct throughout this matter caused to increase defendant's legal fees. That a custody trial lasted fourteen days for a then two-year old – who has been born shortly after the marriage and only a month before the District of Columbia action [the original forum of the custody dispute] was commenced – was a direct result of plaintiff's behavior and scorched earth conduct [footnote omitted].

The Special Referee rejected plaintiff's argument that defendant's counsel's bills were deficient in detail, finding that they contained "fairly typical entries that attorneys make on their bills," and noted that, in reviewing the records, she had been "able to match the motions and court appearances with the appearances in the record."

3

The Special Referee concluded that "[b]ased on the evidence presented and [her] review of the history of this case, it is fair to say that plaintiff probably made this litigation at least twice as difficult and twice as expensive as need be." She further found that there is ample support for a finding that plaintiff, who is an admitted attorney, "had the goal of making defendant and her family spend as much as possible on fees."

The Special Referee recommended that "defendant's request for an award of $400,000 in counsel fees be granted, and that the court provide for an appropriate period of time for this amount to be paid, which should be paid directly to [defendant's counsel,] The Wallack Firm."

Plaintiff now moves for an order:

(1)   rejecting the Special Referee's Report; and

(2)   denying defendant's motion for attorney's fees; or, in the alternative,

(3)   commencing a new evidentiary hearing.

Defendant opposes the motion and cross-moves for an order:

(1)   pursuant to CPLR § 4403 confirming the Special Referee's Report; and

(2)   granting defendant's motion for attorney's fees.

4

Plaintiff contends that the Referee's Report is "the latest act of retaliation from the New York Unified Court System," and argues, *inter alia,* that the Report must be rejected because it does not sufficiently set forth what fees were incurred by defendant as a result of his purported misconduct, and does not, according to plaintiff, sufficiently analyze the reasonableness of the fees sought.

Plaintiff denies that he engaged in unnecessary motion practice and/or that his conduct prolonged the custody trial. He argues that the Referee denied him a full and fair hearing because the Referee did not permit him to re-litigate rulings and findings previously made by Justice Cooper, and because the Referee issued a Decision/Order dated December 8, 2016 granting a motion by the attorney for the child to quash a subpoena served upon her by plaintiff as improper.

Defendant, on the other hand, argues that the Special Referee afforded a fair and complete hearing to both sides, and that the testimony and documentary evidence presented at the hearing amply supports the Special Referee's findings of fact, conclusions of law, and recommendations.

5

It is well settled that "[t]he recommendations of a special referee are entitled to great weight because, as the trier of fact, [s]he has an opportunity to see and hear the witnesses and to observe their demeanor (*Frater v. Lavine*, 229 A.D.2d 564, 646 N.Y.S.2d 46)." *Poster v Poster*, 4 AD3d 145 (1st Dep't 2003), lv to app. denied, 3 NY3d 605 (2004).

"Generally, New York courts will look with favor upon a Referee's report, inasmuch as the Referee, as the trier of fact, is considered to be in the best position to determine the issues presented. Courts will confirm a Referee's report to the extent that the record substantiates [her] findings and they may reject findings not supported by the record (citations omitted)." *Matter of Holy Spirit Assn, v. Tax Commn.*, 81 AD2d 64, 70-71 (1st Dep't 1981) revd. on other grounds, 55 NY 2d 512 (1982). *See also*, *Bergman v Bergman*, 128 AD3d 619 (1st Dep't 2015).

This Court has reviewed the numerous documents admitted into evidence during the hearing, including prior court orders and transcripts of prior appearances in this case, as well as the Special Referee's detailed recitation of the procedural history of this case and summary of the witness' testimony.

6

However, plaintiff failed to pay his portion of the cost of the transcript of the hearing before the Special Referee, as required pursuant to Justice Cooper's Order. As a result, the hearing record was not made available for this Court's review. Plaintiff's motion must, therefore, be denied to the extent that he argues that the Referee's factual findings are not supported by the testimony.

This Court has considered the remaining arguments and finds no basis to disturb the trier of fact's findings and recommendations in this case.

Accordingly, plaintiff's motion is denied in its entirety and defendant's cross-motion is granted.

Plaintiff shall forward payment of counsel fees in the amount of $400,000 directly to The Wallack Firm, P.C. within 120 days of service of a copy of this order with notice of entry.

If plaintiff fails to pay said sum within 120 days of service of a copy of this order with notice of entry, the Clerk may enter a judgment in favor of The Wallack Firm, P.C. and against plaintiff Anthony Zappin in the amount of $400,000 upon submission of an

7

affirmation from defendant's counsel without further notice to plaintiff.

This constitutes the decision and order of this Court.

Dated: February 15, 2018

Michael L. Katz
J.S.C.

HON. MICHAEL L. KATZ
J.S.C.

FILED

FEB 2 1 2018

COUNTY CLERK'S OFFICE
NEW YORK

8

# Exhibit 4

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  MARILYN T. SUGARMAN
          SPECIAL REFEREE
                                                    _____
                                                           Justice              PART 88R

Index Number: 301568/2014
ZAPPIN, ANTHONY                          INDEX NO.     301568/14
vs.
COMFORT, CLAIRE                          MOTION DATE   3/8/17
SEQUENCE NUMBER : 037
HEAR AND REPORT                          MOTION SEQ. NO.  036 and 037

                                         MOTION CAL. NO.  _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

                                                              PAPERS NUMBERED
Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...    _____
Answering Affidavits — Exhibits _____    _____
Replying Affidavits _____        _____

**Cross-Motion:**  ☐ Yes   ☒ No

Upon the foregoing papers, it is ordered that this ~~motion~~

reference (Mot. Seq. No. 037), together with the underlying

motion (Mot. Seq. No. 036), are resolved in accordance with the

attached report and recommendation.

<div style="writing-mode: vertical-lr">JUDGE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):</div>

Dated: _____ DEC 0 7 2017 _____        _____
                                          MARILYN T. SUGARMAN
                                          SPECIAL REFEREE

Check one:  ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST          ☐ REFERENCE
         ☐ SUBMIT ORDER/ JUDG.    ☐ SETTLE ORDER/ JUDG.

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: SPECIAL REFEREE PART 88R
-------------------------------------------------------------X

ANTHONY ZAPPIN,

                                 Plaintiff,

             -against-

CLAIRE COMFORT,

                                Defendant.

-------------------------------------------------------------X

Index No. 301568/14
Mot. Seq. Nos. 036 and 037

**Report and Recommendation**

TO THE SUPREME COURT : NEW YORK COUNTY - IAS PART 24

        By order of reference dated October 31, 2016, the Honorable Matthew F. Cooper, to whom this matter was then assigned, referred the issue of defendant's entitlement to counsel fees and the amount of a fee award in the above-captioned post-judgment matrimonial matter to the Special Referee Part for assignment to a special referee to hear and report (the "Order of Reference").[1] The matter was assigned to me on December 5, 2016. Due to the fact that an order of protection was issued in favor of defendant and against plaintiff on February 29, 2016 which does not expire until March 1, 2021, this matter was heard in a courtroom with security present. The hearing commenced on December 5 and concluded on December 7, 2016. Although defendant's counsel ordered the transcript, because plaintiff failed to order the transcript, the transcript was not provided to plaintiff and to me.[2]

---

    [1] This matter was originally before the Honorable Deborah A. Kaplan, before it was reassigned to Justice Cooper, on or about May 22, 2015. Justice Cooper issued an order of recusal on March 27, 2017. The matter was then subsequently reassigned to the Honorable Michael L. Katz by order of the Administrative Judge, the Honorable Peter H. Moulton, dated March 28, 2017.

    [2] Plaintiff brought an Order to Show Cause ("OSC"), Motion Sequence Number ("Mot. Seq. No.") 040, seeking leave to proceed as a poor person and requiring that the State of New York pay the $2,485.75 in fees to cover the cost of the transcript of the hearing. He also sought to re-open the hearing. (Mot. Seq. No. 040) Justice Cooper declined to sign the OSC. (Decision and Order dated March 17, 2017)

Post-hearing briefs were due to be served and filed by both sides on February 1, 2017; I advised the parties that there would be one courtesy adjournment. On February 1, defendant's counsel sent an email requesting an adjournment until February 22, 2017, which was granted. On February 21, 2017, plaintiff sent an email requesting an extension until March 8, 2017, which I also granted, even though there had already been one adjournment, as there was no objection. On March 7, 2017, plaintiff sent an email to me requesting that the filing of post-hearing briefs be held in abeyance until his motion for leave to proceed *in forma pauperis* (Mot. Seq. No. 040) is decided. Meanwhile, defendant's counsel submitted a post-hearing brief. After the OSC was denied in a decision dated March 17, 2017, plaintiff still failed to submit a post-hearing brief.[3] Since more than sufficient time has elapsed for the submission of a brief, he is deemed to have abandoned his right to submit a post-trial submission. This report and recommendation is based on my notes from the hearing, the exhibits entered into evidence, and defendant's post-hearing submission.[4]

---

[3] A copy of plaintiff's email submissions have been submitted to the County Clerk so that they are part of the record. I further note that I am issuing this Report and Recommendation without benefit of a transcript; plaintiff similarly could have submitted a post-hearing brief based solely on the available court records, exhibits and his notes. So as to be certain that I have addressed plaintiff's legal arguments despite his failure to file a post-hearing brief, I have read plaintiff's affidavit in opposition to the motion for fees that was submitted to Justice Cooper in connection with Mot. Seq. No. 036, and reference it herein.

[4] Plaintiff's exhibits are designated as "Pl. Ex. __" and defendant's exhibits are designated by "Df. Ex. __." Court exhibits are referred to as "Court Ex. __." References to defendant's parties' post-hearing submission is referred to as "Df. Post-Tr. Br." References to affidavits and decisions of the Court that are not in evidence are referred to by date and Mot. Seq. No. In addition to the testimony and exhibits, where appropriate, I have taken judicial notice of uncontroverted matters that are contained in the County Clerk file and on the Court's computerized records. Kevin McK. v. Elizabeth A.E., 111 A.D.3d 124, 133 (1st Dep't 2013); Khatibi v. Weill, 8 A.D.3d 485, 485-86 (2d Dep't 2004). I have also taken background from reported decisions of this court and of the United States District Court for the Southern District of New York. See, Zappin v. Daily News, L.P., 2017 WL 3425765 at footnote 9 (S.D.N.Y. Aug. 9, 2017) (Failla, J.) (Noting that a court is "entitled to 'take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (Citation omitted)

The complete history of this three-year-old matrimonial action is lengthy and protracted and will not be set forth herein in minute detail, although a history is necessary, as this is a Report and Recommendation and the matter was reassigned after the custody and financial trials. I note, however, that despite the recent reassignment, Justice Katz and to a greater extent, the Appellate Division, First Department are well acquainted with these parties and this litigation. Indeed, just a few weeks ago, the First Department affirmed unanimously in its entirety Justice Cooper's determination awarding defendant sole physical and legal custody of the parties' child; granting plaintiff supervised visitation; granting a five-year order of protection in favor of defendant; and, awarding defendant child support beginning July 1, 2016 and arrears from December 2013 through June 2016. Zappin v. Comfort, ___ A.D.3d ___, 2017 WL 5578406 (1st Dep't Nov. 21, 2017). In so doing, the court noted that this was a "lengthy, contentious proceeding" and referred to plaintiff's "conduct and outbursts throughout the trial." In a prior decision affirming an award of sanctions against plaintiff, the First Department stated that "[t]he record establishes that the husband engaged in unprofessional, outrageous and malicious conduct on multiple occasions" and "has exhibited a pattern of bad faith conduct throughout the proceedings despite repeated warnings not to do so." Zappin v. Comfort, 146 A.D.3d 575, 575 (1st Dep't 2017).

The parties to this action were married on May 2, 2013 and have one child, a son, who was born in October 2013. On November 13, 2013, approximately one month after their son was born, plaintiff commenced an action in the court in the District of Columbia, where the parties had resided previously. A consent order was entered into that provided for temporary legal and physical custody of the child to defendant and providing for supervised visitation for plaintiff. (See Court Ex.

-3-

XII at 5)  This action was commenced on February 11, 2014.[5]  A preliminary conference was held in this court on April 2, 2014, at which time the parties, who were both represented by counsel, entered into a parental access schedule whereby plaintiff's time with the child would be supervised, as it was pursuant to the order of the court in the District of Columbia.  On April 23, 2014, this court accepted the custody matter from the District of Columbia Court, and April 30, 2014, Justice Kaplan appointed a forensic to conduct an evaluation of the parties. (Court Ex. XII at 7)

During the forensic process, on or about July 9, 2014, plaintiff discharged his counsel, Aronson Mayefsky & Sloan LLP ("AMS") then, despite having agreed to supervised access, on or about July 11, 2014, plaintiff nonetheless brought an OSC (Mot. Seq. No. 001) for unsupervised access to the parties' child.  At or about the same time, on July 28, 2014, plaintiff commenced an action in the United States District Court for the Southern District of New York against defendant, her parents, and her attorneys in the District of Columbia action.  Zappin v. Comfort, et al., No. 14 Civ. 5772.[6]  (Court Ex. XII at 8)

Justice Kaplan issued a decision and order dated August 8, 2014 (Court Ex. V) with respect to Mot. Seq. No. 001 in which she scheduled an expedited hearing on the limited issue of

_____

[5] Defendant also commenced an action for divorce the same day, Comfort v. Zappin, Index No. 301578/14, but did not file a complaint or an affidavit of service reflecting that plaintiff husband had been served in that action.

[6] It appears from a Westlaw search result that plaintiff commenced no less than three other actions in the United States District Court for the Southern District of New York related to the proceedings in this divorce matter: Zappin v. Daily News, L.P., No. 16 Civ. 8762 (KPF); Zappin v. NYP Holdings, Inc., et al., No. 16 Civ. 8838 (KPF); and Zappin v. Cooper, No. 16 Civ. 5985 (KPF).  See, Zappin v. Daily News, L.P., 2017 WL 3425765 (S.D.N.Y. Aug. 9, 2017) (Failla, J.)

supervised visitation.  By order dated August 11, 2014, Harriet Newman Cohen, Esq., a partner at Cohen Rabin Stine Schumann LLP ("Cohen Rabin") was appointed as the attorney for the child (the "AFC") in this action.  The hearing commenced on September 15, 2014, with plaintiff calling three witnesses, including the forensic.  Before the hearing could be continued on October 20, 2014, the next date all parties were available, plaintiff brought an Article 78 proceeding against Justice Kaplan to compel the hearing to resume and conclude at an earlier date.  In re Zappin v. Kaplan, 122 A.D.3d 460 (1st Dep't Nov. 13, 2014).  Plaintiff did not withdrew the proceeding until after the Attorney General, defendant's counsel and the AFC had expended time on the matter.  (See Df. Ex. B, November 17, 2014 invoice, at pp. 2-3)

On or about October 7, 2014, plaintiff discontinued this matrimonial action (see Court Ex. XXVI), and filed a change of address stating that he was now residing in South Carolina. Defendant then commenced a second action for divorce on or about October 17, 2014.  Comfort v. Zappin, Index No. 313020/14.[7]  The parties appeared before Justice Kaplan on October 20, 2014, at which time, according to the transcript of that proceeding and Justice Kaplan's February 27, 2015 decision and order in this matter (Court Ex. XII), plaintiff filed an action against defendant's counsel and firm in this court; plaintiff represented that he discontinued the federal action against defendant and her parents but was proceeding against her District of Columbia counsel.  Justice Kaplan issued an order on October 20, 2014 prohibiting plaintiff from engaging in certain specified conduct and ordered that the parties maintain the status quo in that plaintiff would continue to have supervised visitation.

---

[7]  The second action for divorce was dismissed without prejudice to the filing of an amended complaint in a decision and order dated February 27, 2015.  (Court Ex. XII)

On about October 22, 2014, plaintiff commenced a new proceeding by filing a Petition for a Writ of Habeas Corpus (Index No. 350075/14) seeking custody of the parties' child and other relief (the "Habeas proceeding"), together with an OSC seeking to vacate the October 20, 2014 order.  By order dated November 6, 2014, Justice Kaplan directed a schedule for plaintiff's access to the child, to be supervised by Comprehensive Family Services ("CFS").  (Court Ex. XIII) Following additional appearances and court orders, on November 14, 2014, plaintiff served a Notice of Withdrawal of Voluntary Discontinuance in order to reinstate this action.  He also filed various applications relating to the hearing that had commenced the month before.  The AFC was then also appointed in the Habeas proceeding.

In January 2015, plaintiff filed an OSC seeking to change custody, only to withdraw the request a few days later.  He filed motions to disqualify the AFC and to strike the testimony of the forensic; both motions were withdrawn, but only after one was opposed by the AFC and a briefing schedule had been set.  (Court Ex. XII and XII-A)  Over the succeeding weeks, plaintiff made various requests for modifications in the access schedule; although the schedule was tweaked in a manner favorable to plaintiff and in a manner he proposed, he nevertheless complained about the result in letters to the court.

In a 64-page decision and order dated February 27, 2015 which addressed multiple applications in the various proceedings before her (Court Ex. XII and XII-A), Justice Kaplan ordered that an evidentiary hearing be conducted to determine whether any of plaintiff's acts of alleged

domestic violence constitute a family offense and whether or not it is appropriate to issue an order of protection in favor of defendant and/or the child. The court also ordered that the custody issues in plaintiff's divorce action and the Habeas proceeding shall be jointly tried at an evidentiary hearing, together with defendant's request for an Order of Protection. The testimony from the September 15, 2014 hearing date was to be incorporated pursuant to a stipulation that was entered into by the parties and the AFC. Plaintiff was to continue to have supervised visitation while defendant would continue to have temporary legal and physical custody. Other requests for relief were denied, either with or without prejudice; defendant's request for counsel fees was denied with leave to renew upon the completion and submission of an updated Statement of Net Worth. Dates were set beginning March 6, 2015 for the evidentiary hearing. (Court Ex. XII at 61-64)

Defendant brought an OSC in which he sought a stay of the trial—despite having earlier demanded it proceed expeditiously—claiming he needed time to prepare; Justice Kaplan denied the request on the record on March 3, 2015, but then in a decision and order dated March 5, 2015 (Court Ex. XIV), adjourned the scheduled dates following additional submissions by plaintiff, including a request for time to obtain counsel. By order dated March 13, 2015, trial dates were set beginning April 24, 2015 and continuing on various dates through mid-June. On or about April 7, 2015, Stein & Ott, LLP submitted a Notice of Appearance on behalf of plaintiff. Trial dates were later adjourned at plaintiff's request due to professional obligations, over objection of defendant. The trial was now scheduled to continue into November 2015.

On or about April 30, 2015, plaintiff commenced a Family Offense proceeding against defendant in New York County Family Court and obtained a temporary order of protection

-7-

that would remain in effect through June 25, 2015. Zappin v. Comfort, Dkt. No. O-35316-15.

Defendant brought an OSC to remove and consolidate this proceeding, and sought other relief with respect to plaintiff's alleged conduct, including an order preventing plaintiff from bringing additional actions without further leave of court and limiting plaintiff's contact with defendant's counsel and his associates. The AFC also brought an OSC seeking, *inter alia,* enforcement of the order of appointment, claiming that plaintiff had failed to pay her fees and the fees he was ordered to pay so the AFC could retain an expert.

On or about April 30, 2015, plaintiff also commenced an action against the State of New York in the State of New York Court of Claims concerning an alleged incident that occurred on April 24, 2015 in Justice Kaplan's courtroom. On May 6, 2015, Stein & Ott, LLP and plaintiff executed a consent to change attorney; plaintiff would now be proceeding *pro se,* after having been represented by the firm for approximately one month.

The matter was reassigned to Justice Cooper. In a series of orders issued July 22, 2015 with respect to six different motion sequences following a court-appearance that same day (Court Ex. XX), Justice Cooper, *inter alia,* directed plaintiff to "conduct himself in accord and with strict adherence to the New York Lawyer's Code of Professional Responsibility" with respect to the AFC and to defendant's counsel, Robert Wallack, Esq. of The Wallack Firm, P.C. ("The Wallack Firm"). In addition, in response to an application brought by defendant (Pl. Ex. 11), plaintiff was ordered to refrain from having any communication with Mr. Wallack for any reason not specifically related to this proceeding. Plaintiff was further ordered to refrain from other enumerated conduct. The family court action plaintiff commenced was removed and consolidated with this action, and

plaintiff was barred from commencing further proceedings against defendant without leave of court. In a separate decision, plaintiff was ordered to pay the outstanding fees owed to the AFC and other fees requested in connection with the upcoming trial, together with other relief. The AFC's request for sanctions against plaintiff was denied, without prejudice to renewal in the event of plaintiff's non-compliance.

A day after the court appearance and issuance of the six decisions, plaintiff sought to file an OSC. Justice Cooper issued an order, dated July 23, 2015, setting forth his reasons for declining to sign the OSC, particularly since much of the requests for relief were addressed in the prior decisions. Justice Cooper reiterated that "[i]t is obvious that plaintiff has nothing but contempt and disdain for Judge Kaplan, having repeatedly called her a liar and made disparaging comments about her personal life in open court."[8] (Court Ex. XXI at 2, Mot. Seq. No. 018) Justice Cooper declined to sign other subsequent applications brought by plaintiff. (See, e.g., Court Exs. XXII, XXIII, XXIV) On July 27, 2015, David Evan Schorr, Esq. submitted a Notice of Appearance as plaintiff's co-counsel. The notice provides that copies of all papers are to be served on both Mr. Schorr and plaintiff.

Prior to the trial, plaintiff filed a complaint with the Office of Professional Medical Conduct ("OPMC") regarding the psychiatrist that the AFC retained as an expert to assist her in connection with the custody trial. The AFC brought an OSC seeking permission to communicate with the OPMC and to release court documents in connection with the matter before the OPMC.

---

[8] See also Court Ex. VII at pp. 5-6 (Mot. Seq. Nos. 019 and 021), quoting the transcript from an appearance before Justice Kaplan on March 3, 2015.

She also sought sanctions against plaintiff. (Court Ex. VII [Mot. Seq. No. 021]) Although plaintiff had actual notice of the OPMC's summary dismissal of the complaint after the OSC was filed, he failed to inform the AFC and defendant's counsel; the AFC prepared papers in reply that should not have been necessary. See, Zappin v. Comfort, 48 Misc. 3d 120 (A), 2015 WL 5511519 at *10-11 and footnote 7 (Sup. Ct. N.Y. Co. September 18, 2015) For the first time in this litigation, plaintiff was sanctioned, and was ordered to pay $5,000 to the AFC to compensate her for the two motions she brought, and $5,000 to the Lawyers' Fund for Client Protection. (Id. at *14) Justice Cooper also denied plaintiff's application to disqualify the AFC and vacate the prior orders requiring him to pay his 50% share of her fees, which was far from the first time he sought both types of relief.   In October 2015, plaintiff filed a Notice of Appeal from this decision and order.[9]

On October 27, 2015, Justice Cooper issued a scheduling order (Court Ex. IV) setting forth the trial dates and how the trial would be conducted, including the time allotments for testimony for each side and the payments the parties would be required to make before the trial to ensure the testimony of the experts, together with a deadline for the filing of any additional applications. This order led to additional motion practice, which was addressed on the record on November 6, 2015. (Court Ex. XIX) These applications included a motion relating to a woman that plaintiff had been involved with prior to the marriage and whom defendant sought to have testify. Plaintiff sought to preclude the woman, referred to as "Jane Doe," from testifying (Mot. Seq. No. 025); Jane Doe brought an OSC to enjoin plaintiff from filing, publishing or disseminating any photographs of her (Mot. Seq. No. 028).  Plaintiff also brought an OSC seeking to have Justice

---

[9] The decision was affirmed. Zappin v. Comfort, 146 A.D.3d 575 (1st Dep't 2017).

Cooper disqualified or to have him recuse himself and to reargue certain other decisions, together with other requests for relief. (Mot. Seq. No. 027)   Justice Cooper granted plaintiff's motion to preclude Jane Doe's testimony (Decision and Order dated November 6, 2015) but denied the motion for disqualification and/or recusal and reargument of the sanctions decision. (Decision and Order dated November 2, 2015) Plaintiff also made another application (Mot. Seq. No. 029) requesting no less than five days to present his case; deducting from defendant's trial time any time used by the AFC; reallocating the fees for the forensic's testimony; awarding sanctions against defendant and her counsel; and, seeking other relief. The OSC was denied, except for the request that plaintiff's expert be allowed to speak with the visitation supervisors. (Decision and Order dated November 6, 2015) Additional applications were brought by both sides with respect to certain evidentiary issues, including the production of the child's "onesie" for testing and preclusion of certain evidence; some applications were brought after the conclusion of the trial. (Mot. Seq. Nos. 031, 032, 033)

At the pre-trial conference on November 6, 2015 (Court Ex. XIX), plaintiff alleged that while everyone was in court, he was shoved by an attorney from Cohen Rabin. On November 10, 2015, Justice Cooper held an evidentiary hearing regarding the incident. The custody trial commenced before Justice Cooper on November 12, 2015 and concluded on December 21, 2015. Justice Cooper issued a 101-page decision, dated February 29, 2016 (the "Custody Decision") (Court Ex. VI). The Custody Decision notes that plaintiff called ten witnesses while defendant called four witnesses; in addition, the forensic was the court's witness. Justice Cooper awarded defendant sole legal and physical custody of the parties' child, with plaintiff's access to be supervised by CFS, and plaintiff bearing all expenses of supervised visitation. Plaintiff was also precluded from communicating with the child's extracurricular and medical providers. The Custody Decision

-11-

further provides that plaintiff cannot seek to modify the supervised access until September 1, 2017. (Court Ex. VI)  Finally, Justice Cooper also issued a five-year order of protection in favor of defendant and against plaintiff that expires on March 1, 2021. (Court Ex. X) The Custody Decision specifically provides that defendant was to settle a partial judgment, on notice. (Court Ex. VI at 101) The Partial Judgment of Divorce Resolving Custody, Parental Access and Decision Making was signed on March 17, 2016 and entered on March 18, 2016.  Plaintiff filed a Notice of Appeal on or about March 24, 2016.

By order dated May 11, 2016, the financial trial was scheduled to begin on June 27, 2016, with each side being given a total of 3 1/2 hours to present his or her case.  On June 23, 2016, plaintiff emailed a request for an adjournment, which was denied in a decision dated June 24, 2016. Plaintiff then brought an OSC (Mot. Seq. No. 034) seeking, *inter alia*, a stay of the financial trial; leave to proceed *in forma pauperis*; the imposition of sanctions against defendant, her counsel, and the AFC; a vacatur of the Custody Decision and Order of Protection; and, other related relief.  The OSC was not signed and Justice Cooper denied all requests for relief on the record on June 27, 2016.

The financial trial proceeded on June 27, with plaintiff proceeding *pro se*.  Following the conclusion of the financial trial and an inquest on the grounds for divorce, Justice Cooper rendered a decision on the record that same day, and directed defendant to settle the judgment of divorce, on notice.  The decision imputed income to plaintiff in the amount of $231,000 annually and, based on that income, awarded defendant child support in the amount of $1,397.29 per month and child support arrears in the amount of $45,383.  Plaintiff was also required to pay 44% of the child's statutory add-on expenses and all of the expenses for supervised visitation.  Plaintiff then

-12-

brought an OSC (Mot. Seq. No. 035) in which he again sought recusal and sought modification or vacatur of various pre-trial decisions, the trial decision, and a new trial, together with a reduction in his monthly child support obligation and a modification of the child support arrears; Justice Cooper declined to sign the OSC. But, the court reduced the amount of child support arrears that were awarded at trial by $4,000 to $41,383, following a review of the transcript. (Decision and Order dated July 21, 2016, Mot. Seq. No. 035). The decision further notes that the only remaining issue is counsel fees, which was severed, and would be heard after the signing of the judgment of divorce, upon defendant making a motion for fees. The judgment of divorce (the "Judgment") was signed on August 16, 2016 and entered that same day. (Court Ex. IX) On or about August 30, 2016, plaintiff filed a Notice of Appeal from the Judgment.

As provided, defendant moved by OSC for an order directing plaintiff to pay $400,000 toward the over $900,000 in counsel fees she has incurred. (Mot. Seq. No. 036) Justice Cooper issued an Interim Decision and Order, dated October 31, 2016, finding that a hearing is necessary so that "defendant will be awarded sufficient counsel fees to compensate her for having to spend more than she should have had to spend but for plaintiff's misconduct." (Court Ex. II at 1) The Order of Reference (Court Ex. I) followed. [10]

---

[10] Subsequent to the hearing, there has been additional motion practice. The motion to proceed *in forma pauperis* and for payment of the transcript (Mot. Seq. No. 040) is addressed, supra, at footnotes 2 and 3. In addition, there were additional applications for a downward modification of child support (Mot. Seq. Nos. 039, 041) and an application by plaintiff to hold defendant in contempt and to modify the access schedule. (Mot. Seq. No. 042) By order dated June 29, 2017, Justice Katz partially modified the Judgment with respect to the access schedule. Plaintiff filed a Notice of Appeal from that decision on or about August 30, 2017. At some point after March 2017, Peter Lomtevas, Esq. appeared as plaintiff's counsel, but there does not appear to be a Notice of Appearance in the court's records, and the August 30, 2017 Notice of Appeal was filed by plaintiff *pro se*. There was also a hearing in family court on January 24, 2017 in

-13-

**THE HEARING**

**Pre-Hearing and Scheduling Issues**

By email dated November 2, 2016 (Court Ex. XV), both sides were notified that the hearing would commenced on December 5 and continue, if necessary, on December 6, 7, 8, 12 and 13. Scheduling issues arose after the hearing dates were set and an issue arose over plaintiff's request to call certain witnesses. Plaintiff requested a late start time because of deadlines for filing his appeal from the Judgment; once he was assured he would have sufficient time, the hearing commenced on December 5.

Prior to the commencement of the hearing, plaintiff issued a subpoena to Cohen Rabin, the firm where the AFC is a partner, directing the production of certain documents, including billing entries. (Pl. Ex. 16) Cohen Rabin brought an OSC to quash the subpoena. (Mot. Seq. No. 038) The OSC was signed by Justice Cooper and referred to me, returnable on December 7, 2016.

Plaintiff sent an email to defendant's counsel and to me at 6:36p.m. after the first day of the hearing, contending that he was required to be at an interview on December 6 in connection with a class he is taking. He requested that the hearing be adjourned until December 7. I rejected his request for an adjournment, noting that I had rejected the last-minute request by defendant's counsel to adjourn the proceedings. (Court Ex. XVII) Plaintiff responded claiming that I made "baseless attacks" on him, and that if the hearing were to proceed, he "will file a formal complaint

_____

connection with an earlier application plaintiff brought in that court for a downward modification of his child support obligations; the application was denied.

with the Special Referee Clerk, the Chief Administrative Chief [sic] and seek all available avenues of relief." (Court Ex. XVIII) I advised him that the hearing was going forward on December 6. Plaintiff appeared, and the hearing continued.

On December 7, the parties and the AFC stipulated to have me hear and determine the OSC. Following oral argument of the OSC on December 7, I granted the motion to quash on the record because the subpoena was improper. (Decision and Order dated December 8, 2016)

**Testimony and Exhibits Entered into Evidence at the Hearing**

The hearing commenced with the testimony of Mr. Wallack, defendant's counsel, who was examined by an associate at his firm, Michael Belmont, Esq. Mr. Wallack testified that he graduated from the Benjamin N. Cardozo School of Law at Yeshiva University in 1999, and has practiced law for seventeen (17) years, first as an Assistant District Attorney in New York County where he worked in the Domestic Violence and Sex Crimes Bureau. Beginning in January 2004, he became an associate at the law firm formerly known as Kazowitz, Benson, Torres & Friedman LLP in the Matrimonial and Family Law department. He left that firm in September 2007 to start The Wallack Firm in September 2007.

In January 2014, defendant retained The Wallack Firm to represent her in this action. Defendant paid a $15,000 retainer against Mr. Wallack's billing rate of $650 an hour, which has since increased to $700 per hour. (Df. Ex. A) Associates bill at a rate of $400 to $500 an hour. Mr. Wallack also testified as to the background of each of the associates who worked on this matter.

-15-

Redacted invoices were entered into evidence (Df. Ex. B) and unredacted invoices were marked as Court Ex. XI. The billings totaled $857,881.19 through June 2016. (Df. Ex. D) Mr. Wallack testified that he stopped billing defendant after the June 26, 2016 invoice; the balance due on that invoice was $472,881.19.[11] Defendant made additional payments thereafter, and since she paid a total of $530,000 through September 19, 2016, the outstanding balance is $327,881.19. (Df. Ex. D)

Mr. Wallack testified as to the history of this action. Initially, plaintiff was represented by AMS. It was after AMS was discharged, Mr. Wallack testified, that the matter became more protracted, particularly due to the extensive motion practice plaintiff initiated. Mr. Wallack candidly admitted that he did not respond to some of plaintiff's motions if he believed a response was not required, in order to keep fees down. On cross-examination, plaintiff elicited testimony that defendant was not required to respond to many of his applications. By refusing to sign a number of the OSC applications plaintiff brought, Justice Cooper also saw to it that responses would not be required and defendant and the AFC would not be compelled to incur fees.[12]

---

[11] As set forth *supra*, this litigation has continued, with appeals and post-judgment applications

[12] In his July 23, 2015 order setting forth his refusal to sign plaintiff's OSC in Mot. Seq. No. 018 (Court Ex. XXI), Justice Cooper recognized that plaintiff's repetitious motion was "presented primarily to put defendant and the [AFC] in the position of having to expend money, time and energy to oppose the application." Justice Cooper similarly declined to sign plaintiff's OSC with respect to Mot. Seq. No. 020 (Court Ex. XXII); Mot. Seq. No. 022 (Court Ex. XXIII); Mot. Seq. No. 023 (Court Ex. XXIV); Mot. Seq. No. 033 (Decision and Order dated January 15, 2016); Mot. Seq. No. 034 (Decision and Order dated June 27, 2016); and, Mot. Seq. No. 035 (Decision and Order dated July 21, 2016). With respect to Mot. Seq. No. 029, Justice Cooper signed the OSC but put the matter down for oral argument without the need for opposition papers.

After defendant rested, plaintiff began his direct testimony on December 6, which continued on December 7. Plaintiff testified as to the history of the litigation. Plaintiff testified that he always had tried to be very nice to Justice Kaplan, but that the costs got out of control because of Justice Cooper. He testified that the proceedings on July 22, 2015 (Court Ex. XX) constituted "an egregious attack." Plaintiff also emphasized that defendant was not required to respond to all of his applications.

Plaintiff testified as to his efforts to settle this matter long before the custody trial. At one point, he told defendant's counsel that counsel could "draft any settlement agreement and proposed divorce decree [defendant] wants" and that he "will sign it as long as there's no bulls**t." (Pl. Ex. 15A) Then plaintiff submitted a settlement outline (Pl. Ex. 15B) to which there does not appear to have been a meaningful response.

After plaintiff's cross-examination and re-direct concluded, plaintiff called defendant to testify. Defendant testified that she reviewed Mr. Wallack's invoices and did not object to his bills. She testified as to a conversation that the parties had in December 2014 in a Starbucks. Defendant stated, "we were so far apart in position." On cross-examination by her own attorney, defendant testified that plaintiff threatened to bankrupt her and her family and to drive up her fees. The hearing then concluded.

## FINDINGS

As Justice Cooper noted in his October 31, 2016 Interim Decision and Order (Court Ex. I), normally fees are awarded to the less monied spouse in a matrimonial action. But, fees may also be awarded because a litigant has acted in such a manner as to require the other party to incur fees that are in excess of what that party otherwise would have incurred. "In determining an award of counsel fees, a court may properly consider one party's unnecessarily prolonging the litigation and escalating costs." R.S. v. B.L., 46 Misc. 3d 595 (Sup. Ct. N.Y. Co. January 26, 2015) (Gesmer, J.), aff'd, 151 A.D.3d 609 (1st Dep't 2017). In Quinn v. Quinn, 73 A.D.3d 887, 887 (2d Dep't 2010), the Second Department affirmed the lower's court's fee award of $9,000 to the wife, even though the parties were on a substantially similar financial footing because "but for the [husband's] conduct in this case, the [wife] would not have incurred significant legal fees." See also, Guzzo v. Guzzo, 110 A.D.3d 765, 766 (2d Dep't 2013); In re Steven S. v. Yelena M., 129 A.D.3d 408, 409 (1st Dep't 2015); Heydt-Benjamin v. Heydt-Benjamin, 127 A.D.3d 814, 815-16 (2d Dep't 2015); Cohen v. Cohen, 120 A.D.3d 1060, 1066 (1st Dep't 2014).

This is one of those cases that cries out for a fee award to the spouse who was subjected to conduct that caused her fees to be more than they should have been. Certainly, I note that a number of court appearances occur in every case, including preliminary conferences, status conferences, and a pre-trial conference. It is also not uncommon to appoint both a forensic and an AFC in a high-conflict case in which custody is in dispute. Additionally, some routine motion practice can expected in a contested matrimonial action, such as a *pendente lite* motion and motions related to discovery issues, or issues related to children or assets.

-18-

Here, however, the sheer number of appearances and applications that were filed—35 motion sequences in the 30 months from date of commencement to Judgment—is but one barometer of the level of hostility.  The motions were voluminous as well.  By all accounts, this was not a typical matrimonial action.  Justice Cooper noted that plaintiff "has done everything in his power to undermine the legal process and use his law license as a tool to threaten, bully, and intimidate." (Court Ex. VII at p. 3 [Mot. Seq. Nos. 019 and 021]) One need only read the opening paragraph of the Custody Decision to get a small flavor of what it was like to be involved in this litigation:

> Child custody trials, almost by definition, are difficult, contentious, even brutal affairs, as each parent attempts to portray the other as negatively as possible.  Unfortunately, this case has set a new standard for brutality, both with regards to the trial itself and the two years of continuous litigation, in this court and others, that preceded the trial.  One reason for this is that the allegations are so serious, consisting as they do of acts of domestic violence and other forms of abuse.  The other reason is that the conduct of the plaintiff-husband, an attorney who has represented himself either as sole or co-counsel throughout most of the proceedings, has been so inappropriate and out of line with what is considered acceptable behavior for attorneys and non-attorneys alike, even when he is in the courtroom or on the witness stand.

(Court Ex. VI at 1)  At the beginning of the financial trial, Justice Cooper stated on the record that today would be the end of "this brutal, acrimonious and dehumanizing divorce case."  (Transcript of Financial Trial, June 27, 2016, at p.2)

It is apparent that plaintiff began almost immediately engaging in conduct that is inappropriate for any litigant—particularly a licensed attorney—including sending letters to the court which contained photographs of Mr. Wallack and Mr. Wallack's minor child.  (Court Ex. V at 6-7, 11)  Plaintiff also made clear in a letter to the court that was submitted the same date as his reply

papers, which can reasonably be read as a threatening letter, that if he did not receive a decision from Justice Kaplan immediately (even though the motion had not been fully submitted at that time), he would seek emergency relief from the Appellate Division. (*Id.* at 7-8)  This pattern of behavior continued throughout this litigation, including a barrage of email messages, letters and motions. Justice Kaplan noted that "there is no excuse for the husband's letter to the court . . . wherein he includes irrelevant, personal information about the wife's counsel.  Even more egregious is the husband's inclusion of pictures of the attorney's young son . . . Such inappropriate, unprofessional, discourteous and undignified conduct on the husband's part raises serious concerns and will not be tolerated by this court." (Court Ex. V at 11).  Justice Cooper was compelled to remind plaintiff, in a Decision and Order dated August 28, 2015, that "as an attorney, he is required to comply with his ethical obligations and comport himself properly. . . .  he may not use intemperate, contemptuous and insulting language, as he has in this application." (Court Ex. XXIV at p. 2, Mot. Seq. No. 023)

Plaintiff's actions created the need for proceedings that would normally not be part of a matrimonial action, such as the hearing that Justice Cooper was compelled to hold on November 10, 2015 after plaintiff claimed that he was attacked in the courtroom by another attorney in this action. (Court Ex. XXV) Plaintiff also served a Notice to Admit containing over 300 separate statements, which led defendant to bring an OSC (Mot. Seq. No. 031) to vacate; Justice Cooper noted that most of the statements were totally irrelevant and "clearly abusive." (Court Ex. XXV at 44-45) On another occasion, plaintiff brought an emergency OSC (Mot. Seq. No. 002) seeking to have his mother deposed by video deposition to preserve her testimony.  Following oral argument on August 25, 2014, Justice Kaplan granted the request, on the record, to the extent that plaintiff

would be permitted to take his mother's video deposition in New York, with defendant's counsel and the AFC having the right to cross-examine.  (Pl. Ex. 2 at 23)  The next day, plaintiff submitted a letter to the court that having his mother travel to New York was "logistically impossible" and he did not further pursue having his mother testify.  (Court Ex. XII at 9-10)

The record reflects that plaintiff's conduct in this case was so egregious that it permeated the entire litigation.  He essentially waged war on defendant by a campaign of chronic abuse on her and everyone else involved in this matter.  There can be no question that plaintiff's conduct throughout this matter caused to increase defendant's legal fees.  That a custody trial lasted fourteen days for a then two-year old—who had been born shortly after the marriage and only a month before the District of Columbia action was commenced—was a direct result of plaintiff's behavior and scorched earth conduct.[13]

I reject plaintiff's attempts in his affidavit in opposition to the fee motion and at the hearing before me to attempt to show that had his settlement overture been accepted, defendant would not have hemorrhaged fees.  (Affidavit of Anthony Zappin, sworn to on October 24, 2016 [Zappin Aff.] at ¶¶19, 26)  Defendant did not fail to respond to or unreasonably reject a legitimate settlement offer, as much of the relief she obtained—including a five-year order of protection—was

---

[13]  That the trial did not go one for a longer period was attributable to Justice Cooper's rejection of plaintiff's attempt to call many more witnesses that were set forth on plaintiff's amended witness list, including, but not limited to, the AFC, defendant's attorney, and Justice Cooper's two court attorneys.  The entire amended witness list included 24 fact witnesses and five expert witnesses.  (Court Ex. XIX at 64-66)  In contrast, defendant's amended witness list contained fifteen names.  (Pl. Ex. 12)

-21-

not part of plaintiff's proposal.  It is also highly unlikely given the history of the marriage and the litigation that any settlement would have ended the litigation and the litigation costs.  Rather than penalize defendant for rejecting plaintiff's non-starter attempts at settlement, defendant must be compensated for having to incur costs in excess of what she should have incurred in an ordinary contested matrimonial action.

In his affidavit in opposition (Zappin Aff. at ¶7) and at the hearing, defendant claimed that Mr. Wallack's bills were deficient in detail.  Defendant questioned the references to "travel time," "trial preparation," "motion work", "review letters," etc.  These are fairly typical entries that attorneys make on their bills.  Because the client is generally aware of the activity in the litigation at any given time, and because bills must be provided every sixty (60) days to the client, these type of entries are sufficient, particularly since I am able to match the motions and court appearances with the appearances in the record.  Based on the testimony and litigation time line, I am able to ascertain the entries; plaintiff's argument that the bills are vague is insufficient.  See, Nestor v. Britt, 23 Misc. 3d 1138(A) (Table), 2009 WL 1636913 at *2 (Civ. Ct. N.Y. Co. 2009) (rejecting claim that billing records are vague).

I also reject plaintiff's efforts to reduce the fees because Mr. Wallack appeared with an associate at some court appearances and at trial.  (Zappin Aff. at ¶9)  Having two attrneys present is not necessarily a duplication of work.  The transcripts reveal that the AFC was often accompanied by one or two attorneys; indeed, plaintiff had Mr. Schorr appear with him as co-counsel.  (Court Exs. XIX, XX, XXV)

-22-

Although not raised in his opposition papers, I note that in my review of the invoices, there are instances where defendant was not billed every sixty (60) days, as is required. 22 N.Y.C.R.R. § 1400, *et seq.* This failure, however, does not constitute a reason to reject the request for fees. The First Department has made clear that "'[i]t is the right of the client, not the adversary spouse, to be billed at least every 60 days, and the client may waive that right.'" Rivacoba v. Aceves, 110 A.D.3d 495, 495-96 (1st Dep't 2013), quoting Petosa v. Petosa, 56 A.D.3d 1296 (4th Dep't 2008).

Based on the evidence presented and my review of the history of this case, it is fair to say that plaintiff probably made this litigation at least twice as difficult and twice as expensive as need be. There is also ample support for a finding that plaintiff had the goal of making defendant and her family spend as much as possible on fees. That plaintiff is an attorney makes the conduct in this case even more egregious and appalling. Accordingly, for all these reasons, I report and recommend that defendant's request for an award of $400,000 in counsel fees be granted, and that the court provide for an appropriate period of time for this amount to be paid, which should be paid directly to The Wallack Firm. See, Schoneau v. Lek, 283 A.D.2d 200, 200 (1st Dep't 2001) ("It was proper for the referee to employ [her] own knowledge, experience and expertise as to the time required to perform similar legal services in determining the reasonable of the claimed fee."); see also, David Realty and Funding, LLC v. Second Ave. Realty Co., 26 A.D.3d 257 (1st Dep't 2006)

One issue merits repeating. While plaintiff may argue that he is not the monied spouse, fees are not recommended on this basis. As set forth in Justice Cooper's decision (Court Ex. II), fees are recommended based his conduct in this litigation, including conduct he engaged in at

-23-

a time when he was earning a salary comparable to plaintiff's salary. The First Department has already determined that plaintiff's unemployment or underemployment "resulted from his own misconduct at trial, not from the court's conduct in sanctioning him or publicly releasing the sanctions order." Zappin v. Comfort, supra, ___ A.D.3d ___ (1st Dep't Nov. 21, 2017). Accordingly, he should not be able to use his unemployment or underemployment as a sword to give him license to engage in misconduct during litigation.

## CONCLUSION

A copy of this report has been mailed to plaintiff and The Wallack Firm, and is being hand-delivered to Justice Katz, together with the exhibits admitted into evidence and the post-trial submission. In accordance with C.P.L.R. Rule 4403 and 22 N.Y.C.R.R. § 202.44(a), following the filing of the report and notice to each party of the filing of the report, plaintiff shall move to confirm or reject all or part of the report within fifteen (15) days after notice of the filing of the report. If plaintiff fails to do so, then defendant shall so move within thirty (30) days after notice of the filing is given. See, Gould v. Venus Bridal Gown and Accessories Corp., 148 Misc. 2d 589 (Sup. Ct. N.Y. Co. 1990). If neither side files a motion, I report and recommend that the court *sua sponte* confirm the findings set forth above, after thirty (30) days has elapsed. Any requests for relief from these time deadlines should be directed to Justice Katz.

This constitutes the report and recommendation of the Special Referee.

Dated:  December 7, 2017                                  Respectfully submitted,

MARILYN T. SUGARMAN
Special Referee

# Exhibit 5

SUPREME COURT, APPELLATE DIVISION
FIRST JUDICIAL DEPARTMENT

                    Rolando T. Acosta,        Presiding Justice,
                    Rosalyn H. Richter
                    Sallie Manzanet-Daniels
                    Troy K. Webber
                    Marcy L. Kahn,            Justices.


------------------------------------------x

In the Matter of Anthony Jacob Zappin,
an attorney and counselor-at-law:

        Attorney Grievance Committee          M-4661, 5804,
        for the First Judicial Department,    5806, 6359
                    Petitioner,

        Anthony Jacob Zappin,
                    Respondent.

------------------------------------------x


Disciplinary proceedings instituted by the Attorney Grievance
    Committee for the First Judicial Department.  Respondent,
    Anthony Jacob Zappin, was admitted to the Bar of the State
    of New York at a Term of the Appellate Division of the
    Supreme Court for the First Judicial Department on September
    19, 2011.

    Jorge Dopico, Chief Attorney,
    Attorney Grievance Committee, New York
    (Kevin M. Doyle, of counsel), for petitioner.

    Respondent pro se.

Motion No. 4661, 5804, 5806 – December 1, 2017
Motion No. 6359 – December 14, 2017

<u>In the Matter of Anthony Jacob Zappin, An Attorney</u>

PER CURIAM

Respondent Anthony Jacob Zappin was admitted to the practice of law in the State of New York by the First Judicial Department on September 19, 2011.  Respondent's current registered address is in West Virginia, where he resides and is admitted to practice.

By unpublished order of October 17, 2016 (October 2016 order), this Court granted the motion of the Attorney Grievance Committee (Committee), finding respondent guilty of professional misconduct and referring the matter to a referee solely to consider evidence in mitigation or aggravation, and thereafter to recommend an appropriate sanction.  The Committee sought, and this Court issued, an order pursuant to the doctrine of collateral estoppel based upon the February 29, 2016 order and decision issued in respondent's divorce and custody action (*Zappin v Comfort*, Sup Ct, NY County, Cooper, J., index No. 301568/14).  Supreme Court's 100-page decision and order had granted respondent's wife sole custody of the couple's then two-year-old son and found that respondent, a pro se litigant: had repeatedly perpetrated acts of domestic violence against his wife; had testified falsely at a custody trial; had knowingly introduced falsified evidence during the proceedings in the form

2

of altered text messages; had presented misleading testimony
through his expert witnesses; had, beginning in April 2014,
engaged in acts that repeatedly demonstrated disrespect for the
court and counsel, by, inter alia, flouting the judicial
directives of three judges (a judge of the District of Columbia
Superior Court, the original matrimonial judge and the
matrimonial judge who made these findings [matrimonial judge]),
setting up a fake website about the attorney for the child by
registering her name as a domain name and posting derogatory
messages about her on it, and baselessly filing a disciplinary
complaint against a court-appointed psychiatric expert witness.
Additionally, Supreme Court found that respondent had sent text
messages to his wife, an attorney, threatening her with loss of
her license to practice law and professional ruin; had made
grossly offensive remarks during cell phone conversations with
his then three-month-old son in which he baselessly accused his
father-in-law of being a child sexual abuser who could harm the
child; had engaged in frivolous and abusive litigation against
his wife, her parents, and her attorneys; and had attempted to
publicly defame the attorney for the child.  Based on Supreme
Court's decision, applying the doctrine of collateral estoppel,
this Court found that respondent had violated New York Rules of
Professional Conduct (22 NYCRR 1200.0) rule 8.4(c) (conduct
involving dishonesty, fraud, deceit or misrepresentation); rule

3

8.4(d) (conduct prejudicial to the administration of justice);
rule 3.1 (frivolous litigation); rule 3.3(a)(1) (knowingly make a
false statement of fact or law to a tribunal); rule 3.3(a)(3)
(knowingly use or offer false evidence); rule 3.3(f)(2)
(undignified or discourteous conduct before a tribunal); and rule
8.4(h) (other conduct adversely reflecting on fitness as a
lawyer), and directed that a sanction hearing be held.

On December 19, 2016, the sanction hearing was held before a
Referee, who recommended that respondent be disbarred.  Before
the Referee, the Committee read into the record a February 19,
2016 deposition it conducted of respondent in which he admitted
that in January 2014 he filed a report with the D.C. police
accusing his former wife of perpetrating acts of domestic
violence against him, which accusations Justice Cooper found to
be entirely unfounded.  As mitigation evidence, respondent
introduced a limited portion of his deposition testimony in which
he made reference to the fact that he was in counseling during
his senior year in college and again sporadically while in law
school, that he took antidepressants while in college, and in
high school, he volunteered with the homeless.  He also
introduced a letter from his therapist, in which she stated that
she had sporadically treated respondent over the course of two
years but starting in April 2016 he consistently attended therapy
on a biweekly basis.  He also introduced four letters from

4

character witnesses, and maintained that any misconduct on his part occurred solely in the context of his custody dispute.

The Referee rejected respondent's mitigation evidence, finding incredible respondent's accusations of domestic violence by his then-former wife, noting their rejection by both the D.C. police and the courts in D.C. and New York; that respondent's deposition testimony as to the sporadic counseling he received in law school and his occasionally taking antidepressants while in college did not constitute mitigation; that his charitable work was insignificant; and that his therapist's letter and the similarly worded letters of four character witnesses provided no basis for mitigation. The Referee opined that while respondent's good conduct during the sanction hearing supported his contention that his disruptive courtroom behavior was confined to the custody litigation, nonetheless, such good behavior is required of lawyers at all times and, thus, did not mitigate his prior misconduct.

> As to his ultimate conclusion, the Referee opined: "[Respondent's] numerous instances of misbehavior may have all occurred in the same litigation, but it was extensive and unbridled. He accused and abused three judges in two states, lied continuously, condoned others' perjury, altered documents, physically abused his wife, and more, during years of litigation. There are no significant mitigating circumstances, but [respondent's] lack of remorse and evident lack of respect for the judicial process are serious aggravating factors. The record demonstrates [respondent's] unfitness for the practice of law, from which the public should be protected by ordering his disbarment."

The Committee now moves this Court to affirm the Referee's report and recommendation of disbarment.  The Committee argues that respondent's misconduct in terms of its scope, duration, ferocity, and maliciousness, coupled with his failure to admit any wrongdoing whatsoever, even in the face of this Court's prior finding of guilt, demonstrates that he is presently unfit to practice law.  The Committee has not submitted a memorandum of law but relies on the parties' posthearing submissions to the Referee.

Respondent opposes the motion and has additionally filed three motions seeking affirmative relief.  The first motion (M-5804) seeks vacatur of our October 2016 order finding him guilty of professional misconduct, finding it constitutionally infirm, and requests a hearing before a different referee and transfer of the matter to a different Judicial Department of the Appellate Division, due to alleged conflicts on the part of members of this Court[1] (vacatur motion); the second (M-5806) seeks vacatur of that same order on the basis of his allegations of fraud on the

---

[1] Respondent's conflicts rationale included the participation of Justices of this Court in affirming the underlying custody decision (*Zappin v Comfort*, 155 AD3d 497 [1st Dept 2017]); in deciding the October 2016 collateral estoppel decision while the appeal of the custody decision was pending; and in one instance, serving on the Commission on Judicial Conduct at the time of respondent's filing of a complaint with that body against the matrimonial judge.  Respondent has more recently commenced an action in federal court against all of the Justices of this Court, both of the matrimonial judges who handled his divorce action, and the chair and staff attorney of the Committee.

6

part of the Committee, an order directing the Committee to produce all exculpatory documents in its possession, transference of this matter to another Attorney Grievance Committee, a stay of this proceeding pending resolution of the motion and imposition of sanctions against the Committee's counsel (fraud motion); and the third (M-6359) seeks vacatur of certain misconduct findings in our collateral estoppel order, a new sanctions hearing, an order striking the Committee's reply in support of its motion to affirm the Referee's report and imposition of sanctions against the Committee's counsel (sanctions motion).

In support of his position opposing his disbarment, respondent argues that it would be fundamentally unfair to discipline him pursuant to the doctrine of collateral estoppel and that this matter should be remanded to the Committee for investigation and the filing of formal charges, if warranted. He further maintains that he was not given notice and a full and fair opportunity to be heard in the custody litigation.   These same arguments were previously raised before us and rejected in our October 2016 order.

Respondent next contends that Supreme Court's findings were biased and that the underlying proceedings were constitutionally tainted.   This argument is refuted by our affirmance of Supreme Court's decision in respondent's custody case (*see Zappin v Comfort*, 155 AD3d 497 [1st Dept 2017], *supra*).   Respondent also

7

urges that he should not be disciplined based on Supreme Court's findings because the New York City Bar Association (NYCBA) has taken the position that only "extreme circumstances" warrant giving collateral estoppel effect to a prior order; that the Committee proceeded by way of a collateral estoppel motion because the Committee knew formal charges based on the conduct at issue would not be sustained; that he has no prior disciplinary history and has never been the subject of misconduct allegations related to his private practice of law; that subsequent to the entry of final judgment in his divorce/custody case he has not engaged in any misconduct; and that he has completely cooperated with the Committee, whose staff counsel, respondent alleges, has engaged in prosecutorial and ethical misconduct.

The Committee replies that this Court's determination to give collateral estoppel effect to Supreme Court's decision in respondent's custody case has already been made and that respondent's argument misstates both NYCBA's position and the law. Further, the Committee asserts that there has been no misconduct on its part and that respondent's characterization of his own lack of misconduct is incredible, given that in March 2017 respondent had been charged with falsely reporting an incident by accusing the matrimonial judge of spitting and swearing at him when, in fact, by respondent's own admission in the criminal case it was respondent who had engaged in

8

threatening behavior toward the matrimonial judge.  The Committee notes that respondent pled guilty to a charge of disorderly conduct for which he received a sentence of three days of community service and waived sealing of the records.  As another example of respondent's lack of candor, the Committee cites a June 27, 2016 court appearance during which respondent accused the matrimonial judge of assaulting his wife and then denied making the accusation even after the transcript of his remarks was three times read back to him.  The Committee further maintains that the additional aggravation findings specified by the Referee were based on the ABA Standards for Imposing Lawyer Sanctions, which the Referee could consider under the new Rules for Attorney Disciplinary Matters (Disciplinary Rules) (see 22 NYCRR 1240.8[b][2]) and were fully supported by the record.  The Committee contends that any errors made by the Referee were not significant and urges disbarment, notwithstanding respondent's lack of a criminal record, due to his egregious conduct.

On a motion to affirm a referee's report and recommendation, this Court must review the referee's report and determine whether the referee properly found, "by a fair preponderance of the evidence, each essential element of the charge[s]" (22 NYCRR 1240.8[b][1]).  With respect to reviewing the referee's report and recommendation to determine whether the referee recommended the appropriate discipline for the misconduct, the Disciplinary

9

Rules provide:

> "(2) Discipline. In presenting arguments on the issue
> of appropriate discipline for misconduct, the parties
> may cite any relevant factor, including but not limited
> to the nature of the misconduct, aggravating and
> mitigating circumstances, the parties' contentions
> regarding the appropriate sanction under the American
> Bar Association's Standards for Imposing Lawyer
> Sanctions, and applicable case law and precedent.  Upon
> a finding that any person covered by these Rules has
> committed professional misconduct, the Court may impose
> discipline or take other action that is authorized by
> law and, in the discretion of the Court, is appropriate
> to protect the public, maintain the honor and integrity
> of the profession, or deter others from committing
> similar misconduct"(22 NYCRR 1240.8[b][2]).

As stated above, in this case, having already found

respondent guilty of professional misconduct as reflected in our

October 2016 order, we referred this matter to the Referee for

the limited purposes of considering the record evidence in

aggravation and mitigation, and thereafter recommending an

appropriate sanction.  Thus, on this motion, our review is

limited to whether the Referee's report and recommendation comply

with our directive and the Disciplinary Rules (see 22 NYCRR

1240.8[b][2]).

This record in this case is replete with numerous egregious

and outrageous acts of misconduct perpetrated by respondent over

the course of a four-year period, including his repeated acts of

domestic violence toward his wife; his false testimony at the

custody trial; his introduction of falsified evidence in the form

of altered text messages; his presentation of misleading

10

testimony through his expert witnesses; his flouting the
directives of three judges; his setting up of a fake website
about the attorney for the child in the custody action and
posting derogatory messages about her on it; his baseless filing
of a disciplinary complaint against a court-appointed psychiatric
expert; his threatening text messages directed to his wife; his
cell phone calls to his then three-month-old son baselessly
accusing his father-in-law of being a child sexual abuser who
could harm him; his engagement in frivolous litigation against
his wife, her parents, and her attorneys; his attempted
defamation of the attorney for the child; and his filing of a
police report falsely accusing his wife of committing acts of
domestic violence.  Notwithstanding the repeated acts of
egregious misconduct respondent has committed over the course of
several years, he has neither demonstrated any remorse nor any
acceptance of responsibility for his intolerable actions.  This
long list of aggravating factors, and the lack of mitigating
factors weighing in respondent's favor, fully support the
Referee's recommendation that respondent be disbarred.

The applicable case law also fully supports respondent's
disbarment here (*see e.g. Matter of Gen,* 29 AD3d 230, 234-235
[1st Dept 2006]; *Matter of Truong,* 22 AD3d 62, 67 [1st Dept
2005], *appeal dismissed* 6 NY3d 799 [2006]; *Matter of Heller,* 9
AD3d 221, 224-228 [1st Dept 2004], *lv denied* 3 NY3d 607 [2004];

11

*Matter of Robb*, 287 AD2d 1, 4-5 [1st Dept 2001]; *Matter of Klapper*, 253 AD2d 72, 75-76 [1st Dept 1999]; *Matter of Friedman*, 196 AD2d 280, 296-297 [1st Dept 1994], *appeal dismissed* 83 NY2d 888 [1994], *cert denied* 513 US 820 [1994]; *Matter of Padilla*, 109 AD2d 247 [1st Dept 1985], *appeal dismissed* 67 NY2d 870 [1986].

Having reviewed the aggravating and mitigating circumstances presented in the record and applicable case law and precedent,[2] we conclude that disbarment is the appropriate sanction "to protect the public, maintain the honor and integrity of the profession, or deter others from committing similar misconduct" (22 NYCRR 1240.8[b][2]).  Therefore, we agree with and adopt the Referee's recommendation that respondent be disbarred.

Accordingly, the Committee's motion for an order affirming the Referee's findings of fact and conclusions of law should be granted and respondent disbarred.

Respondent's vacatur motion is without merit, as respondent has not presented any credible support for his claims of lack of due process, conflicts of interest or bias on the part of this

---

[2]  To the extent that the parties' contentions are based upon the American Bar Association's Standards for Imposing Lawyer Sanctions (ABA Standards), we find that respondent's acts of professional misconduct, considered through the lens of the ABA Standards, favor disbarment (*see* ABA Standards §§ 4.61 [Lack of Candor], 5.11 [Failure to Maintain Personal Integrity], 6.11 [False Statements, Fraud, Misrepresentation], 6.21 [Abuse of the Legal Process], 6.31 [Improper Communications with Individuals in the Legal System], 9.0 *et seq.* [Aggravation and Mitigation]).

Court in rendering its October 2016 order.   Respondent cannot bring suit against all of the members of this Court and then claim conflicts of interest on the part of its members warranting transfer of this disciplinary matter to another Judicial Department.   In any event, in disciplinary matters such as this, we may, in the exercise of our discretion, grant collateral estoppel effect to findings made in earlier actions, which need not be criminal in nature (*see e.g. Matter of Taylor*, 113 AD2d 56, 57-58 [1st Dept 2013]; *Matter of Yao*, 231 AD2d 346 [1st Dept 1997]).   Here, our ruling is amply justified by respondent's having had a full and fair opportunity to litigate the findings made in the custody trial, as well as his history of employing abusive litigation tactics and the likelihood that he would have done so again, in an effort to delay both the appeal of Supreme Court's custody decision and the instant disciplinary proceeding, had this Court not entered its order.

Equally lacking in merit is respondent's fraud motion, as there is no credible support for respondent's allegations of fraud or misconduct on the part of the Committee or its counsel.

With respect to respondent's sanctions motion, respondent's argument that partial vacatur of the misconduct findings is necessitated by this Court's not having considered certain of those findings, thereby depriving him of a full and fair opportunity to litigate them, is based on his misreading of a

13

portion of the language we used in affirming Supreme Court's
custody order.  Specifically, we opined, with respect to Supreme
Court's "rulings in connection with the custody trial[,]" that
"[i]n any event, any claimed error would not warrant a different
custody determination" (*Zappin v Comfort*, 155 AD3d at 499).  As
respondent acknowledges, we did not vacate any of those findings,
but found them "fair and impartial, and . . . based in part on
credibility determinations that have support in the record" (155
AD3d at 500).  Respondent's requests to vacate the Referee's
report and to impose sanctions on the Committee's counsel are
similarly without merit, lacking any credible support in the
record.

Accordingly, each of respondent's motions for affirmative
relief are denied.

Respondent is disbarred and his name stricken from the roll
of attorneys and counselors-at-law in the State of New York,
effective the date hereof.

All concur.

Order filed. [March 8, 2018]


Ordered that each of respondent's motions for affirmative relief
are denied, respondent is disbarred and his name stricken from
the roll of attorneys and counselors-at-law in the State of New
York, effective the date hereof.

14

15

# Exhibit 6

Form SC-2
12/2013

**ORI No:** NY030075J
**Order No:** 2016-000010
**NYSID No:** _____

At a New York County Supreme Court, Civil Term Term (IAS Part) of the Supreme Court, State of New York, County of New York, at the Courthouse at 60 Centre Street, New York, NY 10007

**PRESENT:** Honorable Matthew F. Cooper

**In the Matter of a Proceeding under**
**Section 240 and/or 252 of the Domestic Relations Law**

**ORDER OF PROTECTION**
D.R.L.§§ 240, 252

Plaintiff/Petitioner   ANTHONY J. ZAPPIN
Date of Birth:   ▮▮▮▮▮▮

Case No.   301568/2014

**Both Parties Present in Court**

v.

Defendant/Respondent   CLAIRE K COMFORT
Date of Birth:   ▮▮▮▮▮▮

NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST, AND CRIMINAL PROSECUTION WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO SUPREME COURT PROSECUTION AND PENALTIES FOR CONTEMPT OF COURT.

THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER.

Whereas a determination has been made in accordance with section 240 and/or 252 of the Domestic Relations Law, and the Respondent having been: present in Court and advised of the issuance and contents of this Order, and good cause having been shown,

**Now, therefore, it is hereby ordered** that: ANTHONY J. ZAPPIN ▮▮▮▮▮▮ observe the following conditions of behavior:

[01]    Stay away from [A]    CLAIRE K COMFORT ▮▮▮▮▮▮

    [B]    the home of CLAIRE K COMFORT (▮▮▮▮▮▮) 220 West 98th Street Apt. 11L Floor 11th Flr., New York, NY 10025;

    [D]    the business of CLAIRE K COMFORT ▮▮▮▮▮▮;

    [F]    the place of employment of CLAIRE K COMFORT ▮▮▮▮▮▮ law office of Weil Gotschal & Manges, LLP 767 Fifth Avenue-N.Y., N.Y. 10153-0119;

[14]    Refrain from communication or any other contact by mail, telephone, e-mail. voice-mail or other electronic or any other means with CLAIRE K COMFORT ▮▮▮▮▮▮ THE SOLE EXCEPTION, to be used only in exceptional circumstances and not as a matter of course: Plaintiff may contact the Defendant BY LETTER, TEXT OR E-MAIL- as to the matters concerning the scheduling of visitation with THE CHILD-and the receipt of the notices and records to which he is entitled. The communications are to be brief, civilized and to the point.;

    **It is further ordered** that this order of protection shall remain in force until and including 03/01/2021.

DATED: 02/29/2016

_____
Honorable Matthew F. Cooper

**MATTHEW F. COOPER**
**JSC**

Form SC-2  Page 2
301568/2014
2016-000010

**The Domestic Relations Law** provides that the presentation of a copy of this order of protection to a police officer or peace officer acting pursuant to his or her special duties shall authorize, and sometimes requires, such officer to arrest a person who is alleged to have violated the terms of the order and to bring him or her before the Court to face penalties authorized by law.

**Federal law requires** that this order must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person against whom the order is sought is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect that person's rights (18 U.S.C §§ 2265, 2266).

**It is a federal crime to:**

• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;

• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and

• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired. (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

☒ Party against whom order was issued was advised in Court of issuance and contents of Order

☐ Order personally served in Court upon party against whom order was issued

☐ Service directed by other means[specify]: _____

☐ [Modifications or extensions only]: Order Mailed on [specify date and to whom mailed]:_____

☐ Warrant issued for party against whom order was issued[specify date]: _____

☐ Additional service information [specify]: _____

# Exhibit 7

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
FAMILY COURT
DOMESTIC RELATIONS BRANCH

ZAPPIN, ANTHONY                    :
          Plaintiff,                :         **Docket No. 2017 DRB 3832**
                       :
                       :         **Judge William W. Nooter**
                       :
COMFORT, CLAIRE                    :
          Defendant.               :

**ORDER GRANTING PLAINTIFF'S MOTION TO RECONSIDER ORDER DENYING
PLAINTIFF'S MOTION TO MODIFY CUSTODY ORDER AND HOLDING IN
ABEYANCE PLAINTIFF'S MOTION TO RECONSIDER ORDER DENYING MOTION
TO MODIFY CHILD SUPPORT ORDER**

On January 24, 2018, this Court entered an Order denying the Plaintiff's Motion for

Modification of a Custody and Visitation Order and Motion to Modify a Child Support Award

Issued in Another State, both filed on October 23, 2017.  The Defendant had filed Oppositions to

the motions on December 4, 2017.  On December 6, 2017, the Plaintiff appeared *pro se* and the

Defendant appeared with counsel for an Initial Hearing in this matter.  By consent of the parties,

various findings and orders entered by the State of New York courts were registered with this

Court by Order entered by the Court on December 11, 2017.  The custody issues in this matter

concern the minor child, Reid Comfort Zappin, born on October 6, 2013 (hereafter "minor

child").  At the hearing on December 6, 2017, the Plaintiff was directed by the Court to file any

replies to the Defendant's Oppositions to the motions by December 22, 2017.  No such replies

were filed by the time the Court ruled on the motions on January 24, 2018.  Without explanation

or leave of the Court, the Plaintiff filed a Reply on January 29, 2018, the day the Court had set

the matter for a Status Hearing.  The hearing had already been vacated by the Court in its

January 24, 2018, since the Court denied the motions to modify on January 24, 2018 based upon

the information it had at the time.  This Court found that the Plaintiff had not alleged in his

Motions any material and substantial change of circumstances since the entry of an Order issued

by the New York Court, Justice Michael L. Katz, on June 29, 2017 denying Plaintiff's motions

for contempt and to modify child support which he filed in the New York Court.

On February 8, 2018, the Plaintiff filed his Motions for Reconsideration (hereafter

"Motions") regarding the denial of both his Motion to Modify Custody and his Motion to Modify

Child Support.  The Motions were filed in sufficient time to be considered as Motions to Alter or

Amend Judgment under Dom. Rel. Rule 59, which must be filed within ten business days of the

judgment.[1]  A motion under Rule 59 (a) may be granted to alter or amend a judgment "where the

interests of justice require."   He argues in his Motions that this Court improperly used the

principles of collateral estoppel based upon what had occurred at the last hearing in New York.

Plaintiff states that Justice Katz's order was not a decision "on the merits", as required under

D.C. case law for the application of collateral estoppel.  *See Walker v. FedEx Office & Print*

*Services, Inc.*, 123 A.3d 160 (D.C. 2015).

Plaintiff attached to his Motions as Exhibit 1 the transcript of the proceedings before

Justice  Katz on June 29, 2017 which related to the entry of the June 29, 2017 Order which

constitutes the last modification of the Custody Order in this case.  However, contrary to the

Plaintiff's assertions in his Motions, Judge Katz did hold a hearing on the merits.  The Plaintiff

argues that since he was not present at the hearing, it was not a full hearing "on the merits".  He

claims that he could not attend because the prior judge, Judge Cooper, had obtained an order of

protection against the Plaintiff requiring that he stay away from Judge Cooper's place of

employment.  However, Justice Katz stated: "It seemed a real stretch to me that it would be a

violation of the order of protection for him to come to 111 Centre Street, whereas the subject of

---

[1] *See* Dom. Rel. Rule 6.

2

the order of protection works at 60 Centre Street." *See* Plaintiff's Exhibit 1, page 7.  Prior to the

hearing, Justice Katz had made it clear to Plaintiff that he expected him to be present at the

hearing.  Plaintiff violated his order by not appearing.   The Plaintiff had already filed extensive

arguments in writing and was represented by counsel at the hearing. The Plaintiff simply waived

his right to be present and Justice Katz ruled on the motions considering everything before him.

Therefore, the Plaintiff's voluntary absence from the hearing did not vitiate the preclusive effect

of the rulings by Justice Katz.

However, the Plaintiff is correct in asserting that Justice Katz did not make a full

determination on whether or not he should be allowed unsupervised visits because he found that

it was premature to do so.  On page 11 of that transcript, Judge Katz states: "I think Judge

Cooper very specifically said in his judgment or order that that was going to be the visitation

arrangement, at least through September of 2017.  It's not September 2017  yet, so I don't really

see that I have any authority to undo the law of the case, but we could take Judge Cooper's ruling

that there should be regular supervised visitation and arrange for it to resume in Washington,

D.C. so that this father can rebuild a relationship with his child."   Therefore, it is clear from the

transcript of the hearing that Justice Katz decided not to consider the Plaintiff's request for

removal of the requirement of supervised visits because Judge Cooper's order placed the time

limit of September 2017 upon consideration of any such requests.  It does not appear that he

closed the door to consider such a request after the September 2017 deadline has passed.[2]  In

addition, the Plaintiff attached as exhibits to his Motion to Reconsider the notes of six (6)

---

[2]  This Court's finding in its Order dated January 24, 2018 that Plaintiff has not proffered proof that he has
completed an intensive batterer's program and, therefore, could not establish a sufficient change in circumstances as
a matter of law is, on reconsideration, a matter better addressed in an evidentiary hearing.  While it will be necessary
for the Plaintiff to persuade the Court that he would no longer pose a danger to the minor child or the Defendant if
he were allowed unsupervised visits before such visits would be allowed, it is possible he can do so without having
completed the specific program recommended by Judge Cooper.

supervised visits that occurred in August and October of 2017, which were after the June 29, 2017 ruling by Justice Katz.  Finally, the Plaintiff has averred that the supervising organization that is identified in Justice Katz's June 29, 2017 Order, the Capital Region Children's Center, has gone out of business and can no longer supervise the visits.[3]  These are all circumstances that have occurred since the June 2017 hearing.  Accordingly, the Court will grant the Plaintiff's Motion Reconsider with respect to the Motion to Modify Custody and an evidentiary hearing will be set in due course.

      With respect to the Motion to Modify Child Support, the Court will need additional information from the parties before deciding whether or not the Plaintiff will be able to establish a change of circumstances warranting the requested downward modification of child support. The Court is not persuaded that the hearing regarding child support before Justice Katz was not "on the merits".  While it is true that Justice Katz denied a downward modification of child support based on Plaintiff's "non-appearance", he went on to state: "I think he would have a very hard time showing me that there's been a change of circumstances, because he already tried to make that showing in Family Court, and he had a hearing before a support magistrate this year and the support magistrate found there was no change in circumstances.  That was then the subject of an objection that was denied by a Family Court judge in April.  I have read the papers. I don't see that you've raised anything that's happened between April and June that would constitute a change in circumstances." *See* Plaintiff's Exhibit 1, pages 19-20.  From reading the transcript, this Court currently believes that Justice Katz ruled on the merits of the motion after a

---

[3] The Plaintiff incorrectly states on page two of his Motion to Reconsider relating to modification of custody that this Court denied his Motion to Modify Custody and vacated the January 29, 2018 hearing "despite having the knowledge that Plaintiff's visitation is to be supervised by the Capital Region Children's Center, which closed down in late December 2017, leaving Plaintiff without a way to exercise visitation with his child."  This Court did not know that the supervising agency had "closed down", even though  this Court afforded the Plaintiff the opportunity to file a Reply to the Defendant's Opposition to his motion, in which he could have so advised the Court.

full and fair hearing where the issues were actually litigated and the rulings were essential to the judgment. Therefore, the argument that collateral estoppel, or more accurately, *res judicata*, could not be applied by this Court is erroneous. Therefore, any change of circumstances that would warrant consideration of a motion to modify would have to have occurred since June 29, 2018. However, the Court would be assisted in this determination by being provided a copy of both the support magistrate's decision and the Family Court judge's decision affirming that order in April of 2017. These documents have not been provided to the Court. Therefore, the Court will order the Defendant to provide those orders.

In order to decide whether or not the Plaintiff would, as a matter of law, be able to prevail on his Motion to Modify Child Support based upon any changes in circumstances since the New York orders were entered, the Court needs further briefing by the parties on two legal issues. It is not clear to the Court, and the parties did not address, whether under these circumstances, the Court should apply D.C. law or New York law to determine the amount of child support that would apply under the Uniform Interstate Family Support Act, codified at D.C. Code § 46-351.01 *et seq.* Furthermore, the Court would like the parties to cite to any cases under the applicable law that would elucidate under what circumstances an imputation of income due to a finding of improper conduct of the party can be modified. These issues may determine whether or not the Plaintiff may now seek a modification of his child support obligation. Accordingly, the Court will hold that Motion for Reconsideration in abeyance and will set a deadline for additional submissions on these points.

Since the Court will entertain an evidentiary hearing at least on the Motion to Modify Custody, the parties should consider filing a Motion to Certify this case to the Domestic Relations 1 Calendar. Inasmuch as the custody trial in this case took almost three (3) weeks to

5

try, resulted in a 101-page written decision,  there were over twenty (20) motions filed in this Court before the case was transferred to New York, there were forty-two (42) motions filed in the New York courts (as proffered by the New York attorney for the child, Ms. Cohen, on page 11 of Plaintiff's Exhibit No. 1), that there are other related pending lawsuits between the parties including in federal court, and the Court has already had to expend a considerable amount of time simply trying to determine whether or not to hold an evidentiary hearing in this case, the matter may be better suited for the Domestic Relations 1 Calendar.  This Court is currently setting evidentiary hearings in December and will likely be more backed up before the parties can appear to set a hearing date.  Therefore, if the parties wish to file such a motion, this would be the time, with a courtesy copy sent to this Court.

This Court does not find that the arguments made by the Defendant were made in bad faith.  In addition, this Court afforded the Plaintiff an opportunity to file a Reply to the Defendant's Opposition by December 22, 2017 and he failed to do so, nor did he seek an extension of time.  Therefore, no attorney's fees will be awarded.

Accordingly, it is by the Court, this 4th day of June, 2018, hereby

**ORDERED,** that the Plaintiff's Motion for Reconsideration of the Order Denying the Plaintiff's Motion for Modification of Custody and Visitation of Minor Child be and the same hereby is **GRANTED**; and it is further

**ORDERED,** that the Plaintiff's Motion for Reconsideration of the Order Denying the Plaintiff's Motion to Modify a Child Support Award Issued in Another State be and the same hereby is **HELD IN ABEYANCE**;  and it is further

**ORDERED,** that the parties shall submit a Supplemental Brief **no later than June 29, 2018** with legal authority concerning whether the Court should apply D.C. law or New York law

6

to determine the amount of child support that would apply under the Uniform Interstate Family Support Act, codified at D.C. Code § 46-351.01 *et seq.* as well as citations to any cases under the applicable law that would elucidate under what circumstances a prior imputation of income due to a finding of improper conduct of the party can be modified by this Court; and it is further

**ORDERED,** that the Defendant shall submit to this Court a copy of the New York Support Magistrate's decision concerning the Plaintiff's motion to modify child support filed in that court, and the Family Court Judge's decision affirming that order in April of 2017, **no later than June 29, 2018**; and it is further

**ORDERED,** that the parties shall appear for a **Status Hearing** on **Monday, July 9, 2018 at 10:30 a.m.** in this matter with a list of all witnesses to be called and all exhibits to be offered at the evidentiary hearing on the Plaintiff's Motion to Modify Custody, unless this matter has been certified to the Domestic Relations 1 Calendar.

**IT IS SO ORDERED.**

**William Nooter**
**Associate Judge**

**Copies to**:

Anthony Zappin
1827 Washington Boulevard
Huntington, WV 25701
*Plaintiff Pro Se*

Matthew B. Andelman, Esq.
*Defendant's Counsel*
*Via Case FileXpress*

7

PRIORITY MAIL
POSTAGE REQU

U.S. POSTAGE
PAID
WASHINGTON, DC
JUN 08, 2018
AMOUNT
$28.75
R2304E105973-29

1007
10007

FOR INTERNATIONAL USE

**UNITED STATES**
**POSTAL SERVICE ®**

**PRIORITY**
**★ MAIL ★**
**EXPRESS™**

EE 147471212 US

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day
☐ 2-Day
☐ Military
☐ DPO

PO ZIP Code     Scheduled Delivery Day
(MM/DD/YY)      Rd 26   6/9/18

Date Accepted (MM/DD/YY)   Scheduled Delivery Time   Insurance Fee   COD Fee
6/8/18                     ☐ 10:30 AM   ☒ 3:00 PM   $           $

Time Accepted   1002   ☐ AM  ☒ PM   10:30 AM Delivery Fee   Return Receipt Fee
                                      $                      $

Weight     ☐ Flat Rate   Special Handling/Fragile   Sunday/Holiday Premium Fee
___ lbs ___ oz                        $                    $   Live Animal Transportation Fee   $

Postage   6/9/18   $ 28.75

Total Postage & Fees
$   28.75

Acceptance Employee Initials

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM   Employee Signature
Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM   Employee Signature

**WRITE FIRMLY WITH BALL POINT PEN ON HARD SURFACE TO MAKE ALL COPIES LEGIBLE.**

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE ( 253 ) 592-1578

Claire K. Comfort
1212 4th Street SE
Apt. 801
Washington, DC 20003

**PAYMENT BY ACCOUNT (If applicable)**
USPS Corporate Acct. No.   Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS (Customer Use Only)**
☒ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1)
Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4)
Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's
mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE ( 212 ) 805-0175

U.S. District Court
for the Southern District
Pro Se Intake Unit of NY
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 200
New York, NY

ZIP + 4® (U.S. ADDRESSES ONLY)

1 0 0 0 7 - 1 3 1 2

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

USM D3
MM17



WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.