UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ------------------------------------------------------------- X
ANTHONY ZAPPIN,

                      Plaintiff,

                         Case No. 1:18-cv-01693

              - against -

CLAIRE COMFORT,                      **THIRD AMENDED**
ROBERT WALLACK,                 **COMPLAINT**
THE WALLACK FIRM, P.C.,
HARRIET NEWMAN COHEN,        Jury Trial Demanded
COHEN RABIN STINE SCHUMANN LLP,

                   Defendants.
 ------------------------------------------------------------- X

       Plaintiff Anthony Zappin ("Plaintiff"), proceeding *pro se*, hereby alleges the following against Defendant Claire Comfort ("Comfort"), Defendant Robert Wallack ("Wallack"), Defendant The Wallack Firm, P.C. ("Wallack Firm"), Defendant Harriet Newman Cohen ("Cohen") and Defendant Cohen Rabin Stine Schuman LLP ("CRSS") (collectively, "Defendants"):

<u>**JURISDICTION AND VENUE**</u>

       1.      This Court has subject matter jurisdiction over Plaintiff's state law claims against all Defendants named in this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different states (Plaintiff – West Virginia; Defendant Comfort – District of Columbia; the Wallack Defendants – New York; the Cohen Defendants – New York).

       2.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims in this action occurred in this Judicial District.

## THE PARTIES

3.      Plaintiff Anthony Zappin is the former spouse of Defendant Claire Comfort.  Plaintiff was the plaintiff in the matrimonial action *Anthony Zappin v. Claire Comfort*, Index No. 301568-2014 formerly pending in New York County Supreme Court ("Matrimonial Action" or "*Zappin v. Comfort*"). Plaintiff resides in the State of West Virginia at 1827 Washington Blvd., Huntington, WV 25701.

4.      Defendant Claire Comfort is the former spouse of Plaintiff Anthony Zappin. Comfort was the defendant in the Matrimonial Action. Upon information and belief, Comfort resides in the District of Columbia.

5.      Defendant Robert Wallack is the principal of The Wallack Firm, P.C. Wallack represented Comfort through the Wallack Firm throughout the Matrimonial Action and subsequent post-judgment fee proceeding. Wallack maintains a professional place of business at 777 Third Avenue, 21st Floor, New York, NY 10007. Furthermore, upon information and belief, Wallack resides in the State of New York.

6.      Defendant The Wallack Firm, P.C. is a professional organization organized under the laws of the State of New York. It has one principal: Defendant Robert Wallack. The Wallack Firm maintains a principal place of business at 777 Third Avenue, 21st Floor, New York, NY 10007.

7.      Defendant Harriet Newman Cohen is a name partner at the firm Cohen Rabin Stine Schumann LLP. Cohen was appointed by Justice Deborah Kaplan in August 2014 to act as the "Attorney for the Child" in the Matrimonial Action and participated in all proceeding subsequent to August 2014 in the matter. Cohen maintains a professional place of business at 11 Times Square,

10th Floor, New York, NY 10036. Furthermore, upon information and belief, Cohen resides in the State of New York.

8.     Defendant Cohen Rabin Stine Schumann LLP is a limited liability partnership organized under the laws of the State of New York.  Upon information and belief, Cohen is the managing partner at the CRSS firm. CRSS maintains a principal place of business at 11 Times Square, 10th Floor, New York, NY 10036.  However, for the purposes of diversity jurisdiction, a limited liability partnership, such as CRSS, "takes the citizenship of each of its members." *Bayerische Landesbank v Aladdin Capital Mgmt., LLC*, 692 F.3d 42, 49 (2d Cir. 2012).  Accordingly, upon information and belief, for the purposes of diversity jurisdiction CRSS is domiciled in New York.  Plaintiff came to this well-founded belief by collecting the names of each of the partners on the CRCC website (http://www.crsslaw.com).  Plaintiff then used publicly available search tools to locate the home residence of each and every one of CRSS's partners.  Based on Plaintiff's searches, CRSS's partners are domiciled in New York.  Throughout the Matrimonial Action, CRSS, as well as its partners, associates and employees held themselves out as representing Plaintiff and Comfort's minor-child. Additionally, during of al Cohen's tortious action in the Matrimonial Action as set forth herein in this complaint, she held herself out as a representative of CRSS and admittedly received substantial support from CRSS in engaging in the unlawful and tortious conduct Plaintiff seeks to redress in this action.

## **FACTUAL ALLEGATIONS**

### I.     BACKGROUND

9.     This action largely has its origins in Plaintiff's personal divorce and child custody matter filed against his ex-wife Comfort, which was captioned *Anthony Zappin v. Claire Comfort*, Index No. 301568-2014 formerly pending in New York County Supreme Court.  In that proceeding,

Defendants Wallack and the Wallack Firm represented Comfort.   Defendants Cohen and CRSS purported to act as the "Attorney for the Child" for Plaintiff and Comfort's son

A.      Initial Proceedings Before the Superior Court for the District of Columbia

10.      Plaintiff and Comfort had a short relationship that began in late 2012.   They were married in May 2013 shortly after Plaintiff learned that Comfort had unexpectedly (at least to Plaintiff) become pregnant.   Their child was born on October 6, 2013.

11.      On November 10, 2013, just weeks after the child was born, Comfort and her father, Brian Comfort,[1] abducted Plaintiff's child from Plaintiff and Comfort's marital residence in the District of Columbia.   The one (1) month old child was flown over 3,000 miles to Tacoma, WA without Plaintiff's consent where the child was effectively hidden from Plaintiff by Comfort and her father.   At the time, Comfort was suffering from post-partem depression, which is documented in medical records, and refused to seek medical treatment.   Indeed, Comfort described herself as "unstable" and in need of "getting help" in text messages to Plaintiff during the abduction of the child.   (*See* Ex. ▮, DC Petition and Emergency Motion dated 11/13/13.)

12.      Plaintiff, through counsel, filed a petition for custody and a motion for the emergency return of the child on November 13, 2013 in the Superior Court for the District of Columbia ("DC Superior Court").   (*See* Ex. ▮, DC Petition and Emergency Motion dated 11/13/13.)   Notably, included in Plaintiff's filing were allegations of domestic violence that Plaintiff claimed in detail were committed against him by Comfort.   (*See id.*)   It should be further noted that Comfort subsequently admitted in sworn document to committing some of the acts of domestic violence Plaintiff alleged in his November 13, 2013 filings in the DC Superior Court, which were wholly

---

[1] Brian Comfort is an attorney purportedly admitted to practice law in the State of Washington.   It appears that at least part of Brian Comfort's law practice involves matrimonial and family court litigation.

4

ignored by the New York matrimonial court (*i.e.*, Justice Deborah Kaplan and Justice Matthew F. Cooper).

13.    A hearing was held before Judge Jennifer De Torro in the DC Superior Court on November 13, 2013 with respect to Plaintiff's emergency motion for the return of the child. Judge Di Torro issued an order directing Comfort to immediately return the child to the District of Columbia.

14.    Upon learning of the filing of Plaintiff's child custody petition in DC Superior Court, Comfort (aided and assisted by her father Brian Comfort) began an erratic cascade of filings in multiple jurisdictions and courts. In this filing, Comfort, for the first time ever, began (falsely) accusing Plaintiff of domestically abusing her beginning less than a week before the birth of the child (and never during the prior year of their relationship) as a defense to her abduction of the child and in response. However, in the span of just one (1) week, Comfort filed three (3) separate sworn statements with courts in Washington State and the District of Columbia with wildly different accounts (*e.g.*, different dates of alleged incidents, different supposed injuries, different numbers of alleged incidents) as to her plainly bogus allegations of domestic violence. Notably, Comfort changed, altered and expanded her allegations in each subsequent sworn statement each time Plaintiff or his counsel presented Comfort or her counsel with evidence undermining the allegations in the previous sworn statement.

15.    A *pendente lite* hearing on child custody and visitation was scheduled before Judge Di Torro in the Domestic Relations Branch of the DC Superior Court for November 20, 2013. The hearing was thwarted, however, by Comfort filing for a second *ex parte* temporary order of protection in the Domestic Relations Branch of the DC Superior Court three (3) hours before the start of the

*pendente lite* hearing before Judge Di Torro.[2]   In her Domestic Violence Branch petition, she radically altered her allegations of domestic violence from what she alleged in her two (2) prior sworn statements, which was an effort to stifle Plaintiff's defense and thwart the *pendente lite* custody hearing from taking place that day.   As a result of Comfort's clear gamesmanship, the *pendente lite* hearing was adjourned to March 2014 so as to allow Plaintiff to gather evidence and prepare a defense for Comfort's radically altered and third set of conflicting abuse allegations.

16.     In the interim, however, Comfort once again moved the child without consent or authorization from Plaintiff or the DC Superior Court from Tacoma, Washington to New York City in February 2014.  This undermined and thwarted the DC Superior Court's jurisdiction over the child custody proceeding pending there.  Plaintiff then filed for divorce from Comfort in New York County Supreme Court in February 2014 after the DC Superior Court deemed itself an inconvenient forum to determine the issue of child custody and visitation.

17.     At this stage, Plaintiff had by Comfort's (and her father Brian Comfort's) design became stuck in a crooked and undoubtedly biased family court system.  To make matters worse, the last custody and visitation arrangement before entering the New York court system was not based on any evidence, facts or testimony.  Rather, it was agreed to by the parties so that Plaintiff could prepare a defense in the face of Comfort's gamesmanship whereby she radically altered and falsified domestic violence allegations in last minute filings in the DC Superior Court.  However, it was this custody and visitation arrangement that became *de facto* permanent custody and visitation arrangement throughout the New York proceedings to the clear and undeniable prejudice of Plaintiff.

B.     The New York Divorce Proceeding before Justice Deborah Kaplan

---

[2] As mentioned above, Comfort obtained an *ex parte* temporary order of protection in Pierce County Superior Court in Washington State on November 13, 2014 via a kiosk the day after learning of Plaintiff's custody petition and emergency motion filed in DC Superior Court.

18.     Plaintiff filed divorce against Comfort in early February 2014.  In that proceeding.

Comfort was represented by Wallack and the Wallack Firm.  Plaintiff's divorce suit filed in New

York County Supreme Court was assigned to Justice Deborah Kaplan.  The case was styled as

*Anthony Zappin v. Claire Comfort*, Index No. 301568-2014, the matter from which the instant case

stems.  At this time, Plaintiff was represented by the firm *Aronson, Mayefsky & Sloan LLP* ("AMS").

However, the case was marred by bizarre conduct by Justice Kaplan, most notably Justice Kaplan's

imposition of supervised visitation on Plaintiff without affording him a *pendente lite* hearing required

by New York law, previously agreed to by Plaintiff and Comfort in DC Superior Court and requested

by Plaintiff incessantly.  *See Carlin v. Carlin*, 52 A.D.3d 559, 560 (N.Y. 2008) ("As a general rule,

while temporary custody may be properly affixed without a hearing where sufficient facts are shown

by uncontroverted affidavits, it is an error as a matter of law to make an order respecting custody,

even in a *pendente lite* context, based on controverted allegations without having the benefit of a full

hearing.").

19.     Between April 2014 and July 2014, Plaintiff's counsel AMS requested a *pendente lite*

hearing to determine temporary custody and to remove Justice Kaplan's clearly unlawful imposition

of supervised visitation on four (4) separate occasions.  At each of these proceedings, Justice Kaplan

refused to go on the record so as to allow Plaintiff to document and potentially appeal Justice

Kaplan's orders denying his requests.   Moreover, at each of these proceedings, Wallack

manufactured repeated lies to Justice Kaplan about Plaintiff in an effort to continue to secure

supervised visitation.  Since these proceedings were "off-the-record," Plaintiff was unable to record

or memorialize Wallack's unethical conduct.  Indeed, at this time, Plaintiff was paying approximately

$10,000 a month in costs associated with supervised visitation – well exceeding his salary as a junior

associate attorney.  This was in addition to incurring substantial counsel fees from AMS.  In effect,

Justice Kaplan's refusal to provide Plaintiff with a legally required *pendente lite* hearing while continuing to direct supervised visitation played right into the strategy of Comfort and Wallack, which was to financially crush Plaintiff out of the litigation and deprive Plaintiff of the financial ability to see his child.

20.     As a result, in July 2014, Plaintiff had to make the impossible financial choice of whether to continue to see the child or continue being represented by AMS and incurring legal fees. Plaintiff made the difficult decision to represent himself *pro se* so as to financially allow him to see his child, which was entirely as a result of Justice Kaplan's unlawful refusal to afford Plaintiff a *pendente lite* hearing as required by law.  Plaintiff's decision to represent himself *pro se* – so that he could continue to see his child – was attacked at every turn by Justice Kaplan and subsequently Justice Matthew Cooper.   In effect, Plaintiff's decision to represent himself *pro se* in order to continue to have the financial ability to see his child painted a target on him for corrupt judicial actors like Justice Kaplan and Justice Cooper to shoot at and to justify their unlawful and unwarranted orders throughout the litigation.

21.     In an appalling act of corruption, after Plaintiff fired AMS, Justice Kaplan appointed Harriet Newman Cohen as the so-called "Attorney for the Child" at an unconscionable rate of $600 per hour.  Justice Kaplan did so without notice, consultation or an opportunity to be heard by the parties, which was particularly appalling given Cohen's exorbitant rate of $600 per hour to represent a child less than one (1) year old.  It was later discovered by Plaintiff that at the time of her appointment, Cohen was not qualified by the Appellate Division First Department to be appointed as an Attorney for the Child in New York State in contested custody matters.   Even more disconcerting, it was revealed that Cohen and her firm were substantial campaign donors to and participants in Justice Kaplan's election campaign for New York County Supreme Court Justice.

This raised serious ethical questions, most notably whether the egregious $600 per hour fee awarded to Cohen without notice to the parties was some form of a kick-back by Justice Kaplan.

22.     At this time, Plaintiff had filed an Article 78 proceeding against Justice Kaplan seeking a writ of mandamus compelling her to hold a *pendente lite* custody hearing.  Justice Kaplan's act of appointing Cohen "Attorney for the Child" was not only an unethical kickback, but a clearly biased effort to inflict harm on Plaintiff.  Specifically, as set forth *infra*, Cohen's partner, Paul Kurland, remarked to David Evan Schorr (which Mr. Schorr has admitted) that:  "Kaplan appointed Harriet [Newman Cohen] to take out [Plaintiff] Zappin."

23.     Approximately one (1) month after Cohen's appointment in October 2014, Justice Kaplan indefinitely "stayed" the case after Plaintiff filed a motion to recuse her as Attorney for the Child.  Indeed, Cohen was doing her job, as apparently directed by Justice Kaplan, of antagonizing Plaintiff and turning the Matrimonial Action into a fiasco, all the while ignoring the best interests of the child.   Plaintiff's motion was based on several disconcerting and largely unrefuted actions by Cohen.[3]  This notably included:  (i) Cohen serving unnoticed secret subpoenas on Plaintiff's medical providers without court authorization and then harassing those medical providers; (ii) Cohen's bias in failing to serve subpoenas on Comfort's medical providers, which would have had information relevant to her allegations of domestic violence as well as Comfort's history of drug and alcohol abuse; (iii) Cohen making blatantly false, fabricated and incendiary allegations that Plaintiff had

_____

[3] In addition to egregious misconduct within the context of *Zappin v. Comfort*, Cohen had also made patently sexist, discriminatory and bigoted public remarks concerning men.  *See* "Divorce Lawyers Criticized by Consumer Affairs Chief," *available at* https://www.nytimes.com/1992/03/13/nyregion/divorce-lawyers-criticized-by-consumer-affairs-chief.html;  *see also*  "Trouble in Splitsville," *available at* http://nymag.com/nymetro/news/crimelaw/features/1670/ (characterizing Cohen as a "vocal feminist who is disdained by many of her colleagues at the bar" and quoting Cohen as demanding women receive "very, very substantial child support, the nannies that she needs, her traveling, her clothing … a townhouse and a chauffeur-driven car" in divorce proceedings).  Cohen's bigoted public statements and her vocal third-wave feminist anti-male diatribes fundamentally called into question her ability to act in the best interests of the child as an Attorney for the Child.

abused the child with a thermometer, allegations that were refuted by supervisors and later affirmatively abandoned by Cohen; (iv) Cohen repeatedly violating and disregarding court orders, including with respect to the confidentiality of the forensic custody evaluation report; (iv) Cohen admittedly failing to conduct any investigation into the facts of the case, which was further reflected by her billing statements, as required by the guidelines for Attorneys for the Child in the Appellate Division First Department and instead taking an unqualified "Believe All Women" (*i.e.*, Comfort) approach to the case; and (v) Cohen making numerous knowing and variable misstatements and misrepresentations to the New York court about Plaintiff and the child.  (*See* Ex. ▮▮, Zappin Motion to Disqualify Cohen.)

24.     Plaintiff was eventually required to withdraw the disqualification motion as Justice Kaplan refused to decide it after months of waiting for a decision by Justice Kaplan, despite the urgency of the case.  While the "stay" resulting from the motion was ongoing, Plaintiff was still incurring tens of thousands of dollars a month in costs for supervised visitation and was unable to hire counsel.  More importantly, the imposed "stay" resulting from the motion and Cohen's misconduct was being used by Justice Kaplan to frustrate Plaintiff's requested *pendente lite* hearing on child custody and lifting the unconstitutionally imposed supervised visitation.

        C.     Plaintiff's New York Court of Claims Lawsuit

25.     As the *Zappin v. Comfort* matter continued, it became increasingly frustrating for Plaintiff.  Justice Kaplan refused to make any effort to move the case forward.  For instance, she refused to issue any order, written or otherwise, that would enable him to appeal her imposition of supervised visitation.  Likewise, Justice Kaplan used any excuse to deny Plaintiff his right to a *pendente lite* hearing.  Plaintiff was being financially overwhelmed with the cost of supervised visitation, particularly given the fact it prevented him from hiring counsel.  And, most notably, Justice

Kaplan allowed Cohen to engage in a mountain of misconduct prejudicial to Plaintiff, as mentioned *supra*, with no consequences whatsoever.  At this stage and as a result of the harm that was being inflicted on Plaintiff's child, Plaintiff started to become vocally critical of Justice Kaplan on the Internet.

26.     In March 2015, Plaintiff – at the direction and urging of David Evan Schorr – unearthed an otherwise buried transcript of the criminal trial of Justice Kaplan's father in the Eastern District of New York.  Justice Kaplan's father was a drug dealer and hitman for a notable crime family in New York City.  In the transcript, Justice Kaplan testified in her father's defense.  In her testimony, Justice Kaplan appeared to make several damning admissions, which included:  (i) she frequented the warehouse/building where her father operated his criminal enterprise; (ii) money from her father's criminal enterprise was used to pay for her husband's legal education; and (iii) her father's assets, including the family home, were transferred into her name (presumably in an attempt to avoid criminal forfeiture).  (*See* Ex. __, Excerpt of Transcript of Deborah Kaplan's Testimony.)  Most notably, however, Justice Kaplan disparaged a domestic violence victim who was a key witness in the prosecution's case against of her father.  (*See id*.)  Justice Kaplan subsequently became aware that Plaintiff had obtained the buried transcript.  Plaintiff, again at the urging of David Evan Schorr, had given it to several other fathers who had cases pending before Justice Kaplan and were experiencing similar difficulties.  As a result, the transcript eventually made its way to the Internet and was spreading throughout the courthouse.

27.     On April 24, 2015, a conference was held before Justice Kaplan in *Zappin v. Comfort*.  At the conclusion of the hearing, Plaintiff was quietly waiting for his counsel in the gallery. For no apparent reason, Plaintiff was grabbed from the gallery by Justice Kaplan's personally assigned court officer, Jeffrey Katz ("Officer Katz").  Plaintiff was then hauled and shoved to a side hallway by

11

Justice Kaplan's courtroom, pushed against a wall and confined for several minutes without explanation by Officer Katz.  As a result of the incident, Plaintiff had several serious injuries and was treated at a New York hospital.  In true Mafioso form, both Justice Kaplan and Officer Katz denied that anything took place, despite detailed evidence of Plaintiff's injuries.

28.     On April 30, 2015, Plaintiff filed an action in the New York Court of Claims against Officer Katz and Justice Kaplan relating to the above-described incident on April 24, 2015.  (*See* Ex. __, Zappin Court of Claims Complaint.)  It was served by certified mail on the New York Attorney General's Office on May 5, 2015.  Just over two (2) weeks later, Justice Kaplan was not only removed from the *Zappin v. Comfort* matter, but she was stripped of over ninety-percent (90%) of her caseload and reassigned to an administrative position in the New York Unified Court System with the title "Statewide Coordinating Judge for Family Violence."[4]  (*See* Ex. __, FOIL Spreadsheet of Justice Kaplan's Reassigned Cases.)

D.     The Unusual and Unexplained Transfer of *Zappin v. Comfort* to Justice Matthew Cooper

29.     After Justice Kaplan was transferred to an administrative position in May 2015 just days after the New York State Attorney General was served with Plaintiff's Court of Claims complaint against her, *Zappin v. Comfort* was transferred to Justice Matthew Cooper on May 22, 2015 (with the first appearance being July 22, 2015) under highly irregular circumstances.  *Zappin v. Comfort* was one of the first, if not the first, case transferred from Justice Kaplan's docket.  (*See* Ex. __, FOIL Spreadsheet of Justice Kaplan's Reassigned Cases.)  Even more astonishing, **out of approximately 150 cases transferred from Justice Kaplan's docket, *Zappin v. Comfort* was the**

---

[4] Justice Kaplan's reassignment was announced on the "News and Announcements" webpage for the New York Unified Court System.  However, it was later taken down.  It can now only be found on the archive site.  *See* https://www.nycourts.gov/courts/1jd/supctmanh?News_&_Announcements_Archive.shtml.

**only case transferred to Justice Cooper**.  (*See id*.)   Justice Kaplan's remaining cases were transferred to newly appointed judge, Justice Frank Nervo.  (*See id*.)

30.     The transfer to Justice Cooper was peculiar for a number of reasons.  First, Justice Cooper was a longtime friend and defender of Justice Kaplan.  Indeed, both Justice Kaplan and Justice Cooper came up through the New York court system in nearly identical fashion.  Moreover, upon information and belief, Justice Cooper did work for and/or worked with Justice Kaplan's father when Justice Cooper was an attorney for the Teamsters in New York.

1.     Second, and more importantly, Justice Cooper was well-known for having a penchant for publicly embarrassing and deriding litigants.  In the months before being assigned to *Zappin v. Comfort*, Justice Cooper was responsible for numerous headlines in The New York Post and The New York Daily News ridiculing and shaming litigants.  These included, but were not limited to:

- "Divorce Judge Slams 'Bed-Pooping, Cokehead' Banker, Alcoholic Wife" by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2015/01/08/judge-blasts-banker-wife-for-horrible-fiasco-of-a-divorce/[5];

- "Judge Calls Carnegie Deli Manager 'The Shyster of Smoked Meat'" by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2015/08/05/judge-calls-carnegie-deli-manager-the-shyster-of-smoked-meat/;

- "Judge Slam Paul George For Being a Deadbeat Dad," by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2014/09/23/judge-slams-nba-star-for-being-a-deadbeat-dad/; and

- "Judge Rips 'Broke' Deadbeat Dad Who Skied in Alps," by Julia Marsh, published in The New York Post, *available at*

---

[5] Notably, the father in this custody dispute lost his job as a result of the article instigated by Justice Cooper and published in The New York Post.

https://nypost.com/2015/05/14/deadbeat-dad-claimed-poverty-while-taking-european-ski-trips/.[6]

31.     And, to make matters worse, Justice Cooper had just months prior given testimony before the New York Assembly in which he stated that he "shamed" matrimonial litigants into outcomes he believed were just, even when those outcomes did not comport with the law.  [LINK] As discussed further below, Justice Cooper employed the same unethical and shameful tactics in *Zappin v. Comfort* of publicly shaming Plaintiff in The New York Post and The New York Daily Mail as part of the ongoing scheme and ploy to discredit and publicly disgrace Plaintiff in retaliation for his First Amendment-protected criticisms of and legal actions taken against Justice Kaplan.

32.     Despite numerous inquiries, Plaintiff never received an explanation from the New York court or the New York Office of Court Administration why *Zappin v. Comfort* was singled out and assigned to Justice Cooper.  However, based on the subsequent behavior of both Justice Cooper and the First Department Attorney Grievance Committee ("NYAGC"), it was apparent that the *Zappin v. Comfort* proceeding was being used and manipulated to retaliate against Plaintiff.  This was apparent throughout the proceeding.

E.     A Brief History of the Matrimonial Proceeding before Justice Cooper

33.     Justice Cooper began formally presiding over *Zappin v. Comfort* on July 22, 2015. From the moment Justice Cooper began presiding over the Matrimonial Action, the proceeding was effectively rigged to manipulate the child custody proceedings into a vehicle to manufacture findings of attorney misconduct to attack Plaintiff's law license in retaliation for Plaintiff's Court of Claims lawsuit against Justice Kaplan as well as his exercising his First Amendment rights to speak out against her.  Justice Cooper was aided in this endeavor by Wallack, Cohen, Kevin M. Doyle (a staff

---

[6] It should be noted that Justice Cooper apparently engaged in *ex parte* communications with Julia Marsh, the New York Post reporter who published the disgraceful article, presumably to instigate the publication of the article to publicly embarrass Mr. Phillips.  (*See* Ex. 6, E-mail from I. Phillips to A. Zappin.)

attorney from the Attorney Grievance Committee) and David Evan Schorr. Indeed, as set forth *infra*, David Evan Schorr was acknowledged and effectively conceded the scheme.

34.     Without Plaintiff even opening his mouth in Justice Cooper's courtroom, Justice Cooper unjustly and without notice or opportunity to be heard sanctioned Plaintiff on September 18, 2015 as part of the scheme to retaliate against Plaintiff for his criticisms and legal actions taken against Justice Kaplan. *See Zappin v. Comfort*, 2015 NY Slip Op 51339(U) (hereinafter, the "Sanctions Decision"). The Sanctions Decision contained numerous misstatements and misrepresentations concerning Plaintiff's conduct. (*See* Ex. ___, Addendum of Justice Cooper's Misconduct and Biased Behavior in *Zappin v. Comfort*.) Indeed, as shown in Plaintiff's chart, Justice Cooper's misstatements and misrepresentations were verifiably inaccurate based on the *Zappin v. Comfort* record.[7] (*See id*.)

35.     Most importantly, though, Justice Cooper engaged in outrageous, egregious and, most notably, prejudicial behavior by admittedly personally disseminating the Sanctions Decision to the press (specifically, *The New York Law Journal*, *The New York Post* and *The New York Daily News*) to incite media coverage of the Sanctions Decision and the *Zappin v. Comfort* matter.[8] Not only was this conduct extrajudicial behavior, but it was in direct violation of New York Domestic Relations Law Section 235, a statutory provision which specifically prohibits judges from disseminating files in matrimonial cases in New York. Notably, the United States District Court for the Southern District

---

[7] It should be noted that Plaintiff appealed Justice Cooper's Sanction Decision to the Appellate Division First Department. Among the various issues raised, Plaintiff asserted that he was denied notice and an opportunity to defend himself with respect to the sanction and Justice Cooper's questioning his ability to practice law. The Appellate Division First Department affirmed the Sanction Decision in a perfunctory order failing to address Plaintiff's constitutional arguments.

[8] It should be noted that Justice Cooper provided the press with an advanced draft of the Sanctions Decision, which differed in formatting and contained typographical errors.

of New York has held that Justice Cooper's act of personally disseminating the Sanctions Decision to the media was an extrajudicial act.

36.     Apart and aside from the numerous misrepresentations of fact in the Sanctions Decision, the intent to inflict harm on Plaintiff through disseminating the Sanctions Decision was apparent: (i) Justice Cooper openly and publicly questioned Plaintiff's fitness to practice law without affording him any notice or opportunity to be heard prior to making such declarations; (ii) Justice Cooper publicly branded Plaintiff as a domestic abuser before a single document was entered into evidence by prominently and repeatedly stating that Comfort had accused Plaintiff of domestic violence in the Sanctions Decision despite Comfort's allegations being impertinent to the motions then pending before Justice Cooper and the fact that Plaintiff was first to allege he had been domestically abused by Comfort; and (iii) Justice Cooper resorted to petty name calling to catch headlines by asserting that Plaintiff was a "fool." *Zappin v. Comfort*, 2015 NY Slip Op 51339(U) (2015).

37.     Plaintiff consequently suffered extreme harm as a result of Justice Cooper's improper, unlawful and extrajudicial conduct surrounding the Sanctions Decision. This including Plaintiff losing his job at *Mintz Levin* (which affected his ability to hire counsel for the November 2015 child custody trial ordered by Justice Cooper and otherwise prosecute the case) and creating unnecessary and harmful tabloid media coverage over the case that was largely disparaging to Plaintiff and irreparably harmful to the child. Importantly, as a result of Plaintiff losing his job, he could not afford to hire trial counsel for the child custody trial in *Zappin v. Comfort*, which he had planned to do.

38.     No reasonable person would disagree that the Sanctions Decision was part and parcel to the scheme to retaliate against Plaintiff. Indeed, without Plaintiff having any opportunity to defend

himself, Justice Cooper violated New York sealing laws by publicly issuing the Sanctions Decision and personally disseminating it to the tabloid media in an effort to publicly humiliate, disgrace and destroy Plaintiff.  This intent was apparent by the fact that Justice Cooper publicly questioned Plaintiff's ability to practice law without notice or an opportunity to defend himself as well as labeled Plaintiff a domestic abuser before a single piece of evidence was placed before the matrimonial court. Indeed, as discussed *infra*, the Sanctions Decision was the catalyst for the NYAGC and Kevin M. Doyle to initiate a blatantly harassing and unfounded "*sua sponte*" attorney disciplinary investigation against Plaintiff.  In other words, the Sanctions Decision was written, published and disseminated to the press in conjunction with the NYAGC and its staff attorney Kevin M. Doyle, with aid and assistance from Wallack and Cohen.

39.     It must be noted, though, Justice Cooper's improper, unlawful and extrajudicial behavior with respect to the Sanctions Decision created an apparent and serious conflict of interest in the proceeding.  By engaging in extrajudicial conduct by personally disseminating his disparaging and verifiably untrue statements to the tabloid press through the Sanctions Decision, it put Justice Cooper in a position where his credibility was not publicly at issue and in direct conflict with Plaintiff's credibility.  Moreover, by engaging in unlawful and extrajudicial conduct that caused Plaintiff to lose his job and incited disparaging publicity towards him, it unquestionably placed Justice Cooper in a position where his future rulings had to justify the harm he inflicted on Plaintiff, particularly when making rulings concerning child custody and visitation.  This was particularly so with respect to Comfort's allegations of domestic violence.  Specifically, no reasonable person would conclude that he was in a position to fairly adjudicate the parties' allegations of domestic violence given that Justice Cooper violated state sealing law and publicly branded Plaintiff a domestic abuser – which caused Plaintiff to lose his job – before the start of the child custody trial before a single

piece of evidence was placed in the trial record.  In other words, Justice Cooper was in a compromised position and was not going to subsequently dismiss Comfort's domestic violence allegations at trial after he publicly credited them in the Sanctions Decision.  Moreover, most significantly, by personally and deliberately inciting and exposing the child to tabloid media coverage in a sealed child custody matter pending before him, it fundamentally called into question Justice Cooper's ability to make decisions in the best interests of the child.  Consequently, Justice Cooper's extrajudicial conduct with respect to the Sanctions Decision precluded him from being an impartial arbiter at the child custody trial in *Zappin v. Comfort*, which commenced in November 2015 just two (2) months after the Sanctions Decision.

40.     Despite the clear basis for Justice Cooper's recusal from the case based on his improper, prejudicial and extrajudicial conduct associated with the Sanctions Decision, Justice Cooper refused to step down from the case despite Plaintiff making a formal motion seeking his recusal.  Instead, he presided over the child custody trial that commenced on November 12, 2015.  At the child custody trial, Comfort was represented by Wallack and the Wallack Firm.  Cohen and CRSS acted as purported "Attorney for the Child."  Meanwhile, as a result of Justice Cooper's unlawful, improper and unethical Sanctions Decision, Plaintiff did not have the means to retain trial counsel.  Instead, both by the pressuring of Justice Cooper and the weaseling of David Evan Schorr, Plaintiff was relegated to having David Evan Schorr act as Plaintiff's "co-counsel" for trial while Plaintiff continued to represent himself.  As explained *infra*, David Evan Schorr actively worked to subvert Plaintiff's case in concert with Wallack, Cohen and by extension, Justice Cooper.

41.     Unfortunately, Justice Cooper continued to engage in outrageous and prejudicial conduct throughout the pre-trial proceedings and the custody trial itself that not only fundamentally called into question the fairness of the *Zappin v. Comfort* proceeding, but that would make any

18

reasonable observer question Justice Cooper's fitness to sit on the bench.   (*See, e.g.*, Ex.   , Addendum of Justice Cooper's Misconduct and Biased Behavior in *Zappin v. Comfort*.)

42.     The child custody trial in *Zappin v. Comfort* concluded on December 21, 2015 after thirteen (13) days of trial.  On February 29, 2016, Justice Cooper issued his Decision and Order After Custody Trial (hereinafter "Custody Decision").[9]  Yet again, the Custody Decision, much like the Sanctions Decision, was marred by Justice Cooper's misconduct and contrived findings, which is further set forth below.  (*See also* Ex. 8, Addendum of Justice Cooper's Misconduct and Biased Behavior in *Zappin v. Comfort*.) However, it bears pointing out, Justice Cooper made dozens upon dozens of "findings" in the Custody Decision adverse to Plaintiff that found no support whatsoever in the trial record and that were outright fabricated.  (*See* Ex.   , Chart of Justice Cooper's Fabrications in Custody Decision provided by Plaintiff to Defendants.)

43.     The Custody Decision, however, represented a change in course in the scheme by Justice Kaplan, Justice Cooper and Kevin Doyle to discredit, disgrace and disbar Plaintiff.  As the "*sua sponte*" investigation fizzled as a basis for seeking retaliatory attorney discipline against Plaintiff, it was conceived that the child custody trial and ultimately the Custody Decision could be used to "short-circuit" the attorney disciplinary process.  Specifically, the Custody Decision was written and drafted by Justice Cooper in conjunction with Kevin Doyle and the NYAGC to be used as a basis for seeking attorney discipline against Plaintiff.  Indeed, NYAGC and Kevin Doyle used numerous fabricated findings made by Justice Cooper in the Custody Decision as a basis to seek the imposition of attorney discipline via collateral estoppel on Plaintiff.

---

[9] The Custody Decision is sealed pursuant to New York law.  Defendant has a copy of it, however. Plaintiff will provide a copy to the Court under seal.

44.     With respect to the actual merits of the case, Justice Cooper ruled entirely against Plaintiff.  More specifically, Justice Cooper's Custody Decision gave Comfort full custody of Plaintiff and Comfort's child.  Although Justice Cooper denied Comfort and the Attorney for the Child's unfounded request that Plaintiff be entirely denied access to the child,[10] Justice Cooper directed that Plaintiff continue to have limited supervised visitation with the child for at least a period of eighteen (18) months at a cost of approximately $5,300 a month, despite the fact that Plaintiff was jobless as a result of Justice Cooper's extrajudicial misconduct of disseminating the Sanctions Decision to the New York tabloids.  As expected based on his publicly branding Plaintiff a domestic abuser in the Sanctions Decision prior to trial, Justice Cooper credited Comfort's allegations of domestic violence and entered a five (5) year order of protection against Plaintiff, which Comfort did not even request.

45.     Plaintiff subsequently appealed Justice Cooper's Custody Decision to the Appellate Division First Department.  The Appellate Division First Department failed to address any of Plaintiff's contentions made on appeal and summarily affirmed Justice Cooper's Custody Decision. This was the same Appellate Division First Department that also heard the attorney disciplinary matter brought against Plaintiff by the NYAGC that granted the NYAGC's April 22, 2016 Collateral Estoppel Petition based entirely on the Custody Decision before Plaintiff even had an opportunity to appeal the Custody Decision.

II.     COMFORT AND WALLACK FRAUDULENTLY AND ABUSIVELY SOUGHT A $400,000 ATTORNEYS' FEE JUDGMENT AGAINST PLAINTIFF

A.     Comfort and Wallack's Post-Judgment Fee Motion

---

[10] Throughout the proceeding, there was never an allegation that Plaintiff had ever harmed or attempted to harm the child.  Rather, Plaintiff had two (2) years of spotless supervisor reports that characterized him as a loving, caring and attentive father.  Moreover, five (5) supervisors testified at trial who all confirmed that they had never seen any behavior from Plaintiff that they believed was inappropriate, a danger to the child or that would warrant supervised visitation.

46.    On September 15, 2016, Comfort and Wallack filed a post-judgment motion in the Matrimonial Action seeking an order directing Plaintiff to pay $400,000 in Comfort's counsel fees purportedly stemming from the Matrimonial Action, the vast majority of which were allegedly unpaid.  At that point in time, Wallack alleged that he billed Comfort $857,881.19 in the Matrimonial Action and that Comfort had purportedly paid him $530,000.  That left an outstanding balance of $327,881.19.  In essence, Wallack and Comfort sought to have Plaintiff pay Comfort's outstanding balance of alleged legal fees.

47.    In referring Wallack's motion to a referee for a report and recommendation, Justice Cooper explicitly stated that Wallack and Comfort would only be entitled to fees where they could "show what portion of the fees [Comfort] incurred were the result of [Zappin's] obstructionist and dilatory tactics or other oppressive behavior."  Both in their motion papers and during the hearing before Referee Marilyn Sugarman, neither Wallack nor Comfort could identify a single entry in Wallack's invoices that were a result of Plaintiff's "obstructionist and dilatory tactics or other oppressive behavior."  (*See* Ex. __, Comfort/Wallack Fee Motion (Mot. Seq. 36).)

48.    As Plaintiff's opposition papers to the original September 15, 2016 sets forth, to the extent Comfort incurred substantial fees, it was a result of her own doing and Wallack's improper and fraudulent conduct in driving up fees.  For instance, in Plaintiff's motion filed before Justice Kaplan, he was repeatedly granted his requested relief (*See* Ex. __, Plaintiff's Opposition Papers (Mot. Seq. 36).)  Indeed, Plaintiff was repeatedly forced to bring motions as a result of Comfort refusing to compromise on visitation schedules, comply with discovery directives and obey court orders.  (*See id*.)  Comfort and Wallack, on the other hand, filed wholly frivolous motions like Wallack requesting an order of protection on behalf of himself against Plaintiff under the New York Domestic Relations Laws, which was denied as such relief is unavailable under the statute.  (*See id*.)

Moreover, after Justice Cooper took over the case, it is shocking that Wallack somehow billed Comfort $857,881.19 when Justice Cooper denied over ten of Plaintiff's motions without opposition and only required Comfort to respond two (2) motions, one of which involved her failure to comply with a judicial subpoena for a third time.  (*See id*.)

49.     As discussed below, no reasonable person could conclude that Wallack's bills are an accurate reflection of the work performed in Matrimonial Action.  Rather, they are a product padding, churning and a fraudulent scheme to drive up legal fees in the matter to later seek from Plaintiff. This scheme has now been confirmed by Comfort in sworn testimony in the District of Columbia.

50.     Based on the evidence, the record of the case and Wallack's invoices themselves, Wallack and Comfort's demand for $400,000 in attorneys' fees is part-and-parcel to the ongoing fraudulent scheme to inflict harm on Plaintiff using the Matrimonial Action and constitutes a clear abuse of process where their apparent collateral objective in seeking the fee award was to wrongfully maintain an advantage in the custody litigation by further inflicting financial harm on Plaintiff.

B.     Comfort and Wallack's Scheme to Fraudulently Inflate Invoices

1.     Throughout the Matrimonial Action, Wallack engaged in a strategy to frivolously drive up counsel fees and needlessly prolong the litigation, which excessive and largely padded legal bills to Comfort.  Indeed, it is unfathomable to think that legal fees in a custody matter involving a two (2) year old child could cost nearly a million dollars as Wallack billed Comfort.  Examples of Wallack's strategy to frivolously and unnecessarily drive up legal included, but are not limited to:

- Directing Comfort to not comply with a So-Ordered Judicial Subpoena *Duces Tecum*, which sought *inter alia* documents and information fundamentally material to her allegations of domestic violence.  This included her medical records, which contradicted her domestic violence alleged, and metadata

associated with her purported domestic violence photograph, which later revealed that the photographs were altered and that many they were taken weeks after she had claimed in sworn statements to have taken them (and well after the parties' separation in many cases).   As a result of Wallack and Comfort's stonewalling, Plaintiff was forced to bring <u>three</u> motions to compel compliance, all of which Plaintiff was awarded relief;

- Failing to participate in Court directed settlement negotiations and refusing to entertain any settlement proposal or overture from Plaintiff or his counsel;

- Bringing patently frivolous motions that included seeking a domestic violence protective order under New York's Domestic Relations Law against Plaintiff on his own behalf (which the Court obviously denied);

- Directing Comfort to disobey her discovery obligations, resulting in Plaintiff having to bring motion practice in which he was granted relief; and

- Bringing motions to remedy his own malfeasance, such as his failure to file an answer to Plaintiff's complaint in the Matrimonial Action.

Apart and aside from the later fraudulent scheme Comfort and Wallack entered into discussed below, Wallack *modus operandi* in the Matrimonial Action was to drive up Comfort's legal expenses through non-compliance with court directives, filing frivolous legal papers and, not unsurprisingly, through his own incompetence and malfeasance.

2.      Moreover, in looking to Wallack's billing invoices, it is patently obvious that his billing invoices are rife with fraudulent padding of time.   For example, the near entirety of Wallack's bills consist of non-descript entries such as:

- "E-mail correspondence with [John Doe]"

23

- "Travel Time"

- "Telephone call [or conference] with [John Doe]"

- "Motion work"

- "Review letters"

- "Attention to motion"

- "Review AZ documents"

- "Prepared for court"

- "Trial preparation"

(*See, e.g,* Ex. ▮, Wallack Billing Invoices.)  There is no way to determine what work Wallack and his associates actually did, whether it was necessary and reasonable or if the work was even performed at all.  Any first year attorney would no doubt point out that not only are Wallack's billing invoices insufficient, but that they was rife with padded time and non-descript entries making it impossible to traceback or evaluate his time to drive up fees.

51.     Wallack's bills are littered with entries for work that was never filed, *e.g.*, Comfort's child support motion.  (*See* Ex. ▮, Wallack Billing Invoices.)  Under New York law, Wallack would not be entitled to attorneys' fees for work that was never pursued or presented to the court.  Moreover, Wallack's invoices contain highly duplicative entries between himself and his associates.  Given that Wallack's billing entries are so vague, it is impossible to differentiate any work once again indicating that Wallack's bills are padded to a substantial extent.  (*See id.*)

52. Clear evidence that Wallack's bills were substantially padded can be seen in his opposition papers to Plaintiff's motion to compel Comfort's compliance with a So-Ordered Judicial Subpoena seeking documents related to her domestic violence

allegations.  In response to Plaintiff's approximately 50-page motion, Wallack submitted

a three (3) page opposition, which stated in part:

> As for as plaintiff's other requests for relief, including sanctions on defendant and me, the entering of orders "requiring Ms. Comfort to show cause why she should not be held in contempt," … **blah … blah … blah, frivolous does not even begin to describe them** … Suffice it to say, defendant opposes each and every one of plaintiff's arguments and associated requests for relief.  They are all meritless.  Mr. Zappin – please, for the sake of the Court and everyone involved, just pipe down.  It's really enough already.

(Ex. __, Wallack Opposition Affirmation (Mot. Seq. 6).)  In looking to Wallack's bills, he apparently

charged Comfort thousands of dollars for his three (3) page response to a motion to compel seeking

contempt with the defense of "blah … blah … blah…."  This only further evidences that Wallack's

bills were largely padded and therefore falsified.

53.     Perhaps most egregious of all, Wallack's invoices further consist of luxury valet

parking charges, extravagant meals and other items that clearly indicate his churning and padding of

the bill.  (*See* Ex. __, Wallack Billing Invoices.)  This sort of churning in a child custody proceeding

is indicative of an intent to fraudulent, abusively and unlawfully drive up legal fees.   This is

particularly so where Comfort has acknowledged in sworn testimony that she and Wallack came to

an agreement during the pendency of the Matrimonial Action that she would not pay such fees and

that they would be sought from Plaintiff in a fee motion.

54.     Finally, Wallack's invoices contain tens of thousands of dollars in usurious interest

charges from Comfort's purported non-payment of the bill.  (*See* Ex. __, Wallack Billing Invoices.)

Due to the deficiencies in Wallack's billing invoices, it is impossible to determine what interest

charges are legitimate.  More importantly, however, Comfort's admission in the District of Columbia

that she disputed many of Wallack's billing entries and that she and Wallack made a deal that the

disputed entries would be sought in a fee motion against Plaintiff, charging interest for Comfort's

non-payment of these fees was clearly fraudulent, abusive and a blatant unlawful attempt to drive up the legal fees that he intended to pursue from Plaintiff.

55.    As the facts above describe, Wallack engaged in a pattern of deliberately, unnecessarily and unlawfully inflating the legal fees he billed Comfort during the Matrimonial Action.  By Comfort's own admission in sworn testimony, Comfort and Wallack agreed that they intended to pursue a fee proceeding to pass these fees to Plaintiff.

C.    Clear Evidence that Wallack's Bills Were Fraudulently Padded

56.    In October 2016, in connection with a counsel fees motion filed by Wallack and Comfort, Plaintiff received for the first time copies of Wallack's billing invoices.  (*See* Ex. __, Wallack Billing Invoices.)  These invoices are key in that they definitively show fraud on the part of Wallack and his firm.  Specifically, Wallack's invoices contain dozens of entries in which he and his associates assert having communications with Cohen and members of her firm.  However, Cohen's billing invoices fail to reflect even a single one of these communications.  (*See* Ex. __, Chart Comparing Wallack and Cohen Invoices; *see* Ex. __, Cohen Billing Invoices.)  This is clear and apparent evidence that Wallack's billing entries were padded with work he never performed.

D.    Comfort Admits that She and Wallack Lied under Oath in the New York Fee Proceeding in Furtherance of Obtaining a the $400,000 Fee Award Against Plaintiff

57.    In connection with Comfort and Wallack's fee motion, a trial was held in December 2016 before Referee Marilynn Sugarman in New York County Supreme Court.  At the trial, Plaintiff cross-examined Wallack and called Comfort as a witness (Wallack did not call Comfort as a witness in his case).  During Plaintiff's cross-examination of Wallack, Plaintiff asked whether Comfort had ever disputed any of his billing entries for any reason.  Wallack emphatically and unequivocally answered no, that Comfort never disputed any of his bills or billing entries.

58.     Similarly, when Plaintiff called Comfort to testify, he likewise asked her if she had ever disputed any of Wallack's billing entries.  Like Wallack, Comfort emphatically stated that she never disputed or challenged any of Wallack's bills or billing entries.  Comfort testified:

MR. ZAPPIN:          Ms. Comfort, did you review Mr. Wallack's billing statements?

MS. COMFORT:         Yes, I have.

MR. ZAPPIN:          When did you review each of the statements?

MS. COMFORT:         I don't know exactly when I reviewed them.  I reviewed them –

MR. ZAPPIN:          Did you ever object to any of Mr. Wallack's billing entries?

MS. COMFORT:         I have not.

(*See* Ex. ▮, Excerpt of *Zappin v. Comfort* December 7, 2016 Transcript at 407.)  Thereafter, Plaintiff continued to question Comfort about Wallack's billing entries.  However, Comfort continually denied ever having contesting any of Wallack's billing entries.  (*See id*. at 408-12.)  Even the Special Referee confirmed Comfort's testimony:

MR. ZAPPIN:          Well, your Honor, the basis is that Ms. Comfort is an attorney. Ms. Comfort is practicing law at a large law firm.  She entered billing entries, just like I had to enter billing entries, and quite frankly, I wouldn't have been able to get away with billing entries like Mr. Wallack's, and I'm certain Ms. Comfort' wouldn't be able to get away with them, so I'm just curious why she would not object.

REF. SUGARMAN:       She didn't object [to Wallack's billing entries].  You are free to ask her why she didn't object.

(*Id*. at 409.)

59.     Wallack and Comfort's testimony as to whether Comfort disputed any of Wallack's billing entries was fundamentally material to the issues to be decided at the post-judgment fee proceeding.  That is whether Wallack's fees as describe in his billing entries were "reasonable."  To

the extent that Comfort objected to any of Wallack's billing entries, this would be evidence that the disputed entries were "unreasonable" and therefore should be excluded from any fee award.  Indeed, under New York law, fees disputed by Comfort would likely be unrecoverable in a fee proceeding against Zappin.

60.     It goes without saying that Plaintiff materially relied on Wallack and Comfort's testimony during the New York post-judgment fee proceeding in forming his defense to the fee motion.  In denying that Comfort ever disputed any of Wallack's billing entries, Plaintiff was effectively foreclosed from defending any billing entry actually disputed by Comfort as "unreasonable" and unrecoverable from Plaintiff under New York law.

61.     Just over two (2) years later in March 2019, Plaintiff and Comfort were parties to a child custody and child support modification proceeding in the DC Superior Court.  During the proceeding, Plaintiff called Comfort as a witness.  During his examination of Comfort, Plaintiff once again asked Comfort questions pertaining to the post-judgment fee proceeding in the Matrimonial Action.  On this point, Plaintiff specifically asked Comfort once again whether she had disputed any of Wallack's billing entries.  Comfort, somewhat astonishingly, effectively conceded that she had given false testimony in the prior New York post-judgment fee proceeding.  Comfort testified in the DC Superior Court proceeding:

| | |
|---|---|
| MR. ZAPPIN: | Isn't it true that you never contested a single item in Mr. Wallack's bills? |
| MS. COMFORT: | That, That's not entirely true. |
| MR. ZAPPIN: | What did you contest? |
| MS. COMFORT: | So, so I, I complained to Mr. Wallack … about the bills … |

          ***

MS. COMFORT:   … [S]o, so that, that's sort of my agreement with counsel [Wallack] was somewhat, that they could recover that type of thing from you, but, but that, that I wasn't going to pay every last dollar of, of the bills and, and I, I haven't paid every last dollar.

(Ex. 8, Excerpt of *Zappin v. Comfort* March 11, 2019 Hearing at 44-45.)

62.     As her testimony in DC Superior Court confirms, Comfort (and Wallack) lied under oath in the New York post-judgment fee award proceeding in furtherance of a scheme to obtain a $400,000 fee award judgment against Plaintiff.  In doing so, Comfort and Wallack requested that the New York state court impose a judgment on Plaintiff where Comfort and Wallack were in substantial disagreement about the reasonableness of Wallack's bills, as evidenced by Comfort's admission that she disputed many of his entries, which they hid from the New York state court by lying under oath. Moreover, Comfort and Wallack's false testimony in the New York post-judgment fee proceeding (which as discussed above Plaintiff relied upon at the time in making his defense) prejudicially and materially precluded Plaintiff from raising argument in his defense.

63.     At this stage, it is impossible to determine what Wallack's actual "reasonable" fees are in connection with the Matrimonial Action.  This has been obfuscated through the false testimony of Comfort and Wallack during the post-judgment fee proceeding.  Nevertheless, it is patently clear based on Comfort's testimony in DC Superior Court that she and Wallack gave perjured testimony in furtherance of an unlawful, abusive and fraudulent scheme to have the New York State court enter a crippling $400,000 judgment against Plaintiff.

E.     Comfort and Wallack's Admitted Fraudulent Scheme

64.     During the modification proceeding in DC Superior Court, Comfort not only gave testimony conclusively establishing that she and Wallack had perjured herself during the New York post-judgment fee proceeding, she also gave testimony evidencing an unlawful and abusive scheme

29

entered into between the two.  Specifically, Comfort testified that she disputed Wallack's billing entries where the work performed was due to his own malfeasance.  As an example, Comfort testified about an incident where Wallack failed to file an answer to Plaintiff's complaint in the Matrimonial Action:

> MS. COMFORT:    So for one example there, there was this time where they, they [Wallack] didn't file [an answer], we [Plaintiff and Comfort] both filed divorce action at the same time and then we, they agree with counsel to proceed under yours but we never actually filed an answer.  And so then what happened after you went pro se is you dismissed the action[11] …
>
> And so the response from counsel was to like file lots and lots and lots of papers and it ended up being a, a six-figure response in, in response to your action and so that, that one I said well, you know, yes, Anthony cause it but on some level you [Wallack] didn't file an answer.  And I just, you know, didn't foresee this coming and, and so, so that, that's sort of my agreement with counsel [Wallack] was somewhat, that they could recover that type of thing from you [Zappin] but, but that, that I wasn't going to pay every last dollar of, of the bills and, and I, I haven't paid every last dollar.

(Ex. 8, Excerpt of *Zappin v. Comfort* March 11, 2019 Hearing at 45-46.)

65.    In essence, Comfort's testimony confirms that Wallack churned excessive and unnecessary fees by filing "lots and lots and lots of papers."  But, more importantly, Comfort's testimony confirms that she and Wallack entered into an unlawful agreement to shift fees she disputed to Plaintiff by later making a fee application.  What makes this even worse is that, by Comfort's own admission, this included fees that Wallack billed Comfort for work he performed that was a result of his own malfeasance, incompetence and laziness.  This is a fraudulent and abusive scheme in every sense.

---

[11] Notably, Plaintiff immediately filed a new action in the same court before Justice Kaplan seeking a visitation schedule with the child, which she had never previously entered in the Matrimonial Action.  At the time, Comfort refused to enter into a formal visitation arrangement with Plaintiff.

F.      Comfort's History of Lying in Court; Wallack's History of Lying in Court

66.     As set forth in Exhibit ▮ attached to this Third Amended Complaint, this is not the only instance that Comfort has been caught lying under oath.  Indeed, as Exhibit 9 sets forth, Comfort has given false testimony on several occasions, repeatedly gave conflicting allegations of domestic violence, disobeyed court orders, make deliberate and material misrepresentations in court documents and intimidate and coerced witnesses to give false testimony against Plaintiff.  Comfort's false testimony at the New York post-judgment fee proceeding is part of a pattern of abuse in court proceedings.

67.     With respect to Wallack, since founding his own firm, Wallack has been enveloped in one scheme, litigation or allegation of misconduct after another.  These incidents include, but are not limited to:

- Wallack has been repeatedly rebuked by matrimonial judges for egregious unethical conduct.  For example, in 2011, Justice Deborah Kaplan found that Wallack had engaged in multiple acts of attorney misconduct, including "fabricating" court orders, attempting to engage in *ex parte* communications with the court and repeatedly violating court orders involving the children at issue in the *Nacos v. Nacos* litigation:

  - "Mr. Wallack began a letter writing campaign to the Court choosing to litigate improperly by letter ... Mr. Wallack only increased the volume of mail and raised the level of hyperbole." (Ex. 10, February 8, 2011 Kaplan Letter);

  - "It was Mr. Wallack's improper restraint of [the husband's] bank accounts, achieved by sending misleading letters to numerous financial institutions informing them that the Court had issued restraints prohibiting release of any funds to [the husband], when it had not ....) (*Id.*)

  - "The improper behavior continued as Mr. Wallack chose to repeatedly disregard agreements, orders and directives."  (*Id.*)

- o "[F]ollowing the November 10, 2010 [conference] where the Court instructed Mr. Wallack not to interfere with [the Attorney for the Child's] ability to meet with her clients, he directed the Wife not to allow the meeting." (*Id.*)

- o "Mr. Wallack continued to obstruct the Court's order of appointment and impeded [the Attorney for the Child's] attempts to see her clients." (*Id.*)

- o "It was Mr. Wallack's improper inclusion of sensitive and perhaps privileged [information] in his Reply [papers], which caused both defendant's counsel, and the children's attorney to seek the Court's permission to respond by sur-reply." (*Id.*)

- In 2016, Wallack and The Wallack Firm were sued by Nadine Bocelli & Company, Inc. (a legal staffing company) for failing to pay his associates and staff hired in part for the *Zappin v. Comfort* litigation. *See Nadine Bocelli & Co., Inc. v. The Wallack Firm PC*, Index No. CV-004670-16/NY (N.Y. County Civil Court).

- In 2015, Wallack was forcibly evicted from his Upper East Side apartment after failing to pay rent for over six (6) months. This is shocking considering at that point Comfort and her father had paid Wallack nearly $400,000 in legal fees.

- In 2013, Wallack and The Wallack Firm were sued by American Express after running up large balances and refusing to pay off the firm's Business Platinum Card. *See American Express Bank FSB v. Robert Wallack et al.*, Index No. 158371/2013 (N.Y. County Supreme Court). American Express received a judgment of $50,221.30 against Wallack. Upon information and belief, Wallack has not paid a penny of the judgment despite being paid over $400,000 from the Comforts in the Matrimonial Action litigation to date.

- In 2009, the State Worker's Compensation Board entered a $12,000 judgment against Wallack. *See Workers' Compensation Board of the State of New York v. The Wallack Firm PC*, Index No. 454085/2009 (N.Y. County Supreme Court).

32

- During the Matrimonial Action litigation, at least two (2) female associates quit *The Wallack Firm, P.C.*  Upon information and belief, they subsequently alleged that Wallack sexually harassed them while they were employed at the firm.  Upon information and belief, other female employees had previously accused Wallack of sexual harassment and left *The Wallack Firm, P.C.*, prior to 2014.

- Wallack has repeatedly sued clients *pro se* seeking outrageous judgments of hundreds of thousands of dollars in legal fees he churned from these unsuspecting individuals.  In 2015, Wallack sued former client Kevin Mulrane seeking **$120,883.75**.  *See The Wallack Firm, P.C. v. Kevin Mulrane*, Index No. 150248/2015 (N.Y. County Supreme Court).  In 2013, Wallack sued former client Vanessa Dahlman seeking **$70,440.10**.  *See The Wallack Firm, P.C. v. Vanessa Dahlman*, Index No. 159537/2013 (N.Y. County Supreme Court).  And, in 2012, Wallack retaliated against Julie Nacos' for her malpractice suit by bringing a countersuit against her seeking **$409,356.91** in churned fees.  *See The Wallack Firm, P.C. v. Julie Nacos*, Index. No. 101546/2012 (N.Y. County Supreme Court).

- Recently, Wallack and his firm have been involved in a murder-for-hire scheme executed by his client and her father against her former husband.  (*See* https://nypost.com/2018/03/17/man-sues-father-in-law-wife-after-they-allegedly-plotted-to-kill-him/.)

- Even more recently, Wallack and the Wallack Firm were sued in New York Supreme Court after they stiffed Joseph Tacopina P.C. out of "hundreds of thousands of dollars."  *See Joseph Tacopina P.C. v. The Wallack Firm P.C., et al.*, Index No. 653830-2019 (N.Y. County Supreme Court).

68.     Most pertinent, however, are the repeated accusations by Wallack's former clients that he fraudulently padded bills and churned fees.  For instance, in 2012 Wallack and The Wallack Firm were sued by former client Julie K. Nacos alleging that "lied about rulings of the Court," "disregarded Court orders and directions," "made excessive motions" and "churned Ms. Nacos' file … in order to generate enormous, excessive legal fees."  (*See* Ex. __, Complaint in *Nacos v. The Wallack Firm, P.C. et al.*, Index No. 154278/2012 (N.Y. County Supreme Court).)  Upon information and belief, Wallack agreed to discount portions of Ms. Nacos' fees owed in order to resolve the case and avoid a disciplinary complaint by Mrs. Nacos.  What is important, however, is that Mrs. Nacos' description of Wallack's handling of her case aptly describes Wallack's misconduct and fraudulent behavior in Matrimonial Action discussed herein this Complaint.

G.     The Post-Judgment Fee Proceeding Was Brought with a Clear Ulterior Motive

69.     Comfort and Wallack's post-judgment request for counsel fees was part of a fraudulent and abusive scheme to inflict financial harm on Plaintiff to stifle his access to the child[12] as well as his financial ability to seek modification of the child custody, visitation and child support orders entered in the Matrimonial Action.[13]  More specifically, Comfort sought the extraordinary fee award against Plaintiff not because she believed Plaintiff could ever actually pay it, but in furtherance of a collateral objective to maintain an advantage in the custody litigation.  Comfort knew such a financial award would financially ruin Plaintiff giving Comfort a leg-up in any further modification proceeding, to the extent Plaintiff could even afford to bring a proceeding.

---

[12] This effort to stifle Plaintiff's access to the child through inflicting financial harm has been exponentially multiplied by the fact that Comfort continues to demand supervised visitation and the fact that she unlawfully relocated the child to Washington, DC forcing Plaintiff and his family to incur substantial travel cost to visit with the child.

[13] Modification of Justice Cooper's child custody order was effectively built-in, as it allowed Plaintiff to petition for modification after eighteen (18) months.

70.     By way of example, in large part due to the $400,000 judgment Comfort improperly and fraudulently obtained against him, Plaintiff's credit has effectively been destroyed.  His credit cards have been closed, which has precluded Plaintiff from having the ability to rent a car to travel to Washington, DC to visit with the child.[14]  Moreover, Plaintiff has been unable to rent an apartment (requiring him to live with family), buy a new car (to use to see the child) and has lost employment opportunities due in large part to the $400,000 judgment.  Consequently, not only has the $400,000 made it ever more difficult to exercise his visitation with the child, it has also placed Plaintiff at a substantial disadvantage for ever receiving custody of the child due to his financial status that is a direct result of Comfort and Wallack abusively and fraudulently seeking a $400,000 fee award against Plaintiff.

71.     Most important, however, Comfort and Wallack sought the extraordinary and fraudulent judgment for the collateral and insidious purpose of inflicting financial harm on Plaintiff so as to deprive him of the financial means of hiring counsel in future child custody and child support modification proceedings.  Once again, this has placed Plaintiff in a substantial disadvantage in seeking modification of custody, visitation and child support.

72.     There is no need to infer Comfort's ulterior motive, however,  Comfort has repeatedly stated that she brought the post-judgment fee proceeding with no actual intention of collecting the $400,000.  In the DC Superior Court modification litigation, she testified that:

> MS. COMFORT:     I don't think, it's not expected that you've ever pay the $400,000 …

(Ex. 8, Excerpt of *Zappin v. Comfort* March 11, 2019 Hearing at 55.)  Moreover, Comfort has stated even in this proceeding that she pursued the post-judgment fee award as a means of preventing

---

[14] Car rental agencies will not take debit cards.  Plaintiff has been forced to rely on his parents for transportation to Washington, DC to visit the child or expensive airfare.

Plaintiff from bringing what she perceives as "frivolous litigation."  More precisely, Comfort stated in her original motion to dismiss papers:

> If nothing else, Defendant assumed that a sizeable attorneys' fee judgment would cause Plaintiff to stop pursuing frivolous litigation against her.  However, right after the February 2018 issuance of the Counsel Fees Judgment, Plaintiff filed the instant action in this Court.

(*See* Defendant's MTD Memorandum (Dkt. No. 32) at 3, fn. 1.)  Plaintiff has never been found to have filed a "frivolous" action against Comfort.  Indeed, She believes that any litigation, including child custody, visitation and support modifications, brought against her by Plaintiff is frivolous, even where Plaintiff is granted relief.  This is illustrated by her insinuation that the instant litigation is frivolous, which is certainly not true after Comfort has confirmed she gave false testimony in the New York post-judgment fee proceeding to obtain an unwarranted and unlawful $400,000 judgment against Plaintiff.

73.    As set forth above, Comfort, with assistance from Wallack, initiated the post-judgment fee proceeding with an improper and ulterior purpose of inflicting financial harm on Plaintiff to maintain an advantage in any further child custody litigation and to further limit Plaintiff's access to the child.  This ulterior purpose is further bolstered by the fact that Comfort and Wallack were willing to perjure themselves in furtherance of obtaining the $400,000 judgment that they acknowledge they have no expectation of paying.

H.    Harriet Newman Cohen Was a Key Participant in Comfort and Wallack's Fraudulent Scheme

74.    As discussed above, there are tens of thousands of dollars in discrepancies between Wallack's bills and Cohen's bills form the Matrimonial Action.  During the post-judgment fee proceeding, Plaintiff served Cohen with a subpoena to testify concerning the discrepancies.  However, Cohen moved to quash the subpoena in a motion with an affirmation in support attached

to it by Wallack.  It was apparent that neither Wallack nor Cohen wanted Cohen to testify in fears that Wallack's billing invoices would be exposed as fraudulent or, conversely, that the state court might determine that that Wallack and Cohen were colluding throughout the Matrimonial Action, which she hid in her billing entries.  Referee Marilyn Sugarman granted Cohen's motion without substantive explanation.

75.     Upon information and belief, Cohen was aware of Comfort and Wallack's scheme to seek the fraudulent $400,000 post-judgment fee award against Plaintiff.   Furthermore, upon information and belief, Cohen was aware – likely through Plaintiff's filings – that Wallack's invoices contained entries for work that was never performed (*e.g.*, communications with Cohen) and that the requested fee award included billing entries that Comfort had disputed because they resulted from Wallack's malfeasance.

76.     Cohen acted in conjunction and in furtherance of Comfort and Wallack's scheme to defraud Plaintiff and abuse court process by representing to the state court that Wallack was an "honest man" when the discrepancies between her bills and Wallack's bills was raised.  Specifically, she told the state court:

> MS. COHEN:      I would never be able to remember whether I spoke to Mr. – Mr. Wallack is an honorable man.  He is an officer of the Court. If he says he spoke to me, I have no reason to think he didn't speak to me.  I would have no independent recollection.

(Ex. ▢, Excerpt of *Zappin v. Comfort* Dec. 7, 2016 Transcript at 445-46.)

77.     Cohen's statements to the state court are directly contrary to her very detailed and contemporaneously made billing records.  (*See* Ex. ▢, Cohen Billing Records.)  Cohen's statements in effect vouched for Wallack's billing records, which her billing records made apparent were false. Upon information and belief, Cohen knew that she was misrepresenting to the state court that

Wallack's billing entries relating to communications with her and her firm were accurate "if [Wallack] says he spoke to [her]."

78.    In Referee Sugarman's decision, she failed to discount any of the billing entries in Wallack's invoices that conflicted with Cohen's billing invoices.  In sum, Cohen's statements to the state court were made in substantial assistance to a scheme by Comfort and Wallack to fraudulently and abusively obtained a $400,000 fee award against Plaintiff.  Cohen, in other words, was a key participant in the scheme to vouch for Wallack's billing invoices, which she knew to be false.

III.    DEFENDANTS' SCHEME WITH DAVID EVAN SCHORR TO SUBVERT THE MATRIMONIAL PROCEEDING AND TO ATTACK PLAINTIFF'S LAW LICENSE

79.    David Evan Schorr is a disgraced attorney, serial conman and accused child predator. Unfortunately, Plaintiff was one of his victims.  As set forth more fully below, Schorr pressured and weasel his way into the *Zappin v. Comfort* child custody proceedings as Plaintiff's "co-counsel." Unknown to Plaintiff at the time, Schorr was working with the Wallack and Cohen Defendants to not only undermine Plaintiff's defense in the child custody proceeding, but to materially assist in an effort to manipulate the *Zappin v. Comfort* child custody proceeding to manufacture bogus attorney disciplinary allegations against Plaintiff.

80.    It must be stated that the Wallack and Cohen Defendants' participation in this scheme with Schorr is not mere conjecture, speculation or inference.  Rather, Schorr admitted to the existence of this scheme to at least two (2) separate individuals.  In fact, Schorr went so far as to boast of the *quod pro quo* favors he received from the Wallack and Cohen Defendants in return for his participation in the scheme.  These favors are apparent from the public record in numerous cases – including in Schorr's 2018 disciplinary decision in which Defendant Harriet Newman Cohen is explicating named as a character witness for Schorr.  *See Matter of Schorr*, 2018 NY Slip Op 07278 (October 30, 2018).

38

81.     This unethical, fraudulent and, most importantly, criminal scheme by Schorr and the Wallack and Cohen Defendants is beyond egregious.  As set forth below, the facts as recited by Schorr himself establish not only conspiracy to defraud Plaintiff, but a full-fledged racketeering endeavor directed at Plaintiff.

A.     <u>David Evan Schorr's History of Unethical Conduct</u>

82.     Schorr has a long history of not only abusive litigation tactics, but outright unethical behavior for which he has repeatedly been censured, sanctioned and disciplined.  In 2018, the First Department disciplined Schorr after a disciplinary investigation that began in 2014.  Schorr was able to negotiate public censor as a sanction, despite committing acts of misconduct that justified disbarment.  As discussed further herein, the Wallack and Cohen Defendants were instrumental in securing this lesser sanction for Schorr in return for his participation in the scheme to undermine Plaintiff in the *Zappin v. Comfort* child custody proceedings.

83.     Despite receiving what could at best be described as a "slap on the wrist," the *Matter of Schorr* disciplinary decision spells out numerous instances of Schorr's egregious attorney misconduct, most of which occurred in his own divorce proceeding.  Specifically, the First Department noted that:

- Schorr admitted to setting up defamatory websites about attorney Louis I. Newman, his ex-wife's attorney, falsely accusing him of perjury.  The websites were established with the deliberate and malicious intent to permanently harm Mr. Newman's business, professional reputation and status with the bar;

- Schorr admitted that he had falsely accused Justice Deborah Kaplan's Court Officer, Jeffrey Katz, of assault in a Court of Claims action in furtherance of a scheme to have Justice Kaplan recused from Schorr's divorce proceeding;

- Schorr admitted that he had falsely accusing Justice Kaplan (as well as her law secretary and Court Officer Jeffrey Katz) of lying under oath during a deposition in the above-mentioned Court of Claims action, again in furtherance of a scheme to get Justice Kaplan recused from his divorce proceeding and to smear her reputation;

- Schorr admitted that he falsely accused the Attorney Grievance Committee of retaliating against him on behalf of former Chief Administrative Judge A. Gail Prudenti in a federal lawsuit;

- Schorr admitted that he filed a frivolous lawsuit against the psychologist appointed by the family court in the child custody portion of his divorce proceeding; and

- Schorr admittedly falsely accused the court-appointed financial analyst in his divorce proceeding of bias.

*See Matter of Schorr*, 2018 NY Slip Op 07278 (October 30, 2018).

84.    However, Justice Ellen Gesmer went must further in condemning Schorr's conduct in the *Schorr v. Schorr* matrimonial dispute.  Specifically, Justice Gesmer made the following findings in connection with the financial trial in Schorr's divorce, establishing horrifically unethical and egregiously abusive conduct:

- Schorr was completely not credible in the testimony he gave during the trial and that he had repeatedly lied under oath;

- Schorr "persistent[ly] fail[ed] to answer direct questions [that] resulted in the Court granting countless motions to strike [his] answers, together with admonitions to answer the questions as posed";

40

- Schorr was "argumentative and disrespectful" to the court (Justice Gesmer) and was repeatedly admonished for his conduct at the trial;

- "Although an attorney, [Schorr] claimed not to understand the meaning of the provision of the *Pendente Lite* Order which made his obligation of child support retroactive to September 2011";

- Schorr "made contradictory statements on various financial documents," which established that he had lied to the Internal Revenue Service;

- Schorr "continued to deny throughout the trial that the money judgments entered against him were the result of his failure to pay [his ex-wife] monies due to her under the *Pendente Lite* Order," (*i.e.*, Schorr is a deadbeat dad (like Defendant Wallack) who refuses to pay child support).  As a result, Justice Gesmer issued an award and sanction of $52,000 for child support arrears against Schorr;

- Based on the evidence presented at the financial trial, Schorr has misappropriated (*i.e.*, stolen) funds from his late father's estate and used the funds for personal purposes;

- Schorr deliberately lied and misrepresented his income on his taxes to the tune of tens of thousands of dollars;

- Schorr used his *pro se* status in the divorce to gratuitously run up fees on his ex-wife, Bari Yunis Schorr, resulting in Justice Gesmer sanctioning Schorr $50,000 and directing that it be paid to her counsel, Louis I. Newman, in satisfaction for attorneys' fees incurred due to Schorr's frivolous conduct in the litigation. Specifically, Gesmer noted that Schorr "engaged in contentious and meritless

motion practice and other obstructionist conduct, causing the Wife to incur

unnecessary legal fees."; and

• Schorr manifested a "pattern of nonpayment" with respect to child support

requiring Justice Gesmer to issue an order directing that Schorr "post the sum of

$75,000 as security to insure future payment of child support." To date, Schorr

has not complied with this directive.

Justice Gesmer's full decision lambasting Schorr is attached to this TAC as Exhibit ▮. It should be

further noted that Schorr was later held in contempt by Justice Michael Katz for his failure to obey

Justice Gesmer's orders.

85. Schorr's schemes and scams unfortunately do not end there. In fact, **<u>Schorr</u>**

**<u>attempted to grift a bankruptcy scam in this very court</u>**. More specifically, Schorr filed two (2)

apparent sham bankruptcy proceedings in this court. These sham bankruptcies were filed in order to

try to circumvent an order by Justice Gesmer in the above-referenced financial decision that the

Schorr martial residence be sold and the proceeds distributed as well as a subsequent contempt order

(with the direction that Schorr be jailed) issued by Judge Katz for Schorr's willful failure to obey

Justice Gesmer's financial orders. In the proceedings, the SDNY bankruptcy trustee accused Mr.

Schorr of filing "bad faith" and "frivolous" bankruptcy petitions. (*See* Ex. ▮, Trustee Motion to

Dismiss at pp. 1-2.) In support of this position, the trustee pointed to the following facts, which

Schorr did not dispute:

• Schorr "filed Amended Schedules that he knew to be patently false, apparently to

invoke the automatic stay." The trustee further pointed out that Schorr's "cavalier

attitude about documents filed under oath should not be tolerated.";

42

- Schorr deliberately misrepresented and underreported the value of the martial residence in the Amended Schedules he filed with the bankruptcy court and attested to under oath;

- Schorr lied about the balances in his checking account in the Amended Schedules filed with the bankruptcy court and attested to under oath;

- Schorr intentional failed to incorporate the findings of the First Department in his Amended Schedules, such as the finding that Joel Yunis (Schorr's former father-in-law) has a claim of $124,000 against him.  Instead, Schorr lied on the Amended Schedules stating that Yunis' claim was $62,000, that it was "disputed" and described the claim as "Expired Demand Notes" contrary to Justice Gesmer's and the First Department's orders;

- Schorr concealed assets from the trustee and the bankruptcy court;

- Schorr filed the sham bankruptcies in bad faith to "thwart the consequences of a state court action," where at the time Schorr was facing imminent incarceration for his failure to obey Justice Gesmer's financial order and Justice Katz's contempt orders; and

- Schorr "fail[ed] to meet deadlines… fail[ed] to file a confirmable plan… manipulat[ed] [] his income… and… fil[ed] schedules with inaccurate Amended Schedules" throughout the two sham bankruptcies.

(*See generally id*.)  In sum, the trustee – an individual totally unconnected with the matrimonial law mafia – asserted that Schorr engaged in the same *mondus oeprandi* that he did in his prior divorce action before the New York County Supreme Court, namely that he lied under oath repeatedly, that he filed sham proceedings to thwart state court orders and he engaged in a pattern of frivolous and

43

bad faith behavior throughout the bankruptcy litigations.   Indeed, Louis I. Newman noted in his papers in the bankruptcy proceedings that Schorr was the "post boy for bad faith filings."   *See In re Schorr*, Case No. 1:17-bk-13143 (S.D.N.Y. 2018) at Dkt. No. 18.   The bankruptcy judge agreed and granted the trustee's motion to dismiss the two sham proceedings.

86.     As shown above, Schorr has a long and well-document history of abusive litigation tactics, unethical conduct, fraud and underhanded schemes designed to subvert judicial proceedings. Unfortunately, Plaintiff was also a victim of Schorr in the *Zappin v. Comfort* child custody proceeding and subsequent collateral estoppel disciplinary proceeding brought against Plaintiff.

B.     Schorr's Scheme with the Wallack and Cohen Defendants to Subvert Plaintiff in the *Zappin v. Comfort* Child Custody Proceedings

i.     Plaintiff's Initial Involvement with Schorr

87.     Sometime in 2014, Plaintiff read a series of articles in *The New York Post* and other media outlets about the *Schorr v. Schorr* matrimonial proceeding.   Specifically, in those articles, Schorr was found to be an "unfit father" by the court-appointed child custody evaluator and Justice Deborah Kaplan for Schorr's abusive behavior towards his son with respect to a trip to McDonalds. In retaliation, the articles noted that Schorr sued the court-appointed child custody evaluator in New York County Supreme Court.

88.     In one article, it mentioned that Justice Kaplan had recused herself from the *Schorr v. Schorr* matrimonial action, but did not explain why she recused herself.   Plaintiff found Schorr's contact information and reached out to him to see what exactly had happened in the case.   At that time, Justice Kaplan had repeatedly directed that Plaintiff have supervised visitation with his child without afforded Plaintiff as hearing as required by New York law.   Plaintiff wanted to know if Justice Kaplan has engaged in some impropriety or other act that would impact other cases in her courtroom.

44

89.     Shortly after Plaintiff reached out to Schorr, he responded with a phone call.  On that call, Schorr recounted the story of his matrimonial action.  He then – very proudly – explained how he got Justice Kaplan recused from the *Schorr v. Schorr* matter.  Specifically, Schorr claimed that Justice Kaplan's Court Officer, Jeffrey Katz, attempted to assault him in the courtroom and that he had recorded the incident on his phone.  He further stated that Justice Kaplan recused herself from the case after Schorr subpoenaed Justice Kaplan and her staff.

90.     Schorr went on during this initial phone call to describe his hate for Justice Kaplan repeatedly calling her a "cunt," a "kike," a "JAP," a "bitch" and a "dumb bitch."  He also extensively described Justice Kaplan's connections to the Lucchese Crime Family.  And, most importantly, he described his deep desire to see her removed from the bench.

91.     After that initial call, Plaintiff received a flood on articles and books about Justice Kaplan from Schorr.  Some of the articles described bizarre ruling she had made with respect to supervised visitation.  Others were books and articles that detailed Justice Kaplan's and her father's, Burton Kaplan, involvement in the mafia.  Looking back, it was apparent that Schorr was obsessed with Kaplan, had a strong disdain for her, had extensively researched her live and was singularly focused on seeing her removed from the bench.

ii.     Schorr Pressures and Weasels His Way into *Zappin v. Comfort*

92.     The first few instances of contact between Plaintiff and Schorr primarily focused on Justice Kaplan as a topic of discussion.  However, over the course of several months, Schorr would more frequently contact Plaintiff to discuss his matrimonial proceeding, his ongoing disciplinary investigation and his desire to become a matrimonial lawyer.  To be fair, Plaintiff would also discuss his child custody proceeding with Schorr as Plaintiff had limited people in his life who could relate to being in a high-contested divorce proceeding.

93.     In the April 2015, Plaintiff retained Lara Ott to represented him in the *Zappin v. Comfort* matrimonial action.  Ms. Ott charged Plaintiff a $50,000 retainer and had an hourly rate of approximately $700 an hour.  Plaintiff could not afford her fees, but was left with little options as he was repeatedly and viciously attacked for representing himself by the Wallack and Cohen Defendants as well as Justice Kaplan.

94.     Over the course of the next couple of months, Schorr relentlessly nagged Plaintiff that he should fire Ott and allow Schorr to represented him in *Zappin v. Comfort*.  Plaintiff was extremely hesitant about this idea.  Plaintiff knew that Schorr has no experience as a litigator, that Schorr could be devious and that Schorr has a poor reputation in the court system.

95.     However, Ms. Ott burned through Plaintiff's $50,000 retainer in a matter of days.  Plaintiff did not have hundreds of thousands of dollars to pay Ms. Ott for representation during pre-trial proceedings and the child custody trial.  Put simply, he could not afford Ms. Ott's representation.

96.     Additionally, at this time, Plaintiff was battling severe depression induced as a result legal troubles involving his mother and largely as a result of the *Zappin v. Comfort* proceeding, namely the abusive treatment he received from Harriet Newman Cohen and Justice Deborah Kaplan.  Plaintiff was seeking psychiatric counseling, but the depression was compounded by the fact that Plaintiff had developed a serious Valium addiction through prescriptions he received from his psychiatrist as a way of coping with the depression and panic attacks triggered by the Matrimonial Action.  Indeed, there were many days during this period of time that Plaintiff had taken so much Valium as a coping mechanism that he did not know where he was, did not later recall things he had done while on the Valium and often woke up with strange women in his apartment.

97.     Schorr took advantage of Plaintiff during one of Plaintiff's depression episodes.  Specifically, Schorr persuaded Plaintiff to fire Ms. Ott where he played on Plaintiff's fears of Ms.

Ott running up a half-million-dollar bill.  He further got Plaintiff to agree to allow Schorr to represent

him in *Zappin v. Comfort*.  Schorr asked for $10,000 to do the representation, which Plaintiff paid.

Schorr demanded that the money be paid to him in cash so that there was no "paper trial" for his ex-

wife to find and because he wanted to represent to the court that he was "pro bono counsel," which

he believed would help him in his disciplinary proceeding.

98.    However, several days later when the Valium cleared his system, Plaintiff realized

that Schorr could not represent him in *Zappin v. Comfort*.  Ms. Ott declined to retake the case.

Plaintiff consequently told Schorr that he could be "co-counsel."  Schorr's duties would largely be

sitting at counsel's table and keeping his mouth shut.  It certainly did not turn out that way.

99.    It must be noted that throughout Schorr's entire representation of Plaintiff as "co-

counsel," he repeated stated things like:  (i) "I'm doing what is best for you"; (ii) "I'm offering this

advice because its in your best interests";  (iii) "I'm acting in your interests.";  and (iv) "If you let me

represent you (or continue to represent you), I will work for your best interests and give you counsel

that I think is in your best interests."  As set forth below, these statements and the numerous ones

like that were false and fraudulent.

      iii.   <u>Schorr's Disastrous Advice and Representation of Plaintiff in</u>
          <u>*Zappin v. Comfort* Designed to Undermine Plaintiff's Case in a Collusive</u>
          <u>Scheme with Defendant Wallack and Defendant Cohen</u>

100.    While Schorr purported to represent and advise Plaintiff in *Zappin v. Comfort*, his

true intent was to purposely subvert and sabotage Plaintiff's position in the litigation.  When it

became apparent to Schorr that the Wallack and Cohen Defendants could help him launch his

matrimonial law practice as well as assist him in his disciplinary defense, Schorr undertook a scheme

with both the Wallack and Cohen Defendants to undermine Plaintiff's position in the case and to

pervert the *Zappin v. Comfort* child custody proceedings into a way to manufacture bogus allegations

of attorney misconduct against Plaintiff.  Indeed, Schorr's own former best friend and business partner noted how Schorr was obsessed with "ingratiating" himself with Wallack and Cohen in *Zappin v. Comfort*.  This obsession morphed into an unlawful scheme – similar to Schorr's other litigation schemes described above – with the Wallack and Cohen Defendants to pervert the *Zappin v. Comfort* litigation.

101.    There are numerous examples from the *Zappin v. Comfort* case in which Schorr advised, pressured and directed Plaintiff to carry out or perform some action in the litigation that only served to undermine Plaintiff's position.  At the time, Plaintiff undertook some of these actions and disregarded others.  Looking back and by Schorr's own later admission, however, Schorr's advice to Plaintiff was to serve three (3) purposes:  (i) set traps for Plaintiff that the Wallack and Cohen Defendants could exploit in *Zappin v. Comfort* so as to allow Schorr to ingratiate himself with them; (ii) get Plaintiff to engage in similar, but more exaggerated conduct that Schorr had previously engaged in his own divorce matter so that Schorr could claim to the Attorney Grievance Committee that his actions were "mild" compared to Plaintiff's; and (iii) to get Plaintiff to engage in conduct where Schorr could later come in and appear to be the cool and level-headed attorney that Schorr could later as mitigation evidence in his disciplinary proceeding.  Put simply, Schorr exploited Plaintiff and sold him out in order to cut deals with Wallack, Cohen and the Attorney Grievance Committee.

102.    Some of the most egregious examples of Schorr advising, pressuring and directing Plaintiff to undertake actions detrimental to his case include, but are not limited to, the following examples:

- Schorr advised and pressured Plaintiff to file a complaint with the New York Office of Professional Medical Conduct against Dr. Aaron Metrikin, Cohen's retained expert

48

in *Zappin v. Comfort*, after Schorr learned his fee and the fact that Dr. Metrikin had no experience in child custody litigations or child behavioral health. It must be noted that, as explained *supra*, Schorr attacked and sued two (2) court-appointed experts in his own divorce. Plaintiff was sanctioned by Justice Matthew Cooper for the OPMC complaint. Looking back and based on Schorr's recent statements, it was clear that Schorr was working in tandem with Cohen in an effort to gin up a reason for the matrimonial court to sanction Plaintiff.

- In the litigation, Cohen intended to call as a witness a girl that Plaintiff had a brief sexual relationship with while he was clerking, Kathryn Kelly, an associate at Gibson Dunn LLP. Plaintiff ended the relationship after finding out Ms. Kelly was sleeping with other people and after he discovered photographs of her having sex in the chambers of a United States Circuit Judge. In an apparent attempt by Schorr, Wallack and Cohen to set Plaintiff up for some type of witness intimidation or revenge porn charge, Schorr exerted immense pressure on Plaintiff to post the photographs of Ms. Kelly on the Internet. Schorr's reasoning was that after Justice Cooper's public sanction, Plaintiff had to let the public know that the allegations were true. Plaintiff refused to publicly post the photographs and instead contacted her counsel to determine how best to proceed with the picture if Ms. Kelly were to testify at the child custody trial.

- Schorr directed, pressure and assisted Plaintiff's father to setup a website called: "http://www.justicedeborahkaplan.com". Schorr initially approached Plaintiff with the idea about the website, but Plaintiff refused to participate. The eventual website contained information about Justice Kaplan's ties to the Lucchese Crime Family,

allegations that she had abused her position on the bench, lied under oath and had orchestrated assaults on litigants.  The website also called for her removal from the bench;

- Schorr directed, pressure and assisted Plaintiff's father to setup a website called: "http://www.harrietnewmancohen.com". Again, Schorr approached Plaintiff with the idea for the website, but Plaintiff refused to participate. The website contained numerous documents from the *Zappin v. Comfort* case and called for the removal of Harriet Newman Cohen as Attorney for the Child.  Plaintiff, despite having nothing to do with the website, was accused of setting up the website in Justice Cooper's sanction decision and was apparently disciplined by the First Department for it too (despite never being charged with any disciplinary offense).  Once again, it appears that Schorr's advice was an attempt to set a trap for Plaintiff that Wallack and Cohen could exploit;

- After Justice Cooper's sanction decision, Schorr pressured and directed Plaintiff to setup a website "http://www.justicematthewcooper.com" in order to "counter Justice Cooper's falsehoods in the sanction decision…."  Schorr helped Plaintiff design and select content for the website.  Furthermore, Schorr provided Plaintiff with a CLE in which Cooper was a presenter.  Schorr helped Plaintiff make clips Cooper making inappropriate comments at the CLE, which were then posted on YouTube and the website.  Again, it appears that Schorr's advice was an attempt to set a trap for Plaintiff that Wallack and Cohen could exploit; and

- Additionally, after Justice Cooper's sanction decision, Schorr pressured, directed and assisted Plaintiff in setting up "http://www.zappinvcomfort.com."  The website

50

contained filings and other materials from the *Zappin v. Comfort* case that became a hot-button issue during the child custody trial. Yet again, it appears that Schorr's advice was an attempt to set a trap for Plaintiff that Wallack and Cohen could exploit.

103.    Schorr's attempts to subvert Plaintiff's case became more evident as the child custody trial progressed, however. Some of these actions by Schorr included:

- Schorr tainted two (2) of Plaintiff's forensic pathologist expert witnesses. Specifically, Plaintiff asked Schorr to contact them to gauge their interest in being an expert witness to testify about the inconsistencies in Comfort's alleged domestic violence injuries. However, Plaintiff later learned that Schorr falsely told the two (2) expert that Plaintiff had actually inflicted the injuries on Ms. Comfort – something which Plaintiff has <u>always</u> denied – and that Plaintiff was looking for an expert to who testify that he did not inflict the injuries. Both witnesses obviously refused to testify. Plaintiff believes that Schorr deliberately sabotaged Plaintiff's two (2) experts in the middle of trial as part of the scheme with Wallack and Cohen to subvert Plaintiff's case.

- Schorr directed Plaintiff's father to leave the courthouse in order to prevent him from testifying despite the fact that Plaintiff's father was a material witness – a witness who could testify as to Ms. Comfort's domestic abuse towards Plaintiff – and Plaintiff needed him to testify. Schorr apparently did not want Plaintiff's father to testify because Plaintiff's father was an eye-witness to domestic violence, but also Plaintiff's father would be subject to examination about the websites that Schorr helped him create about Justice Deborah Kaplan and Harriet Newman Cohen;

- Schorr directed Plaintiff not to produce his cells phones in response to a directive by Justice Cooper. At the time, Schorr begged Plaintiff not to produce his cell phones because Schorr believed that had compromising statements made by him in text messages and e-mails about his conduct, Justice Deborah Kaplan and other members of the judiciary that would have no doubt resulted in disciplinary action against him. However, Schorr was also motivated to discourage Plaintiff from producing the phones in a concerted effort with the Wallack and Cohen Defendants to attempt to manufacture an adverse inference that Plaintiff falsified text messages at-issue in the proceeding; and

- At times, Schorr encouraged and egged on Plaintiff to be confrontational with Justice Cooper during the child custody hearing.

- Schorr deliberately refused to raise or preserve objections on Plaintiff's behalf when necessary or called to do so.

Once again, these are just a few notable examples. Schorr, throughout his participation in *Zappin v. Comfort*, worked to undermine Plaintiff's case as part of a crooked scheme with the Wallack and Cohen Defendants designed to undermine Plaintiff's case and to pervert the proceeding to manufacture bogus allegations of attorney misconduct.

104. Plaintiff eventually fired Schorr near the end of the *Zappin v. Comfort* child custody trial after it became apparent that he was working in tandem with the Wallack and Cohen Defendants. However, the straw that finally broke the camel's back is when Plaintiff and his then-girlfriend took Schorr to lunch during the trial. Both Plaintiff and his then-girlfriend observed Schorr inappropriately touch the hair, face, legs and crouch area of a young girl at a nearby table. After observing this and speaking with his former girlfriend about the incident, Plaintiff fired Schorr as his

co-counsel.  It became apparent to Plaintiff that David Evan Schorr was a pedophile and Plaintiff did not want to be associated in any way with him.

iv.   The Collusive Scheme Between Schorr and the Wallack and Cohen Defendants Continued After *Zappin v. Comfort*

105.    This collusive scheme between Schorr and the Wallack and Cohen Defendants continued even after the *Zappin v. Comfort* child custody trial was over.  More specifically, based on Schorr's, Wallack's and Cohen's perversion of the *Zappin v. Comfort* child custody trial, Justice Cooper issued several punitive findings against Plaintiff, all of which lacked any evidentiary basis.  In furtherance of this scheme, Staff Attorney Kevin M. Doyle of the Attorney Grievance Committee – the same disciplinary counsel investigating Schorr – filed an unconstitutional collateral estoppel disciplinary petition against Plaintiff.   Subsequently, Plaintiff was found guilty of attorney misconduct and disbarred without notice, without a hearing, without any opportunity to defend himself and based on Justice Cooper's findings that even the Attorney Grievance Committee has conceded were fabricated and lacked any evidentiary support.

106.    With respect to Schorr, he continued to work the Wallack and Cohen Defendants to ensure Plaintiff be disbarred.  Indeed, Cohen, Wallack and even Staff Attorney Doyle were all obsessed with seeing Plaintiff disbarred, even if it was without any legitimate basis.  Specifically, Schorr did the following in furtherance of this scheme in injure Plaintiff and ingratiate himself with the Wallack and Cohen Defendants as well as the Attorney Grievance Committee:  (i) Schorr destroyed exculpatory evidence from the *Zappin v. Comfort* child custody proceedings that was solely in his possession and was material to the collateral estoppel disciplinary proceeding later brought against Plaintiff by Staff Attorney Doyle, *i.e.*, the metadata to Defendant Comfort's purported domestic violence photographs showing that they were digitally altered (both the picture itself and the timestamps of when the photographs were taken); and (ii) refused to truthfully

participate as a witness in the collateral estoppel disciplinary proceedings against Plaintiff and threatened to lie if subpoenaed.  In effect, the Wallack and Cohen Defendants (as well as Staff Attorney Doyle) exerted influence over Schorr and engaged in a *quid pro quo* with him that amounted to witness tampering and a conspiracy to destroy material evidence.

v.   The Wallack-Cohen-Schorr *Quid Pro Quo*

107.   In return for his deceitful conduct against Plaintiff, Schorr received numerous materials benefits from both the Wallack and Cohen Defendants.  These benefits included, but were not limited to:

- At the time, Schorr was facing an attorney disciplinary action against him which would have likely led to his disbarment.  However, both Wallack and Cohen formally and informally "vouched" for Schorr to Staff Attorney Doyle and submitted character statements to the Attorney Grievance Committee and the First Department on Schorr's behalf.  Additionally, they lobbied Staff Attorney Doyle to seek a substantially lesser sanction against Schorr, which he ultimately received.  These efforts are reflected in Schorr's 2018 disciplinary decision referenced above both explicitly and based on the fact that Staff Attorney Doyle concealed and misrepresented prior findings of attorney misconduct to the First Department in Schorr's disciplinary proceeding;

- At the time, counsel to Schorr's ex-wife, Louis I. Newman, was aggressively seeking attorney discipline against Schorr for his misconduct in the *Schorr v. Schorr* matrimonial action.  Defendant Cohen, in return for Schorr's deceitful conduct in *Zappin v. Comfort*, persuaded Mr. Newman to stop seeking attorney discipline against Schorr and stop filing complaints against Schorr to the bar;

- Wallack began to "hang out" with Schorr and bring him to clubs and parties after the conclusion of the *Zappin v. Comfort* matter. Wallack and Schorr frequented the "SoHo House" or "SoHo Club" together where they preyed on young woman and often engaged in group sex sessions. Notably, the "SoHo House" or "SoHo Club" is the same club that Harvey Weinstein used to lure and abuse women.[15]

- Both the Wallack and Cohen Defendants assisted Mr. Schorr in setting up his matrimonial practice. This has mostly consisted of referring him clients and making introductions for him. Indeed, in one matter, Schorr swindled an unethical $70,000 retainer from a client referred to him by Harriet Newman Cohen. (*See* Ex. ▮▮, Retainer Agreement.)

These are some of the examples of benefits Schorr received from the conspiracy and scheme he engaged in with the Wallack and Cohen Defendants that sought to sabotage Plaintiff's position in the *Zappin v. Comfort* child custody proceedings. However, Plaintiff expects that additional benefits received by Schorr from this *quid pro quo* relationship will be revealed in the course of discovery in this action.

108. Stunningly, however, the criminal enterprise between the Wallack and Cohen Defendants has continued. In 2018, Schorr set up a New York corporation, La Palma LLC, in an effort to illegally purchase a property containing a "hostel" in Cuba in violation of the Cuban Embargo. According to Schorr's partner in the endeavor, a Cuban national, he has attempted to dissolve the corporation after learning that: (i) Schorr was attempting to use the property to hide

---

[15] *See* https://www.buzzfeednews.com/article/claudiarosenbaum/harvey-weinstein-emails; https://www.usnews.com/news/top-news/articles/2020-01-27/testimony-in-harvey-weinsteins-rape-trialenters-second-week; and https://www.cnn.com/2020/03/11/us/harvey-weinstein-sentencetranscript/index.html.

assets from his ex-wife, the Child Support Collections Unit, multiple judgment creditors and the New York Supreme Court where he has several outstanding judgments, including child support judgments; and (ii) Schorr attempted to use the "hostel" in Cuba to establish an underage sex trafficking destination, similar to Jeffrey Epstein's pedo-island.  (*See* Ex. __, Doggart Opposition Papers.)

109.    With respect to the Wallack and Cohen Defendants' involvement in this apparent sex trafficking scheme, both Wallack and Cohen apparently referred some of their wealthy clients to Schorr as "potential investors" in La Palma LLC and, presumably, potential tourists at the sex hostel. Further, Defendant Wallack was also a potential investor in La Palma LLC, but was broke and unable to come up with the money to buy into the project.  Regardless, these interactions between Schorr, Wallack and Cohen concerning La Palma LLC are only possible as a result of their collusive efforts in *Zappin v. Comfort* and were, in effect, a continuance of their conspiracy originating in *Zappin v. Comfort*.

vi.   Schorr's Statements Confirming the Scheme with Wallack and Cohen

110.    Beginning in March of 2020, at least two (2) individuals have come to Plaintiff stating that Schorr made statements to them that he had:  (i) purposely sabotaged Plaintiff's child custody matter and subsequent disciplinary matter; (ii) that he worked with the Wallack and Cohen Defendants (as well as Staff Attorney Doyle) to do it; and (iii) that Wallack and Cohen helped him "keep his law license" (along with Staff Attorney Doyle) and helped him "set up his matrimonial practice."

111.    Plaintiff will refer to the two individuals as Individual A and Individual B.  The two individuals shared this information with Plaintiff and requested that their names be kept anonymous for as along as possible out of fear of being sued by Schorr, an individual with a penchant for

frivolous and retaliatory suits. To the extent that this matter reaches discovery, Plaintiff will reveal the names of the two individuals to Defendants and the Court under whatever circumstances the Court deems appropriate.

112.  With respect to Individual A, Schorr made statements to them which include, but are not limited to, the following:

- Schorr referred to his involvement as Plaintiff's co-counsel in *Zappin v. Comfort* as "one of the greatest cons [he had] ever pulled off…. the guy paid me $20,000 to torpedo his case."

- Schorr stated that he had convinced Plaintiff that he was "going to die" with respect to the litigation and that he should "die running at the turret."

- Schorr referred to his involvement with Wallack and Cohen extensively. Specifically, he stated: "You have to choose the side with power. You have to choose the winning side. Zappin was going to lose. I simply parlayed my opportunity to get tight with Wallack and Harriet [Cohen].";

- Schorr continued: "Wallack and Cohen were obsessed not just with winning… but making sure Zappin was disbarred. They would come to me and ask for something and I would do it. It's all about making friends in this business."

- Schorr further continued: "Wallack and particularly Cohen throw me business. They helped me get started up. Most importantly, Cohen got Newman and the bar [Attorney Grievance Committee] off my back"; and

- Schorr acknowledged that he cut a deal with the Attorney Grievance Committee and Staff Attorney Doyle for a reduced sanction in return for the destruction of the metadata to Defendant Comfort's photographs and his refusal to comply as a

57

witness. Specifically, Schorr said: "It was easy! I gave them Zappin and I kept my law license. Simple as that. I just had to keep my mouth shut, dodge any subpoenas and made sure the Comfort photograph[] [metadata] conveniently disappeared."

113. Individual B heard Schorr make similar statements to those heard by Individual One. The statements Individual B heard included, but are not limited to, the following:

- Schorr referred to Plaintiff as a "sucker."

- Schorr explained that the entire *Zappin v. Comfort* custody trial was a "trap" and a "setup.";

- Schorr stated that: "Everyone was against Zappin. Cohen, Wallack, Cooper… they all wanted his head. People that powerful, you don't stand in their way. I saw an opportunity and I took it. Zappin lost his law license, but I still have mine!";

- Schorr explained that Justice Cooper also was influential in getting a reduction in his disciplinary censure. Schorr stated: "I did so well even [Justice] Cooper made a call to Doyle and Dopico.";

- Schorr stated: "Harriet and Kurland confided in me that they didn't believe Comfort's domestic violence allegations. As Harriet put it: they smelled like rancid fish wrapped in a week-old newspaper. She was shocked that the allegations have not faded away early on in the case they were so week. But, it was Harriet who got the DV finding for Comfort.";

- Schorr further alluded that: "There came a point in the custody trial that I just took my orders from Harriet and to a lesser extent Wallack.  It was a well-orchestrated circus with a predetermined outcome:  FUCK ZAPPIN.";

- Schorr boasted that:  "It was really Harriet that persuaded Doyle to pursue a lesser sanction.  It was a brilliant move to align with her.";

- Schorr bragged:  "You know, Zappin is a smart guy.  I think he knew something was up.  He kicked me to the curb during the trial.  But before that, I had him and his father so wound up making websites and videos.  It really played right into Harriet's and Wallack's strategy, which was to use the custody child decision to bring a disciplinary action against Zappin.";

- Schorr said: "I don't feel bad about it.  In life, you have to pick the winning side."; and

- And, Schorr said:  "It was really Comfort's father who was directing the whole show.  Kurland told me that he had invested over $1,000,000 in the litigation.  Wallack received all his directions from the father-in-law, not the ex-wife.  The father-in-law was even giving directions to Doyle!  But, I tell you one thing, I would give my left nut fuck his ex-wife.  She was looking so damn fine in the court room everyday.  I saw pictures of her ass and tits in the domestic violence photographs….. PERFECT!  Apparently, Sebastian tried to fuck her, but I guess she's into girls now or something."

114.    These statements clearly and evidently establish a conspiracy and scheme by Schorr, Wallack and Cohen to defraud Plaintiff, unlawfully damage his professional reputation and licensure,

sabotage his position in the *Zappin v. Comfort* custody trial and undermine the legitimacy of the *Zappin v. Comfort* matrimonial proceedings.

## COUNT I: ABUSE OF PROCESS (STATE LAW)
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS)

115.    Plaintiff incorporates and re-alleges Paragraphs 1 through 114 as if fully set forth herein.

116.     As set forth above, Defendants unlawful and tortious actions took place in the course of the Matrimonial Action pending in New York County Supreme Court whereby their actions necessarily invoked court process. These unlawful and tortious actions included:

117.    Defendants engaged in the unlawful and tortious actions within the course of the Matrimonial Action for an ulterior, collateral and/or improper purpose.

- With respect to Defendant Comfort, she engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation as set forth in this Complaint for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from her own attorney misconduct; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Wallack and The Wallack Firm, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation as set forth in this Complaint for the ulterior,

collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Cohen and CRSS, they engaged in unlawful and tortious acts and/or aided and assisted Defendants Comfort, Wallack and the Wallack Firm in using court process within the court of the *Zappin v. Comfort* litigation as set forth in this Complaint for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

118.   Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

## COUNT II: CONSPIRACY TO COMMIT ABUSE OF PROCESS (STATE LAW)
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS)

119.   Plaintiff incorporates and re-alleges Paragraphs 1 through 118 as if fully set forth herein.

53

120.     As set forth above, Defendants unlawful and tortious actions took place in the course of the Matrimonial Action pending in New York County Supreme Court whereby their actions necessarily invoked court process.

121.     Defendants entered into an agreement to abuse lawful process by engaging in acts as set forth in the Complaint in furtherance of a common scheme and/or goal. This agreement between Defendants may be implied by their conduct as set forth above in this Complaint.

122.     Defendants engaged in the unlawful and tortious actions within the course of the Matrimonial Action for an ulterior, collateral and/or improper purpose.

- With respect to Defendant Comfort, she engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation as set forth in this Complaint for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from her own attorney misconduct; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Wallack and The Wallack Firm, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation as set forth in this Complaint for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney

misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

- With respect to Defendants Cohen and CRSS, they engaged in unlawful and tortious acts using court process within the court of the *Zappin v. Comfort* litigation as set forth in this Complaint for the ulterior, collateral and/or improper purpose of inflicting undue financial harm to gain an advantage in the child custody litigation; inflicting undue harm to Plaintiff's professional licensure and standing in order to gain an advantage in the child custody litigation and to distract from their own attorney misconduct; defrauding Plaintiff financially for personal profit; and depriving Plaintiff of his lawful right to have reasonable access to his child.

123.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

## COUNT 1II: FRAUD (STATE LAW)
### (Defendants Wallack, The Wallack Firm, Cohen, CRSS)

124.    Plaintiff incorporates and re-alleges Paragraphs 1 through 123 as if fully set forth herein.

125.    Defendants are all officers of the court.

126.    As set forth above, Defendants have each engaged in repeated acts of deceit during the *Zappin v. Comfort* litigation pending in New York County Supreme Court for an illicit purpose. That illicit purpose being to unlawfully inflate counsel fees by engaging in deliberate acts to prolong the litigation, proffering positions that Defendants knew to be false in order to protract the litigation and engaging in acts directed at Plaintiff to cause him unlawful financial harm and to prevent him from exercising his parental rights. Additionally, Defendants have submitted bills

55

and/or requested fees from Plaintiff for alleged work that they knew they did not perform and/or for purported work that they were not entitled collect monies from Plaintiff. Most importantly, Defendants gave materially false testimony as set forth in this Compliant in furtherance of their fraudulent scheme.

127.     Defendants knew that they actions were wrong and unlawful. They further knew that their representations to the court and Plaintiff were false when they made them. And, Defendants knew that their billing invoices were false and/or that they were not entitled to fees when the invoices were submitted to Plaintiff and/or the state court.

128.     Defendants had a duty of under the law as officers of the court to not engage in unlawful acts during the course of the litigation, make false representations or otherwise submit billing invoices that they knew to be false.

129.     Defendants' unlawful actions, misrepresentations, billing invoices and false testimony were relied upon by Plaintiff in proffering a defense to the post-judgment fee proceeding brought by Comfort.

130.     Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

## COUNT IV: CONSPIRACY TO COMMIT FRAUD (STATE LAW)
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS)

131.     Plaintiff incorporates and re-alleges Paragraphs 1 through 130 as if fully set forth herein.

132.     Defendants are all officers of the court.

133.     As set forth above, Defendants have each engaged in repeated acts of deceit during the *Zappin v. Comfort* litigation pending in New York County Supreme Court for an illicit purpose. That illicit purpose being to unlawfully inflate counsel fees by engaging in deliberate acts to

prolong the litigation, proffering positions that Defendants knew to be false in order to protract the litigation and engaging in acts directed at Plaintiff to cause him unlawful financial harm and to prevent him from exercising his parental rights. Additionally, Defendants have submitted bills and/or requested fees from Plaintiff for alleged work that they knew they did not perform and/or for purported work that they were not entitled collect monies from Plaintiff.

134.    Defendants entered into an agreement to commit the above-referenced unlawful acts as set forth in the Complaint in furtherance of a common scheme and/or goal.  This agreement between Defendants may be implied by their conduct as set forth above in this Complaint.

135.    Defendants knew that they actions were wrong and unlawful. They further knew that their representations to the court and to Plaintiff were false when they made them. And, Defendants knew that their billing invoices were false and/or that they were not entitled to fees when the invoices were submitted to Plaintiff and/or the state court.

136.    Defendants had a duty of under the law as officers of the court to not engage in unlawful acts during the course of the litigation, make false representations or otherwise submit billing invoices that they knew to be false.

137.    Defendants' unlawful actions, misrepresentations, billing invoices and false testimony were relied upon by Plaintiff in proffering a defense to the post-judgment fee proceeding brought by Comfort.

138.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

### COUNT V: N.Y. JUDICIARY LAW 487 (STATE LAW)
(Defendants Comfort, Wallack, The Wallack Firm, Cohen, CRSS)

139.    Plaintiff incorporates and re-alleges Paragraphs 1 through 138 as if fully set forth herein.

140.    As set forth in this Complaint, Defendants have engaged in acts of deceit and collusion within the *Zappin v. Comfort* litigation pending in New York County Supreme Court with the intent to deceive Plaintiff and the state court.

141.    As further set forth in this Complaint, Defendants have engaged in acts within the *Zappin v. Comfort* litigation pending in New York County Supreme Court with the intent to delay resolution and/or prolong the matter for their own personal gain.

142.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial, including treble damages as provided by statute.

### COUNT VI: N.Y. JUDICIARY LAW 487 (STATE LAW)
(Defendants Wallack, The Wallack Firm, Cohen, CRSS)

143.    Plaintiff incorporates and re-alleges Paragraphs 1 through 142 as if fully set forth herein.

144.    As set forth in this Complaint, Defendants in collusion with attorney David Evan Schorr have engaged in acts of deceit and collusion within the *Zappin v. Comfort* litigation pending in New York County Supreme Court and in the collateral estoppel disciplinary proceeding filed in the First Department captioned *Matter of Anthony Jacob Zappin* with the intent to deceive Plaintiff and the state courts.

145.    As further set forth in this Complaint, Defendants have engaged in acts within the *Zappin v. Comfort* litigation pending in New York County Supreme Court and in the collateral estoppel disciplinary proceeding filed in the First Department captioned *Matter of Anthony Jacob Zappin* with the intent to delay resolution and/or prolong the matter for their own personal gain.

146.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff

seeks damages in an amount to be determined at trial, including treble damages as provided by statute.

### COUNT VII:  CONSPIRACY TO COMMENT FRAUD (STATE LAW)
(Defendants Wallack, The Wallack Firm, Cohen, CRSS)

147.    Plaintiff incorporates and re-alleges Paragraphs 1 through 146 as if fully set forth herein.

148.    Defendants are all officers of the court.

149.    As set forth above, Defendants have each engaged in repeated acts of deceit during the *Zappin v. Comfort* litigation pending in New York County Supreme Court and the collateral estoppel disciplinary proceeding filed in the First Department captioned *Matter of Anthony Jacob Zappin* for an illicit purpose. That illicit purpose being unlawfully subvert and sabotage Plaintiff's position in the litigations, to deny Plaintiff legitimate counsel, to manufacture bogus disciplinary findings and allegations against Plaintiff and to undermine Plaintiff in the litigation.

150.    Defendants entered into an agreement with attorney David Evan Schorr to commit the above-referenced unlawful acts as set forth in the Complaint in furtherance of a common scheme and/or goal.  This agreement between Defendants may be implied by their conduct as set forth above in this Complaint.

151.    Defendants knew that they actions were wrong and unlawful. They further knew that David Evan Schorr's statements and representations to Plaintiff that he would and was acting in Plaintiff's best interests were false when they made them.

152.    Defendants' unlawful actions and misrepresentations through David Evan Schorr were relied upon by Plaintiff.

153.    Plaintiff has suffered damages as a result of Defendants' tortious conduct.  Plaintiff seeks damages in an amount to be determined at trial.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury on all issues which may be properly tried by jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court:

    (a)      Enter judgment in favor of Plaintiff against Defendants;

(b)      Enter judgment awarding Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendants' activity complained of herein and for any injury complained of herein, inclusive of interest and costs, in an amount to be determined at trial;

(c)      Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)      Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)      Order such other relief that the Court deems just and appropriate.


Dated: October 7, 2019
        Huntington, WV


_____
Anthony Zappin
1827 Washington Blvd.
Huntington, WV 25701
(304) 730-4463 (tel.)
anthony.zappin@gmail.com
*Plaintiff, Pro Se*